| | |
|---|---|
| **DASHAUN MCCRAY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 2:22-cv-02154-DDC-ADM** |
| | ) |
| **DENIS McDONOUGH, M.D., Secretary** | ) |
| **Department of Veterans Affairs** | ) |
| | ) |
| **Defendant.** | ) |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT AGENCY'S MOTION TO DISMISS

**COMES NOW** Plaintiff, DaShaun McCray, and hereby opposes the Agency's Motion to Dismiss. Plaintiff's Petition states claims for harassment, discrimination, disparate treatment, and constructive discharge and none of the causes of action should be dismissed. Further, Plaintiff is filing herewith a Motion to Amend her petition setting forth additional facts that must be considered and further support her causes of action.

## PLEADED FACTS

Plaintiff has requested an Amendment to bring additional facts that further support her causes of action. Plaintiff has pleaded that she was subjected to harassment, unequal treatment, retaliation, and constructive discharge at the KCVA. She has set forth with particularity and in detail that Ruth Duda, the Chief of Plaintiff's division, treated her differently from the way she treated other employees who were white.

Plaintiff began her employment with the VA in December 2015 as Plaintiff began her employment with the VA in December 2015 as a Staff Nurse, Office of Community Care at the Robert J. Dole VA Medical Center in Wichita, Kansas. In or about February 2019, Plaintiff was

promoted to Nurse Manager, Office of Community Care. Ms. McCray is an employee in good standing with the Department of Veterans Affairs.

When Ms. McCray was promoted to Nurse Manager, Ruth Duda became Plaintiff's first-line supervisor. Thereafter, Ms. Duda began systematically discriminating against Ms. McCray and other black females. She engaged in a pattern or practice of demeaning and degrading behavior. This kind of demeaning behavior occurred consistently and pervasively throughout her tenure as Ms. Duda's supervisee.

Ms. McCray engaged in the EEO process set up for Federal Employees. In the formal stage of the EEO process, eight separate claims were accepted.

The claims accepted included the following:

1. Whether on the bases of race (African-American) and reprisal (previous EEO activity), the Plaintiff was subjected to a hostile work environment as evidenced by the following:

a. From April 2018 through the present, Ruth Duda (RD), Community Care Service Chief, attempted to "intimidate" the Plaintiff when she spoke with her in her workspace, RD yelled at her in a public area while discussing another employee's pay and RD stated, "If she wants to get paid, you better tell her to send us the form."

b. Between January 28, 2019 and January 4, 2020, RD required the Plaintiff to complete the staffing model duty, without providing her Nurse Manager training.

c. From January 20198, through the present, RD "usurped" the Plaintiff's supervisory authority by instructing her (Plaintiff's) staff to complete different actions from what she initially instructed her staff to do.

d. On January 24, 2020, RD increased the Plaintiff's workload after she had a meeting with the Chief of Staff to discuss RD's behavior.

e.     On January 30, 2020, RD refused to allow the Plaintiff to speak during a meeting with the Medical Center Director, even though the Director asked RD to allow her (Plaintiff) to speak.

f.     On January 31, 2020, RD violated the Plaintiff's personal space when she looked over her so she could see her computer and RD yelled at her, "You did not allow me to talk during the meeting with the Pentad, and you gave incorrect information. Are you offended?"

g.     On February 10 and 14, 2020, RD undermined the Plaintiff's ability as a supervisor when she stated, "You took all leadership away from Janelle Adams, coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when she falsely accused Plaintiff taking over a February 7, 2020 meeting and did not allow another employee to speak.

h.     On March 2, 2020, RD threatened to fire the Plaintiff when she asked RD how to proceed with an employee's expired nursing license, and RD stated to her, "I find your response interesting, as I was told to fire you when you violated the HIPAA law. Yet, I chose a merciful route. (Name unknown) could produce a license tomorrow, and you would have lost a valuable employee."

The racial systemic discrimination caused Ms. McCray to leave her position at the Wichita, Kansas VA and relocate to Colorado to continue her work with the Department of Veterans Affairs.

During her tenure as supervisor of Plaintiff, Supervisor Duda exhibited discriminatory and harassing behavior toward the black women who worked under her. On a regular and continuing basis, Ms. Duda acted dismissively of her black employees. Ms. Duda's attitude was apparent to

her employees as she belittled them, gave them unreasonable workloads, yelled at them, and undercut their performance. Ms. Duda placed black employees, including Plaintiff, under intense scrutiny. Similarly situated white employees were not subjected to that scrutiny.

