IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DaSHAUN McCRAY,                        )
                          Plaintiff,   )
v.                                     ) Case No. 2:22-cv-02154-DDC-ADM
                                       )
DENIS McDONOUGH,                       )
                                       )
                          Defendant.   )

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, by and through counsel, and for her Opposition to Defendant's Motion for Summary

Judgment states as follows:

## I.     PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF FACT[1]

### Uncontroverted Facts

Defendant's Statement of Fact [hereafter DSOF] 1, 2, 3, 4, 5, 6, 7, 11, 13, 14, 17, 18, 19, 20, 22, 24, 26, 27,

28, 30, 32, 35, 37, 38, 39, 41, 42, 44, 49, 51, 52, 53, 54, 55, 61, 64, 65, 66, 67, 68, 72, 75, 76, 78, 79, 82,

84, 85, 86, 88, 90, 94, 95, 96, 97, 99, 100, 102, 103, 104, 105, 106, 110, 113, 114, 116, 117, 118, 122, 123,

127, 129, 131, and 132 are uncontroverted.

### Controverted Facts

8. Plaintiff controverts DSOF 8. The Defendant relies on unverified double hearsay offered for the truth of

the matter asserted. Unverified hearsay cannot form the basis of admissions and denials under the Federal

Rules of Civil Procedure. *See* F.R.C.P. 56.

9. Plaintiff controverts DSFO 9 in part. Uncontroverted regarding the table of penalties. The cited materials

do not support any allegation that McCray violated "other laws and regulations." [Ex. 1, McCray Dep. 183–

184].

---

[1] Throughout, facts found in Defendant's Statement of Uncontroverted Facts are referred to as DSOF and the corresponding paragraph. Plaintiff's statement of additional facts is referred to as PSOF with the corresponding paragraph number.

10. DSOF #10 is controverted. No admissible evidence is found in the record to support this statement of fact. Duda's Declaration relies upon unverified hearsay for the truth of the matter asserted. Unverified hearsay cannot create issues of material fact for purposes of summary judgment. F.R.C.P. 56.

12. DSOF 12 is controverted in part. The denial was inappropriate as shown by the subsequent successful appeal. [Ex. 1, McCray Dep. 75.]

15. Plaintiff has insufficient information to admit or deny this allegation.

16. DSOF is Controverted. Those who are denied positions have appeal rights requiring a supervisor to submit the appeal. [Ex. 1, McCray Dep. 75:1–9.]

21. DSOF 21 is controverted as the cited materials do not support the statement. *See* Defendant's Exhibit F. This document does not support the fact alleged.

23. DSOF 23 is controverted as to the date. McCray's recollection is that the Mission Act began implementation in early 2019. [Ex. 1, McCray Dep. 87:1–4.]

25. DSOF 25 is controverted. Mission Act created a big change because scheduling was taken from a third-party administrator and given to McCray and her staff; the remaining duties and processes did not change. [Ex. 1, McCray Dep. 89:19–90:1.]

29. DSOF # 29 is controverted. The email does not support the allegations of Paragraph 29. The email is from Elizabeth Dial to staff indicating that *if* they received training, the could use the CTM program. [Ex. 6, 1/28/20 Dial Email String to Team.]

31. DSOF 31 is controverted in part. Defendant's recitation leaves out the following: Whether on the bases of race (African-American) and reprisal (previous EEO activity), the complainant was subjected to a hostile work environment, *as evidenced by* . . . . [Ex. 5, ROI 00040.] The Notice of Acceptance accepts these events as supporting evidence of a claim of harassment. [Ex. 5, ROI 00041.]

33. DSOF 33 is controverted in part. McCray discussed with Cummings the ongoing harassment against her and Elizabeth Dial. [Ex. 1, McCray Dep. 139:13–140:9.]

34. DSOF # 34 is controverted. Whether Cummings specifically told Duda he met with Dial and McCray is unknown to McCray. Immediately following that meeting, Duda used language borrowed from the Cummings meeting and began retaliating against McCray and Dial. Duda understood the information in Cummings's counseling of her came from or regarded Dial and McCray; they were the only supervisors under Duda's command. [Ex. 1, McCray Dep. 143:21–145:3.]

36. DSOF # 36 is controverted. From the earliest EEO complaint through the PTO, McCray has always contended that the examples given are harassment based on race *and reprisal* that occurred continuously. [Ex. 5, ROI 000039; EX. 2, PTO p. 12.][2] She supports this claim with more than just four events. For a complete description of the events, *see* PSOF 31–40.

40. DSOF # 40 is controverted. It is unclear which conversation Defendant is referencing in this DSOF. If it is referencing the conversation Duda had with Phillips, that conversation took place loudly, in the open, in front of other employees. [Ex. 1, MCray Dep. 101:22–102:12.] If Defendant is referring to the conversation between Duda and McCray about the Phillips situation, that conversation took place in Duda's office. [Ex. 1, McCray Dep. 102:12–21.]

43. DSOF 43 is controverted. The meeting aired personal grievances Duda had with McCray to McCray's mentor. [PSOF 115–132]. Even if the purpose was as stated in the Duda declaration, discussion of private personnel matters was inappropriate. [PSOF 104–110.]

45. DSOF 45 is controverted. Duda inappropriately aired personal grievances Duda had with McCray. *See* Response to DSOF 43; PSOF 104–110.

46. DSOF 46 is controverted. The email is an example of Duda's micromanagement. The email string requested Duda to review the plan of action, not the manner in which staff was notified of the plan of action.

---

[2] While the court dismissed Plaintiff's hostile work environment claim, the allegations of continuing harassment based on reprisal form the basis of Plaintiff's Retaliatory Harassment claim.

[Ex. 8, 1/29/20 Email string Bates No. USA-001769; Defendant's Ex. A-2.] This occurred *after* Duda met with Cummings regarding allowing the supervisors to do their jobs. [Ex. 1 McCray Dep., 139:2–140:9.]

47. DSOF 47 is controverted. Duda's actions were intimidating and undercutting. Airing personal grievances and potential disciplinary issues to a third party is inappropriate; Dial had been disciplined for less. [PSOF 62.]

48. DSOF 48 is controverted. Controverted that Plaintiff must establish monetary losses in the form of wages or benefits. *Jones v. Okla. City Pub. Schools.,* 617 F.3d 1273, 1279 (10th Cir. 2010).

50. DSOF 50 is Controverted; McCray understood that this was her yearly performance evaluation. [Ex. 1, McCray Dep. 176:23–177:3.]

56. DSOF 56 is controverted.  McCray was not late with four performance reviews. [Ex. 1, McCray Dep. 202:4–13.]

57.     DSOF 57 is controverted in part. Uncontroverted that she was late with two reviews; controverted that this singular event justified a lowered review as it was part of a series of expectations that accounted for only 20% of the total review. [Ex. 9, Fully Successful Review, USA-000447; D's Ex. N.]

58.     DSOF 58 is denied in that Plaintiff has insufficient information to admit or deny the allegations found in this paragraph and therefore denies the same.

59.     DSOF 69 is controverted. Plaintiff understood that she received an annual review. [Ex. 1, McCray Dep. 176:23–277:3.]

60.     DSOF 60 is controverted. Employees who receive "Outstanding" performance reviews are entitled to awards. A panel has been created to grant awards to high performing employees. Each Agency is required to maintain an awards program. Those who receive "Outstanding" ratings are entitled to a monetary award. While a director may disapprove an award, it is the policy to provide those awards absent unusual circumstances like budget constraints. [Ex. 17, VA Handbook 5017 p. 55.]

62.     DSOF 62 is controverted. McCray testified that there were two types of training that were to take place in OCC. The first type of training is system-wide training in matters such as system-wide nurse manager training. [Ex. 1, McCray Dep. 115:3–8.] That training does not cover the day-to-day duties of supervisors in diverse settings.  McCray was to be trained in her day-to-day duties by her supervisor which did not happen. [Ex. 1, McCray Dep. 114:3–8.] *See* PSOF 46–65.

63.     DSOF 63 is controverted in part. Plaintiff was trained on system-wide matters through TIMS but did not receive one-on-one training for day-to-day duties. [Ex. 1, McCray Dep. 114:3–115:8; 192:5–193:8; PSOF 64–68.]

69.     DSOF 69 is controverted. [Ex. 1, McCray Dep. 111:2–17.]

70.     DSOF 70 is controverted. It is unclear from the testimony as to whether  McCray had no issue with being required to complete the staffing as a duty of hers or whether the testimony means that the staffing model was not so difficult that she could not figure it out. It is uncontroverted that the only training she received was a single time watching  Duda complete the form herself and  McCray found that training inadequate. *See* Response to DSOF 62; PSOF 39–46.

71.     DSOF 71 is controverted. McCray testified that this was *not* a single discrete event but that she was continually not trained. PSOF 39–46. She was given a lowered performance rating and no bonus. [Ex. 1, McCray Dep. 193:22–193:7.]

73.     DSOF 73 is controverted. Job counselings are "informal" discipline that can be used to justify formal discipline. [Ex. 17, VA Handbook 5021 Part 1, Chapter 3, p. I-28.]

74.     DSOF 74 is controverted. Cummings was refusing to resolve the issue with Duda and Plaintiff; Cummings refused to transfer McCray to a position that did not fall under Ruth Duda. [Ex. 5, ROI 000117.]

