## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DASHAUN McCRAY,                          )
                                         )
                        Plaintiff,       )
                                         )
vs.                                      )
                                         )        Case No. 22-2154-DDC-ADM
DENIS McDONOUGH, in his                  )
capacity as Secretary of the Department of )
Veterans Affairs,                        )
                                         )
                        Defendant.       )

## PRETRIAL ORDER

On June 20 and August 22, 2023, U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case. Plaintiff DaShaun McCray ("McCray") appeared through counsel Daniel A. Thomas and Rebecca M. Randles. Defendant Denis McDonough, Secretary of the Department of Veterans Affairs, appeared through counsel Assistant United States Attorneys Brian E. Vanorsby.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

1.    **PRELIMINARY MATTERS.**

    **a.**    **Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. § 1331 and is not disputed.

    **b.**    **Personal Jurisdiction.** The court's personal jurisdiction over the parties is not disputed.

    **c.**    **Venue.** Venue in this court is not disputed.

1

    **d.**    **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties agree that the substantive issues in this case are governed by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

**2.**    **STIPULATIONS.**

    **a.**    The following facts are stipulated:

    i.    The Department of Veterans Affairs ("the VA") is an executive branch of the federal government charged with providing lifelong healthcare services to eligible military through its medical centers and outpatient clinics.

    ii.    The Robert J. Dole VA Medical and Regional Office Center (the "Wichita VA") is part of the Veterans Integrated Service Network 15: VA Heartland Network region ("VISN 15") and is the Westernmost VA Medical Center in Kansas.

    iii.    The Wichita VA facilities include the Medical Center in Wichita and five community-based outpatient clinics ("CBOC") in Dodge City, Hays, Hutchinson, Parsons, and Salina.

    iv.    The Wichita VA provides healthcare and healthcare-related services for 59 of Kansas's 105 counties.

    v.    McCray is an African-American woman.

    vi.    McCray began working at the Wichita VA on December 28, 2015, as a Grade 2, Step 5 Staff Nurse in the Office of Community Care ("OCC"). At that time, the office was known as "Care in the Community."

    vii.    As a Staff Nurse, McCray was a Title 38 employee.

    viii.    Ruth Duda ("Duda") initially began with the VA as a Nurse Manager in Patient Care Services on February 11, 2001. She had about 16 years of experience working for the VA when, on or about June 11, 2017, she became Chief of the OCC and became McCray's supervisor.

    ix.    On or about February 2019, McCray assumed her position as Nurse Manager in the OCC.

    x.    As Nurse Manager, McCray reported directly to Duda.

    xi.    On January 31, 2020, McCray first contacted an EEO Counselor for informal counseling.

xii.    On March 16, 2020, McCray received her Notice of Right to File Formal Complaint.

xiii.    On March 30, 2020, McCray filed a formal complaint of employment discrimination with the VA's EEO office.

xiv.    At the formal stage of the EEO process, the EEO accepted the following eight separate claims:

   i.    From April 2018 through the present, Duda attempted to "intimidate" McCray when she spoke with her in her workspace, Duda yelled at McCray in a public area while discussing another employee's pay, and Duda stated, "If she wants to get paid, you better tell her to send us the form!"

   ii.    Between January 28, 2019, and January 4, 2020, Duda required McCray to complete the staffing model duty without providing her with Nurse Manager training.

   iii.    From January 2019 through the present, Duda "usurped" McCray's supervisory authority by instructing McCray's staff to complete different actions than McCray initially instructed her staff to do.

   iv.    On January 24, 2020, Duda increased McCray's workload after McCray had a meeting with the Chief of Staff to discuss Duda's behavior.

   v.    On January 30, 2020, Duda refused to allow McCray to speak during a meeting with the Medical Center Director, even though the Director asked Duda to allow McCray to speak.

   vi.    On January 31, 2020, Duda violated McCray's personal space when Duda looked over McCray so that Duda could see McCray's computer and Duda yelled at McCray, "You did not allow me to talk during the meeting with the Pentad, and you gave incorrect information, are you offended?"

   vii.    On February 10 and 14, 2020, Duda undermined McCray's ability as a supervisor when Duda said, "You took all leadership away from Janelle Adams, Coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when Duda falsely accused McCray of taking over a February 7 meeting and not allowing another employee to speak.

   viii.    On March 2, 2020, Duda threatened to fire McCray when McCray asked Duda how to proceed with an employee's expired nursing license, and Duda said, "I find your response interesting, as I was also told to fire you when you violated the HIPAA law. Yet, I chose a merciful route.

(Name unknown) could produce a license tomorrow, and you would have lost a valuable employee."

xv.    On or around May 24, 2020, McCray transferred to the VA facility in Aurora, Colorado.

xvi.    McCray still receives a salary from the VA.  As a result of McCray's promotion to the VA in Colorado, she received a $42,472 pay raise.

xvii.    The VA issued its Final Agency Decision on McCray's claims on January 24, 2022, and she filed this lawsuit on April 22, 2022.

b.    The parties have stipulated to the foundation and authenticity of the following exhibits for purposes of summary judgment, subject to any evidentiary objections including without limitation, relevance, hearsay, materiality, prejudice, confusion, duplication, waste of time, improper character evidence, privilege, improper lay and/or expert opinion, lack of personal knowledge, and/or competency:

i.    Notice of Acceptance of EEO Complaint of DaShaun McCray to Interim Director Dr. Dana Foley dated May 12, 2020 (USA_003901 to -3904)

ii.    Notice of Acceptance of EEO Complaint of DaShaun McCray to DaShaun McCray dated May 12, 2020 (USA_003905 to -3909)

iii.    May 4, 2020, Notice of Receipt of Discrimination Complaint (USA_003913 to -3916)

iv.    McCray Affidavit in the Matter of the EEO Complaint of Discrimination filed by DaShaun McCray (USA_003930 to -3941)

v.    2/1/2020 Email String from McCray to Ricky Ament (USA_000185 to -186)

vi.    Duda Affidavit in the Matter of the EEO Complaint of Discrimination filed by DaShaun McCray (USA_003946 to -3956)

vii.    J. Adams Affidavit in the Matter of the EEO Complaint of Discrimination filed by DaShaun McCray (USA_003957 to -3960)

viii.    C. Finley Affidavit in the Matter of the EEO Complaint of Discrimination filed by DaShaun McCray (USA_003967 to -3970)

ix.    S. Raffi Affidavit in the Matter of the EEO Complaint of Discrimination filed by DaShaun McCray (USA_003961 to -3966)

    x.    04/05/2018 Email Chain between McCray and Syed Raffi (000143 to -144) (ROI)

    xi.    Executive Career Field (ECF) Performance Appraisal for January 20, 2019, through September 30, 2019 (USA_000451 to -459)

    xii.    R.J. Cummings Affidavit in the Matter of the EEO Complaint of Discrimination filed by DaShaun McCray (USA_003971 to -3976)

    xiii.    2/15/2020 RMO Response to EEO 102157 (USA_004026 to -4029)

    xiv.    ECF Performance Standard FY 2020-Nurse Manager (USA_000446 to -450)

    xv.    Executive Career Field (ECF) Performance Appraisal for March 26, 2020, through May 24, 2020 (USA_000460 to -463)