Ms. Duda increased the workloads of the black employees, including Plaintiff, but did not treat the Caucasian employees in this manner. Plaintiff believed she was being set up for failure as the quotas and requirements could not reasonably be met within the allowed workday. On multiple occasions, Plaintiff requested training on the new position. She was denied that training and then disciplined for failing to perform duties that she did not know she was assigned and regarding which she had never been trained.

Similarly situated white employees were treated more favorably in that they were given training, direction, and orders to follow. They were treated more favorably in disciplinary matters. Plaintiff's supervisor discredited Plaintiff and her black co-workers with upper management. She would take over the meetings in which Plaintiff was supposed to make presentations. Plaintiff complained to her second-line supervisor and HR but no effective remedial measure was undertaken.

In 2020, Plaintiff was constructively discharged from her employment with the Wichita VA and forced to transfer to Aurora, Colorado. Following continuous and pervasive harassment and discrimination, coupled with threats of termination, Plaintiff left the employment of the Agency in Wichita and transferred to Aurora, Colorado. That constructive discharge was the result of the pervasive harassment and invidious discrimination occurring. Additionally, Plaintiff became aware of other long-term black employees who were set up for termination.

Plaintiff and her co-worker Elizabeth Dial both complained that they were being treated differently from their white counterparts, but no effective remedial measure was provided. As a

direct and proximate result of the conduct of Defendants and the conduct of the supervisors and managers, Plaintiff suffered grievous injury and damage, including but not limited to past, present and future lost wages, benefits, earnings and earning capacity, mental anguish, pain, humiliation, embarrassment, depression, anxiety, anger, physical manifestations of emotional distress and physical injury, and lost enjoyment of life.

Plaintiff would request the opportunity to amend her complaint to include additional information that is found in the Report of Investigation that was produced by the Agency. Defendant's Statement of Facts relies upon the Final Agency Decision issued in this case. Using the Final Agency Decision in this regard can change the Motion to Dismiss into one for summary judgment.

The Defendant relies upon *Johnson v. Perdue*, 862 F.3d 712, 715 (8th Cir. 2017) for the proposition that the entire FAD can be relied upon by the Defense. *Johnson* does not stand for that proposition. *Johnson* indicates that a defendant may rely upon documents outside the complaint only where it "includes documents whose contents are alleged in a complaint and whose authenticity no party questions." In this matter, certain of the facts from the FAD are undisputed and are found in the Amended Petition attached as an Exhibit to the Motion to Amend. However, no conclusions set forth in the FAD should be accepted as "facts" in this matter as there is incomplete discovery, the FAD lacks information from necessary witnesses and the conclusions found in it, Plaintiff believes, are not supported by the facts adduced.

## **ARGUMENT**

1. ***Standard of Review***

A motion to dismiss for failure to state a cause of action solely tests the adequacy of the complaint. It assumes the facts pleaded are true and liberally grants to plaintiff all reasonable inferences therefrom. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Conley v. Gibson*, 355 U.S. 41

(1975); *Sullivan v. Carlisle*, 851 S.W.2d 510, 512 (Mo. banc 1993). When deciding Rule 12(c) motions, "courts may rely on matters within the public record." *Faibisch v. University of Minnesota*, 304 F.3d 797 (8th Cir. 2002) (holding that an EEOC charge is part of the public record). Defendant has relied heavily upon the Formal Complaint of Discrimination and the facts developed in the administrative process below. Those give the Defendant ample notice of the claim involved in this matter. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

The *prima facie* standard is evidentiary, and a plaintiff need not "set forth a detailed evidentiary proffer in his complaint." *Hoaglin v. Hyvee Inc.*, No. 6:18-03262-CV-RK, 2019 WL 2028559, at *2 (W.D. Mo. May 8, 2019). Defendant attempts to bring evidentiary matters into the record through the Final Agency Decision. However, the Final Agency Decision is merely a legal finding based upon facts supportive of the Agency's position.