77.     DSOF 77 is controverted. Plaintiff does not allege four "discrete acts" as forming the basis for her claim that Duda usurped her authority, she alleged many. For a full description of the acts, *see* PSOF 3–30, 39–46, 57–79, 109–110, 164; 104–108; 115–119.

80. DSOF 80 is controverted. This occurred on multiple occasions and is not a single discrete act. Duda told Heather Bardy and Jessica Clausen to engage in multiple workarounds. *See* response to 77. *See also* [Ex. 1, McCray Dep. 119:6–122:5, 132:19–133:24; Ex. 5, ROI 000058, 000069.]

81.　　　DSOF 81 is controverted. This was part of an ongoing pattern of retaliatory harassment. This event occurred after the meetings Dial and McCray had with Cummings and echoed the allegations that McCray made against Duda as McCray alleged that Duda had undercut her when she was attempting to make a presentation, that Duda took credit for her work and did not allow her to speak. [Ex. 1, McCray Dep. 105:10–14.] Duda made these same allegations toward McCray regarding Janelle Ada [Ex. 1, McCray Dep. 105:8–10.] For a more complete explanation, *see* PSOF 131–142.

83.　　　DSOF 83 is controverted in part. McCray believed it was retaliatory harassment/reprisal. [Ex. 1, McCray Dep. 105:8–14.]

87.　　　DSOF 87 is controverted as economic damages are not required to show adverse job action. *See Jones v. Okla. City Pub. Schools,* 617 F.3d 1273, 1279 (10th Cir. 2010).

### Event (iv): Increased Workload

89.　　　DSOF 89 is controverted as it is misleading and incomplete. The fact-finding regarding supervision at OCC concerned this issue and found that Duda kept her supervisors from their mission by giving them busy work. [Ex. 5, ROI 0000145.] *See* PSOF 23.

91.　　　DSOF 91 is controverted as economic damages are not required to show adverse job action. *See Jones v. Okla. City Pub. Schools,* 617 F.3d 1273, 1279 (10th Cir. 2010).

92.　　　DSOF 92 is controverted. McCray testified that she is a working person so an increased workload was not a problem for her but she did believe it was retaliation and the busywork kept her from her duties. PSOF 57. [Ex. 1, McCray Depo. 150–51].

## Event (v): January 30, 2020 Meeting with the PENTAD

93.     DSOF 93 is controverted. The Agency has conflated events. The facts are found in PSOF 104–109. *See also* Ex. 1, McCray Dep. 102:3–14; 162:17–24 and Defendant's Exhibit U.

98.     DSOF 98 is controverted as economic damages are not required to show adverse job action. *See Jones v. Okla. City Pub. Schools,* 617 F.3d 1273, 1279 (10th Cir. 2010).

## Event (vi): January 31, 2020 Duda Allegedly Yells at McCray

101.     DSOF 101 is controverted that this is a discrete act as opposed to another in a continuing pattern of retaliatory harassment and reprisal. *See* Response to 97 above. The harassment and reprisal had a material effect on her employment as it adversely and significantly impacted her health. *See* PSOF 184–192.

## Event (vii): Alleged Undermining

107.     DSOF 107 is controverted. Adams testified to the best of her recollection that McCray presented Adams's work as her own; McCray testified that she stepped in and corrected information given by Ada [Ex. 1, McCray Dep. 167:1–24.]

108.     Controverted. Adams testified she was having trouble with another team member and that her leadership opportunities were blocked. She did not testify that McCray blocked her leadership opportunities. [*See* Adams Declaration, Defendants' Exhibit U.] McCray gave Adams leadership opportunities to allow her to get her Nurse 2 designation along with the raise that would give to her. [Ex. 1, McCray Dep. 166:2–8.] Duda's micromanagement prevented leadership opportunities. [Ex. 5, ROI 000145.]

109.     DSOF 109 is controverted. McCray testified that the events of February 10 coupled with Duda's actions in informing Heather Brown of McCray's alleged poor performance was all designed to harm McCray's future promotability and employability. It also had an effect on her performance appraisal. [Ex. 1, McCray Dep. 169–174.]

111.    DSOF 111 is controverted as Defendant has left out facts causing it to be misleading. For a full

description, *see* PSOF 145–155.

112.    DSOF 112 is controverted as misleading. McCray told Duda and others at 9:51 a.m. that she

needed to know what the regulation required and urged Duda to reply so everyone was on the same page.

[Ex. 10, 3/2/20 McCray email string re: Licensure.] After that, Duda responded privately to McCray, berating

her for failing to show grace, to which McCray responded that Duda was taking her statements out of

context, that she did want to extend a grace period to the nurse but needed to know what the regulation

said. [Ex. 10, 3/2/20 McCray email string re: Licensure.]

115.    DSOF 115 is controverted. Duda's bringing up an old reprimand was giving an implicit threat to

McCray, which is further supported by having contacted McCray's mentor and shared personnel

information with her, showing her mentor that McCray would not listen to her (was insubordinate). [Ex. 1,

McCray Dep. 104:18–105:22.]

119.    DSOF 119 is controverted. McCray sought medical attention because of workplace anxiety and

revivification of PTSD. *See* PSOF 172–180.

120.    DSOF 120 is controverted. McCray testified that Duda treated all African-American employees

under her supervision dismissively and differently from Caucasian employees. *See* PSOF 8–35; 73–99.

121.    DSOF 121 is controverted as economic damages are not required to show adverse job action. *See*

*Jones v. Okla. City Pub. Schools*, 617 F.3d 173, 1279 (10th Cir. 2010).

125.    DSOF 125 is controverted. McCray testified she could keep up with her duties except Duda gave

her busywork and refused to train her on her duties. *See* PSOF 25, 41–48, 58–60.

Duda testified that she was not completing her assignments within the time allotted. [Ex. 5, ROI Aff. Of

Duda 00084–85.]

126.    DSOF 126 is controverted. While McCray testified she did not believe this assignment was given

based on her race, she did indicate it was retaliatory harassment. [Ex. 1, McCray Dep. p. 191.]

128.     DSOF 128 is controverted. It is not a "discrete" event; and it did have a material impact on Plaintiff's employment. Plaintiff was given busy work that interfered with her ability to complete assignments. *See* PSOF 71. That included being given Congressionals, being required to attend meetings when they were short-staffed, Duda taking leave when important rollouts occurred, leaving it all to McCray to handle, and anything that came into Duda's head. [Ex. 5, ROI 000070; Ex. 1, McCray Dep. 144:22–145:3.] These events caused her anxiety, exacerbation of PTSD, performance anxiety and caused her to question her job duties. [Ex. 1, McCray Dep. 188:7–11.]

130.     DSOF 130 is controverted. McCray testified that she had no formal discipline subsequent to the 2017 reprimand. She was verbally counseled by Duda and Cummings [Ex. 5, ROI 000071,72.112, 114.] She was told implicitly by Cummings that she should quit because of her complaints of discrimination [Ex. 1, McCray Dep. 112:1–8], her performance appraisal was lowered [Ex. 1, McCray Dep. 174:19–175:3.] Duda and Cummings' informal counseling could be used in any future disciplinary actions. [Ex. 16, VA Handbook 5021 Part 1, Chapter 3, p. I-28.]

133.     DSOF 133 is controverted. McCray and Dial were the only supervisors and both were African-American. Tenesha Burks was African-American and was similarly targeted by Duda. [Ex. 1, McCray Dep. 107:6–108:24; 109:1–9.] These individuals were similarly situated. There were no Caucasian supervisors but Duda routinely treated Caucasian employees more favorably than African-American employees. *See* PSOF 8–35; 73–99.

134.     DSOF 134 is uncontroverted; however, McCray was required to maintain two households as a result. [Ex. 1, McCray Dep. 206:21–23.]

## II.   PLAINTIFF'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS

## COUNT I: RACIAL DISCRIMINATION

1.      Plaintiff was allowed to pursue a claim on whether the bases of race (African-American) and reprisal (previous EEO activity), the complainant was subjected to a hostile work environment, as evidenced by listing multiple events. [Ex. 5, ROI 00040].

2.      The Notice of Acceptance makes clear Plaintiff's overall claim of harassment was accepted for investigation and the events set forth above are supporting, note complete, evidence of it. [Ex. 5, ROI 00041].

### A.   *Undermining Authority*

3.       McCray was treated less favorably than Caucasian employees in her supervisory chain. [Ex. 1, McCray Depo., pg. 185, 205].

4.       Duda hired McCray as well as two other African-American supervisors. She treated them as second-class citizens, undermining them all and usurping their authority. [Ex. 1, McCray Depo., pg. 119, 123-25].

5.      When she was promoted, McCray and Dial were ostensibly the supervisors, but Duda allowed their supervisees to report directly to Duda, countermanding their instructions. [Ex. 1, McCray Depo. Pp. 119:16-125:3, 187:1121].

6.      As an example, Duda told McCray's employees that they no longer needed to review each clinical document before it is entered into a veteran's record. [Ex. 1, McCray Depo. Pp. 119:16-125:3].

7.      This happened after McCray had given clear instructions in accordance with a national directive requiring that clinical review. [Ex. 1, McCray Depo. Pp. 119:16-125:3].

14.     Allowing certain employees to "shortcut" around the national directives while others followed the rules created more work and harmed morale and cohesiveness. [Ex. 1, McCray Depo. 119:16-125:3].