## 3.    FACTUAL CONTENTIONS.

### a.    Plaintiff McCray's Factual Contentions.[1]

McCray was one of two African-American supervisors in the OCC that Duda supervised. Dr. Robert Cummings was their second-line supervisor. During McCray's tenure with the Wichita VA, she met all requirements of her position. She was an outstanding employee who received monetary performance awards based upon her "Outstanding" ratings. The only formal disciplinary action taken against her was a single written reprimand. Duda singled out McCray for discrimination, disparate treatment, and retaliation.[2]

---

[1] The VA objects to many of McCray's proposed factual contentions on the grounds that they are conclusory allegations. The court largely agrees. The court's form Pretrial Order explains that the parties' factual contentions "should provide a concise statement of the factual contentions that they believe support their respective theories of the case" by providing a "sufficiently specific narrative that, if supported by the evidence, each claim . . . could withstand a dispositive motion." Conclusory allegations and legal theories do not meet this standard. The court therefore sustains the VA's objections to the extent that the court has excluded portions of McCray's proposed narrative that are not factual contentions.

[2] The VA objects to McCray's proposed factual contentions to the extent that they seek to characterize her retaliation claim as including both discrete acts of retaliation "and retaliatory harassment following her complaints" on the grounds that McCray is attempting to assert an entirely new claim for retaliatory harassment to get around the fact that her hostile work environment claim was dismissed. The court agrees and sustains the VA's objection. In both the draft order and on the record during the August 22 pretrial conference, McCray argued that *Kincaid v. Unified Sch. Dist. No. 500*, 572 F. Supp. 3d 1081 (2021), supports this claim. Although the court certainly agrees that the court in *Kincaid* recognized retaliatory harassment claim, which is based on the aggregate effect of ongoing harassment following a report of discrimination, is distinct from a retaliation claim based on a discrete retaliatory act.

## COUNT I: RACIAL DISCRIMINATION

**A.**    **Undermining Authority**

Duda hired McCray and two other African-American supervisors, including Elizabeth Dial

("Dial").  Duda treated McCray and Dial as second-class citizens, undermining them and usurping

their authority.  Although McCray and Dial were ostensibly supervisors, Duda allowed their

supervisees to report directly to Duda, countermanding their instructions.

For example, Duda told McCray's employees that they no longer needed to review each

clinical document before entering it into a veteran's record.  This was after McCray had given

clear instructions in accordance with a national directive requiring that clinical review.  Allowing

certain employees to "shortcut" around the national directions while others followed the rules

created more work and harmed morale, as well as team cohesiveness.  Specific examples concern

two Caucasian employees, Heather Bandy and Jessica Clasen.  Duda often told Bandy and Clasen

to engage in "work arounds" instead of following the required processes.  Because of the

differential treatment, staff became fearful of asking McCray about things they may have done

---

572 F. Supp. 3d at 1089-90.  But, unlike the plaintiff in *Kincaid*, McCray's complaint never alleged retaliatory harassment.  (ECF 1.)  It alleged that the VA's "ongoing harassment and retaliation" caused her to be "constructively discharged."  (*Id.* at 9; *see also id.* at 8 (asserting the VA retaliated by causing "Plaintiff to be constructively discharged").)  But this is not enough to put the VA on notice that McCray was asserting some type of ongoing retaliation claim separate and apart from her constructive discharge claim, and the court held that McCray failed to exhaust a constructive discharge theory.  (ECF 51, at 5-8.)  In granting the VA's motion to dismiss McCray's constructive discharge claim, the court noted that McCray "didn't assert a constructive discharge claim in her EEO charge (Doc. 10-2) and the final agency decision never mentions constructive discharge (Doc. 10-1)."  (ECF 51, at 5.)  Pointedly, the court observed that "neither the EEO complaint nor the final agency decision mentions Colorado or plaintiff's leaving the Wichita VA location."  (*Id.* at 7.)  So McCray cannot circumvent the court's holding by recasting her constructive discharge claim as a retaliatory harassment claim.
    The VA also objects to McCray's proposed factual contentions about leaving the Wichita VA for a VA position in Aurora, Colorado.  The court sustains this objection.  The fact that McCray left the Wichita VA to go work for the VA in Colorado bears only on McCray's constructive discharge claim, which the court previously dismissed on the grounds that McCray failed to exhaust her administrative remedies on that claim because her EEO complaint never mentioned her leaving the Wichita VA or going to work for the VA in Colorado.  (ECF 51, at 7.)  The court has therefore excluded those contentions.

incorrectly because they feared being in the middle between Duda and McCray. All of this made it harder for McCray to supervise her employees.

Duda also gave McCray's employees instructions about documentation concerning Dental Directives that differed from McCray's instructions. Duda took McCray off an email string so that McCray would not see an exchange in which Duda told one of the employees that she would reach out to the VISN because "I am only going on what DaShaun told me," thus insinuating that McCray did not know what she was talking about. When McCray learned about that interaction, she reached out to the VA Central Office about the proper procedures. The Central Office told her that she had correctly instructed her staff regarding these directives. Duda's intervention giving differing orders undercut McCray's credibility with her staff members.

When Caucasian employees had concerns or were unhappy with the instructions or interactions with McCray or Dial, Duda encouraged them to air their grievances to Duda. Duda would often countermand McCray's instructions, and this prevented employees from completing the work or caused the work to be delayed. Duda blamed Dial and McCray for the unfinished/backlogged work that Duda caused—an ongoing dynamic while McCray was a supervisor at OCC. Duda's actions in usurping McCray's authority and undermining her led to a lack of consistency between staff members about the appropriate way to carry out work.

Duda also undermined McCray in front of her superiors and colleagues. During staff or executive meetings, Duda would refuse to let McCray speak, take credit for McCray's work, or give McCray an assignment that differed from what she was given by her superiors, thus setting her up for failure.[3] For example, during a meeting with the Medical Center Director on January

---

[3] The VA objects to McCray including this sentence in her factual contentions on the grounds that it "has no idea what meetings, work, or assignments McCray is complaining about now. This is also especially critical in this case where any claim for a discrete act of alleged discrimination that occurred prior to December 17, 2019 (i.e., 45 days prior to the date Plaintiff contacted an EEO Counselor) is barred as a matter of law." This objection is overruled. The

30, 2020, the Director asked Duda to allow McCray to speak, but Duda refused to do so. McCray was supposed to do a presentation at this meeting, but Duda took over the presentation. This was significant because interaction with the Executive Leadership Team regarding process improvement is one of the criteria for promotion to a higher-grade in nursing in the VA.