2.     ***Plaintiff's Claim for Constructive Discharge Arises from Harassment and has Been Exhausted***

To state a claim for harassment, a plaintiff must establish four elements. The fourth element of a *prima facie* case concerns whether the conduct affected "a term, condition, or privilege of her employment as a matter of law." *Cherry v. Menard, Inc.*, 101 F.Supp.2d 1160, 1169 (Ia. N.D. 2000). Constructive discharge is a significant change in employment status and inflicts economic harm on the plaintiff. *See Spears v. Missouri Dept. of Corrections and Hunan Resources*, 210 F.3d 850, 854 n.3 (8th Cir. 2000). A constructive discharge that results from the sexually harassing conduct of an employee is an adverse employment action as required by the fourth element of a harassment claim. "The substantive facts and elements underlying the sexual harassment and constructive discharge claims are integrally related: e.g., the plaintiff's claim of sexual harassment serves as the lynchpin of her constructive discharge claim while a showing of constructive discharge would establish an element of her sexual harassment claim. . . ." *Flockhart v. Iowa Beef*

*Processors, Inc.*, 192 F.Supp.2d 947 (Ia. N.D. 2001). As plaintiff exhausted the harassment claim, the constructive discharge—which is subsumed in that claim—has also been exhausted. *See Brownlee v. Catholic Charities of the Archdiocese of Chicago*, 2017 LEXIS 27425 (Ill. N.D. 2017); *Green v. Brennan*, 136 S.Ct. 1769, 1779, 195 L.Ed.2d 44 (2016) (a hostile work environment claim is a lesser included component of the graver claim of hostile-environment constructive discharge."); *Pa. State Police v. Suders*, 542 U.S. 129, 149, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004); *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (a constructive discharge constitutes an adverse employment action). Because, in this case, the forced transfer/constructive discharge claim is part and parcel of the harassment claim, administrative exhaustion occurred. The forced transfer was the *raison d'etre* for the harassment—the natural and foreseeable result of the actions of the Defendants. Since Plaintiff set forth specific incidents of poor treatment based on race, the Defendant had fair notice of the claim for constructive discharge/forced transfer. *See Brownlee v. Catholic Charities of the Archdiocese of Chicago*, 2017 U.S. Dist. LEXIS 27425 at 12 (N.D. Ill. 2017).

3.    ***Plaintiff Has Stated A Claim for Disparate Treatment Based on Race***

Employment discrimination cases are evaluated under the framework of the McDonnell-Douglas burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 36 L.Ed. 2d 668, 93 S.Ct. 1817 (19983). The first step in the analysis places the burden of production on the plaintiff to establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties of the job; (3) she suffered an employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination on the basis of membership in the protected class. *Id.*

a.     *Plaintiff Administratively Exhausted her Discrimination Claims*

Defendant attempts to limit the facts of this case to just those incidents (and the manner in which they were phrased by the ORMDI) found in the acceptance letter from the EEO. Defendant argues that any event *not* found in that letter have not been administratively exhausted. This narrow reading does not comport with the law. If no one could bring anything beyond the charge of discrimination, there would be no reason for discovery in a civil case. Charges of discrimination must be liberally construed because the provisions of Title VII "were not designed for the sophisticated and because most complaints are initiated pro se." *Gilbreath v. Brookshire Grocery Co.*, 400 F.Supp. 3d 580 (Tex. E.D. 2019). The exhaustion requirement "is not a procedural 'gotcha.'" *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 272 (5th Cir. 2008). Rather, the charge is intended to "trigger the investigatory and conciliatory procedures of the EEOC. . . ." *Pacheco v. Mineta*, 448 F.3d 783, 788–789 (5th Cir. 2006). Courts are to consider both the "actual statement given by the plaintiff in the administrative charge" and the scope of the investigation that is expected to grow out of it. *See Wright v. HHS*, 311 Fed.Appx. 939 (8th Cir. 2009) (discrimination complaint must be limited to scope of investigation reasonably expected to grow out of charge of discrimination with EEOC).