15.     Heather Bandy and Jessica Clasen (Caucasian) were often told to engage in "work arounds" instead of following the required processes. [Ex. 1, McCray Depo. 119:16-125:3]

16.     Because of the differential treatment, staff became fearful of bringing questions to McCray fearing being in the middle between Duda and McCray. [Ex. 5, ROI 000186–000188.]

17.     Duda instructed McCray's employees on documentation concerning the Dental Directives that differed on how McCray had been teaching her employees. [Ex. 1, McCray Dep. 127-28 132:15-133:24; Ex. 5, ROI 000058, 000069].

18.     Duda took McCray off the email string so she would not see the interchange, then told one of the employees that she would reach out to VISN because "I am only going on what DaShaun told me", insinuating that McCray did not know what she was talking about. [Ex. 1, McCray Dep. 119:6-122:5, 127:6-129:24, 132:19-133:24; Ex. 5, ROI 000058, 000069].

19.     McCray contacted the VA Central Office who informed her that she had correctly instructed her staff regarding these directives. [Ex. 1, McCray Dep. 127:6-129:24].

20.     Duda had intervened and undercut McCray's credibility to her staff members. [Ex. 1, McCray Dep. 119:6-122:5, 127:6-129:24, 132:19-133:24; Ex. 5, ROI 000058, 000069].

21.     As a result of Duda's usurping of authority and undermining McCray, there was no consistency between staff members regarding the appropriate manner to carry out the work. [Ex. 1, McCray Dep. 119:16-125:3, 119:6-122:5, 123-125, 127:6-129:24, 132:19-133:24; Ex. 5, ROI 000058, 000069].

22.     These types of events occurred regularly from 2018 until McCray took a position in Colorado [Formal complaint, ROI 000003].

23.     Whenever Caucasian employees had concerns or were unhappy with the instructions or interactions with McCray or Dial, they were encouraged to air their grievances to Duda. [Exh. 1, McCray Depo., pgs. 185-87]. A fact-finding was conducted by the Agency regarding issues in management of OCC. It found Duda was undermining her supervisors by allowing employees to jump the line of command. These

issues destroyed morale, caused dysfunction at the managerial level, and impacted veteran care. [Ex. 5, ROI 000186–000188.]

24.     Duda would often countermand the instructions that had been given, preventing completion of the work, duplicating work or causing it to be delayed. [Ex. 1, McCray Dep. 119:16-125:3, 119:6-122:5, 123-125, 127:6-129:24, 132:19-133:24; Ex. 5, ROI 000058, 000069, *See also* EEORFA #6.]

25.     Duda continuously and on an ongoing basis blamed Dial and McCray for the unfinished/backlogged work that she had caused. [Ex. 1, McCray dep. 138:19-140:9, see also Ex. 5, ROI Aff. of Duda, 00084-85].

26.     Duda undermined McCray in front of her superiors and colleagues as well. During staff or executive meetings, Duda would refuse to let McCray speak, take credit for McCray's work, or give McCray an assignment that differed from that which was given to her by her superiors, thus setting her up for failure. [Ex. 1, McCray Depo. 130:14-131:5, 153:25-158:25, 160:12-18, 283:16-284:16].

27.     Interaction with the Executive Leadership Team regarding process improvement is one of the criteria for promotion to a higher-grade promotion in nursing in the VA. [Exh. 1, McCray Depo. 61:3-20].

28.     On February 10 and 14, 2020, Ruth Duda undermined McCray's ability as a supervisor by falsely accusing her of taking all leadership away from a coworker and not allowing another employee to speak during a meeting. [Ex. 1, McCray Depo., 104:18-105:22, 122:12-17: 164:3-168:7, 169:10-175:3]. Janelle Adams declaration provided by defendant supports Plaintiff's position as Janelle Adams states that Duda did not approach her and ask if Plaintiff had Duda discredited McCray and her black co-worker with upper management. [Ex. 1, McCray Depo., 130:4-131:5, see also EEO RFP #7, Document E]

**B. Intimidation Attempts**:

**1.** *Unfavorable Treatment in Disciplinary Matters*

31.　　Duda engaged in intimidating behavior towards McCray. [Exh. 1, McCray Depo., pgs. 101-06, Ex. 5, ROI 00039; EX. 2, PTO p. 12]

32.　　McCray was berated, both verbally and in writing, for not possessing knowledge about certain aspects of her position. [Exh. 1, McCray Depo. 192:5-194:6, 201:1-20, *see also* EEO RFA #4, EEO Interrog. #12].

33.　　McCray was never trained in labor mapping, consult data tracking, and budget reports but her failure to know how to perform these functions were the subject of both oral counselings and a basis for her lowered performance rating. [Exh. 1, McCray Depo. 192:5-194:6, 201:1-20].

34.　　The verbal and written "counselings" are the first step in the graduated disciplinary process. *See, e.g., CBA,* Art. 18 § 17 and Art. 27 § 10.

35.　　McCray was downgraded from "Outstanding" to "Fully Successful" on her annual performance review as a result. [Ex. 1, McCray Dep. 174:13-14, 176:23-177:3].

36.　　Those who receive "Outstanding" ratings are entitled to a monetary award. [Ex. 1, McCray Depo., pg. 175]. As a result of the failure to train, McCray was downgraded to "Fully Successful" and lost out on the monetary award. [Ex.1, McCray, Dep. 174:13-14, 175:8-11, 176:23-177:3].

**2.** *Invasion of Personal Space and Curtailing of Interaction with Executive Leadership Team*

37.　　Another instance took place during a meeting where McCray was asked to speak. Duda expressed dissatisfaction and informed her that Dr. Cummings did not want her to participate. [Ex. 1, McCray Depo., 101:23-102:15, *See also*, EEO RFA #1].

38.　　Curtailing McCray's interaction with the executive leadership team negatively impacted one of the core criteria for seeking future pay grade increases. PSOF 29.

### C. <u>Inadequate Training</u>:

39.    Duda failed to provide proper training to McCray for her new position, which hindered her ability to perform her job effectively. [Ex. 1, McCray Depo., pg. 110, 110:4-111:13115:3-8, 114:3-8.]

40.    Despite McCray's requests for guidance, she was not adequately trained in budget reports, labor mapping, and consult tracking data. [Exh. 1, McCray Depo. 192:5-194:6, 110, 110:4-111:13115:3-8].

41.    As a result, McCray was expected to complete tasks without the necessary knowledge and skills, which set her up for failure. [Exh. 1, McCray Depo. 192:5-194:6, 110, 110:4-111:13115:3-8, 114:3-8].

42.    This lack of training was specific to McCray and was not directed at her Caucasian counterparts. [Ex. 1, McCray Depo., 201:1-203:3].

43.    Between January 28, 2019, and January 4, 2020, Ruth Duda required McCray to complete the staffing model duty without providing her Nurse Manager training. [Ex. 1, McCray Depo., pg. 110, 110:4-111:13115:3-8, 114:3-8, 192:5-193:8. *See also*, EEO RFA #5].

44.    McCray was subjected to adverse employment actions including unfavorable treatment in disciplinary matters, receiving discipline for not performing job duties for which she was unaware that she was required to perform and for which she had never been trained. [Ex. 1, McCray Dep. 174:19-175:3, 192:5-194:6, 110:4-111:13, 115:3-8, 114:3-8, 192:5-194:6.]

45.    McCray was subjected to heightened scrutiny in work by Ruth Duda and when she complained of these actions to Dr. Robert Cummings, he responded by asking her when she would be leaving and telling her that Duda had a job to do. [Ex. 1, McCray Dep. 112:1-8, 198:4-18].

46.    McCray, at that time, had no intention of leaving the Wichita VA. [Exh. 1, McCray Depo. 112:1-22].

### D. <u>Notice to the Agency; Failure of Effective Remedial Remedy</u>

47.    In 2018, McCray complained to Raffi Syed, who was in Ruth Duda's supervisory chain, that Duda was publicly talking about other employees and McCray thought it discriminatory. [ROI 00056-00057].

48. Syed spoke with Duda and told her that she should speak to employees in private. [ROI 00056-00057]. He took no further action. [ROI 000057].

49. On January 24, 2020, McCray met with Dr. Robert Cummings, the supervisor of Ruth Duda. [Ex. 1, McCray Dep., 138:18-142:4]. She spoke to him regarding the harassment and discriminatory conduct Ruth Duda directed at her and other African-American employees, including Elizabeth Dial. Dr. Cummings offered to sit down with Duda, McCray and Dial to "discuss any issues." [Ex. 1, McCray Dep., 138:18-142:4].

50. They did not accept his "offer," and he took no further action according to his own statements. [Ex. 1, McCray Dep., 138:18-142:4].

51. He claimed that he had no knowledge or belief that Ruth Duda harbored animosity toward McCray because of her race. [ROI 000-056]. However, he did know that HR conducted a fact-finding regarding Ruth Duda. [ROI 00056, 000108].

52. Another fact finding found that Ruth Duda inappropriately handled a situation in which an employee was referred to as a racist trope. She was eventually relieved of her position as a result of that fact finding information. Tenesha Burks complained that Duda singled her out for discrimination and retaliation, causing her to leave her position. [ROI 00066.]

53. Despite this information, Dr. Cummings took no action. [Ex. 1, McCray Dep., 138:18–142:4.]

### E. Increased Workloads

54. In retaliation for reporting her to Dr. Cummings, Duda created "busy work" for Duda (and Dial) that was not relevant to the core mission of OCC, including excessive meetings and Congressionals. [Ex. 1, McCray Depo., pg. 138, 144:22- 145:3, 150-151, 191; Ex. 5, ROI , 000004, 000059, 000070, 000170].