Also, on February 10 and 14, 2020, Duda falsely accused McCray of taking all leadership away from a coworker and not allowing another employee to speak during a meeting. Duda discredited McCray and her black co-worker with upper management, impeding their professional reputation and opportunities.

### B.    Attempts at Intimidation[4]

Duda berated McCray, both verbally and in writing, for not having knowledge about certain aspects of her position.[5] McCray was never trained in labor mapping, consult data tracking, or budget reports, but her failure to know how to perform these functions was the subject of oral counselings and served as a basis for a lowered performance rating. Verbal and written "counselings" are the first step in the graduated disciplinary process under VA policies and procedures. McCray was downgraded from "Outstanding" to "Fully Successful" on her annual performance review as a result of these counselings. Those who receive "Outstanding" ratings are entitled to a monetary award. As a result of the failure to train, McCray was downgraded to "Fully

VA can litigate the extent to which incidents may be barred as having occurred before December 17, 2019, on the merits.

[4] The VA objects to McCray's factual contentions concerning unfavorable treatment in disciplinary matters on the grounds that they were not properly disclosed in discovery—specifically, when McCray was asked about discipline during her deposition and also in response to the VA's Request for Production No. 24 as supplemented by email correspondence between counsel. In response, McCray concedes that the VA did not take any formal disciplinary actions against her, but she contends that the VA treated her unfavorably by subjecting her to unfair job counseling and informal actions. The VA's objection is overruled because the discovery materials the VA cites do not preclude the clarification/distinction that McCray seeks to make.

[5] The VA objects to this sentence on the grounds that it lacks dates, factual support, and/or an identification of a specific discrete event. The court overrules this objection for essentially the same reasons as stated in footnote 3, *supra*.

Successful" and lost out on the monetary award. The berating, the counselings, and the downgrade caused McCray substantial emotional distress. She found them humiliating and intimidating.

### C.    Inadequate Training

Duda failed to properly train McCray for her new position, which hindered McCray's ability to perform her job effectively. Despite McCray's requests for guidance, the VA did not adequately train her in budget reports, labor mapping, and consult tracking data. As a result, McCray was expected to complete tasks without the necessary knowledge and skills, which set her up for failure. This lack of training was specific to McCray and was not directed at her Caucasian counterparts. Between January 28, 2019, and January 4, 2020, Duda required McCray to complete the staffing model duty without providing her Nurse Manager training. McCray was subjected to beratement, both verbally and in writing, for not possessing knowledge about certain aspects of her position including those reports.

### D.    Notice to the Agency; Failure of Effective Remedial Remedy

In 2018, McCray complained to Raffi Syed, who was in Duda's supervisory chain, that Duda was publicly talking about other employees. She told him that she found Duda's behavior discriminatory. Syed spoke with Duda and told her that she should speak to employees in private.

On January 24, 2020, McCray met with Dr. Cummings about the harassment and discriminatory conduct that Duda directed at her and other African-American employees, including Dial. Dr. Cummings offered to sit down with Duda, McCray, and Dial to "discuss any issues." They did not accept his "offer," and he took no further action. He claimed he had no knowledge or belief that Duda harbored animosity toward McCray because of her race. However, he knew that HR conducted a fact-finding regarding Duda, which found that Duda inappropriately handled a situation in which an employee was referred to as a racist trope. As a result of that fact-

finding information, Duda was eventually relieved of her position. Tenesha Burks, a Supervisory Program Specialist who worked under Duda, also complained that Duda singled her out for discrimination and retaliation, causing her to leave her position. Despite this information, Dr. Cummings took no action.

When McCray complained to Dr. Cummings about Duda subjecting her to heightened scrutiny, Dr. Cummings responded by asking McCray when she would be leaving and telling her that Duda had a job to do. His actions intimated that McCray's continued complaints would lead to dire consequences.

### E.    **Increased Workloads**

Duda created "busy work" for both McCray and Dial that was not relevant to the OCC's core mission, including excessive meetings and responding to congressional inquiries, which were not part of her normal job description.[6] The workload was overwhelming; it could not be completed within a workweek.[7] Duda and Dial began working together to try to cover the workload. McCray was counseled to stop assisting Dial and to do her own work. These actions set up McCray for failure. After Dial and McCray left the Wichita VA, their positions were filled by four employees—three who covered Dial's workload and one who covered McCray's position description. Yet McCray had been required to assist Dial in her workload in order for all of her duties to be accomplished.

---

[6] The VA contends these were a part of McCray's normal job description.

[7] The VA objects to McCray's factual contention that "the workload could not be completed within a workweek" on the grounds that the court already dismissed McCray's overtime claim with prejudice. This objection is overruled because this factual contention does not assert a separate claim; it is merely making the point that McCray believed she was given an unfair workload.

**F.**      **Differential Treatment**

These acts of intimidation, undermining, invasion of personal space, curtailing interaction with the executive team, inadequate training, increased workloads, and unfair discipline were targeted at McCray specifically and not at her Caucasian counterparts. Duda yelled at McCray in a public area while discussing another employee's pay, stating, "If she wants to get paid, you better tell her to send us the form!"[8]  This shows that Duda's actions were racial because, not only did Duda inappropriately discuss official personnel matters of a former African-American employee in front of employees with no need to know, but she also violated VA policy.  Duda knew discussions about employee pay and personnel matters were supposed to be confidential.  Duda used that same basis to discipline Dial in 2020, when Duda disciplined Dial for responding to an employee in a cubicle who asked the purpose of a meeting by mouthing the word "discipline." Dial was disciplined for this, even though no one heard or could have heard her.  Meanwhile, Duda yelled information loudly and in public about Burks's employment status and instructed McCray to engage in prohibited conversation with Burks.  These comments put McCray in a position of having to choose between following her supervisor's directive or VA policy concerning confidentiality.  McCray found this interaction to be both intimidating and discriminatory because only she was treated this way and Burks, whose employment records were at issue, is African-American. This shows that Duda treated all of the African-American supervisors with disdain and dismissively.

---

[8] The VA objects to this factual contention on the grounds that McCray does not specify the date this happened. This objection is overruled.  This was a part of McCray's EEO charge and, to the extent the timing is unclear, the VA can litigate the extent to which this incident may be barred as having occurred before December 17, 2019, on the merits.

On January 31, 2020, Duda tried to physically intimidate McCray by standing over her shoulder to see her computer and yelling at her. On March 2, Duda threatened to fire McCray when she asked about how to proceed with an employee's expired nursing license. In response, Duda told McCray that Duda had previously been told to fire McCray for violating HIPAA laws.