The Notice of Acceptance in this matter does not follow verbatim the Formal Complaints of Discrimination. For example, the Charge filed by Ms. McCray on March 30, 2020 states: In January 2019 *to present,* RMO Duda usurps the AP's supervisory authority towards staff, informs staff of different actions in comparison of what the AP instructed, and *pits the staff against the AP.* Ex. 1., March 30, 2020 Complaint of Discrimination. The investigation then included a fact-finding investigation to which Ms. Duda was required to respond. These investigative materials are found in the Report of Investigation (ROI) and are part of the EEO investigation. Because these facts—which include that Plaintiff was unfairly threatened with discipline; was forced to work

overtime without pay; was constructively discharged, and subjected to heightened scrutiny—are all facts found in the ROI and the investigative file. They are, accordingly, part of the EEO investigation and arise from the allegations found in the formal complaints of discrimination.

Defendant asks for the Court to dismiss all "discrete acts" that have not been exhausted or that do not plausibly state a claim for relief. However, all of the acts that Defendant calls "discrete acts" are actually part of a continuing plan or scheme of discrimination as they are like or related to those that serve as the basis for her discrimination lawsuit. *See Forte v. Southwest Airlines Co.*, 2009 U.S. Dist. LEXIS 149209 (Tex. N.D. 2009). The five allegations that Defendant seeks to dismiss for failure to exhaust are directly related to the accepted issues and are found in the ROI, so they flow from the investigation.

      b.     *Plaintiff has alleged facts capable of supporting a plausible finding or inference of disparate treatment based on race.*

In review of the Complaint, Plaintiff believes that additional facts from the ROI and administrative investigation could be added to more definitively establish that the behaviors of Ruth Duda flowed from intentional discrimination. However, the allegations found in the petition do support her causes of action.

Plaintiff as a black female is a member of a protected class. She satisfactorily performed the duties of her job as is apparent through her job evaluations. Plaintiff's supervisor, Ruth Duda, undercut her black supervisors, made the black supervisors discipline the employees, yelled at the black supervisors in front of the white employees, and generally disrespected them and treated them dismissively in front of both the employees and upper management. The disrespect directed at the black supervisors is found in the allegations that Duda spoke over Plaintiff at meetings with the executive team (Pentad) and that she pitted employees against the supervisors and yelled at the

black supervisors in front of the employees. These actions all undercut the ability of the black supervisors to perform.

Plaintiff would add to the petition information that explains the accepted issues as they are merely single sentence statements summarizing the events and not the events themselves. She would also amend the petition to include information that Ruth Duda treated the black supervisors dismissively while she treated the white employees under them much differently. She usurped the black supervisors' authority so that they were incapable of supervising the white employees and she disrespected the black supervisors in front of their supervisees. Plaintiff would also add the history of Ruth Duda's discriminatory behavior including that she unfairly treated the prior black supervisor, causing her to leave her position, and she was disciplined and demoted for the manner in which she handled racist remarks by one of her employees. All of these facts will further clarify Plaintiff's complaints of discrimination.

Plaintiff observed the black supervisors being treated in discriminatory ways. They were not paid overtime for the hours worked, they were set up for failure, and staff was pitted against them. Duda would not allow the supervisors to speak at functions involving upper management on issues that were uniquely their responsibility; she often spoke over them at meetings, chided them or undercut them at those functions. Duda refused to allow her African-American supervisors to be trained but then held them responsible for the duties for which she refused them training. In all ways, Duda undercut the ability of her African-American supervisors to do their jobs. This kind of undercutting is an adverse job action. *See Kim v. NashFinch Co.*, 123 F.3d 1046 (8th Cir. 1997). Having responsibility shorn from an employee and rendering him or her less likely to be promoted is a tangible adverse employment action. *See Kim v. NashFinch Co.*, 123 F.3d 1046 (8th Cir. 1997).

Plaintiff was singled out for harassment and humiliation. She was given a workload that was impossible to finish and was set up for failure in that position. She was given a written reprimand that was unjustified and unjustifiable. Under the graduated discipline policy, a written reprimand is two levels up the disciplinary chain. These alterations in her employment constitute adverse action. *See Kim v. NashFinch Co.*, 123 F.3d 1046 (8th Cir. 1997).