55. The workload was overwhelming; it could not be completed within a workweek. [Ex. 1, McCray Depo., 188:22-191:12, 201:202:13, Ex. 5, ROI Aff. of Duda, 00084-85].

56.     The fact-finding regarding supervision at OCC concerned this issue and found that Duda kept her supervisors from their mission by giving them busy work. [Ex. 5, ROI 0000145].

### 3. *Differential Treatment*:

57.     The acts of intimidation, undermining, invasion of personal space, curtailing interaction with the executive team, inadequate training, increased workloads, unfair discipline targeted McCray specifically and were not observed towards her Caucasian counterparts. [*See infra* PSOF 74–87.]

58.     Duda also yelled and chastised McCray out in the open in front of her subordinates many times. [Ex. 1, McCray Depo. 100:20-101:10, 161:17-163:20].

59.     Just one example includes a time Duda yelled at McCray in a public area while discussing another employee's pay. [Ex. 1, McCray Depo., 101:1-10, 161:17-163:20].

60.     This also violated VA policy. (Ex. 1, McCray Depo., 101:1-101:8, 161:17-163:20, *See also*, EEO RFA #2].

61.     Duda knew discussions about employee pay and personnel matters were confidential. Duda used that same basis for disciplining Elizabeth Dial in 2020. [Ex. 4, Duda Dep.*,* 155:12-156:11, 157:1-16, 158:13-160:22].

62.     Duda formally disciplined Supervisor Dial for mouthing "discipline" to an employee in the employee's cubicle who asked the purpose of a meeting. [Ex. 4, Duda Dep.*,* 155:12-156:11, 157:1-16, 158:13-160:22].

63.     No one heard or could have heard Dial yet she received disciplined Duda yelled loudly and in public information regarding Tenesha Burks employment status and instructed McCray to engage in prohibited conversation with Burks. [Ex. 4, Duda Dep.*,* 155:12-156:11, 157:1-16, 158:13-160:22].

64.     Duda's comments, which were yelled out in the open, placed McCray in a position of having to choose between following the VA policy on confidential communications or her supervisor's directive. (Ex. 1, McCray Depo., 101:1-101:8, 161:17-163:20, See also, EEO RFA #2].

65.      McCray found this interaction both intimidating and discriminatory, as only she was treated in this manner and Burks, whose employment records were at issue, is African-American. (Ex. 1, McCray Depo., 101:1-101:8, 161:17-163:20, See also, EEO RFA #2].

66.      On January 31, 2020, Duda tried to physically intimidate McCray by standing in her personal space and yelling at her. [Ex. 1, McCray Depo., pg. 161-162].

67.      Duda undermined Plaintiff's ability as a supervisor by falsely accusing her of taking all leadership away from a coworker, not allowing another employee to speak during a meeting, and giving incorrect information. [Ex. 1, McCray Depo., 161-162.] McCray testified that many of the duties were busywork assigned while short staffed and given without training. [Ex. 5, McCray Aff. ROI 000067–68.]

68.      On March 2, 2020, Ruth Duda threatened to fire McCray when she asked about how to proceed with an employee's expired nursing license, stating that she had previously been told to fire McCray for violating HIPAA laws. [Ex. 1, McCray Depo., 181:15-182:4, *See also*, McCray's (Plaintiff) Response to the VA's (Agency) Request for Admissions #21 and #22].

69.      Duda also repeatedly threatened to discipline McCray when it was not warranted. [EEO RFA #16.]

70.      While Caucasian employees could approach Duda with their concerns, McCray, as their direct supervisor, was systematically excluded from such discussions. [Ex. 1, McCray Dep., 185:10-186:17, 187:11-22].

71.      Duda treated McCray differently compared to white employees, particularly in matters of discipline. [Ex. 1, McCray Dep., 185:10-186:17, 187:11-22].

72.      While Duda was openly hostile and derisive with her African-American employees and specifically McCray as set forth above, Duda did not use a dismissive and denigrating tone with white employees nor publicly yell at them. [Ex. 1, McCray Depo. 100:20-101:10, 161:17-163:20, Dial Depo in *Dial*, 69:22-71:3, 119:23-120:19, 139:12-17, 149:18-150:11].

73.     With both Dial and McCray, Duda required the supervisors to initiate discipline against employees then she would intervene to prevent the Caucasian employees from being disciplined—pitting Caucasian staff against their African-American supervisors. [Ex. 1, McCray Dep., 185:10-186:17, 187:11-22].

74.     Similarly situated Caucasian employees received more favorable treatment from Duda. [EEO RFP #6, Document F].

75.     Duda provided training, direction, and clear orders to follow to the Caucasian employees. [EEO RFA #20, EEO Interrog. #62].

76.     This disparate treatment created a hostile work environment based on race. [Ex. 1, McCray Depo., 185:10-186:20, 282:13-283:15]

77.     Duda's attitude was apparent to her employees as she belittled them, gave them unreasonable workloads, yelled at them, and undercut their performance. [Ex. 5, ROI Aff. of Duda, 00084-85].

78.     Duda placed black employees, including McCray, under intense scrutiny. Similarly situated white employees were not subjected to that scrutiny. DSOF 117–118.

79.     As an example, Tenesha Burks was a Supervisory Program Specialist, who worked under Duda. She left abruptly because Duda had acted so discriminatorily toward her. [Ex. 1, McCray Dep. 107:6–108:24, 109:1–9.]

## COUNT III: RETALIATION

80.     On January 24, 2020, McCray and Dial complained of Duda's actions to Dr. Cummings, characterizing them as discriminatory and harassing. [Ex. 1, McCray dep. 139:13 - 140:9]

81.     His response was that Duda needed to "get out of the weeds" and let them supervise. [Ex. 1, McCray Depo., pgs. 139-41].

82.     They also discussed the work backlog in OCC and the need for either additional staff or overtime, neither of which would Duda approve. [Ex. 1, McCray Depo., pgs. 139-41, 188-189].

83.     Immediately following that meeting, Duda began retaliating against McCray. [Ex. 1, McCray Dep. 143:21-145:3]. That same day, Duda blamed Dial and McCray for the backlog to Cummings. [Ex. 1, McCray dep. 138:19-140:9, see also Ex. 5, ROI Aff. of Duda, 00084-85].

84.     She also began piling on additional work and sending "double check" emails to others to see if McCray had done her work. [Ex. 5, ROI Aff. of Duda, 00084-85]. At 3:51 on January 24, 2020, Duda sent a "double check: email to Dean Rhein asking of McCray had sent a list of TMS that new OCC staff need to be assigned (a duty outside of McCray's authority). [Ex. 1, McCray Dep. 142:21-144:24]. Duda also requested that Rhein assign training to McCray and she started nitpicking McCray's work. [Ex. 1, McCray Dep. 142:21-144:24].

85.     McCray had never been requested to send any kind of email to Rhein. Duda began making up duties that had never been required in the past. [Ex. 1, McCray Dep. 142:21-144:24].

86.     Just after January 24th is also when McCray was assigned labor mapping, consult data tracking and budget analysis, duties she had never been trained to do and was downgraded for relying on OCT for these things. PSOF 32.

87.     On January 28, 2020, McCray received an email from Cummings indicating that he had spoken to Duda but had not told her of the meeting between them. [Ex. 1, McCray Dep., 199:11-200:200].

88.     On January 27, 2020, Duda had already come to McCray and told McCray that Duda needs to back off and get out of the weeds. [Ex. 1, McCray Dep., 199:11-200:200].

89.     Duda assigned her even more "busy work" such as congressional responses and meeting attendance. [Ex. 1, McCray Depo., pg. 138, 144:22- 145:3, 150-151, 191; Ex. 5, ROI , 000004, 000059, 000070, 000170, See also, Ex. 5, ROI Aff. of Duda, 00084-85].

90.     Duda increased her workload as retaliation for McCray's complaints. [Ex. 1, McCray Depo., pg. 138, 144:22- 145:3, 150-151, 191; Ex. 5, ROI , 000004, 000059, 000070, 000170].

91.    On January 30, 2020, McCray and Ruth Duda met with Pentad, the executive leadership team. (Ex. 1, McCray dep. 102:7-15, 130:14-131:5, 148:22-26, 153:25-158:25, 160:12-18, 283:16-284:16].

92.    At one point, the medical center director cut into the presentation of Duda by raising his hand and asking Duda to allow McCray to speak on the topic. (Ex. 1, McCray dep. 102:7-15, 130:14-131:5, 148:22-26, 153:25-158:25, 160:12-18, 283:16-284:16, See also, EEO RFA #1, EEO RFA #10, EEO Interrog. #32].

93.    The following day, Duda came into McCray's workspace, violating her personal space, and began yelling at McCray. [Ex. 1, McCray dep. 102:3-14; 162:17-24]. See also Defendant's Exhibit U.

94.    She berated McCrat for responding to the question at the meeting, telling her that McCray did not allow Duda to talk during the meeting. [Ex. 1, McCray dep. 102:3-14; 162:17-24]. See also Defendant's Exhibit U.

95.    Duda asked "Are you offended?" seemingly in reference to the concerns of harassment that McCray had made to Cummings. [Ex. 1, McCray dep. 102:3-14; 162:17-24]. See also Defendant's Exhibit U.