Duda consistently treated McCray and other black/African-American employees differently compared to their white/Caucasian colleagues. While Caucasian employees could approach Duda with their concerns, McCray, as their direct supervisor, was systematically excluded from such discussions. While Duda was openly hostile and derisive with her African-American employees and specifically McCray as set forth above, Duda did not use a dismissive and denigrating tone with white employees nor publicly yell at them. Additionally, Duda readily recommended disciplinary actions against Caucasian employees but failed to redirect concerns from Caucasian staff to McCray, who was their supervisor. With both Dial and McCray, Duda would require the supervisors to initiate discipline against employees then she would intervene to prevent the Caucasian employees from being disciplined—pitting Caucasian staff against their African-American supervisors.[9]

On a regular and continuing basis, Duda acted dismissively of her black employees. Duda's attitude was apparent to her employees as she belittled them, gave them unreasonable workloads, yelled at them, and undercut their performance. Duda placed black employees, including McCray, under intense scrutiny. Similarly situated white employees were not subjected to that scrutiny. As an example, Burks left abruptly because Duda's discriminatory actions exacerbated her health conditions and increased her anxiety and stress.

---

[9] The VA objects to McCray's proposed factual contentions to the effect that the disparate treatment created a hostile work environment based on race. The court sustains this objection because the court already dismissed McCray's hostile work environment claim. (ECF 51, at 15.)

## COUNT III: RETALIATION

On January 24, 2020, McCray and Dial complained to Dr. Cummings about Duda's actions, characterizing them as discriminatory and harassing. Dr. Cummings responded that Duda needed to "get out of the weeds" and let them supervise. They also discussed the work backlog in OCC and the need for either additional staff or overtime, neither of which Duda would approve.

Immediately after that meeting, Duda began retaliating against McCray. That same day, Duda told Dr. Cummings that Dial and McCray were the reason for the backlog. She began piling on additional work and sending "double-check" emails to others to see if McCray had done her work. At 3:51 on January 24, Duda sent a double-check email to Dean Rhein in the VA education department asking if McCray had sent a list of training courses in the Talent Management System that new OCC staff needed to be assigned (a duty outside of McCray's authority and responsibility). Duda also asked Rhein to assign training to McCray, and she started nitpicking though McCray's work. McCray had never been asked to send any kind of email to Rhein. Duda began making up duties that had never been required in the past.

Just after January 24, McCray was assigned the duties of labor mapping, consult data tracking, and budget analysis—duties she had never been trained to do. Also shortly after the January 24 meeting with Dr. Cummings and Duda, McCray was removed from the Referral Coordination Team ("RCT"). That was an important and high-profile task that would have allowed McCray additional opportunities for advancement.

On January 28, Dr. Cummings sent McCray an email that he had spoken to Duda but had not told her about their meeting. But after Duda met with Dr. Cummings, she came back to the OCC and began nitpicking, double checking, accusing, and increasing both McCray and Dial's workloads. Duda assigned McCray even more "busy work" such as congressional responses and

13

meeting attendance. The department was understaffed, and McCray was needed to carry out daily operations and mission-related tasks. Duda increased McCray's workload in retaliation for her complaints.

On January 30, McCray and Duda met with the VA's Executive Leadership Team ("the PENTAD"). At one point, the medical-center director cut into Duda's presentation by raising his hand and asking Duda to allow McCray to speak on the topic. The following day, Duda violated McCray's personal space by coming into her workspace and yelling at her. Duda berated McCray for responding to the question at the meeting, telling her that McCray did not allow Duda to talk during the meeting. Duda asked "Are you offended?"—seemingly in reference to the harassment concerns McCray had made to Dr. Cummings.

On January 31, Dr. Cummings told McCray to review the OCC metrics and reporting on the "outliers" (veterans that had not received service within 30 days) by the close of business. This gave her less than one day to complete the assignment, which was impossible. McCray's sudden workload surge after she reported Duda's actions to Dr. Cummings impeded her ability to perform her job effectively and made it impossible for her to complete her tasks within the allotted time. McCray believed they were trying to start building a paper trail regarding her inability to complete her work tasks.

On February 7, McCray met with her staff to discuss the proper way to notify veterans in community hospitals about the process for inpatient stays and how such notifications would be documented. Janelle Adams was present during this meeting. Adams had done some research, prepared a chart, and gave part of the presentation. On February 10 and 14, Duda accused McCray of taking leadership away from Adams and taking credit for the progress made on the information backlog. Again, Duda falsely accused McCray of things Duda herself had done and about which

McCray had complained. Adams told McCray that she felt undermined because nothing was being done about a Caucasian nurse on the team who was not carrying her load. McCray learned that Duda had tried to pit Adams and other staff against McCray. On February 10, Duda requested/encouraged Adams to complain to management that McCray had created a hostile work environment.

On February 14, Duda memorialized these false allegations in an email to McCray, but Duda also copied an individual named Heather Brown ("Brown") on the email. Brown did not work in the OCC. At the time, she was the Deputy Nurse Executive. She was not in McCray or Duda's chain of command. She was, however, McCray's personal mentor within the VA, and Duda knew that. Duda knew that McCray looked up to Brown and that Brown thought highly of McCray. Duda copied Brown on the February 14 email to try to undermine, defame, and humiliate McCray.

Later that day, Duda asked Brown to attend a meeting with McCray. Brown did not know the purpose of the meeting before she agreed to join. At the meeting, Duda berated McCray for the way she handled Adams at the February 7 meeting. Duda told Brown that McCray had taken over the meeting and did not allow an employee to speak. Duda also told Brown and McCray that the other employees feared discussing anything with McCray for fear of retaliation. These were the same accusations that McCray had taken to Dr. Cummings about Duda. McCray found it both intimidating and retaliatory that Duda would discuss these employment issues in front of Brown, who was McCray's mentor. It appeared to be an effort to decrease McCray's credibility.

On March 2, Duda told McCray that a nurse's license had expired and that the nurse would have to be sent home. When McCray questioned this, Duda explained the HR process. McCray asked Duda how to handle the situation. Under VA policy, the nurse's failure to keep her license

current is an offense that can cause termination.  McCray was concerned because this was a livelihood at stake.  Duda told McCray to reprimand the staff member after she had been removed and reinstated by the VISN Director.  After McCray reprimanded the nurse, Duda then took it down to a lower punishment to make it look like McCray was being cruel and harsh while Duda was being lenient.  Then, Duda berated McCray, reminding her that she could have been fired but Duda reprimanded her instead.  In other words, Duda berated McCray for the very discipline that Duda had asked McCray to mete out.  The way Duda spoke of McCray's discipline—the only formal discipline McCray has ever received—made McCray fearful for her position.  She believed she was being threatened with termination.  McCray reported the incident to VISN and HR.