Plaintiff and her black colleagues were consistently harassed. They were treated unprofessionally and in a dismissive manner. They were under constant scrutiny within the workplace and given the largest workloads. They were passed over for advancement opportunities. All of these actions constituted adverse job actions. *Ellis v. Houston*, 742 F.3d 307, 326 (8th Cir. 2014); *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 412 (6th Cir. 1999).

c.     *Plaintiff Has Suffered an Adverse Personnel Action*

Plaintiff as a black female is a member of a protected class. She satisfactorily performed the duties of her job as is apparent through her job evaluations. Plaintiff suffered an adverse action when Plaintiff was disciplined unfairly, was treated less favorably than similarly situated Caucasian employees, and undermined to both her supervisees and to upper management. Plaintiff was singled out for harassment and humiliation. She was given a workload that was impossible to finish and was set up for failure in that position. She was given a written reprimand that was unjustified and unjustifiable. Under the graduated discipline policy, a written reprimand is two levels up the disciplinary chain. Even the "fully successful" performance review constitutes an adverse job action where other less qualified individuals were given higher evaluations, promotions, and supervisory details and/or positions. These alterations in her employment constitute adverse action. *See Kim v. NashFinch Co.*, 123 F.3d 1046 (8th Cir. 1997).

Plaintiff and the other black supervisors were singled out and treated in demeaning ways including having their work scorned to upper management. Plaintiff and her black colleagues were

consistently harassed. They were treated unprofessionally and in a dismissive manner. They were under constant scrutiny within the workplace and given the largest workloads. They were passed over for advancement opportunities. All of these actions constituted adverse job actions. *Ellis v. Houston*, 742 F.3d 307, 326 (8th Cir. 2014); *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 412 (6th Cir. 1999). Adverse actions may be less severe than outright discharge. *Kim v. NashFinch Co.*, 123 F.3d 1046 (8th Cir. 1997).

The Tenth Circuit is in accord. *See Belgasem v. Water Pik Techs., Inc.*, 457 F.Supp.2d 1205 (Co. D.C. 2006). While the Tenth Circuit has not ruled directly on whether denial of training is an adverse job action, the Tenth Circuit "liberally defines" an adverse job action. *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998). Adverse actions are not limited to monetary losses in the form of wages or benefits. Rather, a court must take a "case by case approach, analyzing the unique factors in each situation. *Id.* One factor in determining an adverse action is whether the action "causes harm to future employment prospects." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004). An adverse job action must cause more than *de minimis* harm to an employee's job opportunities or status. *Id.* Types of actions that have been found to be "adverse job actions" include a negative job reference, *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986–87 (10th Cir. 1996); forced transfer with the admonition to speak to no one, *Duda v. Bd. Of Educ. Of Franklin Park*, 133 F.3d 1054, 1059 (7th Cir. 1998) (*cited in EEOC v. C.R.Eng., Inc.*, 2011 U.S.App. LeXIS 8971 (10th Cir. 2011); a failure to train that plays a role in increasing job duties can be an adverse job action if that materially affects his position (*see Barnes v. Cessna Aircraft Co.*, 2011 U.S. Dist. LeXIS 147780 (Ks. D.C. 2011) (claim failed because plaintiff did not show that denial of training increased job duties or materially affected position).

The allegations in Plaintiff's petition setting forth that her supervisor failed to train her, held her accountable for matters on which she had not been trained [Pet. ¶ 12(a)2, 15]; demeaned her in front of her supervisees, in public and in front of the higher management [Pet. ¶ 12(a)1, 5]; actively discredited Plaintiff to upper management [Pet. ¶ 21], increased her workload after she had a meeting with the Chief of Staff to discuss her supervisor's behavior [Pet. ¶ 12(a)4]; and undercut her ability to supervise her staff [Pet. ¶ 13]. The workload increased to the point that Plaintiff had to work many, many hours of overtime for which she was told she would receive no pay, but still she could not keep up with the work being foisted onto her [Pet. ¶ 18]. Following the departure of Plaintiff and Elizabeth Dial, the other black supervisor, four individuals were hired to cover the work that had been foisted onto these two black supervisors. As discussed above, the constructive discharge/forced transfer is also an adverse job action.

        d.     *Failure to Train Coupled with the Overload of Duties Constitutes an Adverse Personnel Action*

A court must look at the totality of the facts when determining whether a plaintiff has stated a claim for discrimination. *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011) explains that adverse job actions fall within three categories: (1) termination or reduction in financial terms of employment; (2) transfers or changes in job duties that cause skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions such as hostile work environment or conditions amounting to a constructive discharge. *Id.* at 453–54.