96.    On January 31, the day after the January 30, 2020, meeting, Dr. Cummings assigned McCray the duty of reviewing the OCC metrics and reporting on the outliers—that is the veterans that had not received service within 30 days. [Ex. 1, McCray Depo., pgs. 188-191:12, 201:202:13, see also EEO RFA #6, EEO Interrog. #19, Ex. 5, ROI Aff. of Duda, 00084-000085].

97.    McCray was told to complete this task by the close of business; thus she was given less than one day to complete the assignment. [Ex. 1, McCray Depo., pgs. 188-191:12, 201:202:13, see also EEO RFA #6, EEO Interrog. #19, Ex. 5, ROI Aff. of Duda, 00084-000085].

98.    That was an impossible task; McCray believed they were trying to start building a paper trail regarding her inability to complete her work tasks. [[Ex. 1, McCray Dep. 191:4-12].Ex. 5, ROI Aff. of Duda, 00084-85].

99.     On February 10 and 14, 2020, Duda also accused McCray of taking all leadership away from Janelle Adams and taking credit for the progress that had been made on the backlog of information. [Ex. 1, McCray Depo., pgs. 163-64].

100.    Duda falsely accused McCray of things that Duda had done and of which McCray had complained. It was retaliation. (Ex. 1, McCray dep. 102:7-15, 130:14-131:5, 148:22-26, 153:25-158:25, 160:12-18, 283:16-284:16].

101.    McCray learned that Duda had approached Adams in an effort to pit Adams and other staff against McCray. [Ex. 1, McCray Depo., pg. 28:1-12, 168].

102.    On February 10, 2020, Duda also requested/encouraged Janelle Adams to complain to management that McCray had created a hostile work environment. [Ex. 1, McCray Depo., pg. 122].

103.    Duda memorialized these false allegations, *inter alia,* against McCray in an email on February 14, 2020. [Ex. 1, McCray Dep., 104:25-106:1].

104.    Duda sent the email to McCray, but she also inexplicably copied an individual named Heather Brown onto the email as well. [Ex. 1, McCray Dep., 104:25-106:1].

105.    Brown did not work in the OCC; she was not in either McCray's or Duda's chain of command. At the time, she was the Deputy Nurse Executive. [Ex. 1, McCray Dep., 169:10-21].

106.    She was McCray's personal mentor within the VA. Duda knew that McCray looked up to Brown within the VA and that Brown thought very highly of McCray. [Ex. 1, McCray Dep., 73:21-74:5, 104:25-106:1, 169:23-171:16, 172:21-173:10].

107.    Duda copied Brown on the February 14, 2020 email and later that same day, Duda met with McCray and asked Brown to attend the meeting. [Ex. 1, McCray Dep., 104:25-106:1, 169:23-171:16, 172:21-173:10].

108.    At the meeting, Duda berated McCray for the manner in which she handled Adams and the meeting of February 14. Duda told McCray's mentor that McCray had taken over a meeting on February 7,

2020 and did not allow an employee to speak. [Ex. 1, McCray Dep., 104:25-106:1, 169:23-171:16, 172:21-173:10].

109.    Duda also told Heather Brown and McCray that the other employees were fearful of discussing anything with the McCray for fear of retaliation. [Ex. 1, McCray Dep., 104:25-106:1, 169:23-171:16, 172:21-173:10].

110.    McCray found it both intimidating and a form of retaliation that Duda would discuss these employment issues in front of McCray's mentor. [Ex. 1, McCray Dep., 104:25-106:1, 169:23-171:16, 172:21-173:10].

111.    It appeared to be a way to decrease McCray's credibility. [Ex. 1, McCray Dep., 104:25-106:1, 169:23-171:16, 172:21-173:10].

112.    On March 2, 2020, Duda informed McCray that one of the nurses' licenses had expired and she would have to be sent home. *See* Duda Declaration attached to Defendant's Motion, ¶ 25.

113.    When McCray questioned the information, Duda explained the HR process. [Ex. 1, McCray Depo., pg. 181-182, and Ex. 10, 3/2/20 McCray Email String re: DeBellis].

114.    McCray asked Duda how to handle the situation. [Ex. 1, McCray Depo., pg. 181-182, and Ex. 10, 3/2/20 McCray Email String re: DeBellis].

115.    Under the VA policy, that is an offense that can cause termination. [Ex. 1, McCray Depo., pg. 181-182, and Ex. 10, 3/2/20 McCray Email String re: DeBellis].

116.    McCray was concerned because this was a livelihood at stake. [Ex. 1, McCray Depo., pg. 181-182, and Ex. 10, 3/2/20 McCray Email String re: DeBellis].

117.    Duda required McCray to give the staff member a reprimand after she had been removed and reinstated by the VISN Director. [Ex. 1, McCray Depo., pg. 181-182]

118.    After McCray gave the reprimand, Duda then took it down to a lower punishment to make it look like McCray was being cruel and harsh and Duda was being lenient. [Ex. 1, McCray Depo., pg.181-182]

22

119.    Then, Duda berated McCray, reminding her that she could have been fired but Duda gave her a reprimand. [Ex. 1, McCray Depo., pg. 182, and Ex. 10, 3/2/20 McCray Email String re: DeBellis].

120.    Duda berated McCray for the discipline that Duda had requested McCray to mete out. [Ex. 1, McCray Depo., pg. 182, and Ex. 10, 3/2/20 McCray Email String re: DeBellis].

121.    The manner in which Duda spoke of McCray's discipline—the only formal discipline that McCray has ever received—made McCray fearful for her position. She believed she was being threatened with termination. McCray reported the incident to VISN and HR. [Ex. 1, McCray Dep., 181-182].

122.     McCray received her final performance review from Ruth Duda in November of 2020 where Duda marked McCray down for not generating her own budget reports, labor mapping and other reports on which she had never trained. [Ex. 1, McCray 192:5-193:8, 192:5-194:6, 193:22-193:7; 176:23–177:3].

123.    She also falsely reported that McCray had only been timely with her performance reviews 80 percent of the time. [Ex. 1, McCray Dep. 202:4-13, Ex. 9, Fully Successful Review, USA-000447; D's Ex. N].

124.    That 80 percent rate placed McCray in the "Fully Successful" category, not her usual "Outstanding" category. [Ex. 1, McCray Dep. 174:13-14, 176:23-177:3]. McCray's actual timeliness score was much higher. *See* DSOF 56.

**A.  Increased Hostility**:

125.    After reporting Duda to Dr. Cummings on January 24 and 30, 2020, Duda's hostility towards McCray noticeably intensified. Her interactions became more adversarial, characterized by a hostile demeanor and dismissive attitude. [Ex. 1, McCray Depo., 142:21-144:11, 201:1-203:3, *See also*, EEO Interrog. #3].

126.    Duda also began nitpicking McCray's work even more and subjected her to extra supervision. [Ex. 1, 142:21-144:11, 201:1-203:3, *See also*, EEO Interrog. #3, EEO RFA #14].

## B. **Increased Workload**:

127.     As a form of retaliation, Duda significantly increased McCray's workload by assigning her additional tasks and responsibilities beyond her existing workload. [Ex. 1, McCray Depo., 142:21-144:11, 201:1-203:3, *See also*, EEO Interrog. #3, [Ex. 5, McCray Aff. ROI 000067-68, EEO RFA #7, #12, #22, Interrog. #22, Ex. 5, ROI Aff. of Duda, 00084-85].

128.     Her workload included tasks that could not be completed within the given time frame, forcing her to work overtime to meet the demands. [Ex. 1, McCray Depo., pgs. 188-189, see also EEO RFA #6, EEO Interrog. #19, Ex. 5, ROI Aff. of Duda, 000085; ROI 000150].

129.     This sudden surge in workload specifically targeted McCray after she reported Duda's actions to the Chief of Staff, Dr. Richard Cummings, placing an undue burden on her, impeding her ability to perform her job effectively, and made it impossible for her to complete her tasks within the allotted time. [Ex. 1, McCray Depo., pgs. 188-189, *See also*, EEO RFA #22, Ex. 5, ROI Aff. of Duda, 000085].

## C. **Unfair Performance Appraisals**:

130.     In retaliation for reporting Duda, McCray received lowered performance appraisals despite consistently demonstrating outstanding performance. [Ex. 1, McCray Depo., 201:1-203:3, 272:23-25, *See also*, EEO Interrog. #3].

131.      McCray received a performance review that covered the period from March 26, 2020 through September 30, 2020. [Ex. 1, McCray Dep. 174:13-14, 175:8-11, 176:23-177:3, 192:5-194:6, 193:22-193:7, 202:4-13].

132.     Significant portions of the performance appraisal were based on Duda's input. [Ex. 1, McCray Dep. 174:13-14, 175:8-11, 176:23-177:3, 192:5-194:6, 193:22-193:7, 202:4-13].

133.     There are "critical elements" on this performance appraisal: Leading Change, Leading People, Business Acumen, and Results Driven. Based on Duda's input, McCray was given a "Fully Successful"

review in 3 out of 4 critical elements, instead of "Exceptional, the highest category, which is what she should have received in all categories. [Ex. 1, McCray Dep., 174:13-14, 176:23-177:3].

134.     This unjust appraisal negatively impacted McCray, preventing her from receiving a monetary award for an outstanding rating. [Ex. 1, McCray Depo., pg. 175].

### D.  Micromanagement:

135.     Following McCray's report, Duda began micromanaging her work and undermining her decision-making authority. [[Ex. 1, McCray Dep., Ex. 5, ROI Aff. of Duda, 00084-85].