In November of 2020, Duda gave McCray her final performance review at the Wichita VA that covered the period from March 26 through September 30, 2020.  This performance appraisal had four "critical elements": Leading Change, Leading People, Business Acumen, and Results Driven.  In that review, McCray was given a "Fully Successful" in 3 out of 4 critical elements instead of "Exceptional," the highest category, which is what she should have received in all categories.  Duda marked McCray down for not generating her own budget reports, labor mapping, and other reports on which McCray had never trained.  Duda marked her down for having relied on the OCC Chief for budget reports, consult data tracking, and labor mapping.  Duda also falsely reported that McCray had only been timely with her performance reviews 80 percent of the time.  That 80 percent rate placed McCray in the "Fully Successful" category, not her usual "Outstanding" category.  McCray's actual timeliness score was much higher.  This unjust appraisal negatively impacted McCray's professional standing and hindered her opportunities for career advancement, as well as preventing her from receiving a monetary award for an outstanding rating.

## MCCRAY'S DAMAGES

As a result of Duda's actions, McCray experienced severe emotional distress and psychological harm. She suffered from anxiety, sleep disturbances, and depression because of the ongoing mistreatment and racial bias at the VA Hospital. Duda's actions caused McCray to lose confidence in her abilities and negatively impacted her self-esteem. McCray sought therapy and counseling to cope with the emotional toll caused by the discriminatory treatment. Her diminished mental and emotional distress led to a diminished quality of life. McCray has suffered from Post Traumatic Stress Disorder ("PTSD") for a long time, and these events exacerbated her PTSD symptoms. As a result, the PTSD she suffered as a military veteran revivified. She suffers depression, anxiety, flashbacks, and dissociative symptoms, as well as physical manifestations including headaches, racing heart, and other physical symptoms. McCray has also suffered increasing and debilitating migraines as a result of the discrimination and harassment for which she has sought medical care through the VA.

McCray's performance evaluations were unfairly lowered as a result of Duda's bias, resulting in lower raises and bonuses compared to her white colleagues. She also began taking more and more leave because of the migraines and other physical manifestations of emotional distress. She lost out on the performance-based awards she had routinely received.

McCray receives most of her care through the VA. However, she has had ongoing medical expenses because of the exacerbation of her PTSD, depression, anxiety, and other mental and emotional distress. To date, her out-of-pocket expenses have exceeded $562.

The retaliatory actions also affected McCray's professional reputation, making it challenging for her to secure comparable employment opportunities.

### b.    Defendant's Factual Contentions.

Duda was supportive of the VA employees under her supervision, including (and especially) McCray. Duda encouraged McCray to participate in a type of leadership training called Yellow Belt training and allowed her to cover as Chief of the OCC in Duda's absence.

Duda's delegation and support assisted OCC nurses, including McCray, in qualifying for promotions within the nursing grades. For example, prior to Duda's arrival, McCray had been unsuccessful trying to get promoted within the nursing grade. The Nurse Professional Standards Board denied her promotion request because she did not meet education and performance requirements. McCray tried to be promoted again in January 2018 but was denied a third time. Duda submitted an appeal on McCray's behalf, advocating for McCray's promotion. The following month, the Nurse Professional Standards Board reconsidered its decision and promoted McCray to Nurse 3. As a result, McCray received a pay raise, additional responsibilities, and additional recognition within the facility and the OCC.

Duda also was supportive of McCray in other ways. In June 2017, for example, Duda received a report from the facility Privacy Officer that McCray had inappropriately accessed a veteran's medical record 27 times without authorization in violation of the Privacy Act and the Health Insurance Portability and Accountability Act ("HIPAA"). McCray said she accessed the veteran's record to train new nursing staff, but at least 16 of the 27 events occurred before new staff was hired. McCray also disclosed that she had started dating the veteran after she started inappropriately accessing the records. The Chief of Staff, Dr. Areceli Revote, recommended that McCray be removed from federal service. Duda chose instead to proceed with a formal reprimand, which was the lowest discipline McCray could have received. This 2017 reprimand was the only discipline McCray received while working for the VA.

18

Despite McCray's reprimand, Duda personally selected McCray for a promotion to Nurse Manager in the OCC on December 10, 2018. Duda selected McCray in recognition of her ability as a Staff Nurse and because she felt McCray was the perfect person for the job. This promotion to a supervisory position came with a pay raise, additional responsibilities, and recognition within the facility and the OCC. At the time Duda made her selection, she was fully aware of McCray's race.

The OCC went through significant changes starting in late 2018 through 2020. It began the process of implementing significant changes brought on by passage of the MISSION Act, which significantly expanded the number of veterans eligible to receive care in the community. As result of the MISSION Act, the OCC also became responsible for scheduling community care for its entire veteran population. These changes, among others, had a big impact on the Wichita VA OCC, in particular, because it also covers community care for veterans in all of western Kansas. Many, if not most, of those veterans became eligible to receive care in the community, which had to be coordinated, approved, and scheduled through the OCC. The OCC (and at least 12 other units in the Wichita VA) also started using a new metrics software called the Consult Tracking Manager ("CTM"). McCray was one of 22 individuals identified as CTM "Super Users," and she received advanced training on the new software. McCray was aware as early as December 10, 2019, that the CTM software would be implemented at the end of January 2020 and that she would have some responsibility for tracking the CTM. There were also changes to payment systems and third-party administrators during this time.

These changes and others required additional staff training, resulting in increased workloads, increased backlogs, and some uncertainty regarding proper processes. In order to meet the increased demand, Duda began to actively advocate for and seek out additional full-time staff

for the OCC at least as early as 2018.  But this additional staffing had to be approved by the PENTAD.  In November 2019, Duda told Dr. Cummings about the urgent need for additional staffing in the OCC and expressed concerns that the lack of staffing could have a negative effect on veterans' care.  As result of Duda's communication, Dr. Cummings (a PENTAD member) asked to place the issue on the PENTAD's agenda for discussion.

One of McCray's allegations is that she was required to complete a staffing model on January 4, 2020, without receiving Nurse Manager training.  The staffing model is a fillable form used by the OCC (and other services) to identify staffing needs.  McCray testified at her deposition, however, that she *did* receive Nurse Manager training, that Duda sent her to the training, and that the training is a facility-wide training provided by the education department.  And with respect to the staffing model specifically, McCray received on-the-job training where Duda walked McCray through the process as Duda completed the staffing model.  McCray was only asked to complete this duty on one occasion—January 4, 2020.  McCray testified that she had no problem with completing the staffing model when asked to do it.

McCray also alleges that Duda "attempted to 'intimidate'" her.  With respect to this allegation, McCray did not suffer any material consequence to her employment.  She did not receive any discipline, she was not demoted, and her pay and benefits were not reduced.  Instead, this alleged attempt at intimidation appears to be, at worst, a personality conflict between McCray and her supervisor.  As such, this allegation merely shows, at worst, petty slights, differences in opinion, a simple lack of good manners, and/or a normal workplace grievance.