Defendant parses out each particularized job action and exclaims that the specific action standing alone is not an adverse job action. One cannot place blinders on and ignore the environment within which Ms. McCray worked. The workplace was riddled with unbearable changes in job conditions. First, the African-American employees were treated with disdain and dismissively on an ongoing, everyday basis. [Pet. ¶ 15.] Second, the African-American employees

watched as people of color were treated differently from the Caucasians in the work group. Ms. Duda yelled at her black employees and dressed them down publicly. [Pet. ¶ 16.] She placed them under intense scrutiny. [Pet. ¶ 16.] She denied the African-American supervisors training, heaped additional assignments on them for which they were never trained, and then berated, dressed down, and disciplined Plaintiff for failing to perform duties that she did not know were assigned to her and for which she received no training. [Pet. ¶¶ 16–19.] Even without all of the other harassing behaviors—such as invading Plaintiff's personal space and screaming at her on more than occasion, pitting Plaintiff's supervisees against her, undercutting her to her staff, and the other behaviors set forth in the petition—Plaintiff has established that the failure to train coupled with pressing additional duties upon her for which she was not trained, disallowing overtime but holding her accountable and disciplining her for failure to meet these impossible deadlines riddled the work environment with unbearable alterations, creating a hostile work environment. This hostile work environment constitutes an adverse job action for which the agency is accountable.

e.    *Catchall—"Other Events" May be Adverse Personnel Actions*

A plaintiff is not limited to the events set forth in the charge of discrimination or even the EEO investigation alone. As the case commences through discovery, additional facts may well become known. Plaintiff is not required to file a charge of discrimination every time a new fact is discovered through the unearthing of Defendant's closely held secrets. For example, Plaintiff may find that there are additional times that Ms. Duda allowed Caucasians to be trained that she did not allow for her African-American employees. Those additional times are like or related to the allegations which arise out of the actual EEO complaint and would be covered in the catchall phrase used in the petition. Again, Defendant parses out singular events and pontificates that they

are not, in and of themselves, adverse job actions and, therefore, Plaintiff's claims fail. However, when reviewing the totality of the circumstances, Plaintiff and her African-American counterparts suffered a hostile work environment that *included* invasion of their personal space, being yelled at in public and humiliated on multiple occasions, having their authority undercut, their job duties increased after complaint, and treated more harshly than Caucasian counterparts. Even the cases upon which Defendant relies support Plaintiff's position. For example, *Schmidt v. GPI-KS-SB, LLC.*, No. 13-CV-2381-KHV, 2014 WL 5431157, at *8 (D. Kan. Oct. 24, 2014) concluded that a threat of termination "standing alone" is not an adverse employment action. Plaintiff is not alleging that the threats to terminate stand alone. Rather, they are part and parcel of a discriminatorily hostile work environment and therefore create an adverse job action.

4. ***Plaintiff Has Stated a Plausible Claim for Hostile Work Environment***

Throughout this argument, Plaintiff has set forth allegations found in the current petition that support a claim for hostile work environment. However, as the petition is not a model of clarity, Plaintiff would request ten days in which to Amend the Petition to more specifically allege the bases for the hostile work environment claim.

Defendant is correct that the Court must view the totality of the circumstances to determine whether the harassment was pervasive and severe enough to alter the terms and conditions of the employment. Plaintiff has established those facts as set forth above. Plaintiff will also be required to prove that the hostile work environment was due to Plaintiff's race. Plaintiff has pleaded those facts as well.

a.    *Plaintiff has Pleaded Facts Showing a Nexus between the Conduct and Plaintiff's Race*

As set forth above, Plaintiff would request the Honorable Court to allow her to amend to make more definite the facts establishing the nexus between conduct and race. However, even in the present petition, Plaintiff has alleged sufficient facts to establish the existence of that nexus.

In 2019, Plaintiff was promoted to Nurse Manager, Office of Community Care. From the outset, her supervisor, Ruth Duda, began an ongoing practice of discrimination against her. It appears that Ms. Duda believed she could treat the black employees any way she wanted to while treating the white employees with respect. Both Elizabeth Dial and DaShaun McCray—the only two black supervisors—were treated in a demeaning, degrading, dismissive manner. Duda treated all of her black employees this way. She yelled at them, she belittled them, she gave them (and only them) unbearable workloads, she undercut their performance to their supervisees and to upper management. She engaged in none of these behaviors with Caucasian employees.