136.     During the month of January 2020, Ruth Duda began counseling McCray on missing deadlines that were caused by Duda's actions. (ROI 000016].

### E.  Removal from Important Assignments

137.     Shortly after the January 24, 2021 meeting with Dr. Cummings and Ruth Duda, McCray was removed from the Referral Coordination Team, which was an important and high-profile task of a nature required for for advancement. PSOF 29

138.     When McCray sought transfer away from Ruth Duda, she was told there was no position that would be available to her that was not a direct report to Duda. [Ex. 5, ROI 000117].

139.     To get out from under Duda's supervision, McCray moved to a position with the Department of Veteran's Affairs in Boulder, Colorado. [Ex. 1, McCray Depo, 210:1-5

### DAMAGES

### A.  Mental/Emotional Damages:

140.      McCray experienced severe emotional distress and psychological harm as a result of the racial discrimination, retaliatory harassment and retaliation created by Duda. [Ex. 1, McCray Dep. P. 188, 224:8-15, 232:9-233:11, 234:13-235:13, 272:16-273:11, 291:7-17].

141.    McCray testified that she suffered from anxiety, sleep disturbances, and depression due to the ongoing mistreatment and racial bias she faced at the VA Hospital. [Ex. 1, McCray Dep. P. 188, 224:8-15, 232:9-233:11, 234:13-235:13, 272:16-273:11, 291:7-17].

142.    The racial discrimination and hostile work environment created by Duda caused McCray to lose confidence in her abilities and negatively impacted her self-esteem. [Ex. 1, McCray Depo., 188, 224:8-15, 232:9-233:11, 234:13-235:13, 272:16-273:11, 291:7-17]

143.    McCray sought therapy and counseling to cope with the emotional toll caused by the discriminatory treatment she experienced. [Ex. 1, McCray Dep. P. 188, 224:8-15, 232:9-233:11, 234:13-235:13, 272:16-273:11, 291:7-17].

144.    The hostile work environment created by Duda significantly contributed to McCray's mental and emotional distress, leading to a diminished quality of life. [Ex. 1, McCray Depo., [Ex. 1, McCray Dep. P. 188, 224:8-15, 232:9-233:11, 234:13-235:13, 272:16-273:11, 291:7-17].

145.    McCray has suffered from Post Traumatic Stress Disorder for a long time. These events exacerbated her PTSD sympto [Ex. 1, McCray Dep. P. 188, 224:8-15, 232:9-233:11, 234:13-235:13, 272:16-273:11, 291:7-17].

146.    As a result, she has had the PTSD she suffered as a military veteran revivified, she suffers depression, anxiety, flashbacks, and dissociative symptoms as well as physical manifestations including headaches, racing heart and other physical sympto [Ex. 1, McCray Dep. P. 188, 224:8-15, 232:9-233:11, 234:13-235:13, 272:16-273:11, 291:7-17].

147.    McCray has suffered increasing and debilitating migraines as a result of the discrimination and harassment. She has sought medical care for those migraines through the VA. [Ex. 1, McCray Dep. P. 188, 224:8-15, 232:9-233:11, 234:13-235:13, 272:16-273:11, 291:7-17].

### B. Economic Damages:

148.    The discriminatory actions of Duda and the lack of support from Dr. Cummings led to McCray's decision to take a position in Boulder, Colorado as that was the only way she could get out from under Duda's supervision, causing the need to carry the expenses of two households. [Ex. 1, McCray Dep. 206:21–23].

149.    She began taking more and more leave because of the emotional injuries she suffered. *See* PSOF

150.    She lost out on the performance-based awards she had routinely received because of the lowered performance rating. [Ex. 1, McCray Depo., pg. 175].

151.     McCray receives most of her care through the VA. However, because of the exacerbation of her Post Traumatic Stress Disorder, depression, anxiety and other mental and emotional distress, she has had ongoing medical expenses. [Ex. 1, McCray Dep. p. 188].

To date, her out-of-pocket expenses have exceeded $562.00.

## III.    STANDARD AND ANALYSIS

### A.    *Standard of Review*

Summary judgment would be granted only where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court is obliged to view the facts in the light most favorable to the Complainant and draw all inferences in her favor. *Reeves v. Sanderson Plumbing, Inc.,* 530 U.S. 133, 150 (2000). *Bassett v. City of Minneapolis,* 211 F.3 1097, 1098 (8th Cir 2000).

Here Plaintiff has established issues of fact regarding each element of her claims, creating a *prima facie* case. Wilking *v. county of Ramsey,* 153 F.3d 869, 873 (8th Cir. 1998). The required proof necessary to establish a *prima facie* case for a Title VII claim on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.,* 26 F. 3d 885, 889 (9th Cir. 1994; *Young v. Warner Jenkinson,* 152 F.3d 1018, 1022 (8th Cir. 1998) (the *prima facie* burden is

not so onerous as, nor should it be conflated with the ultimate issue of discriminatory action). Because

Plaintiff has established a *prima facie* case of discrimination, Defendant's motion for summary judgment

should be overruled.

      *B.*    **Legal Argument**

           **1.**    **Plaintiff Fully Exhausted her Administrative Remedies on the Remaining Claims**

Plaintiff fully exhausted all of her clai For a Federal employee, administrative exhaustion requires

the employee to seek informal pre-complaint counseling "within 45 days of the allegedly discriminatory act."

*Miles v. Kerry,* 951 F.Supp.2d 272, 286 (D.C. D.C. 2013).

Defendant attempts to limit the facts of this case to just those incidents found in the acceptance

letter from the EEO. Defendant argues that any event not found in that letter have not been administratively

exhausted. This narrow reading does not comport with the law. The charge is intended to "trigger the

investigatory and conciliatory procedures of the EEOC. . . ." P*acheco v. Mineta,* 448 F.3d 783, 788–789

(5th Cir. 2006). Courts are to consider both the "actual statement given by the plaintiff in the administrative

charge" and the scope of the investigation that is expected to grow out of it. *See Wright v. HHS,* 311

Fed.Appx. 939 (8th Cir. 2009) (discrimination complaint must be limited to scope of investigation

reasonably expected to grow out of charge of discrimination with EEOC).

The Notice of Acceptance in this matter does not follow verbatim the Formal Complaints of

Discrimination. The Charge filed by  McCray on March 30, 2020 states: In January 2019 *to* present*,* RMO

Duda usurps the AP's supervisory authority towards staff, informs staff of different actions in comparison of

what the AP instructed, and *pits the staff against the AP.* Ex. 1., March 30, 2020 Complaint of

Discrimination. The investigation included a fact-finding to which  Duda responded. These investigative

materials are found in the Report of Investigation (ROI) and are part of the EEO investigation. These

facts—which include that Plaintiff was unfairly threatened with discipline; had her authority undermined,

was intimidated by Duda; not adequately trained; treated differently regarding disciplinary matters; subjected to heightened scrutiny; and being pushed to leave—are all facts found in the investigative file. They are part of the EEO investigation and arise from the allegations found in the formal complaints of discrimination.

All of the acts that Defendant calls "discrete acts" are like or related to those that serve as the basis for her discrimination complaint. *See Forte v. Southwest Airlines Co.*, 2009 U.S. Dist. LEXIS 149209 (Tex. N.D. 2009). Acts that occurred prior to the filing of the complaint of discrimination may still be relied upon for other purposes, including to establish discriminatory animus or as background evidence supporting a timely claim. *Sanderson v. Wyo. Highway Patrol,* 976 F.3d 1165 (10th Cir. 2020); *Wedow v. City of Kansas City,* 442 F.3d 661 , 670 (8th Cir. 2006).

Most circuits have held that continuing acts of discrimination that are related form a single claim of discrimination. See *e.g. Washington v. Cnty. of Rockland,* 373 F.3d 310, 318 (2nd Cir. 2004); *Walker v. City and City of Denver,* 2019 U.S. Dist. LEXIS 47034 (CO. Mar. 21, 2019). The Tenth Circuit is in the minority in holding that Disparate Treatment claims cannot rely upon the "continuing violation" doctrine. *Semsroth v. City of Wichita,* 304 F.App'x 707, 715 (10th Cir. 2018). The continuing violation doctrine does apply to Plaintiff's Retaliation and Retaliatory Harassment clai *Kincaid v. Unified Sch. Dist. No. 500*, Kansas City, Kansas, 572 F. Supp. 3d 1081, 1089–90 (D. Kan. 2021) explains that retaliatory harassment, if sufficiently severe, may constitute adverse employment action for purposes of a retaliation claim. In the companion case, *Dial v. McDonough,* the District Court found that Dial had sufficiently stated a claim for retaliatory harassment alleging facts identical to these. *Dial v. McDonough,* No. 21-01071-KHV-ADM, 2022 U.S.Dist. LEXIS 2016147 (D. Kan. Nov. 29, 2022).

Because the acts arising *after* the complaint of discrimination are logically related to the claims identified following informal counseling and *were actually investigated* during the EEO process, they have been administratively exhausted. Events that arose prior to the counseling are time-barred; they may be

used as background evidence supporting Plaintiff's timely clai The events both before and after the complaint of discrimination establish a continuing pattern of retaliatory harassment, these events are fully exhausted.