McCray also alleges that Duda "usurped" her supervisory authority by countermanding her instructions at times.  McCray supports this allegation based on events that were not timely exhausted and that do not support a claim for discrimination or retaliation.  Duda, as the second-

line supervisor, shared responsibility for McCray's supervisees. In the situations identified by McCray, employees sought clarification from Duda directly and/or McCray was absent from work. McCray agrees that Duda providing directions and/or clarification in such situations would be appropriate. And to the extent that McCray disagreed with Duda's instruction/clarification, that is not sufficient to support a claim for discrimination or retaliation.

McCray also alleges that her workload increased after January 24, 2020, in retaliation for a meeting she had with Dr. Cummings. In support, McCray testified that Duda sent an email to the VA education department asking whether McCray had sent a list of training requirements for new hires. McCray testified that she had never been asked to do so prior to January 24. Email communications between McCray and Duda establish, however, that McCray was asked to do so at least as early as January 9—before the alleged protected activity. Other than the email on January 24, McCray testified there were just "little things" that increased her workload. Duda had no knowledge of McCray's alleged protected activity before she received notice that McCray had filed an EEO complaint. McCray's allegedly increased workload was simply the result of the multiple changes brought on by the MISSION Act and the unprecedented COVID-19 global pandemic. McCray had "no problem" with her allegedly increased workload.

McCray alleges that Duda refused to allow her to speak during a meeting on January 30. Documentary evidence, including statements submitted by McCray, show that this allegation is false. McCray sent emails shortly after the January 30 meeting that show she was allowed to speak and that the medical center director acknowledged her contribution to the meeting. The medical center director then asked Duda and McCray to get him a plan to address OCC staffing and the backlog by close of business the next day. As further proof, McCray responded to the VA's request for admissions that the medical center director allegedly "had to silence Duda, saying he wants to

get information from [McCray]." In any event, this alleged refusal to allow McCray to speak did not have any material consequence on McCray's employment. To the contrary, the medical center director sent McCray an email after the meeting stating he appreciated her analysis of the problem.

McCray alleges that Duda violated her personal space on January 31, when Duda looked over McCray's shoulder so Duda could see McCray's computer screen. This allegation does not represent an adverse personnel action or a materially adverse employment action. In fact, McCray testified that this event did not have "any material effect on her employment."

McCray alleges that on February 10, Duda approached Adams to ask her whether she felt that McCray created a hostile work environment and whether she felt like McCray took over a presentation on February 7. McCray also alleges that Duda "undermined" her ability as a supervisor when Duda held a private meeting with McCray and her informal mentor, Brown. These alleged events are not adverse personnel actions and are not materially adverse employment actions. McCray testified that these events had "no material consequence to her employment." Moreover, Adams testified that Duda did not approach her about these events and that she did not tell McCray that Duda approached her.

McCray also alleges that Duda "undermined" her ability as a supervisor by inviting her mentor to their weekly meeting on February 14 and, during that meeting, stating that McCray took away leadership from Adams during her presentation on February 7. The purpose of this meeting was to coach and assist McCray with being an effective leader. It was not disciplinary in nature or meant to hurt McCray's feelings. Duda invited Brown because Duda felt that McCray would be more willing to take direction and advice from Brown because McCray had become increasingly unwilling to accept direction and counsel from Duda. Adams *did* feel as though McCray took everything that she worked on for the presentation and presented as if it were her

own work. Adams felt dejected because she had put a lot of work into the presentation. Soon after the February 7 meeting, Adams approached Duda and asked to be removed from the transfer nurse team in part because she felt her leadership opportunities were being shot down.

McCray also alleges that Duda threatened to remove her from federal service on March 2 when Duda stated that "I find your response interesting, as I was told to fire you when you violated the HIPAA law. Yet, I chose a merciful route. (Name unknown) could produce a license tomorrow, and you would have lost a valuable employee." But the facts do not show that Duda threatened to remove McCray from federal service. At worst, this event shows Duda attempted to explain to McCray why McCray should not propose to remove another employee. This allegation does not represent an adverse personnel action or a materially adverse employment action. Also, these alleged events were not based on McCray's race or for a prior protected activity.

McCray also claims she did not receive an annual award because of a "lowered" or "unfair" performance appraisal. However, McCray did not administratively exhaust any such claim and is time-barred from bringing it. But even if this claim was not time barred, McCray is mistaken. Annual awards are not entitlements. Annual awards are dependent on facility budget and executive leadership approval. Only employees assigned to the Wichita VA as their duty station at the end of the rating period are eligible to receive an annual award from the Wichita VA. At the end of the annual rating period, McCray's duty station was Aurora, Colorado. Moreover, the special rating Duda provided did not factor into any annual award considerations because it was not an annual rating of record. Special ratings do not factor into any annual award considerations.

McCray received a "Fully Successful" rating because objective performance criteria dictated that to be her level of achievement. For example, in order to be rated "Exceptional," McCray must have submitted 90% or more of her performance reviews in a timely manner.

McCray submitted 4 of her 19 performance reviews late. McCray's contention that she only submitted 2 late lacks support. But even if that were the case, McCray still would have been less than 90% timely. Thus, Defendant has legitimate, nondiscriminatory, nonretaliatory business reasons for its action. Moreover, McCray cannot establish causation given that the special rating was issued roughly 10 months after her alleged protected activity and 6 months after McCray left Duda's supervision.

As for McCray's complaints about alleged counselings, VA policy provides that counseling, written or oral, that is not accompanied by concurrent disciplinary action does not constitute disciplinary actions and cannot be used as a basis for later disciplinary action or as a prior disciplinary offense. Moreover, McCray specifically demanded that she be informed of any issues with her work "when they happen" when she sent an indignant email to Dr. Cummings. Otherwise, in McCray's words, she "would not be told people are complaining about [her] work." Finally, despite McCray's contention, the VA does not have a "graduated" disciplinary process.

McCray also complains that she was removed from an important assignment when she was allegedly taken off the RCT on January 31. But McCray was never on the RCT. Dr. Cummings established the Wichita VA RCT before December 17, 2019, and McCray was not included on the team. McCray understood this on or before January 22, 2020. Dr. Cummings made any and all decisions about who would participate in the RCT. Regardless, McCray has not exhausted any claim based on her alleged removal from the RCT. McCray also has not exhausted any discrimination or retaliation claim against Dr. Cummings.

For each one of the events listed above, McCray cannot establish by any objective evidence that any action was taken on account of her race or in retaliation for protected activity. For example, McCray testified that disparate treatment claim is based on her idea that she was treated

less favorably than similarly situated non-African American employees. However, she conceded that there were no other similarly situated white employees "in [her] unit." Even if McCray could identify any similarly situated employees, she was not treated less favorably in any respect. Moreover, Duda did not know that McCray participated in a protected activity. In short, all employment decisions regarding McCray were based on legitimate, nondiscriminatory, and non-retaliatory factors.