In fact, Ms. Duda issued a Letter of Reprimand to Elizabeth Dial for allegedly informing an employee that she needed to meet with her on a disciplinary matter in the employee's cubicle on the basis that other employees could have possibly heard it. (They did not.) Yet, black employees, including Plaintiff and Elizabeth Dial, were regularly reprimanded in public and other black employees' personal issues were discussed loudly and in front of others. The allegation in Plaintiff's petition found in Pet. ¶ 12(a)(i) involved that very situation. The employee whom Duda was yelling about was Tanisha Burks, who left OCC because of the treatment she received at the hands of Duda. Screaming in front of employees about the pay or leave status of another employee is prohibited behavior. Screaming at a black employee over the pay status of another black employee in the hearing of white employees is racist behavior. Her prior interaction with Elizabeth Dial establishes that she would not have screamed so if the employee were white. She treated

African-American employees as if they were not entitled to the same rights and treatment as Caucasians. This is but one example that establishes the race-based nature of the harassment.

Ms. Duda was ultimately demoted from her position because of the manner in which she handled an incident of racially inappropriate language being used in her division. This fact will be added to Plaintiff's Amended complaint.

There were only two supervisors under Ms. Duda. The other employees were supposed to be supervised by Plaintiff and Elizabeth Dial, a black female. However, Duda did not allow them to supervise. She had the employees come directly to her instead of to their supervisors with any work-related issues. She changed their job duties after they had been assigned by the supervisors. [Pet. ¶ 16.] As a result, Plaintiff and Elizabeth Dial had much of the supervisory duties shorn from them while Ms. Duda increased their job duties to the point that neither could keep up and Ms. Duda refused them training. [Pet. ¶ 17.] Ms. Duda placed black employees, including Plaintiff, under intense scrutiny. She did not do that to the Caucasian employees. Duda required Plaintiff and Elizabeth Dial to discipline African-American employees but refused discipline for similar offenses of Caucasian employees. All of these facts establish that the actions of Ruth Duda were based upon Plaintiff's race.

b.    *The Facts Establish that the Conduct Was Severe and Pervasive*

The Courts are admonished that "severe and pervasive" should be a fact issue that is more appropriate for summary judgment than a motion to dismiss. For purposes of a motion to dismiss, the Court must view the pleadings in the light most favorable to plaintiff. *Figueroa v. P.D. Sec., Inc.*, 2020 U.S.Dist LEXIS 98413 (Fl. S.D. 2020). Because a question of the severity of the harassment is one of fact, almost all cases are decided at the Summary Judgment stage. *Id.* The Tenth Circuit is in agreement. "Most crucially, severity and pervasiveness are 'matters of degree . . . often best left to the jury. Thus, we have observed that the severity and pervasiveness

evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact, and it is even less suited for dismissal on the pleadings." *Bekkem v. Wilkie*, 915 F.3d 1258, 1275 (10th Cir. 2019). A plaintiff is not required to prove her case at the motion to dismiss state. *Id. a*t 1275.

The Tenth Circuit also observes that evidence of the impact on the plaintiff that the harassment had tends to prove the severity and pervasiveness of the harassment. *Doe v. School District No., Denver Colorado*, 970 F.3d 1300 (10th Cir. 2020). Here, Plaintiff has alleged that the dismissive and degrading behavior occurred continuously from the inception of her position. She also alleges that she saw that African-Americans were treated more poorly than Caucasians and she alleges that the increased workload/failure to train/usurpation of supervisory authority made her job impossible to perform, as well as numerous other events. The pervasive hostility, coupled with the Agency's failure to take any remedial measures, caused her significant emotional distress [Pet. ¶¶ 27, 36] and forced her to transfer to Colorado, although her family is here. [Pet. ¶¶ 23, 44.] The actions of defendant Duda were severe and they occurred regularly from the commencement of Plaintiff's employment as a supervisor in OCC until she moved to Colorado. They were clearly pervasive. Plaintiff's harassment claim should not be dismissed.