Defendant argues that Plaintiff has exhausted no claims against Dr. Cummings. The complaint is against the Agency for all discriminatory acts that took place against any individual. *Sauers v. Salt Lake County,* 1 F.3d 1122 (10th Cir. 1993) (suits against individuals are inappropriate; "A plaintiff must sue the employer, not an individual employee."). *See also Lankford v. City of Hobart,* 27 F.3d 477, 480 (10th Cir. 1994). The events were fully investigated. The event delineated as 31F in Defendant's statement of facts encompassed Dr. Cummings taking Plaintiff out of the Referral Coordination Team position. Duda's screaming at Plaintiff and asking if she was offended concerned Dr. Cummings's actions. Those events are found in the ROI. (Ex. 5, ROI 000016.) As for the lowered performance review, the discriminatory events led to the lowered performance review; the lowered performance review is reasonably related to the allegations at issue. Many of the complaints that  McCray raised—the failure to train on job duties for which she was held accountable—finds its logical conclusion in the 2020 Performance Review as Plaintiff was criticized for relying on OCT for data. She was not trained to mine this data but was held accountable for it. (Ex. 1, 192:21–194:6.)

2. **McCray Has Established Controverted Facts in Both Her Retaliation and Discrimination Claims that Require the Court to Overrule Defendant's Summary Judgment Motion.**

Employment discrimination cases are evaluated under the framework of the *McDonnell Douglas* burden-shifting. analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 782, 802–914, 36 L.Ed.2d 668, 93 S.Ct. 1817 (1998). The first step in the analysis places the burden of production on the plaintiff to establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she satisfactorily performed her job duties; (3) she suffered an employment action; and (4) the adverse

employment action occurred under circumstances that give rise to an inference of discrimination on the basis of membership in the protected class. *Id.*

Defendant raises no argument regarding elements 1 or 2. Defendant only raises arguments regarding adverse job action and whether plaintiff can establish discriminatory intent regarding certain clai Defendant then goes through each act it has cherry-picked to show that that singular event is not an adverse action. As an initial matter, Defendant's analysis fails. This approach violates the very *raison d'etre* of Title VII's broadly remedial scheme. A court must look at the totality of the facts when determining whether a plaintiff has stated a claim for discrimination. *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011).

### C. Defendant is Not Entitled to Summary Judgment on the Factual Statements that Plaintiff Was Yelled at and Intimidated.

From the earliest EEO complaint through the PTO,  McCray has always contended that the examples given are part of a continuing pattern of harassment based on race *and reprisal* that occurred continuously. [Ex. 5, ROI 00039; EX. 2, PTO p. 12.][3] Defendant wholly disregards the facts on which McCray relies for Duda's intimidation. As set forth in the pretrial order, Duda berated McCray both verbally and in writing for l knowledge about labor mapping, consult data tracking or budget reports. Her failure to know how to perform these functions was the subject of oral counseling s and served as a basis for a lowered performance rating. *See* Response to DSOF 36. Verbal and written counselings are the first step in the graduated disciplinary process under VA policies and procedures. McCray was downgraded from "Outstanding" to "Fully Successful" on her annual performance review. *See* Response to DSOF 36. Those who receive "Outstanding" ratings received a monetary award. *See* Response to DSOF 36. As a result of

---

[3] While the court dismissed Plaintiffs hostile work environment claim, the allegations of continuing harassment based on reprisal form the basis of Plaintiff's Retaliatory Harassment claim.

the failure to train, McCray was downgraded to "Fully Successful." The berating, the counselings, and the downgrade were humiliating and intimidating to McCray. S*ee* Response to DSOF 36.

Defendant analyzes four separate events, opining that these events alone do not support Plaintiff's claim. Those four events did occur and were intimidating, 'but they are not singular. Duda made a habit of excoriating African-American employees in front of others. The first instance involved Tenesha Burks, an African-American supervisor who left the Agency due to Duda's behavior toward her. After she left, Duda yelled about Tenesha having a document that had to be signed to get her final check in front of all of the employees. That information is private and confidential. McCray knew that Duda had disciplined her African-American colleague Elizabeth Dial for mouthing sensitive employee information to a Caucasian employee in the employee's cubicle that was heard by no one.

With regard to the second event, Duda came into McCray's small workspace, unhappy about the events of the previous day. McCray and Ruth Duda had gone to a meeting of the executive leadership team. During that meeting, Duda attempted to take over the presentation being given by McCray and was told by Mr. Ament to allow McCray to speak. Duda stormed into McCray's office and began reading an email to McCray about an assignment. She told McCray that Dr. Cummings, McCray's second-line supervisor, did not want her to attend a meeting with Duda. She went on to berate McCray about failing to allow Duda to speak at the meeting and told her the information she shared with the Executive Leadership team was wrong. She also told McCray that Cummings was taking her off of an important and high-profile assignment. She goaded, "Are you offended?" in a loud and aggressive voice as she invaded McCray's personal space, standing over her.

Close in time to these events, Duda contacted Heather Brown, McCray's mentor, to sit in on a meeting with McCray. In her affidavit, Duda indicates that she called the meeting because McCray was frustrated and no longer willing to receive direction and counsel. She brought McCray's mentor into the meeting and dressed down McCray regarding several issues ranging from undermining a subordinate in a

meeting to airing her grievances regarding McCray's response to Mr. Ament telling McCray she was out of line by speaking at the Executive Leadership Meeting instead of deferring to her chief. She falsely accused McCray of giving wrong information in the meeting. [Ex. 1, McCray Dep. 104:18–105:22.] Brown was not in McCray's line of command but was an important person in McCray's advancement in the system. Duda aired confidential grievances in front of Brown, leaving McCray to feel she had been defamed, undermined, and intentionally discredited.

Plaintiff has alleged and established other discriminatory acts as well. Ruth Duda used the intimidation tactics and yelling as a way to disrespect the black employees. Duda often spoke over Plaintiff and the other African-American supervisors in front of their employees. She undercut the ability of the black supervisors to perform, giving them busy work, countermanding instructions, and encouraging employees to bring complaints to her. Ruth Duda treated the black supervisors dismissively while she treated the white employees under them much differently. She usurped the black supervisors' authority so that they were incapable of supervising the white employees and she disrespected the black supervisors in front of their supervisees. Ruth Duda was eventually disciplined and demoted for the manner in which she handled racist remarks directed at one of her employees.

Duda refused to allow her African-American supervisors to be trained on their daily duties but held them responsible for the duties for which she refused them training. In McCray's case, the result was a lowered performance rating with specific reference in the review to the duties for which she had not been trained. McCray was taken off of high-profile assignments and was denied the opportunity to speak at meetings. These kinds of actions constitute adverse job actions. These alterations in her employment constitute adverse action. *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998) (10th Cir. liberally defines phrase adverse employment action; takes case by case approach).

Plaintiff suffered harm as a result of the defendants actions. She was not given a performance award because of the lowered performance appraisal, she was required to carry two households as she

was not allowed to be reassigned away from Duda, she suffered severe anxiety and exacerbation of her PTSD as a result of the Agency's actions. Duda and Cummings tried to harm her future employment prospects—Cummings by trying to force her out over her complaints and Duda by taking her off of high-profile assignments, defaming her to upper management and her mentor (who was upper management) and taking credit for McCray's work while blaming any issues in OCC on her. Adverse actions may be less severe than outright discharge or demotion. *Belgasem v. Water Pik Techs., Inc.*, 457 F.Supp. 2d 1205 (Co. D.C. 2006).

### D. Plaintiff Has Established that the Adverse Acts Were Race-Based and Retaliatory Harassment

Plaintiff has established that the adverse acts were based on race and retaliatory harassment. Defendant argues that Plaintiff can show no nexus between her race and Duda's use of intimidation. In this argument, Defendant wholly ignores all of the other bad acts in which Duda engaged. Plaintiff has shown a nexus between the conduct and Plaintiff's race.

Duda engaged in ongoing discrimination against McCray and Dial. Prior to their arrival, she had racially harassed Tenesha Burks. Both Dial and McCray were treated in a demeaning, degrading, dismissive manner. Duda treated all of her black employees this way. She yelled at them; she gave them (and only them) unbearable workloads; she undercut their performance to upper management. She engaged in none of those behaviors with white employees.

Duda issued a Letter of Reprimand to Dial for allegedly informing an employee that she needed to get with her on a disciplinary matter in the employee's cubicle on the basis that other employees could have possibly heard it (they did not ). She threatened McCray's position by telling others that she was not amenable to supervision—a form of insubordination—and remonstrated her about her choices in discipline, reminding her that McCray could have been terminated for her actions in 2017. Duda yelled at and dressed down McCray in front of others and revealed personnel information that should have remained confidential

in front of other employees. She accused McCray of undercutting her supervisee, Jonelle Adams, taking credit for her work and creating a hostile work environment for her immediately following Plaintiff's complaints that Duda had engaged in these behaviors with her.

Duda did not allow her black supervisors to supervise. She had the employees come directly to her instead of to their supervisors. She changed the job duties of the employees after they had been assigned and she gave both McCray and Dial busy work at a time that they were behind and understaffed. Duda placed the blame for any issues in the organization on Duda and Dial. Duda placed black employees, including Plaintiff, under intense scrutiny. She did not do the same with Caucasian employees. All of these facts give rise to an inference that Duda's actions were motivated by race.