As to McCray's general claims of unfair scrutiny, McCray testified that she believed she was unfairly scrutinized because nurses under her primary supervision and Duda's secondary supervision would go to Duda directly with certain issues, and Duda would handle those issues instead of redirecting those staff members to McCray. McCray also testified that she was unfairly scrutinized when Duda disciplined a Caucasian employee under McCray's supervision. McCray has not presented any evidence suggesting that any alleged scrutiny was based on race, that similarly situated employees were subjected to less scrutiny, or that the scrutiny had "any material effects" on her employment.

With respect to McCray's general claim that she was assigned duties that could not be completed within the time allotted, McCray testified that this claim relates to "one event" that occurred when she was given one day to review certain metrics as it relates to staffing and get a plan to Dr. Cummings. McCray cannot establish that this "one event" was based upon her race or her alleged participation in a protected activity. To the contrary, the facts establish that McCray had been asked to present a metrics-based staffing plan during a meeting with the PENTAD on January 30, and the PENTAD specifically requested the plan be provided by close of business the next day. McCray also testified that this assignment did not have "any material effect on [her] employment."

4.    **LEGAL CLAIMS AND DEFENSES.**

a.    **Plaintiff's Claims.**

McCray asserts that she is entitled to recover upon the following theories:[10]

**Race Discrimination, Disparate Treatment under Title VII (Count 1)** – The VA

violated Title VII by subjecting McCray to race discrimination, disparate treatment in that she is

an African American female, qualified for her position, and meeting her employer's legitimate

performance expectations.  She was treated differently than Caucasian employees, she suffered

adverse job actions,[11] and race was a motivating factor for those actions.

**Retaliation under Title VII (Count 3)** – The VA violated Title VII because, after McCray

complained that black employees were being harassed and discriminated against on the basis of

race, she suffered retaliation and adverse job actions because of her complaints.

b.    **Defendant's Defenses.**

The VA asserts the following defenses:

i.    As to both claims, McCray failed to timely exhaust her administrative
remedies for any discrete event that occurred before December 17, 2020.

ii.    As to both claims, McCray failed to administratively exhaust her claim that
she allegedly was "removed from important assignments," that she received
a "lowered" or "unfair" performance appraisal, or that Dr. Cummings
discriminated and/or retaliated against her in any way.

iii.    As to both claims, McCray cannot establish a prima facia case of
discrimination or retaliation because (a) she has not suffered an adverse
personnel action or a materially adverse employment action, and (b)

---

[10]  McCray also asserted hostile work environment and constructive discharge claims, but the court dismissed those claims.  (ECF 51.)

[11]  The VA objects to McCray's contention that she suffered "adverse job actions" on the grounds that it is insufficiently specific and contends that McCray should be required to specifically identify the discrete acts upon which she bases her disparate treatment claim.  The court overrules this objection because McCray's factual contentions specify how she believes she suffered adverse job actions.  Whether these adverse job actions rise to the level of an actionable claim is an issue to be decided on the merits.

McCray's race and participation in protected activity played no role in any of the events at issue.

iv.  Even if McCray could establish a prima facie case, the VA's actions were based solely on legitimate, non-discriminatory, non-retaliatory business reasons, including changes related to the VA's implementation of the MISSION Act, objective performance criteria, legitimate responses to McCray's own actions, and the normal principles of supervising employees.

v.  To the extent McCray claims her race or prior protected activity was a motivating factor, the VA would have made the same employment decisions and engaged in the same treatment regardless of McCray's race or protected activity.

vi.  As to McCray's retaliation claim, she cannot establish causation or that any alleged action was taken on account of the protected activity because Duda was not aware of her allegedly protected activity at time of the alleged actions.

vii.  McCray's January 24 meeting with Dr. Cummings, which McCray relies upon for her retaliation claim, does not qualify as protected activity under Title VII.

viii.  McCray is not entitled to recover damages because, or to the extent that, she failed to mitigate her damages by failing to follow medical advice and courses of treatment for her mental health conditions.

ix.  The VA is entitled to offset McCray's damages to the extent that she receives funding from other sources, including the VA itself. For example, McCray receives her healthcare from the VA. She also has service-connected disabilities for which she receives monthly benefits from the VA, including for the mental conditions she is claiming in this case. McCray also continues to collect a salary from the VA.

x.  McCray's alleged emotional distress damages are not attributable to the VA or any of the actions alleged in this matter. Rather, they were the result of outside factors, including prior trauma she suffered in her childhood and in the military, prior alleged discrimination in the military, and her own unrelated health struggles.

xi.  McCray's compensatory damage claims (*i.e.*, for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses) are capped at $300,000. *See* 42 U.S.C. § 1981a(b)(3).

xii.  McCray's damages are barred because they are not of the nature/extent claimed and are too speculative and unsupported by expert testimony.

27

5.    **DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

   a.    **Plaintiff McCray seeks the following relief:**[12]

      i.    <u>Attorney's fees</u> – McCray's attorneys charge $450 per hour. At this time, McCray's attorneys have invested approximately $320,000 in attorney time. Expenses as of this date are approximately $9,000.

      ii.    <u>Non-VA Medical Expenses</u> – McCray receives most of her care through the VA. However, because of the exacerbation of her PTSD, depression, anxiety and other mental and emotional distress, she has incurred out-of-pocket medical expenses in the amount of $562.[13]

      iii.    <u>Return of Leave</u> – McCray began taking more and more leave because of the stress she began experiencing while being supervised by Duda. She seeks 10

---

[12] McCray also claims "economic losses caused by McCray's move to Colorado to be out from under Duda's [s]upervision" in the form of relocation expenses to Aurora plus the cost to maintain two households—one in Aurora and one in Kansas. The VA objects to these claimed damages on the grounds that the court already dismissed McCray's constructive discharge claim, whereas McCray contends these claimed damages qualify as backpay. The VA's objection is sustained. Although these types of damages can be recoverable on Title VII claims, they are compensatory in nature and do not qualify as backpay. *See Mitchell v. Seaboard Sys. R.R.*, 883 F.2d 451, 452-53 (6th Cir. 1989) (holding extra mileage and food expenses incurred to avoid discriminatory supervisor are in the nature of compensatory damages for harassment, not backpay); *McGovern v. Gallegos*, No. CIV.A. 84-1534SSH/AK, 1994 WL 193926, at *1 (D.D.C. May 4, 1994) (holding plaintiff's travel, moving, and living expenses incurred when defendants allegedly discriminated against him by transferring him are in the nature of an "out-of-pocket loss" characterized as compensatory damages); *see also Walker v. Ford Motor Co.*, 684 F.2d 1355, 1363 & n. 12 (11th Cir. 1982) (holding moving expenses are compensatory damages, which were not recoverable in Title VII actions before 1991). As such, McCray cannot seek to recover these types of damages here because they were not caused by either of her remaining viable claims. First, as to McCray's remaining disparate treatment-race claim, the court eliminated the aspect of this claim that was based on McCray's alleged constructive discharge (i.e., her relocation to Colorado). (ECF 51, at 11 ("Plaintiff's attempt to use constructive discharge as a factual contention supporting her disparate treatment claim—rather than as a separate claim unto itself—doesn't change the analysis or conclusion. Plaintiff didn't exhaust this allegation administratively, so she can't use it to support her disparate treatment claim.").) Second, as to McCray's remaining retaliation claim, the court has construed that claim as being premised on discrete instances of discrimination, not on ongoing retaliatory harassment leading to constructive discharge. *See supra* note 2 and ECF 51, at 19-20. Accordingly, the court has not included those claimed damages or the VA's corresponding legal defenses in Paragraph 4(b).