5.     ***Plaintiff States a Plausible Claim for Retaliation***

In order to establish a *prima facie* case of retaliation, a plaintiff must establish that (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *O'Neal v. Ferguson Contr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001). Once a plaintiff makes a *prima facie* showing, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. Plaintiff must then respond by demonstrating that the asserted reasons for the adverse action are pretextual. *Id.*

In this case, Plaintiff and her co-worker Elizabeth Dial reported to their second-line supervisor, Robert Cummings, that Ruth Duda was engaging in a racially hostile work environment. This interaction occurred on or around January 24, 2019. Plaintiff documented this interaction with an email as well. On that day, Duda increased Plaintiff's workload to a level that she could not complete her assignments. At that time, she began pitting supervisees against her. Within a week, Duda refused to allow Plaintiff to speak at a meeting with the Medical Center Director on issues that were directly related to her job duties. Then, on January 31, 2020, Duda violated Plaintiff's personal space while screaming at Plaintiff. On February 10 and 14, Duda took actions to intentionally undermine Plaintiff's authority as a supervisor. In that same interaction, she loudly accused Plaintiff of trying to undercut her co-worker and take credit for her co-worker's production—all of which was untrue. [Pet. ¶ 12(iv–viii).] The acrimony increased and on March 2, 2020, Duda threatened to terminate Plaintiff. [Pet. ¶ 12(viii).]

At no time did the Agency take any kind of appropriate remedial measures. They allowed the harassment and retaliation to continue unabated. Plaintiff was given quotas and requirements that she could not reasonably meet while being denied overtime. She was also denied the training that she would require for these new job assignments, setting her up for failure. [Pet. ¶¶ 16, 18, 19.] A failure to train that plays a role in increasing job duties can be an adverse job action if that materially affects a plaintiff's position. *See Barnes v. Cessna Aircraft Co.*, 2011 U.S. Dist. LEXIS 147780 (KS D.C. 2011). Here, Plaintiff's position was materially affected by the failure to train.

As discussed above, all of these actions—especially combined—are adverse job actions. The temporal proximity, along with the fact that other similarly situated employees were treated better, establish the racial animus motivating these actions. Within just days of the complaint, Ms. Duda began retaliating against Plaintiff. This alone can independently support an inference of

causation. *Conroy v. Vilsack*, 707 F.3d 1163, 1182 (10th Cir. 2013). The rationale of the temporal-proximity doctrine is grounded "in the observation that an employer is most likely to retaliate when influenced by anger and resentment. *Conroy v. Vilsack*, 707 F.3d 1163, 1182 (10th Cir. 2013). The causal inference between an employer's adverse action will diminish "as the inflamed embers of anger and resentment . . . cool." *Id.*

In this situation, there were no embers, as Duda's anger was in full conflagration the day of and the weeks after Plaintiff made her complaints known to Robert Cummings, Duda's supervisor.[1] Duda began a concerted campaign that ranged from increasing job duties, undercutting Plaintiff in front of staff, up to and including threatening to fire her. Plaintiff has established a *prima facie* case of retaliation and her complaint should not be dismissed.

## CONCLUSION

Upon review of Plaintiff's complaint, it appears that certain facts could be added that would clarify Plaintiff's allegations. Accordingly, Plaintiff would request ten days within which to file an Amended Complaint. Nonetheless, Plaintiff's complaint is sufficient as it stands to withstand Defendant's Motion to Dismiss as Plaintiff has established a *prima facie* case regarding all elements of her causes of action.

---

[1] Defendant alleges that the workload was only increased on one occasion. However, the petition explains that thereafter, Plaintiff could no longer meet her deadlines. The workload increase continued throughout the remainder of her employment at OCC. To the extent that the petition is unclear on this matter, Plaintiff would amend.

Respectfully submitted,

*/s Rebecca M. Randles*
REBECCA M. RANDLES     KS #16832
**RANDLES MATA, LLC**
851 NW 45th Street
Suite 310
Kansas City, Missouri 64116
(816) 931-9901
(816) 931-0134 (FAX)
rebecca@randlesmatalaw.com

ATTORNEY FOR PLAINTIFF

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 11th day of July, 2022, I electronically filed a true and correct copy of this document with the Clerk of the Court for the United States District Court, District of Kansas, by using the federal eFiling System. Participants in the case who are registered users will be served by the federal eFiling System.

*/s/ Rebecca M. Randles*
Attorney for Plaintiff