### E.    Similarly Situated Analysis

Defendant argues that Plaintiff can show no similarly situated employees who were treated more favorably then she. The Tenth Circuit has authored numerous decisions indicating that a *prima facie* case may not require a similarly situated person standard at all. The "circumstances giving rise to an inference of discrimination" standard is much broader. While the broader standard may be and often is satisfied by proof that the employer treated similarly situated employees more favorably, that method of proof is only one pathway to the truth." *Sorbo v. UPS,* 432 F.3d 1169, 1173 (10th Cir. 2005). Whether circumstances give rise to an inference of discrimination is a fact-intensive determination. All of the African-American supervisors were chased from their positions by Ruth Duda because she treated them as second-class citizens. Ruth Duda treated the Plaintiff's Caucasian subordinates more kindly and with greater deference than she did her African-American supervisors. Reviewing the totality of the facts, it is clear that Duda's actions were motivated by race.

### 3.    Duda Admits to a Retaliatory Motive in her Meeting with Heather Brown

Defendant argues that a "coaching" session to assist Plaintiff to become a better leader is a non-discriminatory reason for holding the February 14 meeting with Heather Brown. The meeting was not such

a coaching session and Duda admitted as much. She indicated that McCray had become insubordinate—failing to listen to the admonishments of her supervisor Duda—and so she brought in an outside third person to help McCray understand her deficiencies. That third person was McCray's mentor who was assisting her in her advancement in the agency. In the meeting, Duda discussed personnel matters that were of no concern to Brown and were outside of the HR/ER process. Had McCray or Dial engaged in these actions, Duda would certainly have disciplined them. Duda followed up with an email to both McCray and Brown in which she further delineated the personnel issues she was having with McCray. (Ex. 5, ROI 000114.)

Duda violated policy by discussing personnel matters that could lead to discipline in front of others. In the case of Heather Brown, McCray felt like she did so to disparage her to senior management and to paper her file. Even if Duda's explanation were true, her explanation establishes that Duda invited Brown to the meeting for the purpose of discussing performance and/or conduct issues regarding McCray in violation of Agency policy. Duda had previously been warned by her supervisor, Dr. Syed Raffi, to maintain personnel matters in confidence. [Ex. 5, ROI 000098.]

### F. *Plaintiff Has Established Her Failure to Train Claims*

Defendant argues that the Agency is entitled to summary judgment on Plaintiff's claim that she was not trained on completing the staffing model. Defendant wholly ignores the other areas in which Plaintiff was not trained—including budget reports, consult data and tracking, and labor mapping. [Ex. 1, McCray Dep. 192:5–18.] Defendant argues that Plaintiff received the systemwide training on a nurse manager position and therefore the claim fails. Defendant fails to recognize Plaintiff's claim concerns the failure of Duda to train her on her daily functions. There are two forms of training at the VA, the systemwide training applicable to all employees and the training required for the specific position. McCray has testified that Duda refused to train her or Dial on how to perform the daily functions of their positions. Failure to train can be an adverse job action. *Pendleton v. Univ. of Kan. Med. Ctr.,* No. 04-2206 KHV, 2006 U.S. Dist. LEXIS

868 (D. Kan. Jan. 11, 2006). In this circumstance, Plaintiff did suffer an adverse job action directly related to the failure to train as she did not receive the monetary award for outstanding performance that she had received in the past and that had been given to others who received outstanding performance evaluations that year. The job duties upon which she was not trained appeared on her performance evaluation as areas of improvement. In this case, the failure to train also impacted Plaintiff's workload. While she believed she was achieving her daily requirements, Duda testified and told others that McCray was behind and missing deadlines. Duda's actions caused the missed deadlines for McCray and Dial. [Ex. 5, ROI 000113–114.]

Defendant also tries to defend Dr. Cummings's leaning back and asking McCray when she would be leaving the VA. Cummings placed pressure on McCray to leave at the very moment she was discussing with him the hostile work environment and retaliation she faced. The Agency tries to justify Cummings's remark by Plaintiff's refusal to mediate with Duda. There is no justification for such a statement. Temporal proximity between the complaint and the retaliation establishes an inference that the act complained of was made for retaliatory reasons. *See Wells v. Colo. Dep't of Transp.,* 325 F.3d 1205, 1217 (10th Cir. 2003). Cummings testified that he reached out to Plaintiff and Dial as part of the EEO process prior to January 24, 2020. Plaintiff did not contact an EEO representative until at least a week later. The proffered explanation—that McCray would not have a mediation session with Duda—has no credibility and is mere pretext for discrimination. False explanations for actions taken can also lead to an inference of discrimination. When an employer has provided an innocent explanation for the adverse action and the employee presents evidence of pretext, the jury may infer that the employer acted with discriminatory intent. *Reynolds v. Sch. Dist. No. 1,* 69 F.3d 1523, 1533 (10th Cir. 1995).

Defendant raises again that Plaintiff cannot establish race as a motive for failure to train Plaintiff regarding the staffing model, budgets, consult tracking, and labor mapping as she cannot show a similarly situated individual who was treated more favorably. Plaintiff would draw the Court's attention to the argumentation regarding similarly situated analysis set forth above. As for objective evidence supporting

the racial motivation, Plaintiff has testified clearly and cogently that African-American employees in Ruth Duda's division—no matter their position—were treated less favorably than Caucasian employees. The treatment of Dial, McCray, and Burks establishes the discriminatory motive along with the fact that Duda was later demoted for her manner of handling a racial slur in the division. All of these raise inferences of discrimination.

With regard to retaliation, the failure to train was ongoing. After Plaintiff complained of the hostile work environment, Duda retaliated by abruptly handing off the labor mapping, employee tracking, and other job duties to McCray immediately following the complaint. She did not train her on them, then lowered McCray's evaluation based on them. This constitutes retaliation for her complaints. As for the employee tracking, while Duda did give the chore to Plaintiff prior to the January 24 meeting, it was her actions afterward that were retaliatory. She emailed a higher-up, Mr. Rhein, and asked whether McCray had completed the assignment instead of asking McCray or training her on the module. Duda did so to undercut McCray to upper management.

Defendant points to the MISSION act as the reason for the increased workload. While that act did increase the workload, the work of which Plaintiff complains is the retaliatory busy work that prevented Plaintiff from performing with all her might the mission of the VA. She and Dial were both berated when they attempted to work together to figure out how to get the workload accomplished; Duda told McCray to stop assisting Dial. [Ex. 5, ROI at 000110–114.] The combination of the increased workload plus the lack of training on day-to-day job duties created an insurmountable obstacle for both Duda and Dial. Duda used these as an excuse to blame McCray for any failures in the processing of workflow. It was this behavior that took Plaintiff to Cummings to complain in the first place and it is this behavior that accelerated following the complaints, in retaliation for them.

**4.** **Plaintiff Has Established Discrimination and Retaliation Based on Usurpation of Authority, Increased Workload, PENTAD Meetings, Undermining of Ability as Supervisor, Heather Brown Meeting.**

Defendant's arguments regarding Summary Judgment on each discrete act are repetitive and have already been answered in the prior responses. In summary, Plaintiff has established that the totality of the evidence shows that Defendant engaged in a series of discriminatory acts including failing to train, usurpation of authority, undermining of ability as a supervisor, undermining Plaintiff's credibility with those in upper management including Heather Brown and both refusing to allow Plaintiff to speak at one PENTAD meeting then retaliating against Plaintiff for speaking at another.

In the last ten pages of the briefing, Defendant raises no new arguments from those already briefed. The only argument for which there is no prior briefing occurs on Page 45 of Defendant's Brief. There, the Defendant argues that Plaintiff cannot establish that Duda's comments about Plaintiff's earlier discipline were a threat of termination and would not likely cause another to refrain from engaging in protected activity.

Again, the failure to consider the record as a whole diminishes defendant's argument. McCray made a complaint on January 24. By January 31, Duda had taken several steps in retaliation that were recorded in emails to Dr. Cummings. Dr. Cummings responded by asking when Plaintiff would be leaving the VA and Duda reminded McCray that she could have terminated her if she had chosen three years earlier. Subsequently, less than ten days later, Duda began making allegations against McCray and her handling of Janelle Adams as well as her insubordinate attitude. She went so far as to broadcast her personnel issues to upper management through Rhein and Brown. The fact-finding conducted regarding OCC establishes that employees were in fact afraid to go to their supervisors, distrusted them, and would not report issues to them. Not only were the Agency's actions likely to dissuade the reporting of prohibited activity, it actually did.

In sum, Duda and Cummings engaged in a continuous pattern of discrimination and retaliatory harassment that altered Plaintiff's working conditions.

## IV. CONCLUSION

WHEREFORE, for the reasons set forth above, Plaintiff prays that the Court enter an order DENYING Defendant's Motion for Summary Judgment.

Respectfully submitted,

HUMPHREY, FARRINGTON, & McCLAIN, P.C.


/s/ Daniel A. Thomas
DANIEL A. THOMAS                                #52030
221 W Lexington, Suite 400
Independence, Missouri 64050
Telephone: (816) 836-5050
Facsimile: (816) 836-8966
dat@hfmlegal.com

and

/s/ Rebecca M. Randles
REBECCA M. RANDLES                          KS #16832
**RANDLES MATA, LLC**
851 NW 45th Street
Suite 310
Gladstone, Missouri 64116
(816) 931-9901
(816) 931-0134 (FAX)
rebecca@randlesmatalaw.com

**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of December, 2023, a true and correct copy of this pleading was served via ECF/Pacer to all counsel of record.


/s/ Daniel A. Thomas
Attorney for Plaintiff