   The VA also argues that McCray is precluded from seeking these damages because of an email from McCray's counsel in December of 2022 saying "we will be withdrawing lost wages." But the court is unpersuaded that this representation necessarily precludes McCray from seeking economic damages allegedly caused by her move to Colorado. McCray's expenses in that regard are not the same thing as lost wages.

[13] The VA objects to McCray seeking medical expenses "exceeding" $562 and the qualifier that "her treatment is ongoing" on the grounds that she did not properly disclose any other medical expenses (past or future) in discovery. The court sustains this objection based on the discovery record and arguments submitted by the parties. McCray's Rule 26 damage computation disclosed that she "continues seeing her healthcare providers for the injuries suffered" and, instead of disclosing an amount, it says that she is "awaiting the records establishing the cost for therapy." McCray then produced medical invoices and testified during her deposition that four of those invoices relate to her damages in this case. Those invoices total $562, so her past medical expenses are limited to $562. She is precluded from claiming future medical expenses because she apparently never disclosed an amount in her Rule 26 damage computation or otherwise in discovery. In so ruling, the court wishes to make clear that the court invited the parties to submit whatever discovery materials they wanted the court to consider in ruling on these objections.

days, or 80 hours of leave at her salary, which is a *per diem* of $42.55 per hour, for a total of $3,404.[14]

    iv.   <u>Compensatory Damages for Emotional Distress and Mental Anguish</u> – McCray seeks $300,000 for emotional distress damages as a result of Duda's actions and the VA's failure to take appropriate remedial measures. As a result, she has had the PTSD she suffered as a military veteran revivified, she suffers depression, anxiety, flashbacks and dissociative symptoms as well as physical manifestations including headaches, racing heart, and other physical symptoms as set out in her medical records that have been provided to the VA.[15]

**b.**    **Defendant.**

None, but Defendant reserves the right to file a bill of costs if it prevails in this case.

**6.**    **AMENDMENTS TO PLEADINGS.**

None.

**7.**    **DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by May 19, 2023. On August 4, 2023, McCray's counsel emailed the court a list of disputes that remain as to Plaintiff's Second Requests for Production of Documents ("RFP"), as well as copies

---

[14] The VA objects to McCray's claim for "Return of Leave" on several grounds, to which McCray responds that this is a form of backpay. This objection is sustained in part and overruled in part. To begin, the court is not persuaded by the VA's reliance on the December 2022 email from defense counsel saying "we will be withdrawing lost wages" for essentially the same reasons set forth in footnote 12, *supra*. In sum, the court is not persuaded that this representation necessarily precludes McCray from "Return of Leave," which is not necessarily the same thing as lost wages. The more salient point is the extent to which McCray properly disclosed these damages in discovery. Her Rule 26 damage computation did not disclose this category of damages at all. But the VA must have nevertheless known she would be seeking "Return of Leave" damages because its Interrogatory No. 3 asked McCray to identify each date on which she allegedly used leave because of the harassment she suffered. McCray answered that she "may have taken up to ten days of leave due to harassment" and that the VA has the records of her sick days and leave. Based on this, the court finds the discovery record put the VA on notice that McCray might be seeking to recover for 10 days of leave such that the VA could have explored this issue further during discovery. The court has therefore reduced plaintiff's "Return of Leave" claim from 144 hours (which was not properly disclosed in discovery) to the amount of leave McCray did adequately disclose, which was 80 hours.

[15] The VA objects to this category of damages on the grounds that McCray's Rule 26 disclosures did not specify an amount. This objection is overruled. McCray's Rule 26 damage computation stated she "has suffered severe emotional distress and seeks the amount allowed by law." Defendant's legal defenses recognize that $300,000 is the amount allowed by law. *See* Paragraph 4(b)(xii), *supra*. McCray therefore adequately disclosed that she would be seeking to recover $300,000 for emotional distress-type damages.

of the disputed RFPs and the VA's answers and objections to the same. During the pretrial conference, McCray made an oral motion to compel the VA's responses to RFP 1-9, 11, 13-20, 25, 32, 33, 39-42, 49, 55, 56, 65, 66, 77, 100-103, 110-127. As discussed fully on the record, the court granted the motion in part and denied it in part.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8.    MOTIONS.**

    **a.    Pending Motions.**

None.

    **b.    Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

    i.    McCray intends to file motions in limine.

    ii.    The VA intends to file a motion for summary judgment, as well as motions in limine.

    iii.    The VA may file a motion under Federal Rule of Civil Procedure 37(c)(1) to exclude certain witnesses and documents, such as the testimony of Tenesha Burks on the grounds that McCray concealed her communications with Burks during her deposition, baselessly objected to production of the communication based on attorney-client privilege, untimely disclosed such communications after Defendant's deadline to submit follow-up discovery requests. McCray also apparently deleted portions of her conversations with Burks to further conceal her communications.

The dispositive-motion deadline is **September 29, 2023.** The parties must follow the summary-judgment guidelines available on the court's website:

https://ksd.uscourts.gov/sites/ksd/files/Summary-Judgment-Guidelines%202023.pdf

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages. *See* D. KAN. RULE 7.1(d)(2). Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline. *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

   c.    **Motions Regarding Expert Testimony.**

Not applicable. The parties have not identified and/or disclosed any experts in this matter.

**9.    TRIAL.**

The trial docket setting **is June 4, 2024,**[16] **at 9:00 a.m., in Wichita, Kansas**. This case will be tried by jury. Trial is expected to take approximately 5 days. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**10.    ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The parties exchanged settlement proposals as required by the scheduling order, and unsuccessfully mediated this matter in February 2023. Defendant currently believes that the prospects for settlement of this case are poor and does not believe that further court-ordered ADR would be helpful. McCray does not take a position one way or another.

---

[16] Plaintiff's counsel notified the court that they may have a conflict on this date based on a pre-existing trial setting in another case. But, given the likelihood that cases (in general) settle before trial, the court did not at this time adjust the trial date because of this potential conflict. Instead, the court advised counsel to file a motion to re-set the trial date, if necessary, as the date approaches.

The parties are reminded that they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties. *See* D. KAN. RULE 40.3. Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated September 15, 2023, at Kansas City, Kansas.


<u>  s/ Angel D. Mitchell</u>
Angel D. Mitchell
U.S. Magistrate Judge