

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

| | | |
|---|---|---|
| DaShaun McCray | ) | |
| 2205 S. Linden | ) | |
| Wichita KS 67207 | ) | |
| | ) | |
| | ) | |
| **Complainant** | ) | |
| | ) | |
| | ) | |
| and | ) | Case No. 2003-589W-2020102157 |
| | ) | |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue, NW | ) | |
| Washington, DC 20420 | ) | |
| | ) | |
| | ) | |
| Agency | ) | |
| | ) | |
| Department of Veterans Affairs | ) | |
| Robert J. Dole VAMC | ) | |

1



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

DaShaun McCray
Table of Contents
2003-589W-2020102157

**1. Formal Complaint**
Formal Complaint                                        1-1
Investigator Assignment Letters                         1-2
Extension                                               1-3

**2. EEO Counselor's Report**
Counselor's Report                                      2-1
Notice of Right to File                                 2-2
Notice of Rights and Responsibilities                   2-3

**3. Procedural Review**
Notice of Acceptance                                    3-1
Notice of Receipt                                       3-2

**4. Settlement Agreements**
Nothing Attached                                        4-1

**5. Prior Appellate Activity**
Nothing Attached                                        5-1

**6. Report of Investigation Summary**
Case No. 2003-589W-2020102157                           6-1

**7. Exhibits, Evidence**
Testimony of DaShaun McCray, Complainant                7-1
Testimony of DaShaun McCray, Complainant                7-1(a)
Testimony of Ruth Duda, RMO                             7-2
Testimony of Janelle Adams, Witness                     7-3
Testimony of Syed Raffi, RMO                            7-4
Testimony of Cynthia Finley, Witness                    7-5
Testimony of Robert Cummings, Witness                   7-6
Complainant's Evidence; Event 6                         7-7
Complainant's Evidence; Event 7                         7-8
Complainant's Evidence; Event 8                         7-9
Complainant's HWE Report                                7-10
Complainant's Supporting Evidence                       7-11
Ruth Duda Evidence                                      7-12
OCC Fact-Finding Investigative Findings                 7-13

COMPLAINT CASE NUMBER: 2003-589W-2020102157

OMB NO.: 2900-0715
EXPIRATION DATE: DEC 31, 2019
RESPONDENT BURDEN: 30 Min.

**Department of Veterans Affairs**     **COMPLAINT OF EMPLOYMENT DISCRIMINATION**

*Read the instructions on the reverse side of this form carefully before completing the front of this form.*

**1. NAME** *(Last, first, middle initial)(Please print)*
McCray, DaShaun , M.

**2. EMAIL ADDRESS**
dashaun.mccray@va.gov

**3. MAILING ADDRESS**
2205 S. Linden
Wichita, KS 67218

**4a. WORK TELEPHONE NUMBER** *(Include Area Code)*
316-239-2734

**4b. PRIMARY TELEPHONE NUMBER** *(Include Area Code)*
314-691-4218

**5. ARE YOU:**
[X] A VA EMPLOYEE
[ ] AN APPLICANT FOR EMPLOYMENT
[ ] A FORMER VA EMPLOYEE

**5a. JOB TITLE, SERIES AND GRADE**
Nurse Manager Community Care
VN 00, Nurse III Step 5

**6b. SERVICE/SECTION/PRODUCT LINE**
Office Community Care

**7. NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED**
Robert J. Dole VAMC
5508 E. Kellogg
Wichita, KS 67218

**NOTE:** For each employment related matter that you believe was discriminatory you must list the basis *(list one or more of the following):*
Race *(Specify)*, Color *(Specify)*, Religion *(Specify)*, Sex *(Male or Female)*, National Origin *(Specify)*, Age *(Provide date of birth)*,
Disability *(Specify)*, Genetic Information *(including family medical history)*, and/or Reprisal for participating in the EEO process or opposing unlawful discrimination.

| 8. BASIS | 9. CLAIM(S) *(What employment related claim(s) - personnel action(s), incident(s), or event(s) caused you to file this complaint? Briefly state the specific claim, personnel action and/or event that caused you to file this complaint. Use an additional sheet of paper if necessary. You should not include information that violates the Privacy Act of 1974 and the Health Insurance Portability and Accountability Act (HIPAA). Some examples are patient medical records, personal records of other VA employees, etc.)* | 10. DATE OF OCCURRENCE *(Include the most recent date(s))* |
|---|---|---|
| Race (African American) | Harassment/Hostile Work Environment (Non-Sexual) | |
| Retaliation (EEO Activity) | 1. In April 2018 to present, Ruth Duda, Responding Management Official (RMO) uses intimidation when speaking at workstation and stood over Aggrieved Party's (AP) to discuss another staff personal issue prior to the AP becoming a Nurse Manager in 2019. | April 5.2018 |
| | 2. In January 2019 to present, RMO Duda usurps the AP's supervisory authority towards staff, informs staff of different actions in comparison of what the AP instructed, and pits the staff against the AP. | January 2019 |

**11. REMEDIES SOUGHT** *(Use an additional sheet of paper if necessary)*
Pain and suffering of $50,000, $25,000 per year under her leadership and transfer into position that utilizes my skill set as it applies in Office Community Care.

**12a. DO YOU HAVE A REPRESENTATIVE?**
[ ] YES   [X] NO

**12b. IF "YES", IS HE OR SHE AN ATTORNEY?**
[ ] YES   [ ] NO

**12c. PROVIDE THE NAME AND ADDRESS OF YOUR REPRESENTATIVE**

**12d. TELEPHONE NUMBER** *(Include Area Code)*

**12e. EMAIL ADDRESS**

**13a. HAVE YOU CONTACTED AN EEO COUNSELOR?**
[X] YES   [ ] NO

**13b. NAME OF EEO COUNSELOR**
Natalina Alford

**13c. DATE OF INITIAL CONTACT WITH ORM**
1/31/2020

**14.** *If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence, listed in item 10, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Right to File a Discrimination Complaint, you must explain why you were untimely in seeking EEO counseling or untimely in filing a complaint. (Use an additional sheet of paper, if necessary.)*

**15a. HAVE YOU FILED A UNION GRIEVANCE ON ANY CLAIM(S) LISTED ABOVE?**
[ ] YES   [X] NO

**15b. IF "YES", LIST THE CLAIM(S) AND DATE GRIEVANCE FILED**

**16a. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE CLAIMS LISTED ABOVE?**
[ ] YES   [X] NO

**16b. IF "YES", LIST THE ISSUE(S) AND DATE MSPB APPEAL FILED.**

**17a. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE?**
[ ] YES   [X] NO

**17b. IF "YES", PROVIDE THE NAME AND ADDRESS**

**18. SIGNATURE OF COMPLAINANT** *(Do not print)*
DaShaun McCray 1130323   Digitally signed by DaShaun McCray 1130323
Date: 2020.03.30 19:06:39 -05'00'

**19. DATE**
03/30/2020

VA FORM
MAR 2017 **4939**

SUPERSEDES VA FORM 4939, MAR 2013,
WHICH SHOULD NOT BE USED.

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS) - 9-24-2015

3.   On January 24, 2020, RMO Duda, increased the AP's workload and sent several emails to the AP after attending a meeting with Chief of Staff to discuss the RMO's behavior.

4.   On January 30, 2020, RMO Duda refused to allow the AP to speak during a meeting with the Medical Center Director to discuss the department's workload. Director raised his hand and request she allow AP to speak

5.   On January 31, 2020, RMO Duda intimated the AP by standing behind the AP's workstation/personal space and looked at the AP's computer. The RMO yelled at the AP and stated, "You did not allow me to talk during the meeting with the Pentad and you gave incorrect information! Are you offended?"

6.   January 28, 2019 to January 4, 2020, RMO Duda failed to provide training to the AP as the nursing manager and instructed the AP to complete the staffing model duty (input data regarding consults and staff) but never formally trained the AP after several requests made by the AP.

7.   On February 10, 2020, during a staff meeting, RMO verbally discredited the AP's ability as a supervisor by stating, "You took all leadership away from Janelle Adams (AP's subordinate) and it appeared you were also taking credit for all progress made and what was to be implemented in the future, with little input from the staff. Janelle came into my office several days later and stated she felt undermined and all the effort to gel and create a successful team was worth her effort and stress. Ms. Adam also stated she felt nothing was being done about Lori Lewis, RN (Transplant team) lack of customer service and attitude to be a team player. The said staff is fearful of speaking to you in fear of retaliation." The AP later spoke with Ms. Adams and was informed that Ms. Duda approached her to pit the Ms. Adams against the AP.

8.   On February 14, 2020, RMO Duda held a meeting with the AP and invited Heather Brown (AP's mentor) without giving the AP the proper notice and  verbally discredited the AP's ability as a supervisor. The AP claims RMO Duda mentioned that the AP took over a meeting on February 7, 2020, did not allow another employee (Registered Nurse) to speak, stated the RN was fearful to discuss anything with the AP due fear of retaliation.

9.   On March 2, 2020,RMO Duda state in email she should have  fired the AP after providing inaccurate information pertaining to staff member (RN) who nursing license may have expired.  RMO Duda sent a text to the AP stating that a staff member (RN) must show her proof of licensure or be fired immediately. The AP checked Kansas State Board of Nursing while the staff member was in her office the system stated the license had lapsed. RMO Duda informed the AP the staff member would need to be sent home. The AP responded sent home as in escorted out show within time frame. The RMO responded, " For now opportunity to show…" The AP asked the RMO who gave her that information and the RMO stated two members of Human Resources and the Nurse Executive. The AP informed RMO Duda that the information was incorrect and the RMO became upset.

**From:** McCray, DaShaun
**To:** Batiste, Cecilia A. (ORM)
**Cc:** Alford, Natalina (ORM)
**Subject:** RE: VA Form 4939
**Date:** Tuesday, March 31, 2020 7:48:24 AM
**Attachments:** VA Form 4939.pdf

Thank you for the notification

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** Batiste, Cecilia A. (ORM) <Cecilia.Batiste@va.gov>
**Sent:** Tuesday, March 31, 2020 6:44 AM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Cc:** Alford, Natalina (ORM) <Natalina.Alford@va.gov>
**Subject:** RE: VA Form 4939

Good morning,

There is no attachment to this email.

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Monday, March 30, 2020 7:30 PM
**To:** ORMCDO4939 <ORMCDO4939@va.gov>
**Cc:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** VA Form 4939

Mr. Rodger L. Evans, District Manager

Aggrieved Person: DaShaun McCray
Case Number: 2003589W-2020102157

Very Respectfully,

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*

**000005**

*Phone: 316-685-2221 ext 52734*



**DEPARTMENT OF VETERANS AFFAIRS**
**CONTINENTAL DISTRICT**
**OFFICE OF RESOLUTION MANAGEMENT**
2002 Holcombe Boulevard Building 110
Houston, TX 77030

In reply refer to: 08N

June 17, 2020

Linda Harris, EEO Investigator
Office Resolution Management 08N
2002 Holcombe Boulevard Building 110
Houston, TX  77030

SUBJECT: Assignment of Investigation

1.  You are hereby assigned to investigate the following discrimination complaint:

**DaShaun McCray  – 2003-589W-2020102157 –** VAMC, Wichita, KS

2.  This letter will be your authorization effective June 22, 2020 to: (1) investigate the accepted claim(s) in this complaint; (2) require all employees of the Department of Veterans Affairs to cooperate with the investigation; and (3) require employees of the agency having any knowledge of the matter accepted for investigation to furnish testimony without a pledge of confidence.  Pursuant to 29 C.F.R. §1614.108(c)(2), the Investigator's authority to administer the oath is automatic during the course of this investigation.

3.  Advanced preparation and investigative work are to begin immediately.  A copy of the list of documents requested from the facility is in CATS.  The resulting report of investigation is to be completed and submitted prior to the 175th day of the formal filing date.  If this complaint has been amended or consolidated with another complaint, the investigation must be completed within the earlier of 175 days after the filing of the last amendment/complaint or not later than 360 days after the filing of the original complaint.

4.  You are authorized to use Peterson for court reporting/transcription services.

5.   For questions or assistance, please contact Timothy Helke, ORM Case Manager at Timothy.Helke@va.gov.

RODGER L. EVANS
Continental District Manager

Enclosure: Assignment Letter to Complainant
              Assignment Letter to Facility Director



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**CONTINENTAL DISTRICT**
**2002 Holcombe Boulevard Building 110**
**Houston, TX 77030**

In reply refer to: 08N

June 17, 2020

VIA Email: DaShaun.McCray@va.gov

DaShaun McCray
2205 S. Linden
Wichita, KS 67207

**SUBJECT:  Assignment of an EEO Investigator to Investigate Your Complaint of Discrimination – Case No. 2003-589W-2020102157, Filed on March 31, 2020**

1.  This is to inform you that effective June 22, 2020, Linda Harris, Investigator of the Office of Resolution Management (ORM) is being assigned to investigate this complaint. This letter serves to authorize the Investigator to (a) investigate the accepted claims of this complaint; (b) require all employees of the agency to cooperate with the investigation; and (c) require employees having any knowledge of the matter accepted for investigation to furnish testimony without a pledge of confidence.   Pursuant to 29 C.F.R. §1614.108(c)(2), the Investigator's authority to administer the oath is automatic during the course of this investigation.

2.   The Investigator will contact you in the near future to inform you of when the investigation will begin.  Should you have any questions, please contact Linda Harris, Investigator at 713-791-1414 extension 28892 or Linda.Harris8@va.gov.   **You are *strongly encouraged* to use email to submit your correspondence and/or documents to ORM.**

3.  When the investigation is complete you will receive a copy of the investigation file as well as a digitized copy of the file on a CD.  <u>If you have opted for Electronic Delivery of Documents, you will receive only a CD</u>.  Should you wish to also receive a printed copy of the file, please inform the investigator in writing.

CONFIDENTIAL DOCUMENT - GENERATED IN THE ORM COMPLAINTS AUTOMATED TRACKING SYSTEM (CATS)

Page 2 EEO Assignment of Investigation
McCray, DaShaun 2003-589W-2020102157

The CD that you receive will be fully text searchable and can be bookmarked.  It is an identical copy of the CD that is provided to EEOC should you request a Hearing.  The password for the CD is **Va$eo115**.


RODGER L. EVANS
Continental District Manager

Enclosure:  PA/HIPAA Notice

cc:  Ricky A. Ament, Director, (589), Via Email: Ricky.Ament@va.gov
     Robert J. Dole VAMC
     5500 E. Kellogg
     Wichita, KS 67218

     Neil K. Simmons, EEO Program Manager, Via Email: Neil.Simmons@va.gov



# Office of Resolution Management
*Department of Veterans Affairs*

**Privacy Act, 5 U.S.C. 552a, and
Health Insurance Portability and Accountability Act (HIPAA)
Violation Notice**

YOU ARE HEREBY BEING INFORMED THAT THE OFFICE OF RESOLUTION MANAGEMENT IS REQUIRED TO REPORT ALL PRIVACY ACT AND/OR HIPAA VIOLATIONS.

The Privacy Act, 5 U.S.C. 552a, applies to any records about an individual which are retrieved by that individual's name or personal identifier (such as Social Security or C-File number). The Department of Veterans Affairs maintains over eighty systems of records. ORM personnel will encounter some of these systems when performing their duties. Some examples are Patient Medical Records (24VA136); General Personnel Records (Title 38) – VA (76VA05); General Personnel Records (Title 5) (OPM/GOVT-1); and Veteran, Employee and Citizen Health Care Facility Investigation Records – VA (32VA00).

The purpose of the Privacy Act of 1974 is to balance the government's need to maintain information about individuals with the rights of individuals to be protected against unwarranted invasions of their privacy stemming from federal agencies' collection, maintenance, use, and disclosure of personal information about them.

The Privacy Act contains a "no disclosure without consent" rule that states no agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains.

The Privacy Act further provides for criminal penalties as follows: Any officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established there under, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.
~~~~~~~~~~~~~~~~~~~~~~~

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) provides security standards and safeguards for individually identifiable health information.  The term "individually identifiable health information" means any information, including demographic information collected from an individual, that
    a) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and
    b) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or
    the past, present, or future payment for the provision of health care to an individual, and  identifies the individual; or

(c) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

The "Safeguards" portion of the Act provides that each person who maintains or transmits health information shall maintain reasonable and appropriate administrative, technical, and physical safeguards

a) to ensure the integrity and confidentiality of the information;

b) to protect against any reasonably anticipated threats or hazards to the security or integrity of the information; and unauthorized uses or disclosures of the information; and

c) otherwise to ensure compliance with this part by the officers and employees of such person.

The Act further provides for penalties of "wrongful disclosure of individually identifiable health information" as follows:

(a) **OFFENSE**--A person who knowingly and in violation of this part

1) uses or causes to be used a unique health identifier;

2) obtains individually identifiable health information relating to an individual; or

3) discloses individually identifiable health information to another person, shall be punished as provided in subsection (b).

(b) **PENALTIES**--A person described in subsection (a) shall

1) be fined not more than $50,000, imprisoned not more than 1 year, or both;

2) if the offense is committed under false pretenses, be fined not more than $100,000, imprisoned not more than 5 years, or both;

3) if the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm, be fined not more than $250,000, imprisoned not more than 10 years, or both.

~~~~~~~~~~~~~~~~~~~~~~~

IF YOU PROVIDE PROTECTED INFORMATION BELONGING TO OTHER INDIVIDUALS (I.E., VA PATIENTS OR COWORKERS) WITHOUT THEIR WRITTEN CONSENT DURING THE PROCESSING OF YOUR EEO COMPLAINT, THIS INFORMATION WILL BE RETURNED TO THE ENTITY RESPONSIBLE FOR MAINTAINING SUCH RECORDS AND DISCIPLINARY ACTION MAY BE TAKEN AGAINST YOU FOR UNAUTHORIZED USE AND DISCLOSURE OF PROTECTED INFORMATION.



# <u>Office of Resolution Management</u>

*Department of Veterans Affairs*
**DaShaun McCray**
**2003-589W-2020102157**

**1.     EEOC regulations require that the formal investigation be completed within 180 days of the file date.  The original file date of your complaint is March 31, 2020 and the regulatory timeline expires on September 27, 2020.**

**2.     ORM requests a voluntary extension of 90 days to the timeline for the following reason: To allow time for a thorough investigation.**

| | |
|---|---|
| DaShaun M. McCray 3471928 <br> Digitally signed by DaShaun M. McCray 3471928 <br> Date: 2020.07.13 11:13:00 -06'00' | 07/13/2020 |
| Complainant | Date |
| N/A | |
| Representative | Date |
| C. Stewart | 7/13/2020 |
| District EEO Manager | Date |

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**CONTINENTAL DISTRICT**
**COUNSELOR REPORT**



**CASE NUMBER: 2003-589W-2020102157**
**COUNSELOR NAME: Alford, Natalina**

| | | |
|---|---|---|
| Name of Aggrieved Party: | Ms. DaShaun McCray | |
| Home and/or Alternate Address: | 2205 S. Linden, Wichita, KS 67207 | |
| Home Telephone Number: | N/A | |
| Cellular/Mobile Number | (314) 691-4218 | |
| Business Address: | 5500 E. Kellogg Avenue, Wichita, KS 67218 | |
| Business Telephone Number: | (316) 685-2221 ext. 52734 | |
| Email Address: | DaShaun.McCray@va.gov | |
| Position Title/Grade: | Nurse Manager /  / VN 3 | |

| Employee | X | Former Employee | | Applicant | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| VHA | X | VBA | | NCA | | Canteen | | Other | |
| Title 5 | | Title 38 | X | Hybrid T38 | | Full-time | X | Part-time | |
| Probationary | | Career | X | Career Conditional | | Temporary | | Term | |

| | | |
|---|---|---|
| Name of Facility: | VAMC, WICHITA | |
| Address of Facility: | 5500 E. Kellogg Avenue, Wichita, KS 67218 | |
| Facility Telephone Number: | (316) 685-2221 | |
| Name of Representative: | N/A | |
| Representative's Address: | N/A | |
| Representative's Telephone: | N/A | |

**NOTIFICATION OF PROCEDURAL RIGHTS**

| | | | | |
|---|---|---|---|---|
| Initial Contact: | Telephone | | Date: | 01/31/2020 |
| Initial Interview | Telephone | | Date: | 02/06/2020 |
| Rights & Responsibilities/Notices: | Email | | Rec'd: | 02/12/2020 |
| Notice to Unreachable Aggrieved: | UPS/Cert Mail: | | Rec'd: | N/A |
| Agreed to Waive Anonymity: | YES [X] | NO [] | Date | 02/06/2020 |
| Notification to Facility Director | Email | | Date: | 02/12/2020 |
| ADR offered by facility [  ]  MOU [  ]: | YES [ ] | NO [ ] | Date: | N/A |
| Facility Returned Signed Refusal | YES [] | NO [X] | Date | N/A |
| ADR Agreed to by Aggrieved: | YES [ ] | NO [X ] | Date: | 02/06/2020 |
| Settlement (SA) [] | Withdrawal (WD) []: | | Date: | N/A |
| Notice of Closure (for SA/WD): | Regular Mail: | | Rec'd: | N/A |
| Notice of Right to File: | Email: | 03/16/2020 | Rec'd: | 03/16/2020 |

Case Number:  2003-589W-2020102157
Name of Aggrieved Party: Ms. DaShaun McCray
Name of Facility: VAMC, WICHITA
Date of Initial Contact: 01/31/2020

## RMO/WITNESS INFORMATION

| | |
|---|---|
| Responding Management Official(s): (Name, Title, Telephone Number) | Ruth Duda, Community Care Service Chief (316)685-2221 x57073 |
| Witness(es) Suggested for Interview by Aggrieved Party (Name, Title, Tele #): | None |
| Witness(es) Suggested for Interview by RMO (Name, Title, Telephone Number): | None |

**Claim - 1:** Harassment/Hostile Work Environment (Non-Sexual)
**Incident Date:** 03/02/2020
**Basis:** Race - Black

| | Yes (date) | No | | Yes (date) | No | If claim is untimely, explain reason for the untimeliness in description of claim below.* |
|---|---|---|---|---|---|---|
| Mixed Case | | X | MSPB Filed | | X | |
| Union Grievance Filed | | X | Is Claim Timely | 03/02/20202 | | |
| Administrative Grievance Filed | | | | | X | |
| Have you contacted another EEO Official? | | | | | X | (EEO Official Name) |

## Brief Description of Claim:

The Aggrieved Party (AP) believed that she was discriminated against based on her Race (Black) by Ruth Duda, Responding Management Official (RMO)  as evidenced by the following events.

1. In April 2018 to present, RMO Duda uses intimidation when speaking at the AP's workstation.

2. In April 2018, RMO Duda yelled and stood over the AP in a public area to discuss another employee's personal's issues regarding pay prior to the AP becoming a Nurse Manager in 2019.  The RMO angrily stated "If she wants to get paid, you better tell her to send us the form!"

3. In January 2019 to present, RMO Duda usurps the AP's supervisory authority towards staff, informs staff of different actions in comparison of what the AP instructed, and pits the staff against the AP.

4. On January 24, 2020, RMO Duda, increased the AP's workload and sent several emails to her after the AP attended a meeting with Chief of Staff to discuss the RMO's behavior.

5. On January 30, 2020, RMO Duda refused to allow the AP to speak during a meeting with the Ricky A. Ament, Medical Center Director to discuss the department's workload. The AP claims Mr. Ament raised his hand and requested the RMO allow to the AP to speak.

6. On January 31, 2020, RMO Duda intimated the AP by standing behind the AP's workstation/personal space and looked at the AP's computer. RMO Duda yelled "You did

Case Number:  2003-589W-2020102157
Name of Aggrieved Party: Ms. DaShaun McCray
Name of Facility: VAMC, WICHITA
Date of Initial Contact: 01/31/2020

not allow me to talk during the meeting with the Pentad and you gave incorrect information! Are you offended?"

7. On February 10, 2020, RMO Duda verbally discredited the AP's ability as a supervisor by stating, "You took all leadership away from Janelle Adams (Registered Nurse, AP's co-worker). It appears you were also taking credit for all progress made what was to be implemented in the future with little input from the staff." The RMO approached Ms. Adams and asked if she felt the AP had taken over the meeting and was this the reason, she no longer wanted to be a Transfer RN.

8. In February 2020, RMO Duda informed the AP that the Mrs. Adams and other staff were fearful of retaliation when speaking with her. The AP states she spoke with Mrs. Adams and was informed that RMO Duda approached her on February 10, 2020, and asked her questions that she felt were pitting the entire staff against the AP.

   Background Information:  In February 2020, Mrs. Adams went to the AP's office stated she felt undermined and all the effort to gel and create a successful team was worth her effort and stress. Ms. Adam also stated she felt nothing was being done about Lori Lewis, RN, Transfer Team, lack of customer service and attitude to be a team player, and the staff is fearful of speaking to you in fear of retaliation." The AP later spoke with Ms. Adams and was informed that Ms. Duda approached her to pit Ms. Adams and other staff against the AP.

9. On February 14, 2020, RMO Duda held a meeting with the AP and invited Heather Brown (AP's mentor) without giving the AP proper notice and verbally discredited the AP's ability as a supervisor. The AP claims during the meeting RMO Duda mentioned that the AP took over a meeting on February 7, 2020, did not allow another employee (Registered Nurse, Name unknown) to speak, and stated the other employees were fearful to discuss anything with the AP due fear of retaliation.

10. On March 2, 2020, RMO Duda threatened to fire and provided inaccurate information to the AP when she requested clarification on how to proceed regarding an employee's expired nursing license. In an email on March 2, 2020, RMO Duda responded,  "I find your response interesting, as I was also told to fire you when you violated the HIPPA law. Yet I chose a merciful route.(Name Unknown) could produce a license tomorrow, and you would have lost a valuable employee."

**Resolution Sought:**
Monetary Amount unspecified
Harassment to stop from RMO.

**Management's Response:**  Email response from RMO Duda.

Claim HWE: Claim states I, RMO, usurped her authority beginning in 2018 and forward. I am confused by this statement as Ms. McCray was a staff nurse and not in a position of authority/supervisory role till returning from surgery in Jan. of 2019 (staff meeting minutes attached for reference). Since no examples were provided with this alleged claim, I can only summarize Ms. McCray is referencing to the frequent changes that occur in the Community Care (CC) arena. Between the changes in the Choice Program, the conversion to TriWest (TW), then Patient Centered Community Care (PC3), then PC3 with VA-scheduling, the preparation for the roll-out of the Mission Act, the many new programs to be initiated and now the switching to Optum the Third-Party Payer replacing TW; varying instructions were provided by VISN

Case Number:  2003-589W-2020102157
Name of Aggrieved Party: Ms. DaShaun McCray
Name of Facility: VAMC, WICHITA
Date of Initial Contact: 01/31/2020

leadership, as they too were trying to figure out all the new regulations and processes to follow. Each communication was then passed on to staff, and at times became very confusing. (Supporting evidence of this noted in e-mail dated 12/11/2019). The Community Care (CC) field guidebook was and is continually being updated to support new processes. Ms. McCray did voice opposition to some of the proposed processes by VISN leadership, and that may be her perception to pitting staff against each other, as I recommend, we follow VISN guidance. In the end, all processes were and are being finalized. All staff are using the most current process to date. I still value Ms. McCray's input as she is very diligent to review the most current directives and processes identified in the CC field guidebook.

Ms. McCray statement in the claim that her behavior was discussed at the meeting between myself and Dr. Cummings is an assumption on her part, as she was not in attendance nor did I discuss any specific behavior of Ms. McCray. I did ask Dr. Cummings, COS, for advice on how best to lead Ms. McCray as I feel she is becoming more frustrated and I am not sure of the reason, and I feel she will no longer accepts advice on leading staff. It was advised to me at one of my standing weekly meeting with Dr. Cummings to allow Ms. McCray to have full responsibility of all Nurse Manger Functions. This was a concern after the EEO review conducted by Neil Simmons in our department concerning the direct supervisors (see attachment). Therefore, the announcement was made at the 1/6/2020 OCC Supervisory meeting as noted above. It was not until the meeting called by Dr. Cummings, on 1/31/20 that I heard from Ms. McCray's mouth how unhappy and dissatisfied she was in her current position. Ms. McCray informed me (announced) that she had spoken to Dr. Cummings and Dr. Cotton weeks earlier concerning me and repeatedly stated 'she was done with Community Care'. The false claims she stated referencing to 2018 were merely out of lack knowing the entire story, one which she would not have been privy to as a staff nurse.

Claim states she was not allowed to speak at the meeting in which I was presenting to our Executive Leadership team, known as the Pentad, of which the Director is present on 1/30/2020. However, such claim is easily disputed by all in attendance. While it was my responsibility to present as Chief of the service, Ms. McCray took over answering questions concerning how the data was gathered. Because Ms. McCray had only a cursory overview of the model, she stated misleading statements to the authenticity of the report which resulted in having to produce another report to address time required on backlog, which is built into the staffing model by Central Office. (Pentad presentation supplied as well as next backlog report post meeting 1/30/20, and the series of e-mails to get correct data submitted). Important to note after meeting with COS on 1/31/20, Ms. McCray refused to complete backlog report or submit a plan, RMO finished report and submitted to COS.

Claim counters the very statement she inferred in not being allowed to speak. When I arrived at the OCC office, post morning huddles with Leadership, with briefcase, lunch bag, purse in hand, and my coat is still on, Ms. McCray asks if I had read the e-mail from Dr. Cummings. I had not, and she had it pulled up on her computer screen. She pushed herself back in the chair and posturing for me to read it. Because I have bi-focals I had to go around her desk to see the screen. Standing beside her, I read the e-mail. At which she belligerently accused me of invading her personal space. I immediately returned to the opposite side of the desk. She was very upset as Dr. Cummings has removed her from participating on the Referral Coordination Team. I asked if she was offended, and indeed she was, in addition to claiming to be the only subject matter expert and certified case manager in this VA. After moving on from that topic, I commented that I was going to allow her to complete the report for Dr. Cummings and the rest of the Pentad, as she took over the presentation and created much more work. I did not yell or raise my voice; it was stated very matter of fact in a calm manner. This too irritated Ms. McCray.

Case Number:  2003-589W-2020102157
Name of Aggrieved Party: Ms. DaShaun McCray
Name of Facility: VAMC, WICHITA
Date of Initial Contact: 01/31/2020

 While I still believed she could become a great manager, she is not listening to advice or suggestions. I tried verbally counseling Ms. McCray on 2/5/20 not for any disciplinary action but to educate her as a manager how to meet deadlines, use Inter Qual criteria, use data and lead staff (see my notes from the verbal counseling). I realized that I could no longer be of value to train Ms. McCray as a manager, however, she mentioned Heather Brown, Deputy Nurse Exc. is her mentor for professional growth. Because I believe that Ms. McCray has the potential to be a good leader, and she has announced she is looking for other job opportunities, with Ms. McCray's knowledge I invited Ms. Brown to the meeting with Ms. McCray and myself on 2/14/2020. Ms. McCray voiced no objection to having Ms. Brown attend our meeting. Heather could provide the mentorship for Ms. McCray for the areas of staff interactions that I had to bring to Ms. McCray's attention (see meeting notes attached). Unfortunately, my best intentions were miss-construed; no self-reflection, no openness to guidance or constructive criticism was accepted by Ms. McCray. Instead she became agitated and left in an abrupt manner.

**Informal Documents Requested:**
a. Documentation, if any, showing whether the supervisor or any management official was made aware of the alleged harassment. (i.e. written/verbal complaints).
b. A copy of any management inquiry or investigation conducted based on the allegation, along with all supporting documents.
c. Documentation, if any, of corrective action(s) taken subsequent to the alleged harassment / hostile work environment.

**Informal Documents Received:**
a.  RMO Duda's response.
b.  Employee Feedback session conducted by EEO Program Manager.
c.  Claim 1-Clarifying with VISN.
d.  Claim 2-Shared delegation of duties
e.  Claim 3- Backlog 1
f.  Claim 3- Backlog 2
g.  Claim 3- Status and Plan
h.  Claim 4- Cummings streamline Reference Coordinator Team
i.  Executive Career Field FY 19 Year End Review

Case Number: 2003-589W-2020102157
Name of Aggrieved Party: Ms. DaShaun McCray
Name of Facility: VAMC, WICHITA
Date of Initial Contact: 01/31/2020

**Claim - 2:** Training
**Incident Date:** 01/04/2020
**Basis:** Race - Black

| | Yes (date) | No | | Yes (date) | No | If claim is untimely, explain reason for the untimeliness in description of claim below.* |
|---|---|---|---|---|---|---|
| Mixed Case | | X | MSPB Filed | | X | |
| Union Grievance Filed | | X | Is Claim Timely | X 01/04/2020 | | |
| Administrative Grievance Filed | | | | | X | |
| Have you contacted another EEO Official? | | | | | X | (EEO Official Name) |

**Brief Description of Claim:**

From January 28, 2019 to January 4, 2020, RMO Duda failed to provide Nurse Manager training to the AP and required her to complete the staffing model duty (inputting data regarding consults and staff) without formally providing training despite several requests.

**Resolution Sought:**
Monetary Amount unspecified
Harassment to stop from RMO.

**Management's Response:** Email response from RMO Duda
To date, Ms. McCray has been in her position approximately one year. However, due to the frequent physical therapy appointments of Ms. McCray in January of 2019 and many program changes in the department, I opted to roll-out her full duties slowly as to not overburden or discourage her as a new manager. Between February of 2019 and June of 2019, I shared the responsibility of investigating, resolution of complaint, and writing the response for all congressional inquiries and White House responses pertaining to CC consults as well as fielding billing inquiry calls and veteran/vendor complaints. I delegated full responsibility of Veteran Care Agreements (VCA) and well as oversight of all Individual Authorization conversion to Ms. McCray. While I assisted in the implementation of Decision Support Tree (DST) program and education of all other services. Ms. McCray was also preforming other routine manager duties such as Nurses Performance appraisals, staffing, time keeping, dispute resolution between staff, and other meetings associated with being a Nurse Manager. From June of 2019 to December of 2019, Ms. McCray led the team in the conversion to Provider Profile Management System (PPMS) and Health Sharing Referral Management (HSRM) programs (programs now replacing TW) (PP slide attached with workload distribution noted). These programs are now being utilized with minimal support needed. Therefore, at the 1/6/2020 OCC Supervisory weekly staff meeting I announced I would be turning over all duties to the immediate supervisor, respectively MSA to Ms. Dial and RN to Ms. McCray. While informing them I, I stated I know it is a heavy load as I have been a front-line manager, and if they needed assistance, I am willing to help. Ms. McCray assured me multiple times 'I can handle it'. She seemed very pleased and confident to have full responsibility for all the nursing functions. Therefore on 1/22/20 I trained Ms. McCray on how to access the VISN SharePoint site and complete the staffing model used for requesting staff. I invited her to attend the meeting with leadership where I was to present the staffing requests for the department on 1/30/20, as this was another opportunity for exposure to upper level meetings and business etiquette. Unfortunately, from 1/6-1/30, less than a month, Ms. McCray was missing many deadlines. She

Case Number:  2003-589W-2020102157
Name of Aggrieved Party: Ms. DaShaun McCray
Name of Facility: VAMC, WICHITA
Date of Initial Contact: 01/31/2020

refused to ask for help and when offered acted offended. When I had to follow-up on assignments as her supervisor to ensure the task was completed, she became angry that I had discovered another deadline missed.

**Informal Documents Requested**:
a. Complainant's request, if submitted in writing, concerning the action at issue.
b. Management's denial of request, if made in writing, with any supporting documents.
c. Written description of course or training denied, if available

**Informal Documents Received:**
a.  RMO Duda's response regarding training.

---

### SUMMARY OF RESOLUTION EFFORTS

On February 6, 2020, during the initial telephonic interview, this counselor educated the AP on the EEO process and Alternative Dispute Resolution (ADR) procedures. The AP declined to participate in mediation. Resolution efforts were unsuccessful and the Notice of Right to File was issued.

---

### FINAL INTERVIEW

On March 16, 2020, during the final interview, this counselor discussed with the AP the results of informal counseling. This counselor informed all AP of the following: (1) The claim listed above was the only claim addressed during informal EEO counseling; and (2) If a Formal Complaint of Discrimination (VA Form 4939) is filed, a new claim(s) raised for the first time on said formal that was not brought to the attention of an EEO counselor and not like or related to the above claim will be subject to dismissal in accordance to C.F.R. § 1614.107 a(2).

On March 16, 2020, the NRTF and VA Form 4939 was sent to the AP via electronic mail.

Natalina "Natalie" Alford                                   04/28/2020
EEO Counselor                                               Date



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**2002 Holcombe Boulevard, Building 110**
**Houston, TX 77030**

March 16, 2020

In reply refer to: 08N

VIA: Email: DaShaun.McCray@va.gov

DaShaun McCray
2205 S. Linden
Witicha, KS 67207

Dear  Ms. McCray:

I am closing the informal counseling on the matter you presented to this office on ,
January 31, 2020 Case Number: 2003-589W-2020102157.  Your complaint is as
follows:

| Bases | Claims and Dates of Occurrence |
|---|---|
| Race (African American)<br><br>Retaliation (EEO Activity) | Harassment/Hostile Work Environment (Non-Sexual)<br><br>1.  In April 2018 to present, Ruth Duda, Responding Management Official (RMO) uses intimidation when speaking at workstation and stood over Aggrieved Party's (AP) to discuss another staff personal issue  prior to the AP becoming a Nurse Manager in 2019.<br><br>2.  In January 2019 to present, RMO Duda usurps the AP's supervisory authority towards staff, informs staff of different actions in comparison of what the AP instructed, and pits the staff against the AP.<br><br>3.  On January 24, 2020, RMO Duda, increased the AP's workload and sent several emails to the AP after attending a meeting with Chief of Staff to discuss the RMO's behavior.<br><br>4.  On January 30, 2020, RMO Duda refused to allow the AP to speak during a meeting with the Medical Center Director to discuss the department's workload.<br><br>5.  On January 31, 2020, RMO Duda intimated the AP by standing behind the AP's workstation/personal space and looked at the AP's computer. The RMO yelled at the AP and stated, "You did not allow me to talk during the meeting with the Pentad and you gave incorrect information! Are you offended?"<br><br>6.  January 28, 2019 to January 4, 2020, RMO Duda failed to provide training to the AP as the nursing manager and instructed the AP to complete the staffing model duty (input data regarding consults and staff) but never formally trained the AP after several requests made by the AP. |

Page 2
Notice of Right to File a Discrimination Complaint
Name of Aggrieved Person: DaShaun McCray
Case Number: 2003-589W-2020102157

7. On February 10, 2020, during a staff meeting, RMO verbally discredited the AP's ability as a supervisor by stating, "You took all leadership away from Janelle Adams (AP's subordinate) and it appeared you were also taking credit for all progress made and what was to be implemented in the future, with little input from the staff. Janelle came into my office several days later and stated she felt undermined and all the effort to gel and create a successful team was worth her effort and stress. Ms. Adam also stated she felt nothing was being done about Lori Lewis, RN (Transplant team) lack of customer service and attitude to be a team player. The said staff is fearful of speaking to you in fear of retaliation." The AP later spoke with Ms. Adams and was informed that Ms. Duda approached her to pit the Ms. Adams against the AP.

8. On February 14, 2020, RMO Duda held a meeting with the AP and invited Heather Brown (AP's mentor) without giving the AP the proper notice and  verbally discredited the AP's ability as a supervisor. The AP claims RMO Duda mentioned that the AP took over a meeting on February 7, 2020, did not allow another employee (Registered Nurse) to speak,  stated the RN was fearful to discuss anything with the AP due fear of retaliation.

9. On March 2, 2020,RMO Duda threatened to fire the AP after providing inaccurate information pertaining to staff member (RN) who nursing license may have expired.  RMO Duda sent a text to the AP stating that a staff member (RN) must show her proof of licensure or be fired immediately. The AP checked Kansas State Board of Nursing while the staff member was in her office the system stated the license had lapsed. RMO Duda informed the AP the staff member would need to be sent home. The AP responded sent home as in escorted out show within time frame. The RMO responded, " For now opportunity to show…" The AP asked the RMO who gave her that information and the RMO stated two members of Human Resources and the Nurse Executive. The AP informed RMO Duda that the information was incorrect and the RMO became upset.

==Upon receipt of this letter please notify me no later than 5 business days whether the above information is incorrect.==

I have enclosed a copy of the Notice of Right to File a Discrimination Complaint (including VA Form 4939). At this point, you have two options available to you. To help you make your decision, I have also enclosed a link to the Equal Employment Opportunity Commission's (EEOC) website for an overview of the guidelines on the federal sector EEO complaint process. http://www.eeoc.gov/federal/
Please select one of the options below as your final decision:

**Option 1:**  You can choose to file a formal complaint of discrimination on some or all of the claim(s) listed above.  If you wish to file a formal complaint, please complete, sign,

Page 3
Notice of Right to File a Discrimination Complaint
Name of Aggrieved Person: DaShaun McCray
Case Number: 2003-589W-2020102157

and date the VA Form 4939; returning the form to the address listed on the *Notice of Right to File a Discrimination Complaint*.

> **If you decide to file a formal complaint, you have 15 calendar days from receipt of this notice in which to do so.**  Please do not mail the VA Form 4939 to me; your formal complaint must be mailed to the address listed on the first page of the enclosed *Notice of Right to File a Discrimination Complaint*.

Upon receipt of a formal complaint, the Office of Resolution Management (ORM) will review your complaint and determine if the claim(s)[1] raised meet(s) EEOC's procedural requirements for continued processing.

If your complaint meets procedural requirements and  is accepted by ORM for investigation, you will be given the opportunity to submit any documentation in support of your allegations of discrimination to the ORM investigator assigned to investigate your complaint, as part of the process for  gathering evidence relevant to the merits of your accepted claim(s). There is no need to provide evidence in support of your claim(s) until notified that your claim(s) is accepted for investigation.

**Option 2**:  You can take no further action, indicating your wish not to pursue the allegations listed above any further.

If you have any questions or need assistance, please call me at (713)770-2434.

Sincerely,

Natalina "Natalie" Alford
EEO Counselor

Enclosure:  Notice of Right to File a Discrimination Complaint
                    VA Form 4939

---

[1] A claim is the action(s) the Agency has taken or is taking that causes the aggrieved person to believe s/he is the victim of discrimination for which, if proven, there is a remedy under the federal equal employment statues.  It is important to limit your description of the specific claim(s) to one or two sentences.

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS) – Revised 9-24-2015



# Office of Resolution Management
*Department of Veterans Affairs*

**NOTICE OF RIGHT TO FILE A DISCRIMINATION COMPLAINT**

Aggrieved Person: DaShaun McCray
Case Number: 2003-589W-2020102157

1. If you are not satisfied with the results of the informal EEO process and believe that you have been subjected to discrimination because of race, color, religion, sex, national origin, age, disability, genetic information, or retaliation, you have the right to file a formal complaint of discrimination. **If you decide to file a formal complaint, you must do so WITHIN FIFTEEN CALENDAR DAYS OF RECEIPT OF THIS NOTICE.**

2. Attached is VA Form 4939, Complaint of Employment Discrimination. If you choose to file a formal complaint at this time, use this form, and carefully read the instructions on the reverse side before completing it. The counselor is available to assist you in filling out this form and to answer any questions you may have about it. If you require assistance, please contact your counselor immediately. **Please note that the <u>15-calendar day</u> time frame will not be extended due to your need to seek my assistance in completing this form.**

3. You may file a complaint in person, by mail, fax, or e-mail with the District Manager at the address below:

   **RODGER L. EVANS, District Manager**
   Department of Veterans Affairs
   Office of Resolution Management 08N
   2002 Holcombe Blvd., Bldg. 110
   Houston, TX. 77030

   **Fax:** (713)794-7672

   **Email:** ORMCDO4939@va.gov

4. You must identify each claim you are protesting and provide the date on which each occurred. Your complaint must be limited to the claim(s) you discussed with the counselor. Therefore, if there are any claims that you have not discussed with the counselor, you must do so immediately. Regulations require that you provide the Department with an opportunity to resolve each claim informally at EEO counseling.

5. You are entitled to representation at every stage of the complaint process. You may choose anyone as a representative, unless the person occupies a position within VA that would create a conflict of interest. If you do select a

Page 2.
Notice of Right to File a Discrimination Complaint
Name of Aggrieved Person: DaShaun McCray
Case Number: 2003-589W-2020102157

representative, you must inform this ORM District Office, in writing, of the
representative's name, telephone number, and business address.

6. If you are a member of the bargaining unit, you may have the right to dispute
   the events discussed with the counselor through the union grievance
   procedure.  Regulations provide that you may file either a grievance <u>or</u> an
   EEO complaint about the events in dispute, but <u>not both</u>.  Should you file both,
   whichever you file first (a union grievance or an EEO complaint) will be
   considered an election to proceed in that forum.

7. If you are complaining about a matter that may be appealed to the Merit
   Systems Protection Board (MSPB), you may file an EEO complaint <u>or</u> an
   MSPB appeal, but <u>not both</u>.  Whichever you file first (a formal EEO complaint
   or an MSPB appeal) will be considered an election to proceed in that forum.  If
   the counselor can be of further assistance to you, please advise.

COMPLAINT CASE NUMBER:

OMB NO.: 2900-0716
EXPIRATION DATE: DEC 31, 2019
RESPONDENT BURDEN: 30 Min.

**VA** Department of Veterans Affairs

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

*Read the instructions on the reverse side of this form carefully before completing the front of this form.*

| 1. NAME *(Last, first, middle initial)(Please print)* | 3. MAILING ADDRESS | 4a. WORK TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| 2. EMAIL ADDRESS | | 4b. PRIMARY TELEPHONE NUMBER *(Include Area Code)* |

| 5. ARE YOU: <br> ☐ A VA EMPLOYEE <br> ☐ AN APPLICANT FOR EMPLOYMENT <br> ☐ A FORMER VA EMPLOYEE | 6a. JOB TITLE, SERIES AND GRADE <br><br> 6b. SERVICE/SECTION/PRODUCT LINE | 7. NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED |
|---|---|---|

**NOTE:** For each employment related matter that you believe was discriminatory you must list the bases *(list one or more of the following)*:
Race *(Specify)*, Color *(Specify)*, Religion *(Specify)*, Sex *(Male or Female)*, National Origin *(Specify)*, Age *(Provide date of birth)*, Disability *(Specify)*, Genetic Information *(including family medical history)*, and/or Reprisal for participating in the EEO process or opposing unlawful discrimination.

| 8. BASIS | 9. CLAIM(S) <br> *(What employment related claim(s) - personnel action(s), incident(s), or event(s) caused you to file this complaint? Briefly state the specific claim, personnel action and/or event that caused you to file this complaint. Use an additional sheet of paper if necessary. You should not include information that violates the Privacy Act of 1974 and the Health Insurance Portability and Accountability Act (HIPAA). Some examples are patient medical records, personal records of other VA-employees, etc.)* | 10. DATE OF OCCURRENCE *(Include the most recent date(s))* |
|---|---|---|
| | | |

11. REMEDIES SOUGHT *(Use an additional sheet of paper if necessary.)*

| 12a. DO YOU HAVE A REPRESENTATIVE? <br> ☐ YES  ☐ NO | 12c. PROVIDE THE NAME AND ADDRESS OF YOUR REPRESENTATIVE | 12d. TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| 12b. IF "YES," IS HE OR SHE AN ATTORNEY? <br> ☐ YES  ☐ NO | | 12e. EMAIL ADDRESS |

| 13a. HAVE YOU CONTACTED AN EEO COUNSELOR? <br> ☐ YES  ☐ NO | 13b. NAME OF EEO COUNSELOR | 13c. DATE OF INITIAL CONTACT WITH ORM |
|---|---|---|

14. If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence, listed in Item 10, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Right to File a Discrimination Complaint, you must explain why you were untimely in seeking EEO counseling or untimely in filing a complaint. *(Use an additional sheet of paper, if necessary.)*

| 15a. HAVE YOU FILED A UNION GRIEVANCE ON ANY CLAIM(S) LISTED ABOVE? <br> ☐ YES  ☐ NO | 15b. IF "YES," LIST THE CLAIM(S) AND DATE GRIEVANCE FILED | 16a. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE CLAIMS LISTED ABOVE? <br> ☐ YES  ☐ NO | 16b. IF "YES," LIST THE ISSUE(S) AND DATE MSPB APPEAL FILED. |
|---|---|---|---|
| 17a. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE? <br> ☐ YES  ☐ NO | 17b. IF "YES," PROVIDE THE NAME AND ADDRESS | | |

| 18. SIGNATURE OF COMPLAINANT *(Do not print)* | 19. DATE |
|---|---|

VA FORM
MAR 2017  **4939**

SUPERSEDES VA FORM 4939, MAR 2013,
WHICH SHOULD NOT BE USED.

# COMPLAINT OF EMPLOYMENT DISCRIMINATION INSTRUCTIONS

**Read the following instructions carefully before you complete this form. Please complete all items on the complaint form.**

**GENERAL:** Pursuant to the Equal Employment Opportunity Commission (EEOC) Title 29 Code of Federal Regulations (29 C.F.R.) §1614, VA Form 4939, Complaint of Employment Discrimination, can be used by VA employees, former employees and applicants for employment who file a formal Equal Employment Opportunity (EEO) complaint of discrimination. This regulation prohibits discrimination based on race, color, religion, gender (sex), national origin, age (40 years and over), physical or mental disability, genetic information (including family medical history), and/or reprisal for participating in the EEO process or opposing unlawful discrimination.

You can obtain assistance from your EEO Counselor in filling out this form. Your EEO Counselor can also answer any questions you may have about this form. In item 8, you should specify the basis of your complaint: race, color, religion, gender (sex), national origin, age *(date of birth)*, physical or mental disability *(specific information about your disability)*, genetic information (including family medical history), and/or reprisal for participating in the EEO process or opposing unlawful discrimination. If you list "Reprisal," please state the nature of the prior EEO activity in which you were engaged, i.e. did you file a prior EEO complaint? Use an additional sheet of paper, if necessary.

It is very important that you be precise as to the dates of all actions or events you are protesting. In addition, the claims listed in item 9, must be limited to those claims discussed with an EEO Counselor *(discussed within 45 calendar days of occurrence of the event, or within 45 calendar days of the effective date, if a personnel action)* or like or related claims. If any of the claims listed in item 9 were discussed with an EEO Counselor, but not within 45 calendar days of their occurrence or of their effective date, you must explain why you waited more than 45 calendar days. If any of the claims listed in item 9 were not discussed with an EEO Counselor, please contact the Office of Resolution Management (ORM), Regional EEO Officer IMMEDIATELY. The requirement that you contact an EEO Counselor about every claim listed in item 9 will not be waived under any circumstances. Failure to do so will only delay the processing of your complaint.

It is your responsibility to keep the (ORM) informed of your current address. If you move, immediately advise the ORM District Office where you filed this complaint of your new address. In addition, you may receive certified and express mail in connection with your complaint. It is your responsibility to claim all certified and express mail. Failure to notify ORM of a change in address or to claim certified and express mail may lead to dismissal of your complaint.

**REPRESENTATION:** You may have a representative of your own choosing at all stages of the processing of your complaint. No EEO Counselor, EEO Investigator or EEO Officer may serve as a representative. (Your representative need not be an attorney, but only an attorney representative may sign the complaint on your behalf.)

**WHEN TO FILE:** Your formal complaint must be filed within 15 calendar days of the date you received the *"Notice of Right to File a Discrimination Complaint"* (NRTF) from your EEO Counselor. If you do not meet this time limit, you must explain why you waited more than 15 calendar days to file. These time limits may be extended under certain circumstances; however, they will NOT be waived and your complaint will NOT be investigated unless you explain your untimeliness and the explanation is acceptable in accordance with EEOC, 29 C.F.R. §1614(c).

**WHERE TO FILE:** The complaint should be filed with the ORM District Office identified in the NRTF. You may submit a copy either by mail, in person, electronically (via e-mail), or by facsimile. Filing instructions are contained in the cover letter attached to the NRTF.

**PRIVACY ACT STATEMENT:** Maintenance and disclosure of VA Form 4939 is made in accordance with the Privacy Act of 1974. Collection of the information on this form is authorized and/or required by the regulations of the EEOC, 29 C.F.R. §1614. All records, from which information is retrieved, by the name or personal identifier of a respondent, are maintained by a Government-wide Systems of Records: EEOC/GOVT-1, Equal Employment Opportunity Complaint Records and Appeal Records. The information collected will be used by ORM to determine whether your complaint is acceptable for investigation and in connection with any subsequent investigation and processing of your complaint. In the course of any investigation, this form may be shown to any individual who may be required by regulations, policies or procedures of the EEOC and/or ORM to provide information in connection with this complaint, including individuals you may have identified as responsible for the acts or events at issue in this complaint. Other disclosures may be: (a) to respond to a request form from a Member of Congress regarding the status of the complaint or appeal; (b) to respond to a court subpoena and/or to refer to a district court in connection with a civil suit; (c) to disclose information to authorized officials or personnel to adjudicate a complaint or appeal; or (d) to disclose information to another Federal agency or to a court or third party in litigation when the Government is party to a suit before the court.

**RESPONDENT BURDEN STATEMENT:** In accordance with the Paperwork Reduction Act of 1995, The Department of Veterans Affairs (VA) may not conduct or sponsor, and the respondent is not required to respond to this collection of information unless it displays a valid OMB Control Number. The valid OMB Control Number for this information collection is 2900-0716. The collection of this information is voluntary. However, the information is necessary to determine if your complaint of employment discrimination is acceptable for further processing in accordance with EEOC, 29 C.F.R. §1614. The time required to complete this information collection is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing the form. Send comments regarding this burden estimate or any other aspects of this collection, including suggestions for reducing this burden, to VA Clearance Officer (005R1B), 810 Vermont Avenue, Washington, DC 20420. SEND COMMENTS ONLY. DO NOT SEND THIS FORM, A COMPLAINT OF EMPLOYMENT DISCRIMINATION, OR REQUEST FOR BENEFITS TO THIS ADDRESS

REVERSE OF VA FORM 4939, MAR 2017

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)  - 9-24-2015

**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
2002 Holcombe Boulevard, Building 110
Houston, TX 77030

In reply refer to: 08N

VIA: Email (DaShaun.McCray@va.gov)

February 12, 2020

DaShaun McCray
2205 S. Linden
Witicha, KS 67207

Dear  Ms. McCray:

I will serve as the EEO counselor in the matter you reported to the Office of Resolution Management (ORM) on January 31, 2020, Case Number  2003-589W-2020102157 as follows:

| Basis | Claim and Date of Occurrence |
|-------|------------------------------|
| Race (African American) | Harassment/Hostile Work Environment (Non-Sexual) <br><br> 1. In 2018 to present, Ruth Duda, Responding Management Official (RMO) usurps the Aggrieved Party's (AP) supervisory authority towards staff, informs staff of different actions in comparison of what the AP instructed, and pits the staff against the AP. <br><br> 2. On January 24, 2020, RMO Duda, increased the AP's workload and sent several emails to the AP after attending a meeting with Chief of Staff to discuss the RMO's behavior. <br><br> 3. On January 30, 2020, RMO Duda refused to allow the AP to speak during a meeting with the Medical Center Director to discuss the department's work load. <br><br> 4. On January 31, 2020, RMO Duda intimated the AP by standing behind the AP's workstation/personal space and looked at the AP's computer. The RMO yelled at the AP and stated, "You did not allow me to talk during the meeting with the Pentad and you gave incorrect information! Are you offended?" |

==If this information is incorrect, please advise me within five days of receipt of this letter.==

I am enclosing the Notice of Rights and Responsibilities and a document entitled "Role & Responsibilities of the EEO Counselor."  Please read these documents carefully, sign where indicated, and return a copy, preferably via e-mail to Natalina.Alford@va.gov or via fax at (713)794-7672 or to the address above.

If you have any questions or need additional information, call me at (713)770-2434.

Sincerely,

Natalina "Natalie" Alford
EEO Counselor

 **Office of Resolution Management**
*Department of Veterans Affairs*

## NOTICE OF RIGHTS AND RESPONSIBILITIES

Aggrieved Person: DaShaun McCray

Case Number: 2003-589W-2020102157

Under 29 C.F.R. §1614.105(a) & (a)(1), aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, reprisal or genetic information must consult an EEO counselor prior to filing a complaint in order to try to informally resolve the matter.

An aggrieved person must initiate contact with an EEO counselor within 45 calendar days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 calendar days of the effective date of the action.

If the alleged matter(s) are beyond the 45 calendar day time limit for contacting an EEO counselor, you will be given an opportunity to provide an explanation of your untimely contact to the EEO counselor.

ORM is required to advise you that you have certain rights and responsibilities regarding the EEO matter that you raised.  They are:

a. The right to remain anonymous during EEO Counseling.  Your name will be divulged to others only upon your authorization for ORM to do so.  You should know, however, that it might be very difficult to resolve your complaint informally if you choose to remain anonymous.  Please indicate your choice by initialing below:

☐ **I want to remain anonymous**

☐ **I do NOT want to remain anonymous**

b. The right to a representative during the EEO complaint process including during EEO counseling.  You may select anyone to represent you, as long as their position with VA would not represent a conflict of interest.  **The EEO counselor cannot be your representative**.  Please initial next to your selection below:

☐ **I do NOT want a representative at this time.**  I understand I may select a representative later (or at any stage of the EEO process).
☐ **I have a representative.  My representative is:**

Name:                                        Attorney: ☐ Yes ☐ No
Address:                                     Phone: (     )
Email:                                         Fax: (     )

Page - 3 -
Notice of Rights and Responsibilities
Name of Aggrieved Person: DaShaun McCray
Case Number: 2003-589W-2020102157

c.  The right to have your claim(s) addressed through the agency Alternative Dispute Resolution (ADR) program or EEO counseling, **but not both.**  Participation in the ADR program is voluntary on your part and ADR may be entered into in lieu of traditional EEO counseling.  If ADR is elected during the pre-complaint process, the counseling period may be extended up to but not more than 90 calendar days.  Your agreement to participate in ADR must be in writing.  When ADR is elected, the EEO counselor will only gather enough information on your basis (es) and claim(s) to assist the agency in making a procedural determination in the event resolution through ADR is not reached.

The EEO counselor will have no further involvement in the matter until the counselor is advised of the completion of the ADR process or the end of the 90 day counseling period, whichever comes first.  At that time, if a resolution is not reached through ADR or the 90 day counseling period has ended, a final interview will be conducted and you will be issued a Notice of Right to File a Discrimination Complaint.

d.  The right to request a reasonable accommodation during the EEO complaint process.  Section 501 of the Rehabilitation Act requires agencies to provide reasonable accommodations to qualified applicants and employees with disabilities.  To make a request and find your local reasonable accommodation coordinator, visit the Office of Diversity and Inclusion website at: http://www.diversity.va.gov/programs/pwd.aspx

e.  Under 29 C.F.R. §1614.301, Relationship to Negotiated Grievance Procedure, if you are employed by an agency subject to 5 U.S.C. 7121(d), and is covered by a bargaining unit agreement that permits allegations of discrimination to be raised in a negotiated grievance procedure, and you wish to file a complaint or a grievance of alleged employment discrimination, you must elect to raise the matter under either Part 1614 OR the negotiated grievance procedure, **but not both**.  You may file the grievance before, during or after EEO counseling, but not after you file a formal discrimination complaint through EEO.  An election to proceed under a negotiated grievance procedure is indicated by the filing of a timely grievance.  Whichever you file first, a formal EEO complaint or a union grievance will be considered an election to proceed in that forum, and it must be presented in writing.  At the formal level, any complaint filed after a grievance has been filed on the same matter, shall be dismissed without prejudice to the complainant's right to proceed through the negotiated grievance procedure.  The dismissal of such a complaint shall advise the complainant of the obligation to raise discrimination in the grievance process and of the right to appeal the final grievance decision to the Commission. https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

f.  If you are disputing a matter that can be appealed to the Merit Systems

Revised: 1/25/2019
CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

Page - 4 -
Notice of Rights and Responsibilities
Name of Aggrieved Person: DaShaun McCray
Case Number: 2003-589W-2020102157

Protection Board (MSPB), you may file an EEO complaint or an MSPB appeal, **but not both**. Whichever you file first (a formal EEO complaint or an MSPB appeal) will be considered an election to proceed in that forum. https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

g. Within thirty (30) days of your first contact with an EEO counselor, you have the right to receive a written notice terminating counseling and informing you of the right to file a formal complaint (unless the period has been extended by prior written consent). You also have the right, at the conclusion of counseling, to file a formal complaint within **15 calendar days** of receipt of the Notice of Right to File a Discrimination Complaint. When you are represented by an attorney, the Commission's service regulations require that all notices be served on the attorney, with a copy to you. Time frames are computed from the date of receipt by the attorney, not the date of receipt by the aggrieved person.

h. If you allege age discrimination, you have the right to file a lawsuit in Federal District Court, without filing a formal EEO complaint. A Notice of Intent to Sue must be filed within 180 calendar days of the date of the alleged discriminatory act. However, you must first notify the Equal Employment Opportunity Commission (EEOC), 131 M Street, NE Fourth Floor, Suite 4NWO2F Washington, DC 20507-0100 of your intent to do so, at least thirty (30) calendar days in advance of the filing your Notice of Intent to Sue. https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

i. If you are complaining about sex-based wage discrimination (being paid less than a person of the opposite sex, even though they are doing equal work), you may file a formal EEO complaint, or lawsuit in Federal District Court, pursuant to the Equal Pay Act. In addition to other remedies available through the EEO complaint process, liquidated damages are available for willful violation of the Equal Pay Act. https://www.eeoc.gov/federal/directives/md-110_appendix_d.cfm

j. If you file a formal EEO complaint and it is accepted, you have the right to request an immediate Final Agency Decision from the Department of Veterans Affairs, or a hearing before an administrative judge of the EEOC after 180 days from the date you file the formal complaint, or after completion of the investigation, whichever comes first. If you request a Final Agency Decision, the request should be addressed to District Manager (08N), Office of Resolution Management, 2002 Holcombe Boulevard, Building 110, Houston, TX 77030. If you request an EEOC hearing, the request should be addressed to the EEOC District office under your geographical jurisdiction with a copy to the above-named District Manager. The list of offices can be found at http://www.eeoc.gov/federal/directives/md-110_appendix_n.cfm.

k. Except for complaints of age discrimination, you have the right to file a lawsuit in Federal District court at any time 180 calendar days after filing a formal complaint or up to 90 calendar days after receipt of a Final Agency Decision from VA. You

Revised: 1/25/2019

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

Page - 5 -
Notice of Rights and Responsibilities
Name of Aggrieved Person: DaShaun McCray
Case Number: 2003-589W-2020102157

may also appeal a Final Agency Decision to EEOC within 30 calendar days of receipt of the decision.  If you choose to appeal a Final Agency Decision to EEOC, you have the right to file a lawsuit in Federal District Court at any time after 180 calendar days from the filing of such an appeal, or up to 90 calendar days after receiving an appellate decision from EEOC.

l.  If you believe that other individuals, similarly situated to you, have suffered from the same kind of discrimination, you may have the right to file a class action complaint.  A class action complaint must allege that you have been individually harmed by a VA personnel management policy or practice that has similarly harmed numerous other class members.  You must also allege that there are questions of fact that are common to, and typical of, the claims of the class, and that you or your representative will fairly and adequately protect the interests of the class.  EEOC also requires that a class agent be represented by a qualified attorney. https://www.eeoc.gov/federal/directives/md-110_chapter_8.cfm

m.  You have the responsibility to cooperate with VA during the processing of your complaint.  You must keep the VA informed of your current address; you must claim any mail sent to you, and you must cooperate with any individual assigned to the complaint.  If you eventually file an appeal with EEOC about the complaint, you must serve copies of the appeal papers on VA.

n.  If your complaint involves back pay, you have a duty to mitigate damages by actively seeking and/or retaining employment.  Interim earnings or amounts, which could be earned by a complainant with reasonable diligence, generally must be deducted from back pay.

o.  If you have filed two or more complaints, the agency will consolidate them after appropriate notice to you. When a complaint has been consolidated with one or more earlier complaints, the agency shall complete its investigation within the earlier of 180 days after the filing of the last complaint or 360 days of the filing of the first complaint.  In addition, the Administrative Judge may consolidate multiple complaints at the EEOC hearing stage.

p.  Finally, you must limit any formal EEO complaint you may file to those matters discussed with ORM, or to like or related matters (that is, matters which are directly related to those matters or which are unmistakably derived from those matters).  Additionally, if you wish to amend a previously filed complaint, only matters that are like or related to the claim(s) in the pending complaint may be added.  To protect your rights, discuss all claims with ORM before you file a formal complaint.

q.  If you reject an agency offer of resolution made pursuant to 29 C.F.R. §1614.109(c), it may result in the limitation of the Agency's payment of attorney's fees or costs.

Revised: 1/25/2019

Page - 6 -
Notice of Rights and Responsibilities
Name of Aggrieved Person: DaShaun McCray
Case Number: 2003-589W-2020102157

r.  Extension of Counseling for Resolution Efforts. When the aggrieved individual and an EEO Counselor engage in resolution efforts, they may decide that they need additional time to reach an agreement. If the aggrieved person consents, the EEO office may extend the counseling period an additional period up to but not exceeding 60 days. See 29 C.F.R. § 1614.105(e). Prior to the end of the 30-day period, the aggrieved person may agree in writing with the agency to postpone the final interview and extend the counseling period for an additional period of no more than 60 days. If the matter has not been resolved before the conclusion of the agreed extension, the notice described in paragraph (g) of this section shall be issued.

s.  Unless you inform us otherwise, all EEO correspondence transmitted by ORM will be sent to you and your designated representative, if applicable, via email. If your representative chooses not to participate in the email receipt of documents, he/she must notify ORM in writing. In instances where documents may be too large to email, ORM will physically mail any such correspondence to your address of record.

If you should file a formal complaint, and it is accepted for investigation, you will receive a copy of the investigative file via encrypted email or via another means approved by the agency. With this election, you will not receive a printed copy of the investigative file unless you notify ORM in writing of your request to receive a printed file.

ORM will use the date you or your attorney, if applicable, received the correspondence via email for purposes of calculating timeliness. Therefore, if the email address to which EEO correspondence is sent is a VA account, you must use the Read Receipt Option in Outlook to provide proof of delivery to ORM. If you or your representative is not using a VA email account to receive EEO correspondence, you must provide ORM with email confirmation immediately upon receipt of documents and notices. For timeliness purposes if read receipt or email confirmation is not provided, it shall be presumed that the parties received the Agency's correspondence within five days after the date it was sent via email.

t.  You may be asked to provide documentation to ORM to support your case.    The Department of Veterans Affairs National Rules of Behavior (§2.hh) state that you "will protect sensitive information from unauthorized disclosure, use, modification, or destruction,…"  You are asked to redact any unnecessary personally identifiable information (names, patient records, addresses, phone number, etc..) from any documents that you provide to ORM.  If you believe that the sensitive information in the documents is essential to your case, contact your ORM counselor/investigator and advise him/her of your concern BEFORE sending the information.

Revised: 1/25/2019

Page - 7 -
Notice of Rights and Responsibilities
Name of Aggrieved Person: DaShaun McCray
Case Number: 2003-589W-2020102157

If you wish to discuss your rights and responsibilities further, or if you have questions or need additional information you may contact me preferably by e-mail, Natalina.Alford@va.gov or via telephone at (713)770-2434 or at the above address.

_____    _____
DaShaun McCray, Aggrieved Person                          Date


_____    _____
N/A , Representative                                              Date

Revised: 1/25/2019

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

# Office of Resolution Management
*Department of Veterans Affairs*

**ROLE AND RESPONSIBILITIES OF THE EEO COUNSELOR**

- I am an information gatherer.

- My counseling activities are intentionally informal in order to contribute to a climate within which facts may be given freely and resolutions explored by both parties with minimum tension.

- I talk with the principles in the dispute in a casual and non-intimidating manner.

- As an EEO counselor, my job is to assist the parties of the complaint in their efforts to reach an amicable agreement.

- I am not a representative or an advocate of the aggrieved person. I do not, for example, advise the aggrieved person whether to file a formal complaint.

- I do not offer opinions about the merits of the case, but I do advise on what EEO laws and regulations require to prevail in a case.

- I provide all parties with technical information about how the process works and about their rights and responsibilities during the process.

- I am not management's representative. I am a neutral of the Office of Resolution Management (ORM).



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**Continental District**
**Houston, TX 77030**

May 12, 2020

In reply refer to: 08N

VIA: E-Mail

Dr. Dana Foley, Interim Director (589W/00)
Department of Veterans Affairs
Robert J. Dole, VA Medical Center
5500 East Kellogg
Wichita, KS 67218

**SUBJECT: Notice of Acceptance of EEO Complaint of DaShaun McCray,
Case No. 2003-589W-2020102157, Filed March 31, 2020**

1.  This is to inform you that DaShaun McCray filed a complaint of discrimination
on March 31, 2020.  Enclosed is a copy of the acceptance letter that was sent to
the complainant.

2.  All documents and records, including the Official Personnel Folder related to
this complaint, must be maintained at the facility and made available at the time
of the investigation.

3.  Advanced preparation for the investigation is to begin as soon as possible.
This includes securing all documents (appropriately redacted)[1] identified in the
attachment to this letter.  We require that the requested information be provided
**within 10 calendar days** of your receipt of this letter using electronic delivery via
email to ORMOICTAdministrativeTeam@VA.gov or via DOD's SAFE portal. You
may contact us at RMOICTAdministrativeTeam@VA.gov for questions related to
using SAFE.

If electronic delivery is not possible, requested information should be mailed to:

DVA-Office of Resolution Management
Attn: Colette Hill
William S Morehead Federal Building
1000 Liberty Ave., Suite 1801
Pittsburgh, PA 15222

---

[1] Any patient/veteran information must conform with VA's guidelines/criteria for release of
information and have the appropriate documentation to verify authorization to release such
information to ORM.

Revised 11/2012

Page 2.
Notice of Acceptance
DaShaun McCray
Case No. 2003-589W-2020102157

If any of the requested documents or information does not exist or is not maintained by your facility, please have an appropriate management official provide a signed and dated statement identifying the information and explaining why it cannot be provided.

4.  The protection of the privacy of veterans, their dependents and beneficiaries, as well as the privacy of all employees and contractors of VA, and other individuals for whom personal records are created and maintained in accordance with Federal law is a critical requirement.  As such, documents provided to us in response to our requests for documents or information **must be redacted prior to their release to ORM** for VA sensitive information[2] and personally identifiable information (PII).  Specific examples of information that should be redacted/sanitized before their release to ORM include:

    a.  Social security numbers
    b.  Names of veterans, their dependents and/or beneficiaries
    c.  Medical/diagnostic and/or veteran claim information related to specific veterans, their dependents and/or beneficiaries
    d.  Dates of birth (the exception to this are for cases that allege age based discrimination).
    e.  Complainant's medical information, unless this information is accompanied with a release of information signed by the complainant.

5.  ORM will make two requests for information deemed necessary for inclusion in the investigative file.  This letter is considered the first request for information. If an additional request is necessary, it will be prepared by the investigator assigned to this complaint.  Requests will be documented in the investigative file along with your facility's response, or lack thereof.  **Failure to submit the requested documents may result in an adverse inference/sanction by the VA Office of Employment Discrimination Complaint Adjudication or the Equal Employment Opportunity Commission.**

6.  The Equal Employment Opportunity Commission (EEOC) encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level.  Agencies and complainants can realize many advantages from using ADR.  ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion.  If you are interested in

---

[2] VA sensitive information as defined by Public Law 109-461, is all Departmental data, on any storage media or in any form or format, which requires protection due to the risk of harm that could result from inadvertent or deliberate disclosure, alteration, or destruction of the information. The term includes information whose improper use or disclosure could adversely affect the ability of an agency to accomplish its mission, proprietary information, records about individuals requiring protection under various confidentiality provisions such as the Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA).

Page 3.
Notice of Acceptance
DaShaun McCray
Case No. 2003-589W-2020102157

using mediation to address the issues raised in this complaint, please contact
Timothy Helke, Case Manager, at (713) 794-7756, or the ADR Program Manager
at (202) 501-2800.

RODGER L. EVANS
Continental District Manager

Enclosure:    Acceptance Letter

Neil Simmons, EEO Program Manager (Via E-Mail)

Page 4.
Notice of Acceptance
DaShaun McCray
Case No. 2003-589W-2020102157

---

**REQUESTED DOCUMENTS FOR PENDING EEO INVESTIGATIONS**

**COMPLAINANT'S NAME: DaShaun McCray**
          **CASE NUMBER: 2003-589W-2020102157**
          **DATE FILED: MARCH 31, 2020**

**INSTRUCTIONS:** Please provide documents checked (√) below. This information is due in the ORM Field Office within ten (10) days of receipt of request. Documents must be accompanied by a statement from an appropriate official certifying the documents as true and accurate. Statements must be on official stationery, dated, signed and must include the title of the certifying official. The EEO category(s)/bases of this complaint are checked (√) below:

**EEO CATEGORIES (BASES)**

| | | |
|---|---|---|
| **[X] RACE** | **[]COLOR** | **[]AGE** |
| **[]SEX** | **[]NATIONAL ORIGIN** | **[]DISABILITY** |
| **[]RELIGION** | **[X]REPRISAL** | |

---

**HOSTILE WORK ENVIRONMENT**

**[x]** Organizational chart for the organizational unit to which the complainant was assigned at the time of the reassignment.

**[x]** Statistical breakdown of the organizational unit[3] involved in the action in question as of the date of the action. Provide name, position (title, series, and grade), and EEO category(s) as checked above.

**[x]** Facility harassment policy in effect at the time the complaint was filed.

---

[3] Organizational unit is defined as the section where complainant was employed (or sought employment if complaint was filed by an applicant for employment) when the complaint was filed. For example, if the complainant worked for Human Resources Management (HRM) Service/Division in the Labor Relations Section, the organizational unit is the Labor Relations Section.

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**Continental District**
**2002 Holcombe Blvd., Bldg. 110**
**Houston, TX 77030**

May 12, 2020

In reply refer to: 08N

VIA: DaShaun.MaCray@VA.gov

DaShaun McCray
2205 S. Linden
Wichita, KS 67207

**SUBJECT:  Notice of Acceptance of your EEO Complaint, Case No. 2003-589W-2020102157, Filed March 31, 2020, against officials of the Department of Veterans Affairs, Robert J Dole VA Medical Center, in Wichita, Kansas**

1. On January 31, 2020, you initiated contact with an EEO counselor. Counseling concluded on March 16, 2020, when you were sent, via email, the Notice of Right to File a Discrimination Complaint, which you received on March 31, 2020.  On March 31, 2020, you filed a formal complaint of discrimination, VA Form 4939.

2. Your complaint raises the following claim:

   **Whether on the bases of race (African-American) and reprisal (previous EEO activity[1]), the complainant was subjected to a hostile work environment as evidenced by the following:**

   **1. From April 2018, through the present, Ruth Duda (RD), Community Care Service Chief, attempted to "intimidate" the complainant when she spoke with her in her workspace, RD yelled at her in a public area while discussing another employee's pay, and RD stated, "If she wants to get paid, you better tell her to send us the form!"**

   **2. Between January 28, 2019, and January 4, 2020, RD required the complainant to complete the staffing model duty, without providing her Nurse Manager training.**

   **3. From January 2019, through the present, RD "usurped" the complainant's supervisory authority by instructing her (complainant's) staff to complete different actions than she initially instructed her staff to do.**

---

[1] The complainant added the basis of reprisal on her formal complaint.

Page 2
Notice of Acceptance
DaShaun McCray
Case No. 2003-589W-2020102157

**4. On January 24, 2020, RD increased the complainant's workload after she had a meeting with the Chief of Staff to discuss RD's behavior.**

**5. On January 30, 2020, RD refused to allow the complainant to speak during a meeting with the Medical Center Director, even though the Director asked RD to allow her (complainant) to speak.**

**6. On January 31, 2020, RD violated the complainant's personal space when she looked over her so that she could see her computer, and RD yelled at her, "You did not allow me to talk during the meeting with the Pentad, and you gave incorrect information, are you offended?"**

**7. On February 10 and 14, 2020, RD undermined the complainant's ability as a supervisor when she stated, "You took all leadership away from Janelle Adams, Coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when she falsely accused her taking over a February 7, 2020, meeting and did not allow another employee to speak.**

**8. On March 2, 2020, RD threatened to fire the complainant when she asked RD how to proceed with an employee's expired nursing license, and RD stated to her, "I find your response interesting, as I was also told to fire you when you violated the HIPAA law. Yet I chose a merciful route. (Name unknown) could produce a license tomorrow, and you would have lost a valuable employee."**

3.  In assessing a hostile environment claim, the totality of the circumstances must be examined, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.  A hostile environment claim generally requires a showing of a pattern of denigrating conduct that unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment.  In determining whether harassment is sufficiently severe or pervasive to create a claim of hostile environment, the harasser's conduct is evaluated from the objective standpoint of a reasonable person.  An objectively hostile or abusive work environment is created only when a reasonable person would find it hostile or abusive.

We have determined your claim of hostile work environment passes the severe or pervasive requirement for further processing.  The events in your complaint

Page 3
Notice of Acceptance
DaShaun McCray
Case No. 2003-589W-2020102157

occurred over an approximate two-year period and could have the potential to affect the work environment of a reasonable person.

4. As noted above, your overall claim of harassment, **events 1-8,** is  **ACCEPTED** for investigation.

5. If you believe that the accepted claim is improperly formulated, incomplete, or incorrect, you must notify this office within 7 calendar days of receipt of this letter, in writing, by mail or fax, stating your disagreement.  We will include your statement in the complaint file.  If you do not contact this office within 7 calendar days, we will assume that the claim is correctly stated. You are *strongly encouraged* to use email to submit any concerns regarding the events identified in the notice of partial acceptance to timothy.helke@va.gov

6.  The accepted claim will be assigned to an impartial investigator under the supervision of the Office of Resolution Management (ORM).  The investigator will contact you directly in order to obtain information or evidence you may wish to offer.

7. You have additional rights that are fully explained in the enclosure to this letter.

8.  Failure to keep this office advised of any change of address could lead to dismissal of your complaint.  You must also immediately advise this office, in writing, of the name, address, and telephone number of any person you may choose to represent you.  If you advise us of representation, we will mail all subsequent complaint-related correspondence to your representative, with copies to you, unless you advise us, in writing, that you are no longer represented by that individual.

9. Our fax number is (713) 794-7672.  If you have any questions, please contact Timothy Helke, Case Manager, at Timothy.helke@va.gov. You are strongly encouraged to use email to submit your correspondence and/or documents to ORM.

*Rodger L. Evans*
RODGER L. EVANS
Continental District Manager

Enclosures:   Complainant Rights
                       EEOC Letter dated April 6, 2020

Page 4
Notice of Acceptance
DaShaun McCray
Case No. 2003-589W-2020102157

cc:
Dr. Dana Foley, Interim Director (589W/00) (Via E-Mail) Department of Veterans Affairs
Robert J. Dole, VA Medical Center
5500 East Kellogg
Wichita, KS 67218

Neil Simmons, EEO Program Manager (Via E-Mail)

Page 5
Notice of Acceptance
DaShaun McCray
Case No. 2003-589W-2020102157

**Complainant Rights**

The investigation must be completed within **180** calendar days of filing your complaint.  You will receive a copy of the investigative file upon completion. You will be advised, in writing, of your right to request a **Final Agency Decision (FAD)** from the VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC, or a **hearing** by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

**Requesting a Hearing**

In order to request a hearing, you must meet the following criteria:
- You have received your completed investigative file  **-OR-**
- 180 calendar or more days elapsed since you filed your formal complaint (and you have not received your complete investigative file)

| To request that EEOC appoint an administrative judge to hear your complaint, complete a "Hearing Request Form" send it to: | You must send a **copy** of your EEOC hearing request to this office: |
|---|---|
| Director<br>U.S. Equal Employment Opportunity Commission<br>St. Louis District Office<br>1222 Spruce St., Room 8.100<br>St. Louis, MO 63103<br>or<br>You may request a hearing through EEOC's online portal at http://publicportal.eeoc.gov | Department of Veterans Affairs<br>Office of Resolution Management<br>Continental District<br>2002 Holcombe Blvd.<br>Houston, TX 77030 |

You are required to certify to the EEOC administrative judge that you sent a copy of the request for a hearing to the Office of Resolution Management at the above address.

**Requesting a Final Agency Decision**

To request a FAD, you must have received your completed investigative file.

| To request a FAD, submit the FAD request form which will be included in your investigation file to: |
|---|
| Department of Veterans Affairs<br>Office of Resolution Management<br>Continental District<br>2002 Holcombe Blvd.<br>Houston, TX 77030 |

If you request a FAD, it will be rendered by VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC.  The FAD will address all claims, and a decision will be made on the merits of your complaint. You may appeal the FAD to EEOC if you are dissatisfied with the decision.  OEDCA will provide you with specific information regarding your appeal rights following its final agency decision, including your right to file a civil action in an appropriate United States District Court.

**Requesting Civil Action**

If you have not received a copy of the investigative file within 180 calendar days from date you filed your formal complaint, and you do not wish to have a hearing, you also have the right to file a civil action in an appropriate United States District Court. If you file a civil action, the court may, at its discretion and upon your request, appoint an attorney to represent you in the matter, if you do not have or cannot afford one. The court may also authorize the civil action to begin without payment of fees, costs, or other security. Finally, if you decide to file a civil action, you must name the Secretary of Veterans Affairs as the defendant.

**Requesting ADR**

The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints. Agencies and complainants can realize many advantages from using ADR.  ADR offers parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion.  If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM case manager listed in the letter or the ADR program manager at workplaceadr@va.gov.



U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSIN
Office of Federal Operations
P.O. Box 77960
Washington, D.C.  20013

April 6, 2020

<u>Memorandum</u>

TO:        Federal Sector EEO Directors & Officials

FROM:      Carlton M. Hadden
           Director, Office of Federal Operations

SUBJECT:   Processing Information for All Parties in Federal EEO Processing under 29 CFR Part 1614

In light of the National Emergency declared by the President due to the Coronavirus (COVID-19), the U.S. Equal Employment Opportunity Commission's (EEOC) Office of Federal Operations (OFO) is issuing the following instructions regarding the processing of federal sector EEO complaints covered by 29 CFR Part 1614.

The EEOC recognizes this crisis affects all federal employees, complainants, and others involved in the EEO process.  We appreciate the dedication of federal EEO professionals throughout the federal government and we further recognize that the centerpiece of our efforts are the employees, applicants, and former employees who believe they have experienced employment discrimination and access our regulatory process for assistance.  Nevertheless, the federal government remains open and committed to providing mission-critical services to the greatest extent possible, given the limitations inherent in the current environment.

The EEOC also recognizes that, because of the National Emergency, applicants who utilize the EEO complaint process may face challenges that preclude them from meeting the regulatory timeframes set forth in 29 CFR Part 1614.

The EEOC must balance its duty to ensure that the EEO process continues efficiently and effectively, without compromising the safety of federal employees or the rights or safety of complainants and others involved in the EEO process.

The EEOC expects that agencies and employees will continue to process EEO complaints in a timely manner that will best preserve the legal rights of the parties involved, unless doing so would interfere with mission-critical operations for an agency.  Accordingly, the Office of Federal Operations is issuing the following instructions, which will remain in effect until further notice:

1.  Agencies will continue all counseling, investigations and other complaint processing set forth in 29 CFR Part 1614, except in circumstances meeting the criteria described below.

2. To the extent practicable, regulatory timeframes concerning the processing of federal sector EEO complaints will continue to be met, wherever feasible. For this purpose, practicable means where the agency and complainant have access to needed witnesses, documents and representation, and where such processing will not interfere with the mission- critical operations of the agency.

3. The regulatory timeframes set forth in 29 C.F.R. Part 1614 will be subject to the equitable tolling provisions set forth in 29 C.F.R. §1614.604(c). Absent mutual agreement, <u>agencies and complainants will be required to document in the record the reason(s) why tolling any of the time limits set forth in 29 CFR Part 1614 is necessary.</u> Such justification will fully be considered by the Commission in any appeal raised in the matter.

4. Agencies and complainants are encouraged to seek mutual agreement with respect to the extension of any timeframes. Where such agreements are reached, they should be reduced to writing and made part of the record. OFO will honor such agreements on appeal, unless they are clearly onerous to one party or otherwise violate the standards for equitable tolling, waiver or estoppel.

5. EEOC Administrative Judges will continue to manage the hearings program. Administrative Judges will continue to hold conferences, manage discovery, refer cases to ADR and settlement, issue summary judgment decisions and, where appropriate, hold hearings and issue decisions. In light of the National Emergency, either party can seek an extension or other relief from any deadline for good cause shown.

6. The EEOC is deeply concerned about protecting (and committed to ensuring every federal employee continues to have) all their rights during this time of National Emergency. To that end, EEOC asks agency EEO offices to continue counseling employees, accepting their discrimination complaints, and investigating these complaints to the fullest extent possible without undermining mission-critical functions. We ask agencies not to issue final actions on any EEO complaint, unless the investigation is complete <u>and</u> the Complainant has requested that the final action be issued.

7. EEOC will continue to prepare appellate decisions but will not mail those decisions. A Complainant who provides an e-mail address and waives first class mailing may request the decision via e-mail to <u>ofo.eeoc@eeoc.gov</u> . The Commission is extremely cognizant of preserving a party's right to file a civil action in U.S. District Court. Given the current National Emergency, the Commission is suspending issuance of all appellate decisions via the U. S. mail until further notice in order to best preserve those rights.

8. Until further notice, OFO does not have access to U.S. Mail; rather, we ask that all submissions and communications from both agencies and complainants be digital, via the Public Portal/FEDSEP. We ask those who submitted items via U.S. Mail on or after March 6, 2020 to resubmit them via the Public Portal/FEDSEP.

9.  The Commission supports and encourages the use of digital documents and electronic signatures. A digital document used by a person, agency, or other entity shall have the same force and effect as those documents not produced by electronic means. "Electronic signature" means any digital symbol, sound, or process attached to or logically associated with a digital record and executed or adopted by a person with the intent to sign the record.

10. Each agency subject to the regulations at 29 CFR Part 1614 is directed to forward a copy of this notice, using the most effective available method, to each Complainant with a pending EEO matter and to each person who hereafter contacts an agency EEO counselor or otherwise enters into the agency's EEO process.

11. For more Commission information and resources, please go to our COVID-19 information links at: https://www.eeoc.gov/coronavirus/

3



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
CONTINENTAL DISTRICT
2002 Holcombe Boulevard Building 110
Houston, TX 77030

In reply refer to: 08

May 4, 2020

VIA: Email (dmmccray@ymail.com)

DaShaun McCray
2205 S. Linden
Wichita, KS 67207

**SUBJECT: Notice of Receipt of your Discrimination Complaint No. 2003-589W-2020102157, Filed March 31, 2020**

1.  The official filing date of your complaint is **March 31, 2020,** based on date your Email was received.  This notice also provides you with written notification of your rights, as well as the time requirements for exercising those rights.

2.  If your claims are accepted, your case will be assigned to an impartial investigator under the supervision of the Office of Resolution Management (ORM).  The investigator will contact you directly in order to obtain information or evidence you may wish to offer.  The investigation must be completed within 180 calendar days of the filing of your complaint.  You will be provided with a copy of the investigative file upon completion and you will be advised, in writing, of your right to request a Final Agency Decision (FAD) from the Office of Employment Discrimination Complaint Adjudication (OEDCA), or a hearing by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

3.  If the investigation has not been completed within the 180 calendar-day time limit, regulations permit the agency and the complainant to agree, in writing, to extend the investigative period for not more than 90 calendar days.  ORM will make every good faith effort to complete the investigation within the prescribed period.  However, where workload demands make it impossible to complete a timely investigation, we will work with you to seek mutual agreement to extend the period so that the investigation can be completed before you seek an EEOC hearing or a final agency decision from OEDCA.

4.  You must keep this office advised of any change of address.  Failure to do so could lead to dismissal of your complaint.  You must also immediately advise this office, in writing, of the name, address, and telephone number of any person you may choose to represent you in this matter. All subsequent actions on your complaint will be emailed or delivered to your representative, with copies to you, unless you advise us in writing that you are no longer represented by that individual. **You are *strongly encouraged* to use email to submit your correspondence and/or documents to ORM**

Page 2
Notice of Receipt
Complainant: DaShaun McCray; 2003-589W-2020102157

5.  The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints at the lowest possible level.  Agencies and complainants can realize many advantages from using ADR.  ADR offers the parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion.  Please see the Mediation Program Information Sheet enclosed.  If you are interested in using mediation to address the issues raised in your complaint, please contact the ADR Director at workplaceadr@va.gov.  If you have questions or concerns contact Timothy Helke, ORM Case Manager at email: Timothy.Helke@va.gov.


RODGER L. EVANS
Continental District Manager


**Enclosure:  Counselor's Report**
Mediation Program Information Sheet


cc:    Ricky A. Ament, Director (589W/00), Via: Email
Robert J. Dole VAMC
5500 E. Kellogg
Wichita, KS 67218

Neil K. Simmons, EEO Program Manager

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)

**MEDIATION PROGRAM INFORMATION SHEET**

**What Is Mediation?**

Mediation is an informal way for employees to address disputes with a fellow employee, manager, or colleague.  In mediation, a neutral person called a mediator helps two or more persons explore ways to resolve their differences and reach an agreement that best addresses their interests.  Mediation allows the parties to create their own unique solutions, instead of taking the problem to an outside decision-maker and having that person's solution imposed on them.

Mediation does not focus on who is right and who is wrong.  It focuses on forward thinking and solving the problem.  The mediator has no authority to make decisions for the parties.  The parties decide what is important to each of them and make decisions based on those factors.  The mediator helps the parties communicate, make informed decisions by understanding and listening to each other, and work together to create options and acceptable solutions.

**Why Should I Request Mediation?**

While conflict is a natural part of our daily lives, unresolved disputes may become unproductive and negatively impact the work environment.  In these instances, mediation can save time and resources for all involved.  Mediation can improve communication and prevent future misunderstandings.  Mediation provides an opportunity to discuss sensitive issues and concerns in a private setting.  Mediation helps the parties to look realistically at the best and worst case alternatives to resolving the dispute, and when possible, develop mutually satisfactory solutions.  By agreeing to mediate, neither party gives up any rights to other processes that may be available to address the dispute.  Parties can designate a representative to attend the mediation and provide support and advice during the process.

**How Does Mediation Fit Into The EEO Process?**

An individual who has initiated the EEO complaint process may advise an Office of Resolution Management (ORM) EEO counselor of his/her interest in mediation as opposed to EEO counseling.  The EEO counselor will inquire and find out if the Agency is willing to participate in mediation.  If so, the pre-complaint process will be extended for no more than 90 calendar days from the individual's date of initial contact with the EEO counselor to allow the parties to mediate.  If mediation does not resolve the matter, the EEO counselor will advise the individual of his/her right to file a formal EEO complaint.

After a formal EEO complaint has been filed, the complainant may request mediation at any time during the processing of his/her complaint.  If the Agency agrees to mediate, the processing of the EEO complaint will be held in abeyance for no more than 90

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)
**000049**

calendar days from the date of the request to mediate. If the complaint is not resolved in mediation, the EEO complaint process resumes at the point mediation was requested.

## How Do I Begin The Mediation Process?

The mediation process is initiated by contacting the ORM official assigned to the EEO complaint or ORM's ADR Program Office. If the request does not involve an issue of fraud, waste, abuse, criminal activity, sexual harassment, or removal for cause, the other party involved in the dispute will be contacted to see if (s)he is amenable to mediation. If the other party is willing to mediate, the ORM ADR Program Office or Facility ADR Coordinator obtains mediators from within VA or another Federal agency, depending on the parties' preference. In some instances, where a party is a member of the bargaining unit, the union may be notified of and invited to participate in the mediation session.

## What Happens During The Mediation Session?

Generally, the mediator begins with an introduction, explaining the process, each party's role, and establishing ground rules. Then, each party is afforded an opportunity to share information about the dispute. The mediator may continue with all parties in a joint session, exploring ways to address the issues raised or the mediator may meet separately with each party in private caucuses. Any information shared only with the mediator will be kept confidential unless permission is given to the mediator to disclose to the other party. If the parties can find common ground and agree to terms, those terms are documented in an agreement.

## What If An Agreement Is Reached?

A written agreement is drafted and signed by all necessary parties. Once the agreement is signed by all parties, the contract is binding and enforceable. The parties may agree not to disclose the terms of the agreement to those who do not have a need to know; however, the document itself is not confidential and may be disclosed to establish compliance.

## What If An Agreement Is Not Reached?

If mediation was elected during the EEO complaint process, the process resumes at the point mediation was requested.

## What If I Have More Questions?

If you would like additional information, please contact the ORM ADR Program Office at workplaceadr@va.gov.

CONFIDENTIAL DOCUMENT – GENERATED IN THE ORM COMPLAINT AUTOMATED TRACKING SYSTEM (CATS)







**DEPARTMENT OF VETERANS AFFAIRS**
**CONTINENTAL DISTRICT**
**OFFICE OF RESOLUTION MANAGEMENT**
**HOUSTON, TX 77030**

**Investigative Report**

**In the Matter of the EEO Complaint of Discrimination of:**

| | |
|---|---|
| Dashaun McCray<br>2205 S. Linden<br>Wichita KS 67207 | )<br>)<br>)<br>) |
| (Complainant) | )<br>) |
| v. | ) **Case No:** 2003-589W-2020102157<br>) |
| | ) |
| Secretary<br>Department of Veterans Affairs<br>810 Vermont Avenue, NW<br>Washington, DC 20420<br>(Respondent) | )<br>)<br>)<br>)<br>) |
| | ) |

Facility: Department of Veterans Affairs
Robert J Dole  VAMC

Linda Harris
EEO Investigator
2002 Holcombe Blvd., Bldg. #110
Houston, TX 77030

## I. Introduction

Having met all procedural requirements for acceptance, with respect to the issues specified hereafter; this complaint was assigned for investigation on June 22, 2020. An

investigation using affidavits and sworn testimony was conducted from June 23, 2020 to September 23, 2020, 2020. This report is submitted for the consideration of the Regional EEO Officer on this 24th day of September.

## II. Background

DaShaun McCray referred to as the Complainant, contacted an EEO Counselor on January 31, 2020 stating that race and reprisal were the bases for her claim. Counseling was unsuccessful in resolving her complaint and she filed a formal complaint on March 31, 2020. The complaint was accepted for investigation on May 12, 2020 (1-1; 2-1; 3-1).

## III. Claims and Basis

**Whether on the bases of race (African-American) and reprisal (previous EEO activity[1]), the complainant was subjected to a hostile work environment as evidenced by the following:**

**Event 1: From April 2018, through the present, Ruth Duda (RD), Community Care Service Chief, attempted to "intimidate" the complainant when she spoke with her in her workspace, RD yelled at her in a public area while discussing another employee's pay, and RD stated, "If she wants to get paid, you better tell her to send us the form!"**

**Event 2: Between January 28, 2019, and January 4, 2020, RD required the complainant to complete the staffing model duty, without providing her Nurse Manager training.**

**Event 3: From January 2019, through the present, RD "usurped" the complainant's supervisory authority by instructing her (complainant's) staff to complete different actions than she initially instructed her staff to do.**

**Event 4: On January 24, 2020, RD increased the complainant's workload after she had a meeting with the Chief of Staff to discuss RD's behavior.**

**Event 5: On January 30, 2020, RD refused to allow the complainant to speak during a meeting with the Medical Center Director, even though the Director asked RD to allow her (complainant) to speak.**

**Event 6: On January 31, 2020, RD violated the complainant's personal space when she looked over her so that she could see her computer, and RD yelled at her, "You did not allow me to talk during the meeting with the Pentad, and you gave incorrect information, are you offended?"**

**Event 7: On February 10 and 14, 2020, RD undermined the complainant's ability as a supervisor when she stated, "You took all leadership away from Janelle Adams, Coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when she falsely accused her taking over a February 7, 2020, meeting and did not allow another employee to speak.**

**Event 8: On March 2, 2020, RD threatened to fire the complainant when she asked RD how to proceed with an employee's expired nursing license, and RD stated to her, "I find your response interesting, as I was also told to fire you when you violated the HIPAA law. Yet I chose a merciful route. (Name unknown) could produce a license tomorrow, and you would have lost a valuable employee."**

## IV. Review of Documents

| | |
|---|---|
| Complainant's Evidence; Event 6 | 7-7 |
| Complainant's Evidence; Event 7 | 7-8 |
| Complainant's Evidence; Event 8 | 7-9 |
| Complainant's HWE Report | 7-10 |
| Complainant's Supporting Evidence | 7-11 |
| Ruth Duda Evidence | 7-12 |
| OCC Fact-Finding Investigative Findings | 7-13 |

## V. Summary

### A. Summary

**Complainant (Race: African American; Previous EEO activity: January 2020 complaints against Ruth Duda)** was the Nurse Manager Office of Community Care at the Robert J. Dole VAMC until May 23, 2020. Ruth Duda (Race: Caucasian) was her first-line supervisor. Ruth Duda became aware of her race in June 2017. She believes she was subjected to reprisal for her January 24, 2020 complaint to Ruth Duda's supervisor against Ruth Duda. Ruth Duda became aware of her complaints when she (Complainant) filed the subject complaint. (7-1)

**RMO, Ruth Duda (Race: Caucasian; Previous EEO Activity: Yes, involving the Complainant)** has been the Nurse 4 at the Robert J. Dole VAMC since 2017. She was

the Complainant's first-line supervisor. She became aware of the instant complaint in February 2020. She did not harbor any animosity towards the Complainant because of her race or the subject EEO complaint. She refutes that she felt threatened or intimidated by the Complainant's knowledge, skills and/or abilities. (7-2)

**RMO, Syed Raffi (Race; Asian/Indian; Previous EEO activity: None)** has been the Deputy Chief of Staff at the Robert J Dole VAMC since 2018. He did not have a working relationship with the Complainant. (7-4)

**Witness, Cynthia Finley** has been the Office of Community Care RN Nurse II at the Robert J Dole VAMC since 2017. The Complainant was her direct supervisor during the period. (7-5)

**Witness, Robert Cummings (Race: Caucasian; Previous EEO activity: Yes, not involving the Complainant)** has been the Chief of Staff at the Robert J Dole VAMC since 2017. He did not have a working relationship with the Complainant. (7-6)

_____

**Witness, Robert Cummings provided the following testimony regarding his knowledge of Events 1-8 of this claim:**

"At some time in 2019, Ms. McCray met with me regarding her perceptions of working with the Service Chief. I do not recall the specifics. I offered to sit down with the Service Chief, Nurse Manager and MSA Supervisor to discuss any issues. The latter two elected not to do so." He did not take any further action. He does not recall that the Complainant told him that RD's behavior, comments and/or actions were unwarranted nor that she felt intimidated or harassed by RD. He has no knowledge or belief that RD harbored animosity towards the complainant because of her complaints against her or because of her race. He has no knowledge or belief that RD felt inferior to the Complainant and/or intimidated by the Complainant. He testified that HR conducted a fact-finding investigation (basis unknown) (7-6; pp. 4-6)

_____

**Event 1: From April 2018, through the present, Ruth Duda (RD), Community Care Service Chief, attempted to "intimidate" the complainant when she spoke with her in her workspace, RD yelled at her in a public area while discussing another employee's pay, and RD stated, "If she wants to get paid, you better tell her to send us the form!"**

**The witnesses provided the following testimonies:**

**Complainant testified** that RD behaved in the alleged manner because that was "her level of communicating". She explained that RD felt that she was entitled to behave in this

manner because of her position.  She felt RD's behavior was inappropriate.  She told RD that her actions/behavior was unwarranted.  She reported the incidents to Syed Raffi who failed to take action in response.  She feared retaliation for her reports against RD.  (7-1; pp. 3-4; 7-10)

**Investigator Note: Off the record, the Complainant explained that there was a fact-finding investigation after she filed her EEO complaint. The fact-finding investigation results can be found in Exhibit 7-13.**

**RMO, Ruth Duda refutes** that she attempted to intimidate the Complainant in her interactions. She believes her interactions with the Complainant were professional and in accordance with the VA's Code of Conduct. She refutes that she yelled at the Complainant in a public area while discussing an employee's pay. The Complainant did not tell her that she felt intimidated and/or harassed by her. (7-2; p. 4; 7-12)

**Witness, Syed Raffi testified that**  in the first quarter of 2018, the Complainant expressed concerns to him regarding RD's behavior. Specifically, the Complainant told him that RD was publicly talking about other employees. In response, he had discussion with RD wherein he reminded her to speak to employees in private. He did not find reason to take any further action.   The Complainant did not tell him that she felt intimidated or harassed by RD nor that she felt RD treated her a discriminatory manner. The Complainant did not tell him that she felt RD was interfering with her ability to do her job. He was unaware of any of the other matters subject of this EEO complaint. He has not witnessed RD subject the Complainant to harassing or discriminatory treatment. He has no knowledge or belief that RD harbored any animosity towards the Complainant because of her reports against her or because of her race. He has no knowledge that RD felt inferior to the Complainant or intimidated by the Complainant.   (7-4; pp. 3-6)

**Event 2: Between January 28, 2019, and January 4, 2020, RD required the complainant to complete the staffing model duty, without providing her Nurse Manager training.**

**The witnesses provided the following testimonies:**

**Complainant testified that**  "Staffing Model is the way leadership prepares to request FTE. I had never been trained this duty by Ms. Duda and it was not being something that I was informed was a duty that should be delegated to the Nurse Manager. I was informed that is was and easy task and I could figure it out in the provided documentation."" To identify departmental needs based on workload and determine the need of appropriate number of FTE to complete assigned duties and requirements of the department. Ms. Duda did not start having meetings with department leadership until 10/28/19 and had never before discussed this process with me until I discussed concerns of her leadership abilities and the hostile work environment with Dr. Cummings COS." (7-1; pp. 4-5)

**RMO, Ruth Duda testified** that she required the Complainant complete this task because it was a part of her job duties. She completed the staffing model with the Complainant whereby she showed her how to complete the task. (7-2; pp. 4-5; 7-12)

**Event 3: From January 2019, through the present, RD "usurped" the complainant's supervisory authority by instructing her (complainant's) staff to complete different actions than she initially instructed her staff to do.**

**The witnesses provided the following testimonies:**

**Complainant testified** that "Ms. Duda would discredit information that I would give to staff to complete task, often times informing staff to do something against the process as a work around and then when I would return on site I would have correct the issued to make sure funding was appropriate according to guidelines This happened particularly with Jessica Clasen nurse covering Dental services, Heather Bandy RN covering Neurology and Pain Management services." "The staff informed me that Ms. Duda informed them to do a different way then how they had been instructed by me and we would then have to more often then not revert what had been done while I was out to meet the current process to appropriately authorize services." She believes RD intentionally removed her supervisory authority so to exert her authority. RD's action interfered with her ability to do her job and her staff's ability to perform their duties correctly. (7-1; pp. 5-6)

**RMO, Ruth Duda refutes** that she gave the Complainant's staff directives without consulting with the Complainant. "With the implementation of the Mission Act of 2018 and the transition from TriWest to Optum, frequent changes that occur in the Office of Community Care (OCC) arena. Between the changes in the Choice Program, the conversion to TriWest (TW), then Patient Centered Community Care (PC3), then PC3 with VA-scheduling, the preparation for the roll-out of the Mission Act, the many new programs to be initiated and now the switching to Optum the Third-Party Payer replacing TW; varying instructions were provided by VISN leadership, as they too were trying to figure out all the new regulations and processes to follow. Each communication was then passed on to staff, and at times became very confusing. (Supporting evidence of this noted in e-mail dated 12/11/2019 previously submitted). The Community Care (CC) field guide book was and is continually being updated to support new processes. Ms. McCray did voice opposition to some of the proposed processes by VISN leadership, and that may be her perception to pitting staff against each other, as I recommend, we follow VISN guidance. In the end, all processes were and are being finalized." The Complainant did not tell her that her directives to her staff was unwarranted nor that she (Complainant) felt that she (Duda) was undermining her supervisory authority. (7-2; pp. 5-7; 7-12)

**Event 4: On January 24, 2020, RD increased the complainant's workload after she had a meeting with the Chief of Staff to discuss RD's behavior.**

**The witnesses provided the following testimonies:**

**Complainant testified** that RD assigned her "busy work" such as congressional responses and attend meetings. She explained that the department was understaff and her efforts were needed carrying out daily operations and mission related tasks. She believes RD increased her workload to exert her authority and out of retaliation. **(**7-1; p. 7)

**RMO, Ruth Duda refutes** that she increased the Complainant's workload. "…As of January 2020, Ms. McCray has been in her position approximately one year. However, due to the frequent physical therapy appointments of Ms. McCray in January of 2019 and many program changes in the department, I opted to roll-out her full duties slowly as to not overburden or discourage her as a new manager. Between February of 2019 and January 2020, I shared the responsibility of investigating, resolution of complaint, and writing the response for all congressional inquiries and White House responses pertaining to OCC consults as well as fielding billing inquiry calls and veteran/vendor complaints, closing of the Individual Authorizations (payment type) and implementing the DST (Decision Support Tree for eligibility). By January of 2020, the new Mission Act programs (HSRM, VCA, PPMS-that Ms. McCray was overseeing) had been successfully rolled out with minimal staff oversight required. Therefore, at the 1/6/2020 OCC Supervisory weekly staff meeting I announced I would be turning over all duties to the immediate supervisor, respectively MSA to Ms. Dial and RN to Ms. McCray. While informing them I, I stated I know it is a heavy load as I have been a front-line manager, and if they needed assistance, I am willing to help. Ms. McCray assured me multiple times 'I can handle it'. She seemed very pleased and confident to have full responsibility for all the nursing functions. Therefore on 1/22/20 I trained Ms. McCray on how to access the VISN SharePoint site and complete the staffing model used for requesting staff. And while I did share the duties of responding to Congressional inquiries, I did not assign all to Ms. McCray as I will still monitoring workload to time requirements. Unfortunately, from 1/6-1/30, less than a month, Ms. McCray was missing many deadlines. She refused to ask for help and when offered acted offended. When I had to follow-up on assignments as her supervisor to ensure the task was completed, she became angry that I had discovered another deadline missed. It was also during this time that Ms. McCray spent a significant amount of time assisting Ms. Dial on her work, thereby taking away time Ms. McCray needed to timely complete her own duties." The Complainant did not tell her that she had a problem with the workload nor that she needed assistance. (7-2; pp. 7-8; 7-12)

**Event 5: On January 30, 2020, RD refused to allow the complainant to speak during a meeting with the Medical Center Director, even though the Director asked RD to allow her (complainant) to speak.**

**The witnesses provided the following testimonies:**

**Complainant testified that** "[i]n meeting with Pentad Ms. Duda was giving information why we were behind on certain metrics. When I would attempt to give information, she would talk over me and continue to speak to the point where the Medical Center Director raised his hand and requested, she allow me to speak." RD did not explain why she refused to allow her to

speak. She told RD that her refusal was unwarranted. She believes RD took this action to exert her authority and out of inferiority; as her (Complainant) knowledge of the department exceeded RD's knowledge. RD did not deny any other person to speak. (7-1; pp. 7-8)

**RMO, Ruth Duda refutes** that she refused to allow the Complainant to speak during a meeting with the Director. "I was presenting to our Executive Leadership team, known as the Pentad, of which the Director is present on 1/30/2020. I invited Ms. McCray to attend the meeting as this was another opportunity for exposure to upper level management. While it was my responsibility to present as Chief of the service, Ms. McCray took over answering questions concerning how the data was gathered. Because Ms. McCray had only a cursory overview of the model, she stated misleading statements to the authenticity of the report which resulted in having to produce another report to address time required on backlog, which is built into the staffing model by Central Office. (Pentad presentation supplied as well as next backlog report post meeting 1/30/20, and the series of e-mails to get correct data submitted provided in original response). Important to note that due to her responses to the Pentad leadership meeting, Ms. McCray was notified the following morning that she was removed from participating in the implementation of the Referral Coordination Initiative (RCI). This did not set well with Ms. McCray." (7-2; pp. 8-9; 7-12)

**Event 6: On January 31, 2020, RD violated the complainant's personal space when she looked over her so that she could see her computer, and RD yelled at her, "You did not allow me to talk during the meeting with the Pentad, and you gave incorrect information, are you offended?"**

**The witnesses provided the following testimonies:**

**Complainant testified that "**Ms. Duda arrived at my office and informed me that Dr. Cummings did not feel I needed to go to meeting with community provider today and I should work on project that was due by COB 1/31/20. She then asked me if I had received the email from Dr. Cummings. I informed her yes. She then proceeded to come around my workstation and look over my shoulder at something I was addressing. She then burst out and started yelling at me about me not letting her talk when it was clearly the other way around and am I offended about being taken off of the meeting with community provider." In response, she asked RD to leave her workspace. "She was not happy the I was able to give a clearer picture to the Pentad regarding the need for staff to complete the current outliers for Community Care active and scheduled appointments." She believes RD behaved in this manner out of retaliation and because of her race. She reported the incident to the COS, Robert V. Cummings and the former Director. In response, the Director told her that the matter would be addressed.    (7-1; pp. 8-9; 7-1(a); -7)

**RMO, Ruth Duda refutes** that she yelled at the Complainant. "When I arrived at the OCC office, post morning huddles with Leadership, with briefcase, lunch bag, purse in hand, and my coat is still on, Ms. McCray asks if I had read the e-mail from Dr. Cummings. I had not, and she had it pulled up on her computer screen. She pushed herself back in the chair and posturing for me to read it. Because I have bi-focals I had to go around her desk to see the screen. Standing beside her, I read the e-mail. At which she belligerently accused me of invading her personal space. I immediately returned to the opposite side of the desk. She

was very upset as Dr. Cummings has removed her from participating on the Referral Coordination Team. I asked if she was offended, and indeed she was, in addition to claiming to be the only subject matter expert and certified case manager in this VA. Which is not true, not only do I have other OCC RN's with case manager certifications there are case managers in the VA working on the main campus with certifications. Ms. McCray has never worked on the inpatient side or in an outpatient setting at the VA." She asserts that she behaved in this manner in response to the Complainant's question. Neither retaliation, hostility nor the Complainant's race were factors in the matter. (7-2; p. 9)

**Event 7: On February 10 and 14, 2020, RD undermined the complainant's ability as a supervisor when she stated, "You took all leadership away from Janelle Adams, Coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when she falsely accused her taking over a February 7, 2020, meeting and did not allow another employee to speak.**

**The witnesses provided the following testimonies:**

**Complainant testified that** on "February 7,2020 Team meeting to discussed ER notification and authorization process. Ms. Duda did not state anything to me regarding how she interpreted the way the task was discussed with the staff in the meeting, nor did the staff. On February 10, 2020 she went to the desk of Janelle Adams and asked her if she felt that I took leadership away from her and if she felt unable to talk to me about this type of thing due to fear of retaliation. Ms. Adams immediately went to the desk of Cynthia Finley RN and stated that she felt Ruth was trying to pit her against me." "Ms. Finley informed me of the incident, and I contacted Ms. Adams to verify the information. Ms. Adams confirmed the statement and information although was not willing to put it in writing. I could accept this as it is understandable that the staff would fear going against the Chief when they are trying to work toward promotion and other opportunities within the department and facility and she was currently working toward attaining her Nurse II." She confronted RD regarding the matter. She believes RD took this action out of retaliation. (7-1; pp. 9-11; 7-8)

**RMO, Ruth Duda testified** that she did make the referenced statements to the Complainant because of complaints she received from nursing staff. She claims that she gave the Complainant her "…observation of her leadership and how is was received by the staff". She asserts that she did not "accuse" the Complainant of taking over the meeting but made a "statement of facts". She refutes that she attempted to undermine the Complainant's supervisory authority. She did not make these statements to provoke, harass or intimidate the Complainant. Neither retaliation, hostility nor race were factors in the matter. (7-2; pp. 10-11; 7-12)

**Witness, Janell Adams refutes** that Ruth Duda came to her desk and asked her if she felt the Complainant took leadership away from her and if she felt unable to talk to the Complainant in fear of retaliation. At no time, did she witness RD subject the Complainant to harassing or discriminatory treatment. The Complainant told her that she felt RD

treated her differently. She has no knowledge or belief that RD harbored animosity towards the Complainant because of her complaints against her or because of her race. She has no knowledge or belief that RD felt inferior to the Complainant or intimidated by the Complainant (7-3; pp.2-4)

**Witness, Cynthia Finley testified**   that she did not witness the alleged conversation between Ruth Duda and Janelle Adams. At no time, did she witness RD subject the Complainant to harassing or discriminatory treatment. She has no knowledge or belief that RD harbored animosity towards the Complainant because of her complaints against her or because of her race. She has no knowledge or belief that RD felt inferior to the Complainant or intimidated by the Complainant  (7-5 ;pp. 2-4)

**Event 8: On March 2, 2020, RD threatened to fire the complainant when she asked RD how to proceed with an employee's expired nursing license, and RD stated to her, "I find your response interesting, as I was also told to fire you when you violated the HIPAA law. Yet I chose a merciful route. (Name unknown) could produce a license tomorrow, and you would have lost a valuable employee."**

**The witnesses provided the following testimonies:**

**Complainant testified**   that "Ms. Duda informed me that Ms. DeBellis nursing license had expired, and she would have to be sent home. When I question information, she gave me regarding the process to HR she responded reminding me when she was told to fire me." "She does not like her actions to be questioned, but as a new supervisor and never being involve in an issue as such I wanted to have a clear understanding this was a livelihood. Then I was made to give the staff a reprimand after she had been removed and reinstated by the VISN Director. Ms. Duda then took it down to a lower punishment to make it look like she was being lenient and I was being cruel and harsh." She told RD that her actions/behavior was unwarranted. She reported the incident to VISN Director and HR (7-1; pp. 11-12; 7-1(a); 7-9)

**RMO, Ruth Duda testified** that "Ms. McCray had a subordinate RN working with an expired licensure. I have never had to deal with such an issue therefore we were seeking guidance from HR. HR Guidance was to terminate the employee. Ms. McCray felt this was too harsh and there should be a way to avoid termination. I agreed and referenced her own personal experience and shared when I was told to terminate her by Dr. Revote, Chief of Staff at the time, when she deliberately and admittedly violated the HIPPA regulation. However, we discovered that not all violations have the same flexibility of disciplinary action. Ms. McCray has taken the conversation out of context." She refutes that she threatened to terminate the Complainant or implied that she should/could be terminated. (7-2; pp. 11-12; 7-12)

## Pretext

The final burden now shifts to the Complainant, to demonstrate the articulated reasons of management are pretext. The Complainant can show either with direct evidence of

discriminatory motive or by showing that the articulated reasons of management are unworthy of belief.

The information in this report was obtained from witness testimonies and documentation provided by the complainant and /or the Agency.

*Linda Harris*
Linda Harris
EEO Investigator

September 24, 2020
Date



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**


Written Affidavit of DaShaun McCray

in the Matter of the EEO Complaint of Discrimination filed by


DaShaun McCray                              )
                                            )
Complainant                                 )
                                            )
                                            **)**      Case No. 2003-589W-2020102157


                                            )
Secretary                                   )
Department of Veterans Affairs              )
810 Vermont Avenue, NW                       )
Washington, DC  20420                        )
                                            )
Respondent                                  )
                                            )
                                            )
Facility: Robert J. Dole, VAMC              )
                                            )
                                            )
                                            )
                                            )
                                            )
                                            )
_____ _____)

**(SEE BELOW FOR RELATED EVENTS AND QUESTIONS)**


I, DaShaun McCray, solemnly swear/affirm that the information given in response to the
following questions is true and correct to the best of my knowledge and belief.

_DMM_
 Initial



**Please answer the following questions:**

1. Please identify the facility where you were employed at the time of this claim.

   Robert J. Dole VAMC

2. Please provide your race.

   African American

3. Please provide the name of your direct supervisor at the time of this claim.

   Ruth Duda

4. Please identify the position and grade you held at the time of this claim.

   Nurse Manager Office Community Care

   a. Are you currently in this position?  No

      i. If yes, how long have you been in this position?

      ii. If yes, how long have you been with the organization?

      iii. If no, when was your last day in this position? 5/23/20

5. What was your working relationship with Ruth Duda during the period of the claim ( 1st line supervisor, 2nd line supervisor)? 1st line supervisor

6. What is Ruth Duda's race? Caucasian

7. Was Ruth Duda aware of your race? Yes

   a. If yes, when was she made aware? June 2017 upon assuming her position in Community Care

   b. If yes, how was she made aware?  Upon presentation

---
**Reprisal is a basis of this claim**

1. Please explain the event or circumstance that would have caused you to be subjected to reprisal. January 24,2020 I went to Ms. Duda direct supervisor and informed him how she continues to create hostile work environment and has not improved.

2.  When did this event or circumstance occur (Date)?

    January 24,2020 Ms. Duda returned to the office at 3:15pm requesting I present to weekly meeting Monday ready to address priorities. January 24,2020 3:51pm sent email to Dean Rhein in Education to request if I sent him an email with TMS that needed to be assigned to OCC staff. Which was not the procedure how these are assigned,

3.  Who was involved in this event or circumstance? Ms. Duda and I

4.  Was Ruth Duda aware of this event or circumstance? Yes

    a.  If yes, how did she become aware? When notified of EEO filing

    b.  If yes, when did she become aware? When notified of EEO filing

_____

**Whether on the bases of race (African-American) and reprisal (previous EEO activity[1]), the complainant was subjected to a hostile work environment as evidenced by the following:**

**Event 1: From April 2018, through the present, Ruth Duda (RD), Community Care Service Chief, attempted to "intimidate" the complainant when she spoke with her in her workspace, RD yelled at her in a public area while discussing another employee's pay, and RD stated, "If she wants to get paid, you better tell her to send us the form!"**

1.  Explain the incident(s) subject of Event 1;separately.

    a.  Explain the event/circumstance preceding the incident, person(s) involved in the incident, the actions/behavior of the person(s) involved, and witnesses to the incident. Tenesha Burks previous Supervisory Program Specialist who left abruptly after experiencing hostile work environment under the leadership of Ms. Duda that caused her to have exacerbations of health conditions, increased anxiety and stress.

2.  Why do you believe RD took these actions and/or behaved in the described manner? This is her level of communicating as she, being in a leadership position felt she had the right to

    a.  Explain the motivating factors. Ms. Duda knew I had a good working relationship with my previous supervisor and felt that if anybody communicated with her it would be me. But her discussing the issues of Ms. Burks pay with me or the need for any paperwork was inappropriate.

3. Did you tell RD that her actions/behavior were unwarranted? Yes

    a. If yes, how did you object? By informing her that Ms. Burks has worked many years and I am sure she would know the appropriate thing to do.

        i. If in writing, submit a copy with your response.

4. Did you report the incidents subject of Event 1 to any management official? Yes

    a. If yes, to whom? Dr. Syed Raffi

    b. If yes, how did you report this? In Writing and Meeting

        i. If in writing, submit a copy with your response.

    b. What action did this person take in response?
No action, but later informed Ms. Duda per her statement that I had reported her to him in 2018 when she was planning to hire me at the Nurse Manager in Community Care.

    c. Did you tell this person that RD's actions/behavior were unwelcomed? Yes

5. Explain how the incidents subject of Event 1 contributed to the hostile work environment in which you allege. This behavior went without acknowledgement and caused me to be in continual fear of reprisal for reporting her to her superior.

6. Explain why you believe the incidents subject of Event 1 were motivated by your race. Ms. Burks is African American and I African American and her having the audacity of implying I was on that level to communicate with me about another person of color work issues was inappropriate.

7. Explain why you believe the incidents subject of Event 1 were motivated by your previous EEO activity. At the time of this incident I had no previous EEO activity. I was just working to provide the best care to veteran's under continually changing circumstances.

———————————————————

**Event 2: Between January 28, 2019, and January 4, 2020, RD required the complainant to complete the staffing model duty, without providing her Nurse Manager training.**

1. Explain the referenced Staffing Model duty.

    Staffing Model is the way leadership prepares to request FTE. I had never been trained this duty by Ms. Duda and it was not being something that I was informed was a duty

that should be delegated to the Nurse Manager. I was informed that is was and easy task and I could figure it out in the provided documentation.

2. Was this duty within your scope of duties?

To identify departmental needs based on workload and determine the need of appropriate number of FTE to complete assigned duties and requirements of the department. Ms. Duda did not start having meetings with department leadership until 10/28/19 and had never before discussed this process with me until I discussed concerns of her leadership abilities and the hostile work environment with Dr. Cummings COS

3. Have you performed this duty prior to this time?

I had never performed any of the of the duties she stated were supposed to be completed by the Nurse Manager and were at my level of leadership. I had primarily worked in the role of completing daily operations and making sure our department remained in compliance with VACO identified metrics. These other duties were assigned without any formal training or documentation for me to self-train. One session with her pointing and clicking and an "Oh it's easy is all I received.

4. Did you have a problem completing this duty? No

   a. If yes, explain.

   b. If yes, did you tell RD that you had a problem completing this duty?

5. Why do you believe RD had you perform this duty? She was not happy when her direct supervisor informed her to get out of the weeds and allow me to learn the true duties and responsibilities of my job.

   a. Explain the motivating factors. My going to her supervisor regarding how I felt I was being treated as a manager,

6. What affect did this have on you? I felt thrown into an area of unknown with duties and responsibilities of my position. Having to train myself, but the need to do this task prior to leaving the work area never came up again.

_____

**Event 3: From January 2019, through the present, RD "usurped" the complainant's supervisory authority by instructing her (complainant's) staff to complete different actions than she initially instructed her staff to do.**

1.    Please explain the Event.

    a.  Explain the event/circumstance, person(s) involved in the incident, the actions of the person(s) involved, and witnesses to the incident. Ms. Duda would discredit information that I would give to staff to complete task, often times informing staff to do something against the process as a work around and then when I would return on site I would have correct the issued to make sure funding was appropriate according to guidelines This happened particularly with Jessica Clasen nurse covering Dental services, Heather Bandy RN covering Neurology and Pain Management services.

2.  How did you discover RD took this action? The staff informed me that Ms. Duda informed them to do a different way then how they had been instructed by me and we would then have to more often then not revert what had been done while I was out to meet the current process to appropriately authorize services

3.  Do you believe RD took this action to intentionally take away your supervisory authority? Yes

    a.  If yes, explain. She did not understand the interworking processes of Community Care and if I was out of office, she would either ask staff to wait until I return or try to work to the best of her knowledge without understanding the process,

    b.  If yes, why do you believe she took this action? She is the Chief and she would have me the person that would either take the fall or have the situation cleaned up before it was ever noticed.

        i.  Explain the motivating factors. She strives on power and uses that to her advantage even when she knows she may not have the process correctly

    c.  If yes, did you tell RD that her actions were unwarranted? Yes, continually. I would ask her what she understood about the process and how things should flow and she would inform me she has read and understand the Field Guide Book, but really had not did the job of this role.

4.  What affect did this have on you? Staff were afraid to bring me things that they knew they possibly had did incorrectly in fear of going against her and ultimately I would have to clean up the fall out from the action.

_____

**Event 4: On January 24, 2020, RD increased the complainant's workload after she had a meeting with the Chief of Staff to discuss RD's behavior.**

1. How did RD increase your workload? Busy work that took away the time that I was spending doing daily operations that assisted in keeping our department afloat.

   a. Provide examples. Giving me more congressional responses and requirements to attend meetings while our department was understaffed and in need of a working RN manager to assist in meeting goals while preparing for CCN roll out, which she took off the whole week of and left me to run the department.

2. Why do you believe RD increased your workload? As reprisal for going to her boss

   **a.** Explain the motivating factors. She was informed by her supervisor to get out of the weeds and began to drop more in my workload.

3. What affect did the increased workload have on you? Impacted outcomes of the department when I was not able to do the second level reviews as consistent to assist nursing staff to get care expedited.

4. Did you have a problem with the increased workload? (yes/no) No

   a. If yes, did you tell RD that you had a problem with this?

5. Is there a justifiable non-discriminatory reason why RD increased your workload? She increase the workload because she could. I assumed my responsibilities and continued to run things as before with additional task continuing to meet deadlines and maintain processes.

———————————————————

**Event 5: On January 30, 2020, RD refused to allow the complainant to speak during a meeting with the Medical Center Director, even though the Director asked RD to allow her (complainant) to speak.**

1. Please explain the Event. In meeting with Pentad Ms. Duda was giving information why we were behind on certain metrics. When I would attempt to give information, she would talk over me and continue to speak to the point where the Medical Center Director raised his hand and requested, she allow me to speak.

   a. Explain how RD refused to allow you to speak. She kept explaining the circumstance from her perspective which were not completely correct.

2.   Did RD explain why she refused to allow you to speak? No

   a.  If yes, what was her justification?

      i.  Did you find this justification acceptable?

         1. If no, explain. She stated that is not what the Pentad wanted to hear, although I have email from Medical center director stating my thought process was exactly how we needed to address our issue to complete the task

3.   Did you tell RD that her refusal was unwarranted? Yes

4.   Why do you believe RD refused to allow you to speak? She is inferior to my knowledge base of Community Care and enforces she is the Chief and lets people know she is my boss.

   a.  Explain motivating factors. Her knowing that many considered me the subject matter expert for Community Care offended her.

5.  Did RD refuse to allow any other person to speak? No

_____

**Event 6: On January 31, 2020, RD violated the complainant's personal space when she looked over her so that she could see her computer, and RD yelled at her, "You did not allow me to talk during the meeting with the Pentad, and you gave incorrect information, are you offended?"**

   1.  Explain the incident subject of Event 6.

      a.  Explain the event/circumstance preceding the incident, person(s) involved in the incident, the actions/behavior of the person(s) involved, and witnesses to the incident. Ms. Duda arrived at my office and informed me that Dr. Cummings did not feel I needed to go to meeting with community provider today and I should work on project that was due by COB 1/31/20. She then asked me if I had received the email from Dr. Cummings. I informed her yes. She then proceeded to come around my workstation and look over my shoulder at something I was addressing. She then burst out and started yelling at me about me not letting her talk when it was clearly the other way around and am I offended about being taken off of the meeting with community provider.

   2.  Why do you believe RD took these actions and/or behaved in the described manner? She was not happy the I was able to give a clearer picture to the Pentad regarding the need for staff to complete the current outliers for Community Care active and scheduled appointments.

      a.  Explain the motivating factors. She has inferiority to my abilities to discuss Community

Care processes and did not like to be looked as less knowledgeable then myself

3. Did you tell RD that her actions/behavior were unwarranted? Yes

   a. If yes, how did you object? I asked her to please remove herself from my personal space

      i. If in writing, submit a copy with your response.

4. Did you report the incidents subject of Event 6 to any management official? Yes

   a. If yes, to whom? Chief of Staff and Medical Center Director.

   b. If yes, how did you report this?

      i. If in writing, submit a copy with your response.

   c. What action did this person take in response? I received a response from the Medical Center Director asking to allow them to handle this.

   d. Did you tell this person that RD's actions/behavior were unwelcomed? Yes.

5. Explain how the incidents subject of Event 6 contributed to the hostile work environment in which you allege. Ms. Duda has the inclination she can talk to and approach me and any kind of way based on me being her subordinate.

6. Explain why you believe the incidents subject of Event 6 were motivated by your race. I have seen Ms. Duda with nurses in my department have situations and her behavior with nurse not of color have not been to this level of outburst.

7. Explain why you believe the incidents subject of Event 6 were motivated by your previous EEO activity. To this point I had not filed, but I did file that afternoon.

_____

**Event 7: On February 10 and 14, 2020, RD undermined the complainant's ability as a supervisor when she stated, "You took all leadership away from Janelle Adams, Coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when she falsely accused her taking over a February 7, 2020, meeting and did not allow another employee to speak.**

1. Explain the incident(s) subject of Event 7;separately.

   February 7,2020 Team meeting to discussed ER notification and authorization process. Ms. Duda did not state anything to me regarding how she interpreted the way the task

was discussed with the staff in the meeting, nor did the staff. On February 10, 2020 she went to the desk of Janelle Adams and asked her if she felt that I took leadership away from her and if she felt unable to talk to me about this type of thing due to fear of retaliation. Ms. Adams immediately went to the desk of Cynthia Finley RN and stated that she felt Ruth was trying to pit her against me.

a. Explain the event/circumstance preceding the incident, person(s) involved in the incident, the actions/behavior of the person(s) involved, and witnesses to the incident. Ms. Finley informed me of the incident, and I contacted Ms. Adams to verify the information. Ms. Adams confirmed the statement and information although was not willing to put it in writing. I could accept this as it is understandable that the staff would fear going against the Chief when they are trying to work toward promotion and other opportunities within the department and facility and she was currently working toward attaining her Nurse II.

2. Why do you believe RD took these actions and/or behaved in the described manner? She had been trying to build a case against me since I reported her to Dr. Cummings.

a. Explain the motivating factors. She is a vindictive person and it is known around the facility.

3. Did you tell RD that her actions/behavior were unwarranted? Yes

a. If yes, how did you object? Informed her that I know she is trying to pit staff against me, but I did not care as I know I have provided opportunity for all staff to approach me with any issues, as I have and open-door policy. No staff would be in fear to approach me.

i. If in writing, submit a copy with your response.

4. Did you report the incidents subject of Event 7 to any management official? No

a. If yes, to whom?

b. If yes, how did you report this?

i. If in writing, submit a copy with your response.

c. What action did this person take in response?

d. Did you tell this person that RD's actions/behavior were unwelcomed?

5. Explain how the incidents subject of Event 7 contributed to the hostile work environment in which you allege. Ms. Duda continually trying to pit staff against me, to make me look to be the manager that is not easily approachable when truly it has been her. Staff have stated this but are in fear of reprisal from Ms. Duda for siding with me.

6.  Explain why you believe the incidents subject of Event 7 were motivated by your race. She only approach Caucasian nurses to try to make it look like and issue of race

7. Explain why you believe the incidents subject of Event 7 were motivated by your previous EEO activity. These incidents did not start happening until I reported her to her supervisor regarding her behavior.

_____

**Event 8: On March 2, 2020, RD threatened to fire the complainant when she asked RD how to proceed with an employee's expired nursing license, and RD stated to her, "I find your response interesting, as I was also told to fire you when you violated the HIPAA law. Yet I chose a merciful route. (Name unknown) could produce a license tomorrow, and you would have lost a valuable employee."**

1.  Explain the incident subject of Event 8.

    a.  Explain the event/circumstance preceding the incident, person(s) involved in the incident, the actions/behavior of the person(s) involved, and witnesses to the incident. Ms. Duda informed me that Ms. DeBellis nursing license had expired, and she would have to be sent home. When I question information, she gave me regarding the process to HR she responded reminding me when she was told to fire me.

2.  Why do you believe RD took these actions and/or behaved in the described manner?

    a.  Explain the motivating factors. She does not like her actions to be questioned, but as a new supervisor and never being involve in an issue as such I wanted to have a clear understanding this was a person's livelihood. Then I was made to give the staff a reprimand after she had been removed and reinstated by the VISN Director. Ms. Duda then took it down to a lower punishment to make it look like she was being lenient and I was being cruel and harsh.

3.  Did you tell RD that her actions/behavior were unwarranted? Yes

    a.  If yes, how did you object?

        i.  If in writing, submit a copy with your response.  Email response 3/2/20

4.   Did you report the incidents subject of Event 8 to any management official? Yes

    a. If yes, to whom? Dr. Patterson VISN Director and Keith Blackstone VISN HR

    b. If yes, how did you report this?

        i. If in writing, submit a copy with your response.

c. What action did this person take in response?  None to my knowledge

d. Did you tell this person that RD's actions/behavior were unwelcomed?

5. Explain how the incidents subject of Event 8 contributed to the hostile work environment in which you allege. Ms. Duda made me to look to be inconsiderate after following the instructions he she and Tina Dean in HR. Once again trying to have another RN think that I am excessively punitive when I was enforced to provide that action.

6.  Explain why you believe the incidents subject of Event 8 were motivated by your race.

7. Explain why you believe the incidents subject of Event 8 were motivated by your previous EEO activity.
_____

**What are you seeking in terms of resolution for this complaint? Financial damages for pain and suffering. From the beginning of working under the leadership of Ms. Duda. I received a reprimand she was instructed to issue and I have felt in fear of her and was not ever willing to bring issues forward that made me feel inferior to her in fear of losing my job. I still feel that she blocked me from positions that I applied for and outscored the other candidate on interview and resume. I would like damages of $50,000 per year under her leadership and pain and suffering of $50,000.**

**Upon the completion of this investigation, the EEO file will be emailed. Please provide an email address to which you would like your file delivered. Dashaun.Mccray@va.gov**

**Do you have anything else you would like to add to your testimony?**

**If yes, please provide your statement below.**

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this _13___day of __July___, 2020.

DaShaun M.
McCray 3471928

Digitally signed by DaShaun
M. McCray 3471928
Date: 2020.07.13 18:07:47
-06'00'
_____

DaShaun McCray

**Harris, Linda (ORMDI)**

| | |
|---|---|
| **From:** | McCray, DaShaun |
| **Sent:** | Thursday, September 3, 2020 1:55 PM |
| **To:** | Harris, Linda (ORMDI) |
| **Subject:** | RE: Office of Resolution Management- Response Requested |

1) Robert V. Cummings – COS
2) Ricky A. Ament- Previous Medical Center Director
3) William P. Patterson- VISN 15 Medical Director

*DaShaun M. McCray MBA, BSN, CCM*
*Program Manager C6, Clinical Integration*
*VHA Office of Community Care*

---

**From:** Harris, Linda (ORMDI) <Linda.Harris8@va.gov>
**Sent:** Wednesday, September 2, 2020 1:01 PM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** Office of Resolution Management- Response Requested
**Importance:** High

Ms. McCray,

Please provide the following information for the record **on or before September 4, 2020:**

1) Full name of the Chief of Staff referenced in you testimony.
2) Full name of the Medical Center Director referenced in you testimony.
3) Full name of "Dr. Patterson" reference in testimony.

Thank you in advance,
Linda Harris
EEO Investigator
Office of Resolution Management- Diversity and Inclusion
Fax: 713-794-7672
Linda.Harris8@va.gov

***NOTICE: ORM-DI is operating in a 100% telework environment. ORM-DI does not have the capability to send and/or receive hardcopy documents at this time.  In order to be more responsive, we ask that if you have previously sent documents to us via U.S. Mail or other delivery services, please resend those documents to us electronically.  All meetings, interviews, and mediation sessions will be conducted in a virtual capacity (i.e. telephonic, skype, video conference etc.). Your patience is appreciated during the COVID-19 Pandemic.***



*VA Core Values:* **I**ntegrity **C**ommitment **A**dvocacy **R**espect **E**xcellence
*VA Core Characteristics:* Trustworthy | Accessible | Quality | Innovative | Agile | Integrated

*Thank you for contacting the Office of Resolution Management. Our goal is to provide you with exceptional customer service. Please take a moment to* complete a very brief survey *to let us know how my service was today.*

This e-mail and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited.  If you have received this e-mail in error, please notify me via return e-mail and permanently delete the original and any copy of any e-mail and any printout thereof.



**DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF RESOLUTION MANAGEMENT**

Written Affidavit of Ruth Duda

in the Matter of the EEO Complaint of Discrimination filed by

| | | |
|---|---|---|
| DaShaun McCray | ) | |
| | ) | |
| Complainant | ) | |
| | ) | |
| | **)** | Case No. 2003-589W-2020102157 |
| | ) | |
| | ) | |
| Secretary | ) | |
| Department of Veterans Affairs | ) | |
| 810 Vermont Avenue, NW | ) | |
| Washington, DC  20420 | ) | |
| | ) | |
| Respondent | ) | |
| | ) | |
| | ) | |
| Facility: Robert J. Dole, VAMC | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**(SEE BELOW FOR RELATED EVENTS AND QUESTIONS)**

I, Ruth Duda, solemnly swear/affirm that the information given in response to the following questions is true and correct to the best of my knowledge and belief.

*RED*
‾‾‾‾‾‾‾‾
Initial

**Claim: Whether on the bases of race (African-American) and reprisal (previous EEO activity), the complainant was subjected to a hostile work environment as evidenced by the following:**

**Event 1: From April 2018, through the present, Ruth Duda (RD), Community Care Service Chief, attempted to "intimidate" the complainant when she spoke with her in her workspace, RD yelled at her in a public area while discussing another employee's pay, and RD stated, "If she wants to get paid, you better tell her to send us the form!"**

**Event 2: Between January 28, 2019, and January 4, 2020, RD required the complainant to complete the staffing model duty, without providing her Nurse Manager training.**

**Event 3: From January 2019, through the present, RD "usurped" the complainant's supervisory authority by instructing her (complainant's) staff to complete different actions than she initially instructed her staff to do.**

**Event 4: On January 24, 2020, RD increased the complainant's workload after she had a meeting with the Chief of Staff to discuss RD's behavior.**

**Event 5: On January 30, 2020, RD refused to allow the complainant to speak during a meeting with the Medical Center Director, even though the Director asked RD to allow her (complainant) to speak.**

**Event 6: On January 31, 2020, RD violated the complainant's personal space when she looked over her so that she could see her computer, and RD yelled at her, "You did not allow me to talk during the meeting with the Pentad, and you gave incorrect information, are you offended?"**

**Event 7: On February 10 and 14, 2020, RD undermined the complainant's ability as a supervisor when she stated, "You took all leadership away from Janelle Adams, Coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when she falsely accused her taking over a February 7, 2020, meeting and did not allow another employee to speak.**

**Event 8: On March 2, 2020, RD threatened to fire the complainant when she asked RD how to proceed with an employee's expired nursing license, and RD stated to her, "I find your response interesting, as I was also told to fire you when you violated the HIPAA law. Yet I chose a merciful route. (Name unknown) could produce a license tomorrow, and you would have lost a valuable employee."**

_____

REO

**Please answer the following questions:**

1. Please identify the facility where you were employed at the time[1] of this claim
   a. Robert J Dole VA

2. Please provide you race.
   Caucasian
3. Please provide the name of your direct supervisor at the time of this claim.
   Robert Cummings, MD-Chief of Staff

4. Please identify the position and grade you held at the time of this claim.
   Nurse 4, step 6

   a. Are you currently in this position?
      Yes
      i. If yes, how long have you been in this position?
         3 years
      ii. If yes, how long have you been with the organization?
         19 years
      iii. If no, what was your last day in this position?

5. What was your working relationship with the Complainant during the period of the claim (e.g. first-line supervisor; second-line supervisor; coworker)?
   First-line supervisor
6. Have you previously been involved in EEO activity?
   Yes
   a. If yes, did that activity involve the Complainant?
   Indirectly-when I began to hold Ms. Elizabeth Dial accountable to her work, DaShaun McCray became defensive and began to cover and complete the work required of Ms. Dial.
   Ms. McCray was often found in Ms.Dial's office re-explaining how to pull data and defining processes.

7. When did you become aware of the Complainant's grievances that are subject of this EEO complaint? (date)
   Some time in February of 2020 when I received notice from EEO office.
   a. Did the Complainant's grievances present a problem for you?
   No-

_____


**Event 1: From April 2018, through the present, Ruth Duda (RD), Community Care Service Chief, attempted to "intimidate" the complainant when she spoke with her in her workspace, RD yelled at her in a public area while discussing another employee's pay, and RD stated, "If she wants to get paid, you better tell her to send us the form!"**

_____

[1] April 2018 through March 2020.

RED

1. Did you attempt to intimidate the Complainant in your interactions with her?
   No
2. Do you believe your interactions with the Complainant were professional and in accordance with the VA's Code of Conduct?
   Yes

3. At any time, did you yell at the Complainant in a public area while discussing another employee's pay?
   No

     a. If yes, why did you behave in this manner?

     b. If yes, did you did you behave in this manner out of hostility?

     c. If yes, did you did you behave in this manner out of retaliation?

     d. If yes, did you did you behave in this manner because of the Complainant's race?

4. Did the Complainant tell you that she felt intimidated and/or harassed by you?

   No

5. If Event 1 is untrue, please explain.
   In 2018, Ms. McCray was a staff nurse and therefore her workstation was in a cubicle area. Oftentimes while making rounds staff would ask questions of processes, including HR leave processes. Several in her area had questions regarding FLMA and how it is used and approved. I answered the question for those in that area. Additionally, it was then presented in the staff meeting in July as I figured is several had questions then others might as well. (Staff meeting attached)
   _____

**Event 2: Between January 28, 2019, and January 4, 2020, RD required the complainant to complete the staffing model duty, without providing her Nurse Manager training.**

   1. Did you require the Complainant to complete the staffing model duty?

     Yes

     a. If yes, why was the Complainant required to complete this duty?
        Part of her job duties as Nurse Manager in Office of Community Care
     b. If yes, was the Complainant trained to perform this duty?

RED

Yes, in fact, we completed it together in my office while I walked her through each step. This can be verified as I was the one who submitted it to the VISN share point site. Submission is the final step of the process.

i. If yes, when was she trained to perform this duty?-Yes

ii. If yes, who provided this training to the Complainant?-I did, Chief of OCC

iii. If no, why was the Complainant required to perform this duty without training?

iv. If no, did you require the Complainant to complete his duty without training in an attempt to negatively affect her performance/reputation or program/service?

v. If no, did you require the Complainant to complete this duty without training out of hostility?

vi. If no, did you require the Complainant to complete this duty without training out of retaliation?

vii. If no, did you require the Complainant to complete this duty without training because of her race?

2. Did the Complainant object to performing this duty?
   1) we completed it together and I submitted the staffing model for 2020 and 2) Ms. McCray knew this was the expectation of the Nurse Manager to know not only how to complete the model but the use of the model to justify current staff or use as a tool to request additional staff.

3. If Event 2 is untrue, please explain.-

VISN share point site verifies who uploaded document as the primary POC (screen shots from VISN Share point site attached)

_____

**Event 3: From January 2019, through the present, RD "usurped" the complainant's supervisory authority by instructing her (complainant's) staff to complete different actions than she initially instructed her staff to do.**

1. Did you give the Complainant's staff directives without consulting with the Complainant? No

   a. If yes, do you believe that it was appropriate to give these directives without consulting with the Complainant?

*RED*

i. If yes, explain.

b. If yes, did you take this action in attempt to take away the Complainant's supervisory authority?

c. If yes, did you take this action in an attempt to exert your authority?

d. If yes, did your directives conflict with the Complainant's directives to staff?

i. Did you intentionally give conflicting directives out of spite?

e. If yes, did you fail to consult with the Complainant before giving these directives out of hostility?

f. If yes, did you fail to consult with the Complainant before giving these directives out of retaliation?

g. If yes, did you fail to consult with the Complainant before giving these directives because of her race?

2. Did the Complainant tell you that your directives to her staff was unwarranted?
   No
3. Did the Complainant tell you that she felt you were undermining her supervisory authority?
   No
3. Did you give directives to the Complainant's staff in an attempt to interfere with her ability to do her job?
   No
4. If Event 3 is untrue, please explain.
 With the implementation of the Mission Act of 2018 and the transition from TriWest to Optum, frequent changes that occur in the Office of Community Care (OCC) arena. Between the changes in the Choice Program, the conversion to TriWest (TW), then Patient Centered Community Care (PC3), then PC3 with VA-scheduling, the preparation for the roll-out of the Mission Act, the many new programs to be initiated and now the switching to Optum the Third-Party Payer replacing TW; varying instructions were provided by VISN leadership, as they too were trying to figure out all the new regulations and processes to follow. Each communication was then passed on to staff, and at times became very confusing. (Supporting evidence of this noted in e-mail dated 12/11/2019 previously submitted). The Community Care (CC) field guide book was and is continually being updated to support new processes. Ms. McCray did voice opposition to some of the proposed processes by VISN leadership, and that may be her perception to pitting staff against each other, as I recommend, we follow VISN guidance. In the end, all processes were and are being finalized.

_____

**Event 4: On January 24, 2020, RD increased the complainant's workload after she had a meeting with the Chief of Staff to discuss RD's behavior.**

*RED*

1. At any time, did you increase the Complainant's workload?
   No

       a. If yes, why did you increase her workload?

       b. If yes, did you increase her workload out of retaliation for her complaints against you?

       c. If yes, did you increase her workload in an attempt to interfere with her ability to perform her job?

       d. If yes, did you increase her workload out of hostility?

       e. If yes, did you increase her workload in an attempt to exert your authority?

2. Did the Complainant tell you that she had a problem with the workload?
   No, and continually denied need for assistance when offered

3. If Event 4 is untrue, please explain.

Claim states RMO increased her workload on 1/24/2020. As of January 2020, Ms. McCray has been in her position approximately one year. However, due to the frequent physical therapy appointments of Ms. McCray in January of 2019 and many program changes in the department, I opted to roll-out her full duties slowly as to not overburden or discourage her as a new manager. Between February of 2019 and January 2020, I shared the responsibility of investigating, resolution of complaint, and writing the response for all congressional inquiries and White House responses pertaining to OCC consults as well as fielding billing inquiry calls and veteran/vendor complaints, closing of the Individual Authorizations (payment type) and implementing the DST (Decision Support Tree for eligibility). By January of 2020, the new Mission Act programs (HSRM, VCA, PPMS-that Ms. McCray was overseeing) had been successfully rolled out with minimal staff oversight required. Therefore, at the 1/6/2020 OCC Supervisory weekly staff meeting I announced I would be turning over all duties to the immediate supervisor, respectively MSA to Ms. Dial and RN to Ms. McCray. While informing them I, I stated I know it is a heavy load as I have been a front-line manager, and if they needed assistance, I am willing to help. Ms. McCray assured me multiple times 'I can handle it'. She seemed very pleased and confident to have full responsibility for all the nursing functions. Therefore on 1/22/20 I trained Ms. McCray on how to access the VISN SharePoint site and complete the staffing model used for requesting staff. And while I did share the duties of responding to Congressional inquiries, I did not assign all to Ms. McCray as I will still monitoring workload to time requirements. Unfortunately, from 1/6-1/30, less than a month, Ms. McCray was missing many deadlines. She refused to ask for help and when offered acted offended. When I had to follow-up on assignments as her supervisor to ensure the task was completed, she became angry that I had discovered another deadline missed. It was also during this time that Ms. McCray spent a significant amount of time assisting Ms. Dial on her work, thereby taking away time Ms. McCray needed to timely complete her own duties.

_____

*RED*

**Event 5: On January 30, 2020, RD refused to allow the complainant to speak during a meeting with the Medical Center Director, even though the Director asked RD to allow her (complainant) to speak.**

1. In or about January 2020, did you refuse to allow the Complainant to speak during a meeting with the Medical Center Director?
No

a. If yes, why did you take this action[2]?

b. If yes, do you feel this was appropriate?

      i. If yes, explain.

c. If yes, did you take this action to intimidate her?

d. If yes, did you take this action to embarrass her?
e. If yes, did you take this action to exert your authority?

f. If yes, did you take this action to forgo appearing less knowledgeable?

g. If yes, did you take this action out of retaliation?

h. If yes, did you take this action out of hostility?

i. If yes, did the Complainant's race motivate you to take this action?

2. Did the Complainant tell you that your refusal to allow her to speak was unwarranted ?

3. If Event 5 is untrue, please explain.

I was presenting to our Executive Leadership team, known as the Pentad, of which the Director is present on 1/30/2020. I invited Ms. McCray to attend the meeting as this was another opportunity for exposure to upper level management. While it was my responsibility to present as Chief of the service, Ms. McCray took over answering questions concerning how the data was gathered. Because Ms. McCray had only a cursory overview of the model, she stated misleading statements to the authenticity of the report which resulted in having to produce another report to address time required on backlog, which is built into the staffing model by Central Office. (Pentad presentation supplied as well as next backlog report post meeting 1/30/20, and the series of e-mails to get correct data submitted provided in original response). Important to note that due

RED

to her responses to the Pentad leadership meeting, Ms. McCray was notified the following morning that she was removed from participating in the implementation of the Referral Coordination Initiative (RCI). This did not set well with Ms. McCray.

_____

**Event 6: On January 31, 2020, RD violated the complainant's personal space when she looked over her so that she could see her computer, and RD yelled at her, "You did not allow me to talk during the meeting with the Pentad, and you gave incorrect information, are you offended?"**

1. On or about the referenced date, did you yell at the Complainant and/or make the referenced statement?

I did not yell but answered her question if I had read the latest e-mail from Dr. Cummings. (I had not), After reading she wanted to know why Cummings removed her, it was then I stated probably based on her responses to the Pentad questions at yesterday's (1/30) meeting.

   a. If yes, why did you behave in this manner? I responded to her question.

   b. If yes, did you did you behave in this manner out of hostility?
        no
   c. If yes, did you did you behave in this manner out of retaliation?
        no
   d. If yes, did you did you behave in this manner because of the Complainant's race? no
2. Did the Complainant tell you that your behavior and/or statement was unwarranted?
   Only after she invited me to read the e-mail.

3. If Event 6 is untrue, please explain.
   When I arrived at the OCC office, post morning huddles with Leadership, with briefcase, lunch bag, purse in hand, and my coat is still on, Ms. McCray asks if I had read the e-mail from Dr. Cummings. I had not, and she had it pulled up on her computer screen. She pushed herself back in the chair and posturing for me to read it. Because I have bi-focals I had to go around her desk to see the screen. Standing beside her, I read the e-mail. At which she belligerently accused me of invading her personal space. I immediately returned to the opposite side of the desk. She was very upset as Dr. Cummings has removed her from participating on the Referral Coordination Team.
   I asked if she was offended, and indeed she was, in addition to claiming to be the only subject matter expert and certified case manager in this VA. Which is not true, not only do I have other OCC RN's with case manager certifications there are case managers in the VA working on the main campus with certifications. Ms. McCray has never worked on the inpatient side or in an outpatient setting at the VA.

*RED*

_____

**Event 7: On February 10 and 14, 2020, RD undermined the complainant's ability as a supervisor when she stated, "You took all leadership away from Janelle Adams, Coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when she falsely accused her taking over a February 7, 2020, meeting and did not allow another employee to speak.**

1. Did you make the referenced statements to the Complainant?
   yes
   a. If yes, why did you make these statements? Direct complaints from RN staff in the meeting lead by Ms. McCray

   b. If yes, did you make these statements to provoke the Complainant? No

   c. If yes, did you make these statements in an attempt to harass her? No

   d. If yes, did you make these statements in an attempt to intimidate her? No

   e. If yes, did you make these statements out of retaliation? No

   f. If yes, did you make these statements out of hostility? No

   g. If yes, did you make these statements because of her race? No

2. Did you accuse the Complainant of taking over a February 7, 2020 meeting and not allowing another employee to speak?

   a. If yes, was your accusation untrue? It was not an accusation but a statement of the facts

   b. If yes, why did you make this accusation? Factual evidence supported by complaints from multiple staff members, including Ms. Adams, and my physical presence in the meeting as an observer.

3. At any time, did you attempt to undermine the Complainant's supervisory authority? No

4. Did the Complainant tell you that your behavior and/or comments were unwelcomed? No, as I informed Ms. McCray in private in my office after the meeting.

5. If Event 7 is untrue, please explain. Post meeting held by Ms. McCray I have her my observation of her leadership and how it was received by her staff. She refused to accept any constructive criticism.

_____

RED

**Event 8: On March 2, 2020, RD threatened to fire the complainant when she asked RD how to proceed with an employee's expired nursing license, and RD stated to her, "I find your response interesting, as I was also told to fire you when you violated the HIPAA law. Yet I chose a merciful route. (Name unknown) could produce a license tomorrow, and you would have lost a valuable employee."**

1. At any time, did you threaten to terminate the Complainant or imply that she should/could be terminated? No

    a. If yes, why did you take this action[3]?

    b. If yes, do you feel this was appropriate?

           i. If yes, explain.

    c. If yes, did you take this action to intimidate her?

    d. If yes, did you take this action out of retaliation?

    e. If yes, did you take this action out of hostility?

    f. If yes, did the Complainant's race motivate you to take this action?

2. Did the Complainant tell you that your threat and/or comment was unwelcomed? no

3. If Event 8 is untrue, please explain.
   Ms. McCray had a subordinate RN working with an expired licensure. I have never had to deal with such an issue therefore we were seeking guidance from HR. HR Guidance was to terminate the employee. Ms. McCray felt this was too harsh and there should be a way to avoid termination. I agreed and referenced her own personal experience and shared when I was told to terminate her by Dr. Revote, Chief of Staff at the time, when she deliberately and admittedly violated the HIPPA regulation. However, we discovered that not all violations have the same flexibility of disciplinary action. Ms. McCray has taken the conversation out of context.
_____

Did you harbor any animosity towards the Complainant because of her race? No

Did you harbor any animosity towards the  Complainant because of the subject EEO complaint? No

Did you feel threatened or intimidated by the Complainant's knowledge, skills and/or abilities? No

_____
[3] a thing done; an act.

*RED*

_____

**Do you have anything else you would like to add to your testimony?** No

    **If yes, please provide your statement here.**

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint.  This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this 12 day of September , 2020.


*Ruth Duda*
_____
Ruth Duda

*RED*

1



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**


Written Affidavit of Janelle Adams
in the Matter of the EEO Complaint of Discrimination filed by


DaShaun McCray                              )
                                           )
Complainant                                )
                                           )
                                           )     Case No. 2003-589W-2020102157




                                           )
Secretary                                  )
Department of Veterans Affairs             )
810 Vermont Avenue, NW                     )
Washington, DC  20420                      )
                                           )
Respondent                                 )
                                           )
                                           )
Facility: Wichita VAMC                     )
                                           )
                                           )
                                           )
                                           )
                                           )
_____)

**(SEE BELOW FOR RELATED EVENTS AND QUESTIONS)**


I, Janelle Adams, solemnly swear/affirm that the information given in response to the
following questions is true and correct to the best of my knowledge and belief.


_JMA___
 Initial


Affiant's Initials: _____     Date:_____

2

**Whether on the bases of race (African-American) and reprisal (previous EEO activity[1]), the complainant was subjected to a hostile work environment as evidenced by the following:**

**Event 7: On February 10 and 14, 2020, RD undermined the complainant's ability as a supervisor when she stated, "You took all leadership away from Janelle Adams, Coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when she falsely accused her taking over a February 7, 2020, meeting and did not allow another employee to speak.**

_____

**Please answer the following questions:**

1. Please identify the facility where you were employed at the time of this claim[1].
   RJDVA

2. Please identify the position and grade you held during the period of the claim.
   Community Care RN -Nurse I

   a. Are you currently in this position? Yes

      i. If no, provide the date of the last day in this position?

      ii. If yes, how long have you been in your current position?
      Since 6/25/18

      iii. If yes, how long have you been with the organization?
      Since 6/25/18

3. Please provide the name of your direct supervisor during the period of the claim.
   DaShaun McCray

4. What was your working relationship to the Complainant during the period (e.g. first-line, second-line supervisor, co-worker) ?
   The complainant was my direct supervisor.

_____

1. On February 10, 2020, did Ruth Duda (RD) come to your desk and ask you if you felt that the Complainant took leadership away from her and if you felt unable to talk to the Complainant about this type of thing due to fear of retaliation? No

      a. If yes, did RD explain why she was questioning you about this?

_____

[1] February 2020

Affiant's Initials:_____     Date:_____

**000092**

3

       i. If yes, what was the justification?

    b. If yes, did you feel RD's questioning was appropriate?

        1. If no, explain.

    c. If yes, why do you believe RD questioned you about this?

    d. If yes, what was your response to RD?

    e. If yes, did you report this incident to any person?

       i. If yes, to whom?

       ii. If yes, why did you report this to this person?

    f. If yes, do you believe RD was attempting to set you against the Complainant?

       i. Do you have any knowledge as to why she would want to do this?

        1. If yes, explain.

2. At any time, did the Complainant tell you that RD's actions, behavior and/or statements were unwelcomed?  NA

3. Was the Complainant your supervisor during the period of this Event?  Yes

4. At any time, have you witnessed RD subject the Complainant to harassing treatment? No

    a. If yes, how often have you witnessed this treatment?

    b. If yes, explain the harassing treatment you have witnessed.

5. At any time, did you witnessed RD subject the Complainant to discriminatory treatment? No

    a. If yes, how often have you witnessed this treatment?

    b. If yes, explain the discriminatory treatment you have witnessed.

6. At any time, did the Complainant tell you that he felt harassed by RD?  No

7. At any time, did the Complainant tell you that he felt RD treats her differently?  Yes

8. Do you have any knowledge and/or belief that RD harbored any animosity towards the Complainant because of her (Complainant) reports against her (RD)?  No

Affiant's Initials:_____    Date:_____

**000093**

4

    a. If yes, explain.

9. Do you have any knowledge and/or belief that RD harbored any animosity towards the Complainant because of her (Complainant) race? No

    a. If yes, explain.

10. Do you have any knowledge and/or belief that RD felt inferior to the Complainant and/or intimidated by the Complainant because of her (Complainant) knowledge, skills or abilities? No

    a. If yes, explain.

_____

**Do you have anything else you would like to add to your testimony?**

    **If yes, please provide your statement below.**

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint.  This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this _14___day of __September_____, 2020.

Janelle M Adams 1660964
Digitally signed by Janelle M Adams 1660964
Date: 2020.09.14 09:08:08 -05'00'
_____
Janelle Adams



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

Written Affidavit of Syed Raffi

in the Matter of the EEO Complaint of Discrimination filed by

| | |
|---|---|
| DaShaun McCray | ) |
| | ) |
| Complainant | ) |
| | ) |
| | )      Case No. 2003-589W-2020102157 |

| | |
|---|---|
| Secretary | ) |
| Department of Veterans Affairs | ) |
| 810 Vermont Avenue, NW | ) |
| Washington, DC  20420 | ) |
| | ) |
| Respondent | ) |
| | ) |
| | ) |
| Facility: Wichita VAMC | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**(SEE BELOW FOR RELATED EVENTS AND QUESTIONS)**

I, Syed Raffi, solemnly swear/affirm that the information given in response to the following questions is true and correct to the best of my knowledge and belief.

*Sr*
Initial

Whether on the bases of race (African-American) and reprisal (previous EEO activity[1]), the complainant was subjected to a hostile work environment as evidenced by the following:

**Event 1:** From April 2018, through the present, Ruth Duda (RD), Community Care Service Chief, attempted to "intimidate" the complainant when she spoke with her in her workspace, RD yelled at her in a public area while discussing another employee's pay, and RD stated, "If she wants to get paid, you better tell her to send us the form!"

**Event 2:** Between January 28, 2019, and January 4, 2020, RD required the complainant to complete the staffing model duty, without providing her Nurse Manager training.

**Event 3:** From January 2019, through the present, RD "usurped" the complainant's supervisory authority by instructing her (complainant's) staff to complete different actions than she initially instructed her staff to do.

**Event 4:** On January 24, 2020, RD increased the complainant's workload after she had a meeting with the Chief of Staff to discuss RD's behavior.

**Event 5:** On January 30, 2020, RD refused to allow the complainant to speak during a meeting with the Medical Center Director, even though the Director asked RD to allow her (complainant) to speak.

**Event 6:** On January 31, 2020, RD violated the complainant's personal space when she looked over her so that she could see her computer, and RD yelled at her, "You did not allow me to talk during the meeting with the Pentad, and you gave incorrect information, are you offended?"

**Event 7:** On February 10 and 14, 2020, RD undermined the complainant's ability as a supervisor when she stated, "You took all leadership away from Janelle Adams, Coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when she falsely accused her taking over a February 7, 2020, meeting and did not allow another employee to speak.

**Event 8:** On March 2, 2020, RD threatened to fire the complainant when she asked RD how to proceed with an employee's expired nursing license, and RD stated to her, "I find your response interesting, as I was also told to fire you when you violated the HIPAA law. Yet I chose a merciful route. (Name unknown) could produce a license tomorrow, and you would have lost a valuable employee."



_____

**Please answer the following questions:**

1. Please provide your race.
   Asian(Indian)

2. Please identify the facility where you were employed at the time[1] of this claim.
   Robert J Dole VA Medical Center
3. Please provide the name of your direct supervisor at the time of this claim.
   Dr. Robert Cummings
4. Please identify the position and grade you held at the time of this claim.
   Deputy Chief of Staff

   a. Are you currently in this position?

      i. If yes, how long have you been in this position?
         2 years approximately
      ii. If yes, how long have you been with the organization?-19 years

      iii. If no, what was your last day in this position?-N/A

5. What was your working relationship with the Complainant during the period of the claim (e.g. first-line supervisor; second-line supervisor; coworker)?
   None

6. Have you previously been involved in EEO activity?-Yes

   a. If yes, did that activity involve the Complainant?-No

   _____

      1. Did the Complainant report to you any of the matters subject of Events 1-8?-
         I was aware of only #1-For a brief time as I was the acting chief of staff(Nov 17-April 18 approximately)-I have a vague recollection that the complainant was sharing concerns regarding RD's behavior I think in first quarter of 2018-cannot recall the exact date

   a. If yes, explain what she reported to you?It was something about RD talking in public about other employees

   b. If yes, did she tell you that RD's behavior, comments and/or actions were unwarranted?-Not sure about unwarranted but the complainant was concerned

_____
[1] April 2018 through March 2020.

   c.  If yes, did she tell you or imply that she felt intimidated by RD?
      No

   d.  If yes, did she tell you that she felt harassed by RD?
      No

   e.  If yes, did she tell you that she felt that RD treated her in a discriminatory manner?
      No

   f.  If yes, did she tell you that she felt RD was interfering with her ability to do her job?
      No

   g.  If yes, what action did you take in response?

      I had discussed with RD to be mindful and speak to employees in private and RD understood and said would comply

   h.  If yes, did you discuss the matter with RD?
      As above
      i.  If yes, what was her response to the allegations? RD was complementary of the complainant.

   h.  Was any action taken against RD?-No

      i.  If yes, what action was taken?

      ii.  If no, action why was no action taken against RD? Did not see a reason to as RD was complementary of the employee and acknowledged that her future conversations would be in private and did not get any further complaints and my detail as acting chief of staff ended in April 2018

      iii.

     2.  Did you conduct an investigation into the matters subject of Events 1-8?-No. I was only aware of #1 when I was acting chief of staff briefly & RD was complementary of the employee and acknowledged that her future conversations would be in private and did not get any further complaints and my detail as acting chief of staff ended in April 2018

3.

   a. If no, why did you fail to conduct an investigation? No reason to

   b. If no, did any person conduct an investigation?

      i. If yes, name the person- I am not aware

      ii.  If yes, what was the outcome of the investigation? I am not aware

   c. If yes, what was the outcome of the investigation?-Not applicable

      **i. Please provide a copy of the investigative report and findings with your response.**

3. Are you familiar with the VA's anti-harassment policy?

    a.  If yes, what does the policy state a supervisor should do when an employee reports harassment?-Yes

        i.  Do you believe in this instance that you took action in accordance with this policy?-Yes- Harassment was not reported it was more of a concern about talking about other employees in public

4. Have you witnessed RD subject the Complainant to harassing treatment?-No

    a. If yes, how often have you witnessed this treatment?-Not applicable

    b. If yes, explain the harassing treatment you have witnessed.-Not applicable

5. Have you witnessed RD subject the Complainant to discriminatory treatment?-No

    a. If yes, how often have you witnessed this treatment? Not applicable

    b. If yes, explain the discriminatory treatment you have witnessed.-Not applicable

6. Do you have any knowledge and/or belief that RD harbored any animosity towards the Complainant because of her (Complainant) reports against her (RD)?

    a. If yes, explain.-**No**

7. Do you have any knowledge and/or belief that RD harbored any animosity towards the Complainant because of her (Complainant) race?-**No**

    a. If yes, explain.

8. Do you have any knowledge and/or belief that RD felt inferior to the Complainant and/or intimidated by the Complainant because of her knowledge, skills or abilities?-**No**

    a. If yes, explain.

_____ _Sv_____

**Do you have anything else you would like to add to your testimony?**

Yes

        **If yes, please provide your statement below.**

RD was complementary and pleased with the complainant. From what I recall the complainant was selected for a promotion as the manager later . My role in this whole activity was confined to a small period of 30 days -April 2018. (As acting Chief of Staff)

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this ___14___ day of ___SEPTEMBER___, 2020.

_____
Syed Raffi

1



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

Written Affidavit of Cynthia Finley
in the Matter of the EEO Complaint of Discrimination filed by

DaShaun McCray                    )
                                  )
Complainant                       )
                                  )
                                  )     Case No. 2003-589W-2020102157


                                  )
Secretary                         )
Department of Veterans Affairs    )
810 Vermont Avenue, NW            )
Washington, DC  20420             )
                                  )
Respondent                        )
                                  )
                                  )
Facility: Witchita VAMC           )
                                  )
                                  )
                                  )
                                  )
_____ )

**(SEE BELOW FOR RELATED EVENTS AND QUESTIONS)**


I, Cynthia Finley, solemnly swear/affirm that the information given in response to the
following questions is true and correct to the best of my knowledge and belief.


__CF_____
 Initial

Affiant's Initials: _____   Date:_____

2

**Whether on the bases of race (African-American) and reprisal (previous EEO activity[1]), the complainant was subjected to a hostile work environment as evidenced by the following:**

**Event 7: On February 10 and 14, 2020, RD undermined the complainant's ability as a supervisor when she stated, "You took all leadership away from Janelle Adams, Coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when she falsely accused her taking over a February 7, 2020, meeting and did not allow another employee to speak.**

_____

**Please answer the following questions:**

1. Please identify the facility where you were employed at the time of this claim[1].
   Robert J. Dole VA Medical Center

2. Please identify the position and grade you held during the period of the claim.
      Office of Community Care RN/ Nurse II
   a. Are you currently in this position? Yes

         i. If no, provide the date of the last day in this position?

         ii. If yes, how long have you been in your current position? 3 years

         iii. If yes, how long have you been with the organization? 4 years

3. Please provide the name of your direct supervisor during the period of the claim.
   DaShaun McCray

4. What was your working relationship to the Complainant during the period (e.g. first-line, second-line supervisor, co-worker) ? Complainant was my first line supervisor

_____

1. On February 10, 2020, did Ruth Duda (RD) go to Janelle Adams desk and ask her if she felt that the Complainant took leadership away from her and if she felt unable to talk to the Complainant about this type of thing due to fear of retaliation? I did not witness this conversation nor did I see Ruth Duda go to Janelle Adams desk.

         a. If yes, how are you aware of this incident?

         b. If yes, did you discuss this matter with Janelle Adams?

_____

[1] February 2020

3

         i If yes, did Janelle Adams explain why RD was questioning her about this?

              1. If yes, what was the justification?

     b. If yes, did Janelle Adams say that she felt RD's questioning was appropriate?

          1. If she stated that RD's questioning was not appropriate, did she explain why she felt it was inappropriate?

              a. If yes, explain.

     c. If yes, why do you believe RD was questioned Janelle Adams about this?

     d. If yes, did you report this incident to the Complainant ?

         i. If yes, why did you report this to the Complainant?

     e. If yes, do you believe RD was attempting to set Janelle Adams against the Complainant?

         i. Do you have any knowledge as to why she would want to do this?

             1. If yes, explain.

2. At any time, did the Complainant tell you that RD's actions, behavior and/or statements were unwelcomed? I do not recall a specific incident

3. Was the Complainant Janelle Adam's supervisor during the period of this Event? Yes

4. At any time, have you witnessed RD subject the Complainant to harassing treatment? No

     a. If yes, how often have you witnessed this treatment?

     b. If yes, explain the harassing treatment you have witnessed.

5. At any time, did you witnessed RD subject the Complainant to discriminatory treatment? No

     a. If yes, how often have you witnessed this treatment?

     b. If yes, explain the discriminatory treatment you have witnessed.

6. At any time, did the Complainant tell you that he felt harassed by RD? I do not recall.

Affiant's Initials:_____    Date:_____

4

7. At any time, did the Complainant tell you that he felt RD treats her differently?  I do not recall.

8. Do you have any knowledge and/or belief that RD harbored any animosity towards the Complainant because of her (Complainant) reports against her (RD)? No

     a. If yes, explain.

9. Do you have any knowledge and/or belief that RD harbored any animosity towards the Complainant because of her (Complainant) race? No

     a. If yes, explain.

10. Do you have any knowledge and/or belief that RD felt inferior to the Complainant and/or intimidated by the Complainant because of her (Complainant) knowledge, skills or abilities? No

     a. If yes, explain.

_____

**Do you have anything else you would like to add to your testimony?**

     **If yes, please provide your statement below.**

**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**

**The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint.  This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.**

This statement is made under penalty of perjury on this 15th day of  September, 2020.

*Cynthia Finley*

_____
Cynthia Finley



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**

Written Affidavit of Robert Cummings

in the Matter of the EEO Complaint of Discrimination filed by

DaShaun McCray                      )
                                    )
Complainant                         )
                                    )
                                    )        Case No. 2003-589W-2020102157


                                    )
Secretary                           )
Department of Veterans Affairs      )
810 Vermont Avenue, NW              )
Washington, DC  20420               )
                                    )
Respondent                          )
                                    )
                                    )
Facility: Wichita VAMC              )
                                    )
                                    )
                                    )
                                    )
_____    )

**(SEE BELOW FOR RELATED EVENTS AND QUESTIONS)**


I, Robert Cummings, solemnly swear/affirm that the information given in response to the following questions is true and correct to the best of my knowledge and belief.

___RVC____
Initial

Whether on the bases of race (African-American) and reprisal (previous EEO activity[1]), the complainant was subjected to a hostile work environment as evidenced by the following:

Event 1: From April 2018, through the present, Ruth Duda (RD), Community Care Service Chief, attempted to "intimidate" the complainant when she spoke with her in her workspace, RD yelled at her in a public area while discussing another employee's pay, and RD stated, "If she wants to get paid, you better tell her to send us the form!"

Event 2: Between January 28, 2019, and January 4, 2020, RD required the complainant to complete the staffing model duty, without providing her Nurse Manager training.

Event 3: From January 2019, through the present, RD "usurped" the complainant's supervisory authority by instructing her (complainant's) staff to complete different actions than she initially instructed her staff to do.

Event 4: On January 24, 2020, RD increased the complainant's workload after she had a meeting with the Chief of Staff to discuss RD's behavior.

Event 5: On January 30, 2020, RD refused to allow the complainant to speak during a meeting with the Medical Center Director, even though the Director asked RD to allow her (complainant) to speak.

Event 6: On January 31, 2020, RD violated the complainant's personal space when she looked over her so that she could see her computer, and RD yelled at her, "You did not allow me to talk during the meeting with the Pentad, and you gave incorrect information, are you offended?"

Event 7: On February 10 and 14, 2020, RD undermined the complainant's ability as a supervisor when she stated, "You took all leadership away from Janelle Adams, Coworker. It appears you were also taking credit for all of the progress made, what was to be implemented in the future with little input from the staff," and when she falsely accused her taking over a February 7, 2020, meeting and did not allow another employee to speak.

Event 8: On March 2, 2020, RD threatened to fire the complainant when she asked RD how to proceed with an employee's expired nursing license, and RD stated to her, "I find your response interesting, as I was also told to fire you when you violated the HIPAA law. Yet I chose a merciful route. (Name unknown) could produce a license tomorrow, and you would have lost a valuable employee."

__ RVC _____

**Please answer the following questions:**

1. Please provide your race.  **White**

2. Please identify the facility where you were employed at the time[1] of this claim.
   **Robert J Dole VA Medical Center, Wichita**

3. Please provide the name of your direct supervisor at the time of this claim.
   **Rick Ament, Medical Center Director**

4. Please identify the position and grade you held at the time of this claim.
   **Chief of Staff**

   a. Are you currently in this position? **Yes**

      i. If yes, how long have you been in this position?
         **2 ½ years**
      ii. If yes, how long have you been with the organization?
         **2 ½ years in this Medical Center and approximately 10 years in VA**

      iii. If no, what was your last day in this position?
         **N/A**

5. What was your working relationship with the Complainant during the period of the claim (e.g. first-line supervisor; second-line supervisor; coworker)?
   **None**

6. Have you previously been involved in EEO activity?
   **Yes**
   a. If yes, did that activity involve the Complainant?
   **No**

---

1. Did the Complainant report to you any of the matters subject of Events 1-8?

   a. If yes, explain what she reported to you?
      **At some time in 2019 Ms. McCray met with me regarding her perceptions of working with the Service Chief.  I do not recall specifics.  I offered to sit down with the Service Chief, Nurse Manager, and MSA Supervisor to discuss any issues.  The latter two elected not to do so.**

RVC
April 2018 through March 2020.

b. If yes, did she tell you that RD's behavior, comments and/or actions were unwarranted?

c.
   **I do not recall specifics.**

d. If yes, did she tell you or imply that she felt intimidated by RD?
   **Not that I recall.**

e. If yes, did she tell you that she felt harassed by RD?
   **Not that I recall.**

f. If yes, did she tell you that she felt that RD treated her in a discriminatory manner?
   **Not that I recall.**

g. If yes, did she tell you that she felt RD was interfering with her ability to do her job?
   **Not that I recall.**

h. If yes, what action did you take in response?
   **N/A - but I offered to sit down with the Service Chief, Nurse Manager, and MSA Supervisor to discuss any issues.  The latter two elected not to do so.**

i. If yes, did you discuss the matter with RD?
   **N/A**
   i. If yes, what was her response to the allegations?
   **N/A**

j. Was any action taken against RD?
   **N/A**
   i. If yes, what action was taken?
   **N/A**
   ii. If no, action why was no action taken against RD?
   **No "action".  Discussed teamwork amongst leaders in Service.**

2. Did you conduct an investigation into the matters subject of Events 1-8?

   a. If no, why did you fail to conduct an investigation?
   **No**

   b. If no, did any person conduct an investigation?

      i. If yes, name the person **There was a Fact Finding through HR.**

      ii. If yes, what was the outcome of the investigation?
      **Perhaps HR could provide details.**

   c. If yes, what was the outcome of the investigation?

      i. Please provide a copy of the investigative report and findings with your response.
      **Perhaps HR could provide details.**

RVC 

3. Are you familiar with the VA's anti-harassment policy?
   **Yes**
   a. If yes, what does the policy state a supervisor should do when an employee reports harassment?
   **I was not the complainant's supervisor.**
      i. Do you believe in this instance that you took action in accordance with this policy?
         **N/A**

4. Have you witnessed RD subject the Complainant to harassing treatment?
   **No**
      a. If yes, how often have you witnessed this treatment?
   **N/A**
   b. If yes, explain the harassing treatment you have witnessed.
   **N/A**

5. Have you witnessed RD subject the Complainant to discriminatory treatment?
   **No**
   a. If yes, how often have you witnessed this treatment?
   **N/A**

   b. If yes, explain the discriminatory treatment you have witnessed.
   **N/A**

6. Do you have any knowledge and/or belief that RD harbored any animosity towards the Complainant because of her (Complainant) reports against her (RD)?
   **No knowledge or belief.**
   a. If yes, explain.

7. Do you have any knowledge and/or belief that RD harbored any animosity towards the Complainant because of her (Complainant) race?
   **No**
   a. If yes, explain.

8. Do you have any knowledge and/or belief that RD felt inferior to the Complainant and/or intimidated by the Complainant because of her knowledge, skills or abilities?
   **No**
   a. If yes, explain.
   **N/A**

_____

**Do you have anything else you would like to add to your testimony?**
   **No**
   **If yes, please provide your statement below.**
**PLEASE NOTE THAT ORM RESERVES THE RIGHT TO SUPPLEMENT OR ASK ADDITIONAL QUESTIONS AS THE INVESTIGATION REQUIRES.**
RVC

The above information has been furnished without a pledge of confidence and I understand that it may be shown to any interested party[ies] with a need to know for this complaint. This includes but is not limited to VA, EEOC, contracting officials with a need to know during the course and scope of the informal and formal EEO process including administrative procedures and litigation as applicable and mandated by law.

This statement is made under penalty of perjury on this 14th day of September 2020.

Robert V. Cummings, MD

**Harris, Linda (ORMDI)**

| | |
|---|---|
| **From:** | McCray, DaShaun |
| **Sent:** | Monday, July 13, 2020 7:21 PM |
| **To:** | Harris, Linda (ORMDI) |
| **Subject:** | McCray Event #6 |

*DaShaun M. McCray MBA, BSN, CCM*
*Program Manager C6, Clinical Integration*
*VHA Office of Community Care*

**From:** McCray, DaShaun
**Sent:** Saturday, February 1, 2020 1:37 PM
**To:** Ament, Ricky A. <Ricky.Ament@va.gov>
**Subject:** RE: Plan by COB

Mr. Ament,

I really do appreciate you and what you have shown me in regard to how to run a business. I value your input and the opportunities you have given me to address concerns that affect RJD as a whole and not just Community Care. With that said, Dr. Cummings called me to his office to meet with he and Ruth 1/31/20 at 3:30 pm. When I arrived we initial discussed the plan for the backlog and in which I had sent him the numbers for but did not have it in excel format like he wanted. He requested Ms. Duda and I work together to get that to him by Noon Monday. After that conversation he stated that he wanted RJD Community Care to be the Platinum Standard for VISN 15 and that would require Ms. Duda and I working together. I informed him I do not trust her, she usurps my authority and pits my staff against me. She takes information I give her and puts it off as her own. I do understand she is the Chief of this department and I respect her position but I no longer respect her as a person or professional. I continued to request re-assignment and decline resolving my issue with Ms. Duda as this has been going on between she and I since 2018 and I just took it because I am a single parent and was in fear of losing my job. His words were, " when are you leaving because Ms. Duda has an organization to run". I am one of the reasons RJD Community Care did so well of the past years and he will see that once I am gone.  In do thank you for the continued support and opportunities, but now I have no faith in Ms. Duda direct supervision addressing her behavior. He made it look like I am the problem, although without me Community Care will run different, but the good this is I have supported the team and trained them well so it will continue to function without me.

Very respectfully,

*DaShaun M. McCray BSN, RN, CCM*
*Nurse Manager Care in the Community*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** Ament, Ricky A. <Ricky.Ament@va.gov>
**Sent:** Saturday, February 1, 2020 8:12 AM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Plan by COB

DaShuan,
I am out of town until Tuesday. I can assure you Dr. Cummings and I will discuss this on my return.
Regarding the discussion on Thursday, I felt good about the interchange. In fact, after your departure, we addressed the difference between throwing bodies (perhaps the wrong ones) at the problem rather than Fixing the real problem then staffing accordingly. Your analysis and articulation were right on target.

Rick

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Date:** Friday, Jan 31, 2020, 11:42 AM
**To:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Cc:** Ament, Ricky A. <Ricky.Ament@va.gov>
**Subject:** Plan by COB

Dr. Cummings,

On Ms. Duda return to Community Care this morning after morning report she approached me regarding Plan by COB. She had also sent a text during morning report stating " You need to focus on the GT 7 as this is the PM" on my personal cell phone. These are not the standard she has held the department to and is the reason we are so far out. When myself and Elizabeth attempted to implement this standard she stated " we will get behind and then maybe the front office will see we need people', and many have heard he state this. She asked me if I had received email regarding Plan by COB. I informed her I have been in receipt of the email and I am working to address the 2183. She came around my desk and was in my personal space stating these were the numbers I gave and I know that these are the numbers given by Ms. Behnk. She continued to stand over me and talk I requested she go on the other side of the desk and she continued to be loud and telling me that I took over the meeting yesterday and did not allow her to speak. This is retaliation, intimidation and abuse of authority which are unacceptable practices of a person in a leadership role. I feel threatened and will not accept this behavior.

Very respectfully,

*DaShaun M. McCray BSN, RN, CCM*
*Nurse Manager Care in the Community*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** McCray, DaShaun
**To:** Alford, Natalina (ORM)
**Subject:** Additional Information McCray
**Date:** Tuesday, February 18, 2020 4:22:13 PM

Good Afternoon Ma'am,

Wanting to know if your received my signed forms.

Highlighted areas in Yellow.
3) She added this to me and we are on short notice to the COS and she never has trained me. Added to my work load.

4) She also stated in front of Deputy Nurse Executive that the said staff was fearful of speaking to me in fear of retaliation. I have spoken with this staff member and she states Ms. Duda came to her on 2/10/20 and asked her these questions and she felt like Ms. Duda was trying to pit her against me. I am not sure I would be able to get her to state this again. But it definitely substantiates what I had stated in the reason for my case.

V/r

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** Duda, Ruth <Ruth.Duda@va.gov>
**Sent:** Friday, February 14, 2020 4:12 PM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Cc:** Brown, Heather (WIC) <Heather.Brown_7@va.gov>
**Subject:** meeting on 2/14/2020

DaShaun
This is a recap of today's meeting to assist keeping us on the same page.
These weekly meetings will be conducted and to mirror those I have with Dr. Cummings. The intent is information sharing by both parities as well as to assist in training to be a strong leader. This is why Heather Brown was invited, as you had told me she is your mentor to assist with professional growth and development. Thank you Heather for attending.
Items Reviewed:
   1. I was informed this am that ALL radiation oncology will be routed through KC VA first as an

IFC. They will do the reach out call as part of the RCI and then forward the consult to OCC if need be. You raised a valid point to see if the radiation oncology has been pulled from the SECOC. Thank you for following up on that issue. Please let Pam B and myself know.

2. Sunshine Vanderboom's last day to process consults will be 3/26/2020. The administrative decision to assist with coverage will be a joint effort between OCC RN staff and ARNP from PC. For grandfather eligible veterans and any RFS received for a grandfather eligible veteran; the OCC RN will receive the consult, gather all clinical information needed to do a clinical review and apply IQ criteria.
   If met, the OCC RN will enter the appropriate consult under the ARNP's name, the consult be entered as hold for signature.
   If the criteria is not met, we follow IQ process and first request additional information from the ordering community provider, once received, if meets criteria proceed as above. If it still does not meet criteria then send the request to the ARNP for medical determination and disposition. At that point the ARNP will enter the consult.
   This will be a good trial as we approach the CPO process.

3. I confirmed with HR that for staffing requests the Chief of the Service does present, however the preparation of staffing request does not have to be the Chief of the service. This is within the expectations of Nurse Managers and therefore I am providing you with the opportunity to take control of your staffing and prepare the request for intermittent RN staffing. I have provided a sample of my past staffing proposals to assist.

4. Reflecting upon the transfer nurse meeting held on Friday, Feb. 7, 2019 and Janelle's request to leave the team post meeting. I would like to provide feedback to you on how you were perceived by not only myself but Ms. Adams. Ms. Adams was given autonomy to lead the transfer team as part of a way to earn her Nurse 2, therefore she had prepared the handout of processes tried-successes and failures. However, at the meeting in front of the entire team, you took all leadership away from Janelle and it appeared you were also taking credit for all progress made and what was to be implemented in the future, with little input from the staff. Janelle came into my office several days later and stated she felt undermined and all the effort to gel and create a successful team was worth her effort and stress. She additional stated she felt nothing was being done about Lori's lack of customer service and attitude to be a team player. I assured her you were aware and that is all I could share. I appreciated you voicing your perspective that you were unaware of Janelle being asked to 'lead the team' but did acknowledge the conversation that we had discussed this would be a good way for her to earn her Nurse 2. I appreciate you voicing it was never any intent to upset or take away from Janelle.

5. I need you to focus on managing the nurses and allow Ms. Dial to manage the MSA as she is the Program Specialist Supervisor. You stated you understood.

6. When in meetings, be it is always good practice to always show respect and if you feel there is an error, allow a way to 'save face'. Be it with the Pentad or in the staff meeting. On Tues to

address the backlog, you announced very blatantly, 'Ruth was wrong' . You did not correct yourself until I cleared my throat and stated, I was given wrong information. Therefore, the misguidance was unintentional.  By your denial of making the statement, I will surmise that it was not intentional to show any disrespect.


Ruth Duda, RN, BSN, MBA, MHC
Chief of Community Care
Robert J Dole VA
Wichita, KS
(316)685-2221 X57073

**From:** McCray, DaShaun
**To:** Alford, Natalina (ORM)
**Cc:** McCray, DaShaun
**Subject:** Claim
**Date:** Monday, February 10, 2020 12:35:47 PM

Timeline

1/24/20- Met with COS to discuss behavior of direct supervisor

1/24/20- Met with local EEO to discuss Mediation

1/24/20- Direct supervisor returns from meeting at main campus and begins to increase email traffic regarding prioritizing work

1/30/20- Attended meeting with Chief Nurse Ruth Duda with Pentad. Discussion was going as planned and Ms. Duda was reporting information without plan for resolution. Medical Center Director placed his had up to ask her to allow me to speak. I gave information in perspective to department workflow and he understood recommendation and request myself and Ms. Duda have information to Pentad by COB 1/31

1/31/20 7:58 - Ms. Duda sent Text message stating what I needed to focus on and I agreed

1/31/20 approximately – Ms Duda came to my office informing me COS sent an email stating the need for plan by COB. I informed her I had received the email and would be working to get the information to COS. She came behind my desk and started looking at my computer. I did not ask or invite her to look at my email. She started stating I was the one that did not let her talk and gave wrong information to Pentad. Informed her it was not me it was the information from the GPM that gave the numbers. She began getting loud and stating to me am I offended and continued to stand over me. I am making a claim on harassment due to racial discrimination.

*DaShaun M. McCray BSN, RN, CCM*
*Nurse Manager Care in the Community*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

| | |
|---|---|
| **From:** | McCray, DaShaun |
| **To:** | Alford, Natalina (ORM) |
| **Cc:** | McCray, DaShaun |
| **Subject:** | FW: Plan by COB |
| **Date:** | Monday, February 10, 2020 12:19:31 PM |

Ms. Alford here is the email traffic.

*DaShaun M. McCray BSN, RN, CCM*
*Nurse Manager Care in the Community*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** McCray, DaShaun
**Sent:** Saturday, February 1, 2020 2:37 PM
**To:** Ament, Ricky A. <Ricky.Ament@va.gov>
**Subject:** RE: Plan by COB

Mr. Ament,

I really do appreciate you and what you have shown me in regard to how to run a business. I value your input and the opportunities you have given me to address concerns that affect RJD as a whole and not just Community Care. With that said, Dr. Cummings called me to his office to meet with he and Ruth 1/31/20 at 3:30 pm. When I arrived we initial discussed the plan for the backlog and in which I had sent him the numbers for but did not have it in excel format like he wanted. He requested Ms. Duda and I work together to get that to him by Noon Monday. After that conversation he stated that he wanted RJD Community Care to be the Platinum Standard for VISN 15 and that would require Ms. Duda and I working together. I informed him I do not trust her, she usurps my authority and pits my staff against me. She takes information I give her and puts it off as her own. I do understand she is the Chief of this department and I respect her position but I no longer respect her as a person or professional. I continued to request re-assignment and decline resolving my issue with Ms. Duda as this has been going on between she and I since 2018 and I just took it because I am a single parent and was in fear of losing my job. His words were, " when are you leaving because Ms. Duda has an organization to run". I am one of the reasons RJD Community Care did so well of the past years and he will see that once I am gone.  In do thank you for the continued support and opportunities, but now I have no faith in Ms. Duda direct supervision addressing her behavior. He made it look like I am the problem, although without me Community Care will run different, but the good this is I have supported the team and trained them well so it will continue to function without me.

Very respectfully,

*DaShaun M. McCray BSN, RN, CCM*

*Nurse Manager Care in the Community*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** Ament, Ricky A. <Ricky.Ament@va.gov>
**Sent:** Saturday, February 1, 2020 8:12 AM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Plan by COB

DaShuan,
I am out of town until Tuesday.  I can assure you  Dr. Cummings and I will discuss this on my return.  Regarding the discussion on Thursday, I felt good about the interchange.  In fact, after your departure, we addressed the difference between throwing bodies (perhaps the wrong ones) at the problem rather than Fixing the real problem then staffing accordingly.  ==Your analysis and articulation were right on target.==

Rick

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Date:** Friday, Jan 31, 2020, 11:42 AM
**To:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Cc:** Ament, Ricky A. <Ricky.Ament@va.gov>
**Subject:** Plan by COB

Dr. Cummings,

On Ms. Duda return to Community Care this morning after morning report she approached me regarding Plan by COB. She had also sent a text during morning report stating " You need to focus on the GT 7 as this is the PM" on my personal cell phone. These are not the standard she has held the department to and is the reason we are so far out. When myself and Elizabeth attempted to implement this standard she stated " we will get behind and then maybe the front office will see we need people', and many have heard he state this.  She asked me if I had received email regarding Plan by COB. I informed her I have been in receipt of the email and I am working to address the 2183. ==She came around my desk and was in my personal space stating these were the numbers I gave and I know that these are the numbers given by Ms. Behnk. She continued to stand over me and talk I requested she go on the other side of the desk and she continued to be loud and telling me that I took over the meeting yesterday and did not allow her to speak.== This is retaliation, intimidation and abuse of authority which  are unacceptable practices of a person in a leadership

**000118**

role. I feel threatened and will not accept this behavior.

Very respectfully,

*DaShaun M. McCray BSN, RN, CCM*
*Nurse Manager Care in the Community*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** McCray, DaShaun
**To:** Alford, Natalina (ORM)
**Subject:** FW: Functional Statement
**Date:** Monday, February 10, 2020 1:01:16 PM
**Attachments:** Utilization Management Nurse NII.pdf

This is the Functional statement that was sent to me by her secretary and I was told it was because they received information from HR that I was requesting re-assignment, which I did 1/22/20, but it ironically got addressed when I stated I am just going to address this with my caseworker.

*DaShaun M. McCray BSN, RN, CCM*
*Nurse Manager Care in the Community*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** Seymour, Gwen C. <Gwen.Seymour@va.gov>
**Sent:** Friday, February 7, 2020 11:18 AM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** Functional Statement

DaShaun,

Please see attached functional statement for the Utilization Management Nurse NII.

Thank you,

*Gwen Seymour*

**Secretary, Nurse Executive**
**Robert J. Dole VA Medical Center**
**5500 E. Kellogg**
**Wichita, KS 67218**
**(316) 685-2221 ext. 53622**

*Disclaimer: This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.*

**Department of Veterans Affairs**
**Robert J. Dole VA Medical Center**
**Wichita, KS**

**FUNCTIONAL STATEMENT**
**UTILIZATION MANAGMENT NURSE**
**NII**

**Qualifications**
- Citizen of the United States
- Graduate of an NLN accredited or state approved school of nursing
- Current RN registration
- Physical and intellectual capacity to satisfactorily perform assigned duties

**Education and Experience**
- Doctoral degree in Nursing or in a related field with no experience (and meets basic requirements for appointment); OR
- Master's degree in Nursing or in a related field with a BSN or Bachelor's degree in a related field with ADN or Diploma and 1-2 years' experience; OR
- MSN from bridge program and 1-2 years' experience; OR
- BSN and 2-3 years' experience; OR
- Bachelor's degree in related field with ADN or Diploma and 2-3 years' experience

**Position Summary**
The UM Nurse (UMN) is a member of the Quality Management team and is supervised by the Chief of Quality Management. The incumbent functions as a generalist in quality improvement activities and serves as the expert in Utilization Management. The UMN meets VA's Dimensions of Nursing Practice at the Nurse II level.

The UM Nurse demonstrates leadership, experience, and creative approaches to improve safe, cost effective, and medically appropriate levels of care for the management of patients throughout the continuum of care in all settings. The UMN is assigned to conduct utilization review for patients on admission and continued stay days. S/he recommends transitions to appropriate clinical settings and in collaboration with interdisciplinary medical center resource utilization. The incumbent seeks guidance, as necessary, to differentiate and understand diagnostic procedures and apply this knowledge when reviewing patient medical records to ensure that the care provided is medically necessary and provided in the appropriate level of care. S/he is responsible for assessing, planning, implementing, coordinating, monitoring, and evaluating the clinical operations and medical management activities across the continuum of care. The UMN assesses the appropriateness of admission and continued stay for billable and non-billable inpatient cases, screening for outpatient services and case management. The UMN is accountable for accurate and complete data collection and reporting, including trending and analysis, as it relates to these responsibilities. The UMN also works closely with the designated Physician Utilization Management Advisors (PUMAs) and other members of the health care team. This nurse regularly collaborates with other UM and Tricare staff at Veterans Affairs medical centers and facilities throughout VISN 15.
The UMN is also responsible and accountable for completing mandatory training in a timely manner and independently seeking additional knowledge/information necessary in order to fulfill his/her role

RJD VAMC December 2017

responsibilities that reflect the educational, experiential and competency requirements outlined in the four dimensions:

* Practice
* Scientific Inquiry
* Professional Development
* Collaboration

In addition, this registered nurse is accountable and responsible for possessing the knowledge and skills to:

*Communicate and interact appropriately with all internal and external customers.
*Maintain confidentiality of electronic, written, and/or verbal patient/employee information.

**NURSE III CAREER TRACK:**    CLINICAL    ☐    SUPERVISORY    ☐

ADVANCE PRACTICE    ☐    CONSULTANT    ☒

**Evaluation**

Rating Official:  Chief, Quality Management
Approving Official:  Medical Center Director

**Approved by:**

*Norman J. Forbes, MA, RN, NCA-BC*
NORMAN J. FORBES, MA, RN
Associate Director Patient Care/Nurse Executive

**Work Environment:**
The UM Nurse will work primarily in the Quality Management office but may be required to make rounds throughout the facility.

**Physical Demands:**
While performing the duties of this job the employee is frequently required to stand, walk, and bend and reach with hands and arms.  Must give good manual dexterity and keyboarding skills are essential. Must be able to express or exchange ideas by means of the spoken word.  Must obtain impressions through the eyes of shape, size, distance, motion, color or other characteristics of objects.  Must be able to view and read information on computer screens.  Must be able to occasionally lift and/or move 45 pounds or more.  Must be able to carry 25 pounds, short distances.

**I understand and can perform the essential job functions, physical demands and competencies of this job.**

_____        _____
Employee Signature        Date

RJD VAMC December 2017

### PRACTICE QUALIFICATION STANDARDS

A. **PRACTICE: Applies the nursing process to systems or processes at the unit/team/workgroup level to improve care. Demonstrates leadership by involving others in improving care. Supports and enhances client self-determination. Serves as a resource for clients and staff in addressing ethical issues. Identifies and assesses resource utilization and safety issues, taking appropriate action.**

1. Analyzes and interprets data to identify the effectiveness of initiatives and programs and identify opportunities for improvement.
2. Utilizes expertise to monitor level of care throughout the continuum of care across settings.
3. Demonstrates effective decision making skills.
4. Participates in process improvement activities/teams
5. Maintains professional boundaries with patients, families, and employees. Behavior as a role model is transparent and above reproach.
6. Demonstrates leadership in identifying, analyzing, and addressing ethical issues that impact patients and staff. Analyzes ethical issues, applying appropriate theoretical principles and provides guidance/consultation as appropriate.
7. Manages workload in an efficient manner.

B. **Scientific Inquiry: Initiates /participates in quality improvement activities that result in approved outcomes. Uses a body of research to validate and/or change work group practice.**

1. Identifies opportunities for improvement and assists with initiation, development, implementation and evaluation of plans that result in improved patient care and/or productivity of providers at the unit/team/work group level.
2. Works collaboratively with the Chief of Quality Management in the management of performance measure tracking, analyzing and reporting.
3. Interacts with staff and responds immediately to any expressions of concern related to performance measure tracking/reporting and actions for improvement.
4. Applies established findings of health-related research into practice.

C. **Professional Development: Implements an educational plan to meet changing program or service needs for self and others. Maintains knowledge of current techniques, trends, and professional issues. Uses professional standards of care and practice to evaluate programs and/or service activities.**

1. Actively participates in the advancement of nursing through contributions to knowledge development and education.
2. Functions as a mentor/role model for staff fostering professional growth and development.
3. Enhances professional knowledge and skills through active participation in professional organizations and participation in independent learning activities or projects.
4. Seeks experiences to develop, maintain, and improve competence in nursing professional development.
5. Assesses educational needs to implement program, service or Medical Center practice changes.
6. Continuously evaluates practice for a program or service based on established professional, community, or regulatory standards.
7. Assists staff with assessment, implementation, and evaluation of new approaches, procedures and standards of patient care based on reliable research.

RJD VAMC December 2017

8. Identifies need for staff education at the unit/team/work group level. Coordinates, organizes and leads staff in the presentation of unit/team/work group educational offerings; this may be extended beyond the assigned unit, as needed to support patient care throughout the facility.

**D. COLLABORATION: Uses the group process to identify, analyze, and resolve care problems. Educates colleagues and/or students and serves as a preceptor and/or mentor.**

1. Consistently demonstrates effective communication skills and professional behaviors that promote cooperation and teamwork with internal and external customers.
2. Initiates and leads multidisciplinary groups in critical thinking processes that lead to decisions that positively impact the program, service, or Medical Center.
3. Works effectively with others by resolving conflicts and assisting others to cope with stressful situations
4. Initiates and applies a collaborative team approach in identifying, analyzing, and resolving problems at the service or Medical Center level.

RJD VAMC December 2017

| | |
|---|---|
| **From:** | McCray, DaShaun |
| **To:** | Alford, Natalina (ORM) |
| **Subject:** | Additional Information |
| **Date:** | Tuesday, March 3, 2020 10:37:31 AM |

Ms. Alford,

Area in highlighted in yellow is badgering. First she gives me wrong information stating the employee can have a "grace period" so I asked for the regulation from HR including her in the email so we be on the same page, then she comes to me and states how she could have fired me.

Respectfully,

*DaShaun M. McCray MBA, BSN, RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

---

**From:** Duda, Ruth <Ruth.Duda@va.gov>
**Sent:** Monday, March 2, 2020 10:40 AM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Licensure

Do you have a minute? Please come to my office

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Monday, March 2, 2020 10:34 AM
**To:** Duda, Ruth <Ruth.Duda@va.gov>
**Subject:** RE: Licensure

You are taking this out of context as I am not choosing to terminate. I agree with the provide licensure within 72 hours and written counseling. I was just asking the regulation so I know for myself. I do not want the staff to be blind sided as that I had also discussed the grace period with her prior to her leaving.

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** Duda, Ruth <Ruth.Duda@va.gov>
**Sent:** Monday, March 2, 2020 10:22 AM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Licensure

I sent you the e-mail I sent Dr. Cotton per advisement of Sydney Kaus.

I find your response interesting, as I was also told to fire you when you violated the HIPPA law. Yet I chose a merciful route.
(Name Retracted) could produce a license tomorrow, and you would have lost a valuable employee.
Ruth

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Monday, March 2, 2020 9:51 AM
**To:** Duda, Ruth <Ruth.Duda@va.gov>
**Cc:** Dean, Christina <Christina.Dean@va.gov>
**Subject:** RE: Licensure

Ruth,

Please reply all so we all are on the same page. I am wanting to make sure where I should be from a management standpoint with HR. I cannot allow any personal feelings about this situation over rule the regulation.

Very respectfully,

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** Duda, Ruth <Ruth.Duda@va.gov>
**Sent:** Monday, March 2, 2020 9:43 AM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Licensure

DaShaun,
While I believe in acting justly, and providing mercy, there still needs to be a disciplinary action even if she produces her nursing license in the next 48 hours.
Anything over 72 hours is grounds for termination.

Ruth

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Monday, March 2, 2020 9:35 AM
**To:** Dean, Christina <Christina.Dean@va.gov>
**Cc:** Duda, Ruth <Ruth.Duda@va.gov>
**Subject:** Licensure
**Importance:** High

Christina,

Staff member ( Name Retracted) has been notified that her RN license shows lapsed in KSBN quick verification. This staff member has been sent home  and I am emailing you to verify my position as the Nurse Manager of this staff in resolution of this issue, ie. grace period versus removal.

Very respectfully,

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** McCray, DaShaun
**To:** Alford, Natalina (ORM)
**Subject:** Add to Case
**Date:** Tuesday, March 3, 2020 3:49:11 PM

Yes.

7:57 am 3/2/20- Text to my cellphone stating Staff Member RN must show proof of licensure or be fired immediately. I checked Kansas State Board of Nursing while the staff member was in my office the system stated lapsed. Ms. Duda informed me the staff member would need to be sent home and I asked sent home as in escorted out show within time frame and she responded, " For now opportunity to show…" I asked her who gave her that information and she state two members of HR and the Nurse executive.

Approximately 8:40 she arrives to the office and the staff member comes by and we both inform her to work to get the process expedited as she could have opportunity to show and retain her job.  I send an email to HR representative and stating "This staff member has been sent home  and I am emailing you to verify my position as the Nurse Manager of this staff in resolution of this issue, ie. grace period versus removal." HR responds with the regulation which was removal. I clarify that is what I read in the regulation also and my Chief responds with " I find your response interesting, as I was also told to fire you when you violated the HIPPA law. Yet I chose a merciful route. Staff member could produce a license tomorrow, and you would have lost a valuable employee. " I was not speaking of termination, I was wanting to know the regulation for myself, as she had brought back contradicting information from another HR specialist and she as the Chief was giving me miss information that I then passed on to the staff member. I find her statement to me badgering and causing me to feel undue stress because I want to know the regulation so I can be able to properly inform staff.  This could also fall with the usurps my authority as she could have passed me the information she received from the Nurse Executive and I would have handled the situation with HR giving the staff member appropriate guidance.

V/r

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** Alford, Natalina (ORM) <Natalina.Alford@va.gov>
**Sent:** Tuesday, March 3, 2020 10:49 AM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>

**Subject:** RE: Additional Information

Do you want this added to your claim?

If so please give a brief description (Date and What Happened)

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Tuesday, March 3, 2020 10:37 AM
**To:** Alford, Natalina (ORM) <Natalina.Alford@va.gov>
**Subject:** Additional Information

Ms. Alford,

Area in highlighted in yellow is badgering. First she gives me wrong information stating the employee can have a "grace period" so I asked for the regulation from HR including her in the email so we be on the same page, then she comes to me and states how she could have fired me.

Respectfully,

*DaShaun M. McCray MBA, BSN, RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

---

**From:** Duda, Ruth <Ruth.Duda@va.gov>
**Sent:** Monday, March 2, 2020 10:40 AM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Licensure

Do you have a minute? Please come to my office

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Monday, March 2, 2020 10:34 AM
**To:** Duda, Ruth <Ruth.Duda@va.gov>
**Subject:** RE: Licensure

You are taking this out of context as I am not choosing to terminate. I agree with the provide licensure within 72 hours and written counseling. I was just asking the regulation so I know for myself. I do not want the staff to be blind sided as that I had also discussed the grace period with her prior to her leaving.

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

---

**From:** Duda, Ruth <Ruth.Duda@va.gov>
**Sent:** Monday, March 2, 2020 10:22 AM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Licensure

I sent you the e-mail I sent Dr. Cotton per advisement of Sydney Kaus.

I find your response interesting, as I was also told to fire you when you violated the HIPPA law. Yet I chose a merciful route.
(Name Retracted) could produce a license tomorrow, and you would have lost a valuable employee.
Ruth

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Monday, March 2, 2020 9:51 AM
**To:** Duda, Ruth <Ruth.Duda@va.gov>
**Cc:** Dean, Christina <Christina.Dean@va.gov>
**Subject:** RE: Licensure

Ruth,

Please reply all so we all are on the same page. I am wanting to make sure where I should be from a management standpoint with HR. I cannot allow any personal feelings about this situation over rule the regulation.

Very respectfully,

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

---

**From:** Duda, Ruth <Ruth.Duda@va.gov>
**Sent:** Monday, March 2, 2020 9:43 AM

**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Licensure

DaShaun,
While I believe in acting justly, and providing mercy, there still needs to be a disciplinary action even if she produces her nursing license in the next 48 hours.
Anything over 72 hours is grounds for termination.
Ruth

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Monday, March 2, 2020 9:35 AM
**To:** Dean, Christina <Christina.Dean@va.gov>
**Cc:** Duda, Ruth <Ruth.Duda@va.gov>
**Subject:** Licensure
**Importance:** High

Christina,

Staff member ( Name Retracted) has been notified that her RN license shows lapsed in KSBN quick verification. This staff member has been sent home  and I am emailing you to verify my position as the Nurse Manager of this staff in resolution of this issue, ie. grace period versus removal.

Very respectfully,

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

| | |
|---|---|
| **From:** | McCray, DaShaun |
| **To:** | Alford, Natalina (ORM) |
| **Subject:** | Additional information |
| **Date:** | Friday, February 14, 2020 4:00:52 PM |

Ms. Alford,

2/14/20- Scheduled for an update meeting with my direct supervisor 2/14/20 at 2:00pm she then lets me know it is rescheduled to invite my personal mentor that happens to be the Nurse Executive. During this meeting she begins with business as usual and states that the things that are appropriate to the team. She then begins to go into instances where she states she is going to allow me to manage the nurses, states that I took over a meeting on 2/7/20 and did not allow the RN to speak, then proceeds to tell me the RN was fearful to discuss anything with me secondary to fear of retaliation.  She had my personal mentor that is the Nurse Executive there while she verbally discredited my ability as a supervisor and stated rumored information. She once again used intimidation tactics in which I felt threatened me credibility in the whole facility bringing an outside party to a meeting, and she never asked me if I was okay with her attending.  These are two senior level nurses that are not of my race sitting in a meeting with me that I was completely not aware of the allegations presented until she starts saying them in front of her.


Very respectfully,


*DaShaun M. McCray MBA, BSN, RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**Harris, Linda (ORMDI)**

| | |
|---|---|
| **From:** | McCray, DaShaun |
| **Sent:** | Monday, July 13, 2020 7:16 PM |
| **To:** | Harris, Linda (ORMDI) |
| **Subject:** | McCray Email for Event #8 |

*DaShaun M. McCray MBA, BSN, CCM*
*Program Manager C6, Clinical Integration*
*VHA Office of Community Care*

**From:** McCray, DaShaun
**Sent:** Tuesday, April 14, 2020 11:59 AM
**To:** Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Subject:** RE: Excessive Punitive Treatment

Yes Sir. My number is 316-239-2734

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Sent:** Tuesday, April 14, 2020 12:58 PM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Excessive Punitive Treatment

Will 3:00 today work?

Keith Blackstone
Employee/Labor Relations Branch Chief
VA Heartland (VISN 15) Network Office
Ph: 816-728-9169

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Tuesday, April 14, 2020 12:49 PM
**To:** Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Subject:** RE: Excessive Punitive Treatment

Mr. Blackstone,

It has been a week and I still have not heard from you. I really would like to set up a time to talk.

Respectfully,

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

---

**From:** Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Sent:** Tuesday, April 7, 2020 1:43 PM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Excessive Punitive Treatment

Hopefully I can answer some of the questions you have, when we talk

Keith Blackstone
Employee/Labor Relations Branch Chief
VA Heartland (VISN 15) Network Office
Ph: 816-728-9176

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Tuesday, April 7, 2020 1:37 PM
**To:** Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Subject:** RE: Excessive Punitive Treatment

Mr. Blackstone,

I do many questions about HR practices here. I just feel that my employee situations was double jeopardy. I now am aware that what is given to me from HR is a recommendation and I could have decided to give a verbal counseling, as this employee had already been through a lot. I am learning the more I read, and abuse of position is not good.

*DaShaun M. McCray MBA, BSN, RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

---

**From:** Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Sent:** Tuesday, April 7, 2020 1:30 PM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Excessive Punitive Treatment

DaShaun,
I wanted to follow up with you. I apologize for the delay, this COVID crisis has me hopping. I have not forgot about your situation and have been looking into some things. I still need to talk to you at some point in the near future. I am sure you are busy too. I will be in touch soon. If you have any questions let me know.

Keith Blackstone
Employee/Labor Relations Branch Chief
VA Heartland (VISN 15) Network Office
Ph: 816-728-9176

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Thursday, March 26, 2020 8:56 AM
**To:** Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Subject:** FW: Excessive Punitive Treatment

Sir,

I do understand we are all very busy, but for the well being of our staff I would like a response. This is not just one staff we are dealing with. I also have detailed staff to my area that is questioning the practices of our HR and how they is leading the processes. I really am working to get the information so that I will not be put in this position again in the future.


Very Respectfully,

*DaShaun M. McCray MBA, BSN, RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

---

**From:** Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Sent:** Tuesday, March 24, 2020 2:27 PM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Excessive Punitive Treatment

I will be reaching out to you soon, I am a little tied up at the moment.  What number can I reach you?

Keith Blackstone
Employee/Labor Relations Branch Chief
VA Heartland (VISN 15) Network Office
Ph: 816-728-9176

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Tuesday, March 24, 2020 2:25 PM
**To:** Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Subject:** RE: Excessive Punitive Treatment

Mr. Blackstone,

For my understanding is this the process that is to be followed? As I see being removed as the top penalty and then coming back and giving additional excessive. I have read the credentialing and the HR regulations in regard to this and I am wanting to be aware for myself if this happens in the future.

Very Respectfully,

*DaShaun M. McCray MBA, BSN, RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

---

**From:** Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Sent:** Monday, March 23, 2020 12:20 PM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>; Patterson, William P. (V15) <William.Patterson@va.gov>
**Cc:** Washington, Tanya D. (V15) <Tanya.Washington@va.gov>
**Subject:** RE: Excessive Punitive Treatment

Dr. Patterson,
I am gathering all the pertinent information and will ensure this issue is resolved.

Keith Blackstone
Employee/Labor Relations Branch Chief
VA Heartland (VISN 15) Network Office
Ph: 816-728-9176

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Monday, March 23, 2020 11:20 AM
**To:** Patterson, William P. (V15) <William.Patterson@va.gov>
**Cc:** Washington, Tanya D. (V15) <Tanya.Washington@va.gov>; Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Subject:** Excessive Punitive Treatment
**Importance:** High

Dr. Patterson,

I am DaShaun McCray Nurse Manager Community Care Robert J. Dole VAMC. I had staff member on 3/2/20 that was notified her nursing license lapsing which was identified as error of the KSBN and resolution made by COB 3/2/20 with her license being reinstated. I reached out to Nurse Executive and Tina Dean HR specialist to work to resolve issue. This staff member had already been removed in which you overturned on 3/4/20, she was off from 3/2-3/4 leave without pay which could be looked at as a suspension.

I have been made to give her a reprimand which was issued on 3/18/20 under the direction of Tina Dean HR specialist, but I feel this is Double Jeopardy and this staff member has received due disciplinary action. I am a newer supervisor and just did not know how to approach this situation and had no effective guidance from my direct supervisor, as her response was this was above her.

Please see this as an appeal on the behalf of my staff member as I did not feel just culture is being observed by issuing the reprimand, but did not know how to approach the situation.

Very Respectfully,

*DaShaun M. McCray MBA, BSN, RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*

very低

*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**Harris, Linda (ORMDI)**

| | |
|---|---|
| **From:** | McCray, DaShaun |
| **Sent:** | Monday, July 13, 2020 7:17 PM |
| **To:** | Harris, Linda (ORMDI) |
| **Subject:** | Email for event #8 |
| **Attachments:** | Debellis prop repriamnd.docx; licensure lapse.pdf |

*DaShaun M. McCray MBA, BSN, CCM*
*Program Manager C6, Clinical Integration*
*VHA Office of Community Care*

---

**From:** McCray, DaShaun
**Sent:** Tuesday, April 14, 2020 2:24 PM
**To:** Blackstone, Keith (V15) <Elmer.Blackstone@va.gov>
**Subject:** FW: Proposed Reprimand

*DaShaun M. McCray RN, CCM*
*Nurse Manager Community Care*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

---

**From:** Dean, Christina <Christina.Dean@va.gov>
**Sent:** Tuesday, March 10, 2020 5:14 PM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Cc:** Irick, Matthew W. <Matthew.Irick@va.gov>
**Subject:** Proposed Reprimand

Attached is the proposed reprimand and evidence for Jessica Debellis related to her license lapsing. There were 3 employees who had licenses lapse and all 3 are receiving the same level of proposed action.  Please notify the employee of a meeting time and let her know she can bring a Union rep. Issue the proposed action and the employee's timeframe to respond to Ruth is outlined in the letter.  Let us know if you have any questions.

Tina Dean
Supervisory ER/LR Specialist
Robert J. Dole VAMC
Wichita, KS 67218
(316) 685-2221 ext 58029

**Help us serve you better with the VISN 15 HR Customer Service survey:** VISN 15 HR Quick Card

**Please make sure you select *VISN 15* and *Wichita***

| | |
|---|---|
| **From:** | Cotton, Julianna |
| **To:** | Duda, Ruth |
| **Cc:** | Billings, Christopher A.; VHAWIC ER-LR |
| **Subject:** | licensure lapse |
| **Date:** | Sunday, March 1, 2020 5:33:04 PM |
| **Attachments:** | image001.png |

Hi Ruth, the RN license for Jessica De Bellis is showing lapsed. Please make sure she does not work without a license. Please contact ER/LR for how to address this matter if it has not been resolved. Thank you.

Data last updated on Sunday, March 01, 2020 16:45:27

| | |
|---|---|
| **License Method :** | 13 - RN originally licensed in Kansas |
| **License :** | 131643 |
| **Last Name :** | DeBellis |
| **Middle Name :** | Leigh |
| **First Name :** | Jessica |
| **IV Certified :** | IV033 |
| **Professional Description :** | (RN) Registered Nurse |
| **Original Issue Date :** | 06/03/2015 |
| **Expiration :** | 02/29/2020 |
| **Status :** | Lapsed |
| **Multi State :** | No |
| **Alert List :** | |

*Julie (Julianna) Cotton, DNP, RN, NE-BC*
*Associate Director of Patient Care Services/Nurse Executive*
**Robert J. Dole VA Medical Center**
5500 E. Kellogg Ave.
Wichita, KS 67218
Office: 316-685-2221 ext. 53728
Cell: 316-285-8742

*Every journey begins with the first step…*

 

March 12, 2020                                          Reply Refer To: 589A7/HR

Jessica Debellis
Staff Nurse
Robert J. Dole VA Medical Center
Wichita, KS 67218

SUBJECT:  Proposed Reprimand

1.  I am proposing to *reprimand* you for the following reason(s):

    ***CHARGE: Failure to Maintain License***

    ***Specification:*** A requirement for your employment with the Department of
    Veterans Affairs is to maintain a state license as a Registered Nurse (RN).  On
    February 29, 2020, your RN license issued by the state of Kansas expired. You
    were notified on March 2, 2020 that your license had lapsed.

2.  Maintaining your required license is a requirement for you to function as a RN.
    The lapse of your license put undue hardship on your co-workers since you were
    not available to perform your duties.

3.  **RIGHT TO REPLY**:  In accordance with 38 U.S.C. § 7463, which was modified
    by Public Law 115-41, Section 208 on June 23, 2017, the time period for you to
    respond to this notice of proposed reprimand is 7 business days from receipt of
    this notice.  Business days are defined as Monday through Friday, in Washington
    D.C., excluding Federal holidays.  If you choose to reply, you may do so orally, or
    in writing, or both orally and in writing, and you may submit affidavits and other
    documentary evidence in support of your reply, showing why the charge is
    unfounded and any other reasons the proposed action should not be effected.  If
    you elect to reply, please contact Ruth Duda, Chief, Office of Community Care,
    to arrange for a meeting or submit a written reply, which must be received no
    later than 11:59 p.m. 7 business days from receipt of this notice.

4.  **RIGHT TO REVIEW EVIDENCE**:  The evidence on which this notice of proposed
    action is based is enclosed.  You will be allowed eight hours of official duty time
    for reviewing the evidence relied on to support the reason(s) in this notice,

preparing a written reply, securing affidavits, and for making a personal reply. Arrangements for the use of official time or requests for additional time should be made with me.

5. **RIGHT TO REPRESENTATION**:  You may be represented by an attorney or other representative of your choice at all stages of this matter, up to and including the issuance of the decision.  Any representative must be designated in writing.

6. **FREEDOM TO PRESENT DEFENSE:**  Be assured that you and your representative have freedom from restraint, interference, coercion, discrimination, or reprisal in discussing, preparing, and presenting a defense.

7. **DECISION:**  The final decision to effect the action proposed has not been made. Ms. Duda will make the final decision and will give full and impartial consideration to your reply(ies), if submitted.  You will be given a written decision within 15 business days of the date you receive the notice of proposed action.  If an action is effected, the applicable grievance or appeal rights will be included in the decision letter.

8. If you have any questions or do not understand the above reason(s) why this action is proposed, contact me, or Sandy Miller, Employee and Labor Relations Specialist at 316-651-3625 or me for a further explanation.  The Agency has an Employee Assistance Program (EAP) that is available with a wide range of services.  If you believe that this program may be of benefit, you may call EAP at (800)-604-4371.

DaShaun McCray
OCC Nurse Manager

_____   /_____
Employee Receipt Signature                                          Date:

Enclosure:  Evidence File

cc: HR (ER/LR)

**Harris, Linda (ORMDI)**

| | |
|---|---|
| **From:** | McCray, DaShaun |
| **Sent:** | Monday, July 13, 2020 7:25 PM |
| **To:** | Harris, Linda (ORMDI) |
| **Subject:** | Event #1-McCray |

*DaShaun M. McCray MBA, BSN, CCM*
*Program Manager C6, Clinical Integration*
*VHA Office of Community Care*

---

**From:** McCray, DaShaun
**Sent:** Monday, February 10, 2020 1:38 PM
**To:** Alford, Natalina (ORM) <Natalina.Alford@va.gov>
**Subject:** FW: Appointment Please

This is the information from 2018 that shows this is not isolated.

*DaShaun M. McCray BSN, RN, CCM*
*Nurse Manager Care in the Community*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

---

**From:** McCray, DaShaun
**Sent:** Thursday, April 5, 2018 11:19 AM
**To:** Raffi, Syed <Syed.Raffi@va.gov>
**Subject:** RE: Appointment Please

Yes I will meet you in the COS office.

---

**From:** Raffi, Syed
**Sent:** Thursday, April 05, 2018 11:12 AM
**To:** McCray, DaShaun
**Subject:** RE: Appointment Please

Thank You. Could we still meet and talk at noon ?

---

**From:** McCray, DaShaun
**Sent:** Thursday, April 05, 2018 11:09 AM
**To:** Raffi, Syed <Syed.Raffi@va.gov>
**Subject:** RE: Appointment Please

I will stand down at this time. I will just put it in the email for you

On 5 April 18  approximately 0830 Ruth Duda came to my desk standing over me and told me I might want to have Tenesha call her if she wants to get her time approved. Then proceeded to say she has not returned her phone calls

ore text and she will not be approving her time. I informed her that Tenesha has been working in the business long enough to know what she needs to do to get her pay. She also informed me that we meaning RJD VAMC does not have the paperwork.

---

**From:** Raffi, Syed
**Sent:** Thursday, April 05, 2018 11:00 AM
**To:** McCray, DaShaun
**Subject:** RE: Appointment Please

Do you want me to come or you can come here we can sit down at the chief of staff office

---

**From:** McCray, DaShaun
**Sent:** Thursday, April 05, 2018 10:58 AM
**To:** Raffi, Syed <Syed.Raffi@va.gov>
**Subject:** RE: Appointment Please

I am at Parklane. I need a sit down time. If you do not have that I will go to the next up the chain. Thank you

---

**From:** Raffi, Syed
**Sent:** Thursday, April 05, 2018 10:57 AM
**To:** McCray, DaShaun
**Subject:** RE: Appointment Please

I am in a meeting with the pentad now but you can come to Director's Conference Room and knock and I can step out.

---

**From:** McCray, DaShaun
**Sent:** Thursday, April 05, 2018 10:53 AM
**To:** Raffi, Syed <Syed.Raffi@va.gov>
**Subject:** FW: Appointment Please
**Importance:** High

I am requesting an appointment with you soon I will have to move up the chain as this is a time sensitive matter. This is an Ethical concern and Mr. Brigman encouraged I go up the chain of command.

---

**From:** McCray, DaShaun
**Sent:** Thursday, April 05, 2018 9:09 AM
**To:** Raffi, Syed
**Subject:** Appointment Please
**Importance:** High

Dr. Raffi,

I need to speak to you today. I have a direct complaint and I do not chose to discuss in an email.

Thank you,

DaShaun McCray RN, BSN, CCM
Care in the Community
Robert J. Dole VAMC
316-685-2221 ext 57025

OCC FACT FINDING DISCUSSION SYNOPSIS---                DISCUSSION DATE        4-20-2020

DASHAUN MCCRAY

1) Please share your preferred name, professional credentials, # of years at the VA, current position, and length of time serving in that role. DaShaun McCray, MBA BSN RN, CCM Have been with the VA for 4 years and in my current role (RN Supervisor in CC) since 1/29/2019. I was previously a staff nurse in CC from my start date in 2015. Whole four years at VA have been in Community Care.

2) Could you describe for us the **culture** of the OCC department when you began in your role of Supervisor and compare it to the current culture of the department? Culture when I began, I was the peer of the nurses and had worked side-by-side with the MSAs as a staff nurse in CC. The culture changed in 2017 when Dr. Ravodi placed Ruth Duda and Dr. Tran into CC without any warning. They did not notify the supervisor she was being demoted. Ruth Duda became the RN supervisor and Dr. Tran was like physician over the Program. Tenesha Burks had been the supervisor over both the MSAs and the nurses since 2013; until they did what they did in June of 2017. The culture went down effective that very day.

As I came in to CC we had much cohesiveness. People were willing to follow Ms. Burks, we were meeting metrics and following guidelines, we lead in our VISN, and we were doing what we needed to do in OCC. I worked side-by-side with the MSAs and the nurses and then became the manager of the RN. Ruth Duda had been the nurse manager, but then she became the Chief and she was the supervisor over the MSAs.

Feb 4 of 2019, Ms. Elizabeth Dial arrived as MSA supervisor. She came to us with supervisory experience from the KCVA medical center where she had been the MSA supervisor in Specialty Care; she ran a tight ship and she intended to continue in that process as she had ran things in that previous position.

If you go against Ruth Duda, you have no opportunity in community care. Ms. Dial was trying to learn her job and get staff in be productive, follow rules, arrive on time, notify supervisor when they were taking leave, be at their duty station…she ran a tight line. She had several staff...if they came in after 8, came in at 8:10 and 815; well that's AWOL. Ruth and Dr. Foley said she needed to be a little more lenient. Not the "7minute rule", but give them 7 minutes and we'll go from there.

April 15th of 2019: Ruth Duda came to me and said "If you're still in contact with Tenesha, let her know that her paperwork didn't go through and she's not going to get paid." I have the emails; the emails even to Dr. Raffi. Nothing ever got done with it.

When we were expecting Elizabeth to get here; Ruth was over the MSAs (about a year and a half). Every time things would come up that needed done, she would just say, "We'll just wait until the new supervisor gets here, I'll let her handle it." Ms. Dial didn't get to learn her job or build relationships with her staff. When she got here, she was given a list of 5 staff members that the Chief wanted her to **target**: Katie Smith (she took FMLA and then resigned), Janet Gunter, Jacklyn Murphree, Marcia Dickenson (reassigned and was on her way out the door until

me and Ms. Dial pleaded; she targeted by Ruth and Tina Dean) and Rowana Gully (She was ready to do an EEO; until Ruth took her reprimand down to a written in January of this year). Ruth always has the backing of Tina Dean; it's just an unprofessional personnel practice for HR. If you speak out against Ruth, she is very vindictive and retaliatory. She was placed in that position and everyone knows that if I did not remain there, it would be different. In the unit, facility, VISN, and region, it is known that I am considered an expert in CC . I tried for a different job and I got the FOIA. I outscored the person who got it and I did better on the interview, but the other person got the job. Terry Scott and Ruth Duda made the decision because Ruth wouldn't know what's going on if I left CC. Dr. Cummings won't admit it but he knows if I wasn't there. Mr. Ament knew. I am the one who knows the program. They know that nurses come to me and state they are afraid; they ask "what are we going to do if you're not here".

The culture did change, but it WAS NOT Elizabeth Dial, she was set up by Ruth to write people up, there'll be documentation.
Tracy Hudson is an example. She's been given a written 3 times; but it has not reached the table of penalty. She's protected by Ruth. Every times Ms. Dial tries to hold Tracy accountable, nothing has ever happened; she had an EEO and was on her way to another EEO from staff just this year. Ruth said that Elizabeth had gone around and asked the staff to give a statement about Tracy. Elizabeth was trying to get the facts, like a supervisor should. Tracy was disrespectful in an open forum. Some people would give NO statement because it's been going on for 2 years and Ruth and has done nothing about it.
Environment is not good. It WASN'T Elizabeth Dial. Ruth put her up to those things. She set her up like that. Ms. Dial was trying to meet standards and do what a supervisor should, but she couldn't. She retired due to hostile and retaliative environment. She had lost 15lbs in one month and doctor encouraged her not to subject herself to this environment. She saw the doctor on Friday, called in sick Monday, came in Tuesday and filed her paperwork, and she was out the door by Wednesday.
THREE staff have retired with 1 day notice: Talisha sent keys and badge in the mail—just never came back, Bob tried—but retired with no notice, and Elizabeth retired...she had no plan on retiring. This a master's educated woman with experience, but she was out the door because of Ruth Duda.

3) Tell us how you **communicate** within the department:
   a. With Ms. Duda and how successful is that? I do my best. I respect her position. There's not a task she gives me I can't complete. She's good at delegating. She's incompetent and reckless but I don't speak out about that in front of people.
   ASKED IF THERE IS AN EXAMPLE OF THE INCOMPENENCE AND RECKLESSNESS: If I'm away; she would give my staff instructions and tell them to do something and I'd have to come back and correct it all. She doesn't know what she's doing but she just makes decisions. I've had to clean up many things in the department because most of the time she has no idea. At least NOW she'll usually say "let's wait until DaShaun gets back".
   On 1/30 of this year: Dr. Cummings sat in his office, leaned back in his chair, folded his hands in front of his face and asked, "So when are you leaving because Ms. Duda has a job to do." He didn't care about me or what I've done or the fact that I know CC and actually do the work or get it done. I don't trust her. I do not respect as a person, but I

respect her position. I will continue to come here and do my job until I find a new one.  I received and email from Ruth Duda the other day saying a new nurse said he hadn't been properly trained by me. He emailed, just to protect himself,  and said he appreciates all I have done.  How can I trust her?

b.   With Ms. Dial and how successful is that? Until I received an email from Ruth Duda on 2/14/2020; it was good. I tried to train her. She had supervisory experience at the VA, but it was a different department and a different VA.

c.   With staff and how successful is that? Oh that's fine! I have an open door; any time they need me, I'll  answer a question or find the answer if I don't know. They are able to pick my brain. I don't keep knowledge to myself. I share what I know with them. I help with issues related to their work, nursing, their career, or what I can help them promote in life.

d.   Do you believe that given the ever changing nature of the department and the fast-paced environment, that communication is adequate and that everyone receives and understands what is communicated at all times? How do you ensure that? It's well enough because they just communicate with me. I don't know how to say it but Ruth Duda is the "face", if you see my emails, people from VISN, if our IMs would save….people communicate with me if they want information or answer. If they say we need it by COB on the 16th, it gets done, but not by Ruth Duda. I have glowing recommendations by anyone outside of Robert J Dole.  Misty Lester can tell you that when she got here,  I tried to make sure all bases were covered between SW and CC.

Miss Dial was always asking for training; but Ruth gave her a wrong Position Description. She was never told what was expected except what Ruth told her to do as an order. They still don't have the PD and she's retired. She was doing whatever Ruth wanted her to do.  She came in with 22 now 33 staff to supervise, supervisory program analyst role, meeting the metrics that was all new,  and trying to keep all of those people on course; the only person who could train her was me. Why? Because Ruth Duda can't. She doesn't know the job or what it takes to do it and she told Ms. Honeycutt (via email with Elizbeth which cannot be retrieved now that she's gone).   On top of that, they gave her the OA work and said they had to do that in order for her to even qualify as an 11. Ruth will say "As a supervisor you 'should'…". But she handed her a MESS. She had been the supervisor for a year and a half, but the folders were A MESS when she gave them to Elizabeth.  When she dropped the RN folders off with me when I took over she never showed me how to do it. I had to reach out to other nurse managers. Asked Heather Brown how to do things, what's the process, what do I do? Ruth doesn't know. Ms. Duda don't know how to do the job. Elizabeth reached out to other VAs in the VISN to people with her job or similar job and she trained herself how to do the things she was doing in CC. If she ran into things, I know all of it, I would tell her how to do it or what the process was. I helped her out with a lot of things.  I had the email from Feb. 14 "I need you to not…" basically saying that my role is not to train Elizabeth. I still helped her. She needed the help!  If I didn't, my department fails and that falls on me. I DID NOT do part of her job. I *helped* her so she would not fail. She was set up to fail.

<span style="color:red">Negligence on one side would affect the other side. There is no failure in this department. I have good nurses. We are dedicated. We know what we are doing. ; our # dropped when they gave us our own scheduling. We are still known as one of the best in Comm. Care.   This department runs the way it runs.</span>

What barriers do you believe exist that prohibit effective communication?
   i. What have you done to remove those barriers and ensure that quality communication exists?
   ii. If staff reports that there is poor communication, what steps have been taken to improve it?
   iii. If staff indicate that communication is not adequate for them to know their roles and execute their work, how do you address that?

4) What is your **relationship** like with the OCC Chief, Ms. Duda?
   a. What factors contribute to the status of your relationship?
   b. At what level do you think she understands and executes her role?
   c. How would you describe her ability to coach and lead her staff in the department?
   d. How would you describe the way she sets expectations with staff and describes their work? <span style="color:red">She delegates. She's a super delegator. She is NOT a leader. Ms. Duda has been moved around at Robert J Dole. I've been told that it is even documented that she was **not** to be in a supervisory role. She was removed from surgery, removed from UM, placed in CC as a manager; Tenesha was still running it and keep her out of the way. She was then given the Chief job supposedly because she had a degree.  I know the program, but I didn't get it because I didn't have a master's degree. I've been done so badly at this VA, it's not even worth talking about.  They took someone who was REMOVED from other places and then put her to be the leader in a high profile program. Nobody expected it to be so high profile, but she is nothing more than the face. Even when she tries to speak about the program, she's IMing me asking me for the information so that I can make it look like she knows.</span>

5) What was your **relationship** like with Administrative Supervisor, Ms. Dial?
   a. We understand she retired unexpectedly.  Can you tell us why that was?
   b. What factors contribute to the status of your relationship?
   c. At what level do you think she understands and executes her role?
   d. How would you describe her ability to coach and lead her staff in the department?
   e. How would you describe the way she sets expectations with staff and describes their work?

6) How would you describe the **collaboration** and **coaching**:
   a. That occurs between yourself, Ms. Duda, and Ms. Dial as a leadership team?
      i. Is there poor collaboration between you and one or both of them? If so, what has been done to address and improve collaboration with the other member/s the leadership team?
   b. Are there barriers or limits to your ability to collaborate with Ms. Duda or Ms. Dial?

    c.   How would you describe the collaboration or coaching that occurs between Ms. Duda and her staff?

    d.   What about the collaboration or coaching that occurs between Ms. Dial and her staff?

    e.   What about the individual collaboration between yourself and Ms. Dial?

    f.   And between Ms. Dial's staff and your staff?

        i.   Is there poor collaboration between the 2 areas? What has been done to address and improve collaboration within the department?

10/28/2019 is when we even started having meetings with her.  We had been in our roles for months, but she never met with us or tried to get us training.

This has been an ongoing issue, but I've emailed and they want us to work on it at the lowest level. I've got all the emails between me and Dr. Cummings, Mr. Ament….just let me do my work; she can take the check and all is well because the job will get done. Get out of my way; be the chief, let us run the department and the people.  Whenever she's not there; people are happy. As soon as she returns; people are not happy again.

What she does is she makes the Supervisors be the bad cop; we can't hold people accountable because they run to Ruth.  They aren't doing their work and we try to hold them accountable and then she gives them a break, making HER look good and US look bad.  I didn't come to work for building friendship; I come to work to build an organization. She want's everyone to make her look good. She told Elizabeth "they don't trust you". But the thing is, Ruth didn't ever want to write them up because she didn't want to look bad…so Ruth had *her* writing them all up.  Good Cop/Bad Cop.  A staff member just came to me and said that Ruth is pitting staff members against me. She approached them and tried to get them to say I did something.

I've turned in all the emails, all of the documentation that I have to the Office Of Resolution Management. I have everything to show them the Retaliation and Hostile work environment against Ruth Duda.

7)   How would you describe staff's **understanding of their roles** within OCC: They all know their roles, they all been trained, they all know how to do it. We have a lot of things stacked on us. We're an ever changing beast.  News things are rolled out. We do additional training if they don't understand. We are overworked.
We do group trainings. The lead MSA do PowerPoints with examples and screen shots. We try different things and we adapt so that we  work smarter, not harder.
Because there are lots of changes; everybody is frustrated because everything is changing all the time.  We have to be adaptable. Adapt and recover.  Since Mission Act Rolled out 10 months ago it has been all about changing.  They know their role and the other roles on the team.  Every nurse and MSA team that are working together work well together. Some of the younger nurses may not communicate the best. But if they tell on each other, it all gets taken care of. We all have one primary focus.  We've had ADR between one of our teams. Otherwise they know their role.

      a. How well do the nurses understand and execute their role?
          i. What has been done to ensure understanding?
      b. How well do the MSAs understand and execute their role?
      c. How well does each section understand the role of the other?
      d. If there is an lack of understanding of roles or poor execution of work, how is that addressed?

8) When changes need to be implemented or new processes are put in place, how is staff alerted and how do you verify that everyone understands and implements their piece successfully?

9) If an issue is brought up within the department, how is that handled?
      a. If it is between members of the leadership team?
      b. If it is between the staff of the two sections/supervisors? If an issue brought up…well, if it's an MSA issue Elizabeth would work to get all the facts. Take the people in who it concerned and try to have open discussion with them. First team that couldn't get along, she got Neil Simmons involved and did ADR to work together and tried to work it out. She knows ER/LR HR stuff like the back of her hand. If people don't get to where they can work together. Well... Tracy and the RN (Tracy has protective status with Ruth) don't get along. She was my MSA before I became the nurse manager. I never had a problem with her, but now she's got problems. It's like once Elizabeth came it all went downhill. Not sure what Tracy and Ruth were up to with that, but since Ruth protects her so much, there's got to be something to it.

I don't have any RN issues: they reported one nurse. It was a communication thing and she's set in her ways. She's been there 8 years with NO opportunity for promotion. She's disheartened. Ruth wrote her up and but made ME issue it. I just told her that I didn't agree, but I was directed to do it.

A lot of the things that Ruth Duda tries to….Tina and Ruth reprimanded Ms. Dial for the first time in her ENTIRE career over a blatant lie. If you asked Ruth about it, she'd say that I just don't know all the information and I probably don't, but I do know Ms. Dial's work. Elizabeth was here 12 hours a day; on the weekends. She whipped things into shape. Every employee folder is pristine; completely up to date and all accurate. All of her stuff was organized and kept neatly completed. Even though she was working, Ruth told her she couldn't get overtime as a supervisor and she still continued to work probably 70 hours per week. It's ILLEGAL. They have to pay her if she's working overtime. But that's Ruth's idea. Supervisors can't get overtime.

I work overtime; my boss has always refused to pay me overtime. I went to read the directive myself and I started putting my name down on the list to get paid. I've been getting it. I don't try to milk the system. She had 33 staff; and so many brand new MSAs, still not learned her job. She'd be here 7a-630/7pm. She burnt her candle at every end just trying to do her job and do it right and figure it out.
Ruth's orders that supervisors cannot get overtime.

Under the supervision of Ruth Duda, Elizabeth's career is gone…this is actually her second career and she's good at it, but because of one person, she retired.
One person, someone with a flight of ideas: we're both Veterans; both master's prepared; both with fully successful careers. How do you deal with that? I just say she's the boss.

If they get into her file; there may not be anything documented that she shouldn't be in a supervisory position, but I've been told that is the case.

10) It is reported that issues that arise within the department, remain unresolved and simply may not be addressed.  Are you aware of unresolved issues and if so, what are they?

The PENTAD isn't taking action on many supervisors: no disciplinary actions at all.  Dr. Cummings can look me in the eye and act like what I do is of no value.  I didn't get the last job here I applied for because they said that my transcript wasn't conferred. They slide things around here how they want them; there are very bad HR and personnel practices at this facility. I could go do a whistleblower right now. I'm on the way out the door, so why?

I'd like to know if Dr. Cummings has Dementia? I've gone to him and let him know Ruth's actions. His question is when am I leaving Ms. Duda has a service to run.  You won't see any unresolved issues in the department. The only things that are left unresolved are accountability of the Chief and things that are pending Dr. Cummings action. We are now staffed at 1 RN to 2 MSA.  We had to wait for approval from Dr. Cummings.  We are on the radar for being over 8281 consults scheduled and not closed as of January. I was to get a plan to Cummings by COB. I sent him a plan (increase of 10 staff).  He denied it; didn't like my plan.  Said that nothing I had done worked; but now we have added 8 people. The same plan that I sent on 1/30, didn't go forward…because of Dr. Cummings. He didn't want to address Ruth Duda's behavior either. I come to work. I just come and do my job.

I'm proud. I'm a Veteran (whole family) I love what I do. I follow directives. I live in directive land. Very black and White. The reason we don't have any local policy is because when I came, I said that if we  just follow national directive we'd be ok.  We were ok until 11/19 when they put scheduling on us.

      a.  What prevents these issues from being addressed?
      b.  How do you think it impacts staff when they bring up and issue and it is not addressed or resolved?
      c.  What steps could be taken to resolve issues as they arise?
      d.  How do you communicate with staff when an issue has been addresses/resolved or cannot be resolved?

She's the only reason I'm leaving here. I should have been the Chief but didn't get it because I didn't have the degree; even though I know CC. I worked hard and I got my degree. I've got everything HERE (kids in school, man, house, family, etc.), but *she's* the reason I'm leaving here.

And Julie Cotton is part of why I didn't get a job because of a  Prohibited personal practice.  I scored the highest, but she put an "* she has corrective action". I did. I had a reprimand. When I first got here, I had

a friend who asked me to check in his record for an appointment and I did it. I wouldn't ever do that again!

I'm taking that information where it needs to go.  It was privileged information.  Julie Cotton wrote it on my interview form. She can feel like she's the bomb-diggity sitting up on the PENTAD when I know where she's from. I'm from here. I know the neighborhood, but I'm not trying to ruin her career.  She ruined my career. You can't put it on the interview form. That's so dumb.  I'm not dumb. I have the emails where Ruth would argue back and forth and say things; who is so dumb?

Heather Brown is my mentor outside of my job I value and respect her. Ruth was going to have a meeting with me and she called and invited Heather Brown to come to the meeting. We didn't need my mentor there.  That was intimidation (2 white woman vs 1 black girl).  I value Heather Brown; she didn't do anything. Ruth brought my mentor into a meeting (2/14) and she had no right to do that.

The thing about Ruth, she wanted us to be "angry black women". Elizabeth handled her with so much class. We are NOT angry black women. We could come in here acting one way, but we don't.

Ruth has protective status with Dr. Cummings and Tina Dean. Nothing will happen. They won't hold her accountable. They'll just let this go on for whatever reason. I'm not here to ruin her career, but she is not a leader. She is not leading this department. She's destroying the department.  I'm far from dumb.

**The items on this document reflect the synopsis of the conversation as accomplished by the OCC fact finding panel.**

*DaShaun McCray*
_____          5/22/2020
                                                              _____
**Signature**                                                        **Date**

| Care in the Community          Staff Meeting Minutes          Date: 7-20-18 | | | | | | | | | | | | | | 9/29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1=Present/Designee, 0=Absent/Excused | TITLE | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | extra |
| Chief of Care in the Community | Chair | x | 0 | | x | | | x | 1 | | 1 | | | |
| Medical Director for CITC | Co-Chair | 0 | x | | x | | | 0 | 0 | | 1 | | | |
| Supervisor for CITC | Co-Chair | x | x | | x | | | | | | | | | |
| Adams, Janelle | member | | | | | | | | | | 1 | | | |
| Beall, Elizabeth | member | | | | 0.1 | 1 | 1 | 1 | 1 | 1 | 1 | | | |
| Bennett-Smith, Teresa | member | x | x | | x | | | x | 1 | 1 | 1 | | | |
| Byrum, Ila | member | x | x | | x | | | x | 1 | 1 | 1 | | | |
| Campbell, Dawn | member | | | | x | | | 0 | 1 | 0 | 1 | | | |
| Clasen, Jessica | member | | | | | | | | | 1 | 1 | | | |
| Dickinson, Marcia | member | x | x | | x | | | x | 1 | 1 | 1 | | | |
| Dir, Stephanie | member | x | x | | x | | | x | 1 | 1 | 0 | | | |
| Field, Renee | member | | | | x | | | x | 1 | 0 | 1 | | | |
| Finley, Cynthia | member | x | x | | x | | | x | 1 | 1 | 1 | | | |
| Gulley, Rowe | member | | | | x | | | x | 1 | 1 | 1 | | | |
| Gunter, Janet | member | x | x | | x | | | x | 1 | 0 | 1 | | | |
| Hampt, Daniel | member | x | 0 | | 0 | | | 0 | 0 | 0 | 0 | | | |
| Hudson, Tracy | member | x | x | | x | | | x | 1 | 1 | 1 | | | |
| Keller, Becky | member | 0 | x | | x | | | x | 1 | 1 | 1 | | | |
| Keller, Chad | member | x | x | | x | | | x | 1 | 1 | 1 | | | |
| Kim, Min | member | x | x | | x | | | 0 | 1 | 1 | 1 | | | |
| Lewis, Lori | member | x | x | | x | | | x | 1 | 1 | 1 | | | |
| McCray, DaShaun | member | x | x | | x | | | x | 1 | 1 | 1 | | | |
| Murphy, Jacquelyn | member | 0 | x | | x | | | x | 1 | 1 | 1 | | | |
| Phillips, Susan | member | x | x | | x | | | 0 | 1 | 1 | 1 | | | |
| Profit, Crystal | member | x | x | | x | | | x | 1 | 1 | 1 | | | |
| Rosewicz, William | member | x | x | | x | | | x | 0 | 1 | 1 | | | |
| Sincere, Anjette | member | | | | | | | | 1 | 1 | 1 | | | |
| Smith, Katie | member | x | x | | x | | | x | 1 | 1 | 1 | | | |
| Steele, Michele | member | x | x | | x | | | x | 1 | 1 | 1 | | | |
| Thorne, Rosalie | member | x | x | | x | | | 0 | 1 | 1 | 1 | | | |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Warren, Joni | member | | | | x | | | x | 1 | 0 | 1 | | | |
| Williams, Alicia | member | x | x | | x | | | x | 1 | 1 | 0 | | | |
| Wilson, Peggy | member | | | | x | | | x | 1 | 0 | 1 | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Guests:
Rick Ament-Director

| DATE: 7-20-18 | Discussion | Action | Responsible Party/Follow UP |
|---|---|---|---|
| Review and approval of minutes | Meeting was called to Order: 1300- | approved via voting | Duda |
| GUEST: Director Rick Ament | | | |
| Saftey Issues: | | | |
| Ethical Issues: | | | |
| | | | |
| Welcome New Employees | Janelle Adams RN | | |
| Staffing Update: | Mr. Michael Chavez and Charlotte Porter have accepted the position-vice Roberson and Steele. Both start new employee orientation Aug. 5th.      Open position-AO/MSA Supervisor-in HR process | none | Duda |
| **Old Business** | | | |
| Choice Update | CCN is still in roll out phas-VISN 15 not anticipated to roll out ill near end of FY 2019 | | Tran |
| Consult Closure Performance/New Performance Measures |  Document     S:\Fee\Oversight Committee\Meeting Minutes\work book    All consults should be touched every month unless awaiting an appointment. |  Document    Good job everyone-keep up the great work | Duda |
| Ns. DOA | 1)progressing-using IQ-official training requested form VISN IQCI-training dates to be announced-two sessions will be held just for CITC. Instructor has asked for categories of care that currently present problems finding. | TBA-on IQ  training | Duda |

| MSA meetings | to assist with flow and congruency-MSA meetings will be re-started for every other Thursday | Topic board in Ruth's office, feel free to list topics you want discussed or issues that need addressing-please initial | Duda |
|---|---|---|---|
| AES | We reached 100%-results forthcoming. | | Thorne |
| **NEW BUSINESS:** | | | |
| New Time-VATAS | Leave request must be entered by employee-only exception is if it is on the Friday at the end of the PP -if you are taking more than 1 week off, each week must be entered at a time, rather than collective dates -If you are requesting leave and there is not enough leave in your balance,  the system will not allow you enter the leave. In the same vein, if you are requesting LWOP in lieu of AL -anticipate that it may be denied. Justication explained by Supervisor        -When you enter leave watch the hours calculated closely, the system has been messing up, if it does, delete the request and re-enter                         -SL authorization does not change, FLMA does not change. | Information Only | Duda |
| Mail Room | Bill has volunteered to oversee the mail room rotation schedule and ensure coverage in the case if person assigned is absent. | see MSA meeting minutes-closed | Duda |
| OPEN DISCUSSION | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Sign In Sheet**

| DATE: | 7/20/2018 |
|---|---|
| EVENT: | Staff Meeting |

| Guest | |
|---|---|
| Adams, Janelle | |
| Beall, Elizabeth | |
| Bennett-Smith, Teresa | |
| Byrum, Ila | |
| Campbell, Dawn | |
| Clasen, Jessica | |
| Dickinson, Marcia | |
| Dir, Stephanie | |
| Field, Renee | |
| Finley, Cynthia | |
| Gulley, Rowe | |
| Gunter, Janet | |
| Hampt, Daniel | |
| Hudson, Tracy | |
| Keller, Becky | |
| Keller, Chad | |
| Kim, Min | |
| Lewis, Lori | |
| McCray, DaShaun | |
| Murphy, Jacquelyn | |
| Phillips, Susan | |
| Profit, Crystal | |
| Rosewicz, William | |
| Sincere, Anjette | |
| Smith, Katie | |
| Steele, Michele | |
| Thorne, Rosalie | |
| Warren, Joni | |
| Williams, Alicia | |
| Wilson, Peggy | |
| | |
| GUEST: Rick Ament | |
| | |
| | |





## Station Level Staffing Updates

| | |
|---|---|
| VISN | V15 |
| Station | (V15) (589A7) Robert J. Dole Department of Veterans Affairs Medical and |
| Primary POC | Duda, Ruth |
| Alternate POC | McCray, DaShaun |
| Admin FTEE Required | 16 |
| Baseline Admin FTEE Reported | 18 |
| Current Admin FTEE Approved | 41 |
| Current Admin FTEE Onboard | 22 |
| Clinical FTEE Required | 7 |
| Baseline Clinical FTEE Reported | 8 |
| Current Clinical FTEE Approved | 21 |
| Current Clinical FTEE Onboard | 12 |

**Department of**
**Veterans Affairs**

# Memorandum

Date: February 15, 2020

From: Chief of Office of Community Care (OCC)

Subj: RMO response to case number 102157

To: Natalina Alford

Thru: EEO Manager
Human Resources

The following response is to alleged allegations of harassment/HWE (non-sexual) raised by Ms. DaShaun McCray, Nurse Manager for Office of Community Care (OCC). To my knowledge this is the first time I have been made aware of harassment towards Ms. McCray. As noted in explanation in Claim #2, I was made aware she no longer wanted to work in Community Care or under my supervision, but not a hostile environment or harassment. And I must say I am very surprised she is filing a harassment/HWE: in 2017, Ms. McCray blatantly and admittedly violated the HIPPA regulation by accessing a veteran's chart in CPRS. Because I believe in, and govern in a just culture mindset, I investigated the case. Realizing that indeed the violation occurred, it also allowed Ms. McCray the details needed to suggest to the medical staff a different plan of treatment. The suggested treatment did indeed save the limb and avoid an amputation for her significant other. Against advice from the Chief of Staff (COS), Dr. Revote, to terminate Ms. McCray, I proposed a lessor disciplinary action. In 2018, Ms. McCray continued to demonstrate strong clinical skills and leadership qualities, therefore I petitioned and appealed the Board of Nursing's decision to reconsider promoting Ms. McCray to a Nurse III, waiving the educational requirement (see appeal attachment). She was promoted to a Nurse III without the completion of a master's degree. When the position opened to hire a Nurse Manager for OCC, I encouraged Ms. McCray to apply. Ms. McCray was selected by the interviewing panel and was introduced to the staff as the New Nurse Manager in February of 2019. The following is to address each stated claim proposed by Ms. McCray with supporting documents attached.

Claim HWE:

1) Claim states I, RMO, usurped her authority beginning in 2018 and forward. I am confused by this statement as Ms. McCray was a staff nurse and not in a position of authority/supervisory role till returning from surgery in Jan. of 2019 (staff meeting minutes attached for reference). Since no examples were provided with this alleged claim, I can only summarize Ms. McCray is referencing to the frequent changes that occur in the Community Care (CC) arena. Between the changes in the Choice Program, the conversion to TriWest (TW), then Patient Centered Community Care (PC3), then PC3 with VA-scheduling, the preparation for the roll-out of the Mission Act, the many

new programs to be initiated and now the switching to Optum the Third-Party Payer replacing TW; varying instructions were provided by VISN leadership, as they too were trying to figure out all the new regulations and processes to follow. Each communication was then passed on to staff, and at times became very confusing. (Supporting evidence of this noted in e-mail dated 12/11/2019). The Community Care (CC) field guide book was and is continually being updated to support new processes. Ms. McCray did voice opposition to some of the proposed processes by VISN leadership, and that may be her perception to pitting staff against each other, as I recommend, we follow VISN guidance. In the end, all processes were and are being finalized. All staff are using the most current process to date. I still value Ms. McCray's input as she is very diligent to review the most current directives and processes identified in the CC field guide book.

2) Claim 2 states RMO increased her workload on 1/24/2020. To date, Ms. McCray has been in her position approximately one year. However, due to the frequent physical therapy appointments of Ms. McCray in January of 2019 and many program changes in the department, I opted to roll-out her full duties slowly as to not overburden or discourage her as a new manager. Between February of 2019 and June of 2019, I shared the responsibility of investigating, resolution of complaint, and writing the response for all congressional inquiries and White House responses pertaining to CC consults as well as fielding billing inquiry calls and veteran/vendor complaints. I delegated full responsibility of Veteran Care Agreements (VCA) and well as oversight of all Individual Authorization conversion to Ms. McCray. While I assisted in the implementation of Decision Support Tree (DST) program and education of all other services. Ms. McCray was also preforming other routine manager duties such as Nurses Performance appraisals, staffing, time keeping, dispute resolution between staff, and other meetings associated with being a Nurse Manager. From June of 2019 to December of 2019, Ms. McCray led the team in the conversion to Provider Profile Management System (PPMS) and Health Sharing Referral Management (HSRM) programs (programs now replacing TW) (PP slide attached with workload distribution noted).  These programs are now being utilized with minimal support needed. Therefore, at the 1/6/2020 OCC Supervisory weekly staff meeting I announced I would be turning over all duties to the immediate supervisor, respectively MSA to Ms. Dial and RN to Ms. McCray. While informing them I, I stated I know it is a heavy load as I have been a front-line manager, and if they needed assistance, I am willing to help. Ms. McCray assured me multiple times 'I can handle it'. She seemed very pleased and confident to have full responsibility for all the nursing functions. Therefore on 1/22/20 I trained Ms. McCray on how to access the VISN SharePoint site and complete the staffing model used for requesting staff. I invited her to attend the meeting with leadership where I was to present the staffing requests for the department on 1/30/20, as this was another opportunity for exposure to upper level meetings and business etiquette.
Unfortunately, from 1/6-1/30, less than a month, Ms. McCray was missing many deadlines. She refused to ask for help and when offered acted offended. When I had to follow-up on assignments as her supervisor to ensure the task was completed, she became angry that I had discovered another deadline missed.

Ms. McCray statement in the claim that her behavior was discussed at the meeting between myself and Dr. Cummings is an assumption on her part, as she was not in attendance nor did I discuss any specific behavior of Ms. McCray. I did ask Dr. Cummings, COS, for advice on how best to lead Ms. McCray as I feel she is becoming more frustrated and I am not sure of the reason, and I feel she will no longer accepts advice on leading staff. It was advised to me at one of my standing weekly meeting with Dr. Cummings to allow Ms. McCray to have full responsibility of all Nurse Manger Functions. This was a concern after the EEO review conducted by Neil Simmons in our department concerning the direct supervisors (see attachment). Therefore, the announcement was made at the 1/6/2020 OCC Supervisory meeting as noted above. It was not until the meeting called by Dr. Cummings, on 1/31/20 that I heard from Ms. McCray's mouth how unhappy and dissatisfied she was in her current position. Ms. McCray informed me (announced) that she had spoken to Dr. Cummings and Dr. Cotton weeks earlier concerning me and repeatedly stated 'she was done with Community Care'. The false claims she stated referencing to 2018 were merely out of lack knowing the entire story, one which she would not have been privy to as a staff nurse.

3) Claim 3 states she was not allowed to speak at the meeting in which I was presenting to our Executive Leadership team, known as the Pentad, of which the Director is present on 1/30/2020. However, such claim is easily disputed by all in attendance. While it was my responsibility to present as Chief of the service, Ms. McCray took over answering questions concerning how the data was gathered. Because Ms. McCray had only a cursory overview of the model, she stated misleading statements to the authenticity of the report which resulted in having to produce another report to address time required on backlog, which is built into the staffing model by Central Office. (Pentad presentation supplied as well as next backlog report post meeting 1/30/20, and the series of e-mails to get correct data submitted). Important to note: after meeting with COS on 1/31/20, Ms. McCray refused to complete backlog report or submit a plan, RMO finished report and submitted to COS.

4) Claim 4 counters the very statement she inferred in claim 3 of not being allowed to speak.
When I arrived at the OCC office, post morning huddles with Leadership, with briefcase, lunch bag, purse in hand, and my coat is still on, Ms. McCray asks if I had read the e-mail from Dr. Cummings. I had not, and she had it pulled up on her computer screen. She pushed herself back in the chair and posturing for me to read it. Because I have bi-focals I had to go around her desk to see the screen. Standing beside her, I read the e-mail. At which she belligerently accused me of invading her personal space. I immediately returned to the opposite side of the desk. She was very upset as Dr. Cummings has removed her from participating on the Referral Coordination Team. I asked if she was offended, and indeed she was, in addition to claiming to be the only subject matter expert and certified case manager in this VA. After moving on from that topic, I commented that I was going to allow her to complete the report for Dr. Cummings and the rest of the Pentad, as she took over the presentation and created

much more work. I did not yell or raise my voice, it was stated very matter of fact in a calm manner. This too irritated Ms. McCray.

While I still believed she could become a great manager, she is not listening to advice or suggestions. I tried verbally counseling Ms. McCray on 2/5/20 not for any disciplinary action but to educate her as a manager how to meet deadlines, use Inter Qual criteria, use data and lead staff (see my notes from the verbal counseling). I realized that I could no longer be of value to train Ms. McCray as a manager, however, she mentioned Heather Brown, Deputy Nurse Exc. is her mentor for professional growth. Because I believe that Ms. McCray has the potential to be a good leader, and she has announced she is looking for other job opportunities, with Ms. McCray's knowledge I invited Ms. Brown to the meeting with Ms. McCray and myself on 2/14/2020. Ms. McCray voiced no objection to having Ms. Brown attend our meeting. Heather could provide the mentorship for Ms. McCray for the areas of staff interactions that I had to bring to Ms. McCray's attention (see meeting notes attached). Unfortunately, my best intentions were miss-construed; no self-reflection, no openness to guidance or constructive criticism was accepted by Ms. McCray. Instead she became agitated and left in an abrupt manner.

I will continue to treat Ms. McCray respectfully and am confident she will perform her Nurse Manger duties in a satisfactory manner. If I can be of any further service to you, please feel free to contact me. I appreciate your time to investigate and resolve this issue.


Ruth Duda, BSN, MBA, MHC, RN
Chief of Office of Community Care
Robert J Dole VA
5500 E Kellogg Ave.
Wichita, KS 67218
(316) 685-2221 X57073

*Conducted by*
*Neil Simmons*
*EEO Manager*

Care in the Community Employee Feedback Session

Friday, Sept. 20, 2019

**Topic: Management and Employee Relationships**

\* Approximately 30 employees in attendance

Question 1

*By a show of hands, who feels they have a good working relationship with their supervisor*

Response:

1/4 of employees raised hands

Question 2

*What are examples of what your supervisor or management does well, and you would like to see continued?*

Responses:

- Ruth, Elizabeth and Dashaun tell their staff what they're doing good/well
- Ruth has an open door and is available to employees
- Ruth creates a team felling and makes you feel you're on the same level as her
- Elizabeth and Dashaun give morning greetings and check on employees
- Dashaun gives her employees adequate time to speak during meetings
- Ruth maximizes her time with staff; makes them feel she is invested in their career growth and learning opportunities; invested in mission
- Deshaun and Ruth are good at communicating higher up VA guidance to the staff
- Deshaun is a good active listener, giving good eye contact, acknowledgement, and undivided attention to employee
- Elizabeth implemented methods to improve productivity and team work and sends out regular reports.

Question 3

*What are some challenges in your working relationship with your supervisor or management, and how would you improve or fix it?*

Response:

- **Lack of timely notification when staff is out sick/leave**. When a staff member is going to be absent please communicate to all staff as soon as it is known to include the coverage plan for that absence.

- **Unrealistic Expectations.** Provide new staff standardized, consistent training on his/her role and develop routine refresher training for existing staff.  Treat knowledge shortfalls as training and mentoring opportunities to encourage employees to seek advice/help. Avoid lectures on what employee should know.

- **Lack of feedback**. Let staff know how they are doing regularly outside required performance evals.  Provide both positive and negative feedback, to enable professional development, but give feedback in courteous manner to make employees more receptive to input, less defensive.  Acknowledge positives and give undivided attention during one-on-one sessions.

- **Too numbers driven.**  Ensure managers remember that employees are people and seek to understand them on a personal level, not just focus on performance numbers.  Also clarify with employee why numbers are off as there may be unknown circumstances.

- **Supervisor not subject matter expert.**  Elizabeth should train on MSA roles to enable her to better evaluate and mentor her staff.

- **Need a "speak up" culture.**  Employees stated they feel they walk on eggshells, specifically around Elizabeth, citing when they bring up issues/concerns to her those issues have later appeared on their evals, or were turned away for not having a solution before complaining.  Employees want to be able to raise concerns without perceived retaliation and get help, not a lecture.

- **Poor Email Etiquette.** Emails amongst are sometimes too concise or directing, leading to appearance of hostility.  Adding more pleasantries such as greetings, please, and thanks would help alleviate this.

- **Poor MSA time management.** Staff have observed Elizabeth directing MSAs to do multiple tasks in the morning then question why other tasks where not complete in the afternoon, seemly to have either lost track of what was assigned to each person and how long it takes to accomplish those tasks.  Ensure realistic tasks/times are given or prioritize which ones must be done over others.

- **Inconsistent Guidance and Priorities.**  Employees stated that they often receive inconsistent or conflicting guidance from each supervisor (Ruth, Dashaun, and Elizabeth). Would like to clarity on what is needed, by who, and when it is needed (clear

reporting).  Also ensure guidance is given to everyone that needs to know.  Others stated this inconsistency has led to them tracking what they are doing in case they need proof later, which is time taken away from work.

- **Public rebukes.**  Employees cited cases where Deshaun and Elizabeth have verbally rebuked employees in public spaces for performance or conduct, within ear shot of other employees.  Staff feel these conversations should always be had in private, behind closed doors, and only with the employee present, no other staff that do not have a need to know.

- **Inconsistent Leave Interpretation.**  Employees want the everyone held to the same standard when approving or disapproving leave.

- **Overuse of AWOL.**  Staff cited numerous instances where employees were marked AWOL by Elizabeth if late, even when it is an isolated incident.  Would like to see understanding that things happen on the way into work, and not reprimand if it is not habitual.

- **Unclear on Sick/Late notification.**  Employees were unclear on what the approved method of calling in sick or if running late.  Stated they could not always reach their supervisor, and also pointed out that it was not always safe to call in late when still driving.

- **No MSA Meetings.**  Staff stated the bi-weekly MSA meetings were canceled by Elizabeth.  MSAs felt they were helpful in keeping them informed and would like to see them continued but with a clear agenda/plan of discussion.

- **Emergency meetings include everyone.**  Staff would like when an "emergency" meeting is called to discuss an urgent change that all staff be invited so no one is left out of the loop.

- **Hear all sides.**  If one employee reports a concern with another employee, understand it is only one side of the story and get other employee's perspectives before deciding what to do.

- **Designate more MSA leads.** Identify MSAs with knowledge AND interpersonal skills to help mentor other MSAs.

- **Complaints should go up.**  Just as employees should bring concerns up to supervisors, supervisors should always take complaints to their managers and avoid letting subordinates hear these concerns as it undermines confidence in leadership.

- **Follow-up.**  When staff provide concerns, please provide them follow-up up what you can or even cannot do to remedy.  This alleviates perception management forgot / does not care.

*Claim 1*

*Steering Committee call*

## Duda, Ruth

| | |
|---|---|
| **From:** | Carpenter, George  (STL) |
| **Sent:** | Wednesday, December 11, 2019 1:58 PM |
| **To:** | Duda, Ruth |
| **Subject:** | RE: clarification of coverage care for veterans under the Mission Act |

Yes, we can bring it up Wed. I agree with you. We should keep it standardized.

---

**From:** Duda, Ruth <Ruth.Duda@va.gov>
**Sent:** Wednesday, December 11, 2019 1:43 PM
**To:** Carpenter, George (STL) <George.Carpenter2@va.gov>
**Subject:** clarification of coverage care for veterans under the Mission Act

George
As I read the Mission Act and several others in OCC in other states: under the Mission Act, if a veteran has received care in a community hospital outside of the VA in which they are enrolled at, the closest VA is to enter the Emergent care consult and cover the cost providing a 72 hour notification was received.
Example: a Wichita veteran in Orlando Florida and suffered an MI. He contacted our facility on day 1, we alerted the Orlando VA who entered the consult and covered the hospitalization. I personally called them and they stated that yes this is the process under the Mission Act.
Within our VISN, it seems this rule should still apply, however, I don't think we have that understanding as consults are being forwarded to whichever VA the veteran is enrolled at.

Can we bring this up or get clarification?

Ruth Duda, RN, BSN, MBA, MHC
Chief of Community Care
Robert J Dole VA
Wichita, KS
(316)685-2221 X57073

*Claim 2*

*Additional Assigned Duties*

## Duda, Ruth

| | |
|---|---|
| **From:** | Duda, Ruth |
| **Sent:** | Wednesday, January 15, 2020 1:19 PM |
| **To:** | Cummings, Robert V.; Dunton, Benjamin L.; Ament, Ricky A. |
| **Cc:** | Williams, Alicia (WIC); McCray, DaShaun; Ahmed, Mahfuza; Kraus, Nicholas L.; McCray, DaShaun |
| **Subject:** | RE: RESPONSE REQUESTED: Memorandum: New Standardized Approval Process and Requirements for Community Care In Vitro Fertilization (IVF) and Assisted Reproductive Technology (ART) Services (VIEWS #02234300) |

Dr. Cummings

Per your recommendations the following people will make up the IVF interdisciplinary team for the Robert J Dole VA.

Chair: Alicia Williams-OCC    (DaShaun McCray will be the back-up)

Women's Health Rep-Dr. M. Ahmed

Specialty Services- Nicholas Kraus

Ms. Williams will send out the Regulation Background, New Standardize Approval Process for IVF with the meeting invite.

Thank you all for your providing excellent care for our veterans

Ruth Duda, RN, BSN, MBA, MHC

Chief of Community Care

Robert J Dole VA

Wichita, KS

(316)685-2221 X57073

---

**From:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Sent:** Tuesday, January 14, 2020 4:07 PM
**To:** Duda, Ruth <Ruth.Duda@va.gov>
**Subject:** FW: RESPONSE REQUESTED: Memorandum: New Standardized Approval Process and Requirements for Community Care In Vitro Fertilization (IVF) and Assisted Reproductive Technology (ART) Services (VIEWS #02234300)

---

**From:** Chatterjee, Kanan (V15) <Kanan.Chatterjee@va.gov>
**Sent:** Tuesday, January 14, 2020 2:08 PM
**To:** Carpenter, George (STL) <George.Carpenter2@va.gov>; VISN 15 Chiefs of Staff <V15COS@med.va.gov>; Joson, Genevieve T. (V15) <Genevieve.Joson@va.gov>; Herr, Aaron M. (STL) <aaron.herr@va.gov>
**Cc:** VISN 15 Leaders <VISN15Leaders@va.gov>; Holzemer, Eve M. (V15) <Eve.Holzemer@va.gov>
**Subject:** FW: RESPONSE REQUESTED: Memorandum: New Standardized Approval Process and Requirements for Community Care In Vitro Fertilization (IVF) and Assisted Reproductive Technology (ART) Services (VIEWS #02234300)

COSs and OCC staff:

Please review the attached documents. There are areas specifically mentioned as responsibilities of COS or designee, OCC staff at the facility level, PCPs etc. I discussed with my colleagues in MidCon and VISN 10 CMO received response from VACO which clarifies my question. I was confused with the contradiction between the 10N Memo and the SOP from VACO.

Claim 2

**Duda, Ruth**

| | |
|---|---|
| **From:** | Joson, Genevieve T. (V15) |
| **Sent:** | Friday, January 3, 2020 8:00 AM |
| **To:** | Gilmore, Laura E. (MRN); Smith, Andrea NMI. (MRN); Willis, Juanita L.   (STL); McCurter, Lisa L. (VHAPOP); Potter, Jessica S. (VHAPOP); Frey, Angela J. (KCVA); Johann, Rebecca A. (KCVA); Duda, Ruth; McCray, DaShaun; Paulsen, Marian; Wilson, Priscilla D.; Fulton, Susan L.; Crum, Ladonna D. CMOVAMC |
| **Cc:** | Carpenter, George   (STL) |
| **Subject:** | RE: No Affiliation HSRM |
| **Attachments:** | Copy of Copy of SetNetworkFromAffiliation-NoAffiliationLog-HSRM-2019-12-20 211750-Final_VISN 15 Filter.xlsx |

Hi Managers,
We need your help with correcting these HSRM referrals. Seems that OCC-CI might be sending this out as a tasker sometime. Region 2 is hoping to get ahead of this before it comes out.

Attached are the referrals that don't have an Affiliation selected. Sounds like the Affiliation field is key to getting it to the right place so it can get paid.

I don't know all of the options under the Affiliation field, but based on the HSRM User Guide, the Affiliation should auto-populate when you select the Provider. If it comes up blank, then clicking the magnifying glass will give the options.

We are not under CCN yet so most of ours should  be TW or VCA.

Thank you all for your help with this.
-Genevieve

| Row Labels | Count of Referral Number |
|---|---|
| Colmery-O'Neil Veterans' Administration Medical Center | 82 |
| Harry S. Truman Memorial Veterans' Hospital | 37 |
| John Cochran Veterans Hospital | 188 |
| John J. Pershing Veterans' Administration Medical Center | 29 |
| Kansas City VA Medical Center | 38 |
| Marion VA Medical Center - 657A5 | 258 |
| Robert J. Dole Department of Veterans Affairs Medical and Regional Office Center | |
| (blank) | 10 |
| **Grand Total** | **642** |

**From:** Wilson, Corey <Corey.Wilson2@va.gov>
**Sent:** Monday, December 23, 2019 7:55 AM
**To:** Schumacher, Christine, VHAV10 <Christine.Schumacher2@va.gov>; Jennings, Burnetter (V12) <Burnetter.Jennings@va.gov>; Frost, Andrew D. <Andrew.Frost@va.gov>; Carpenter, George (STL) <George.Carpenter2@va.gov>; Griffin, John F. (V9) <john.griffin@va.gov>
**Subject:** No Affiliation HSRM

Claim 3

Backlog #

## Duda, Ruth

| | |
|---|---|
| **From:** | Cummings, Robert V. |
| **Sent:** | Friday, January 31, 2020 1:08 PM |
| **To:** | McCray, DaShaun |
| **Cc:** | Duda, Ruth |
| **Subject:** | RE: Consult Backlog 1-31-20 |

*The request, as I remember it, was*

- *What are the hours of work required to resolve all portions of the backlog – approving, authorizing, appointing consults; gathering consult reports; and scanning/indexing documents to the records to achieve consult closure*
  - *What are the tasks required to eliminate all backlogs*
  - *Backlog volume*
  - *What amount of time is required to process each task*
  - *What volume can be achieved per hour per staff member*
  - *What number of hours of time are required to eliminate all backlog in each component of the backlog*
  - *Type of staff required for each task  (RNs, MSAs, etc.)*
- *Once backlog is eliminated by the temporary staff, what staffing is required for each task, by type of staff, to maintain timeliness within all standards*
  - *This would include achieving the scheduling of consults within seven work days of receipt of the consult.  This recognizes that the actual date could be an unknown period depending on community availability.*

---

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Friday, January 31, 2020 12:02 PM
**To:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Cc:** Duda, Ruth <Ruth.Duda@va.gov>
**Subject:** Consult Backlog 1-31-20

Sir,

Is this what you are looking for? I have went over this with the Lead MSA and we see this as an appropriate plan if we are able to get the staff from department X.  We currently have 6  fully operable work stations available and 4 chairs.

To Sustain we would need to add the 4 additional MSA's to finish covering our current teams and anticipated 1 new team. Once we know how the RCT affects Community Care we would address the need based on increased workload.

Very Respectfully,

DaShaun

*Backlog 2*

## Duda, Ruth

| | |
|---|---|
| **From:** | McCray, DaShaun |
| **Sent:** | Friday, January 31, 2020 3:07 PM |
| **To:** | Cummings, Robert V.; Duda, Ruth |
| **Subject:** | RE: Consult Backlog 1-31-20 |

The numbers I have sent in the word documents can be plugged in there. I will bring to my meeting with you at 3:30

*DaShaun M. McCray BSN, RN, CCM*
*Nurse Manager Care in the Community*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Sent:** Friday, January 31, 2020 3:03 PM
**To:** McCray, DaShaun <DaShaun.McCray@va.gov>; Duda, Ruth <Ruth.Duda@va.gov>
**Subject:** RE: Consult Backlog 1-31-20

**If I were attempting to look at resolution of backlog and recommending a sustainability plan, it would look something like the attached.**

**The volume numbers are fictional since I do not know current backlog or number per month or time required per task. Formulas are entered to perform the calculations.**

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Friday, January 31, 2020 12:26 PM
**To:** Duda, Ruth <Ruth.Duda@va.gov>
**Cc:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Subject:** RE: Consult Backlog 1-31-20

We have 15 RN's and are adding 1. We will have to address the Care Coordination and how it affects our process. We must asses each performance measure independently. I am working on scheduled consult for closure right now.

*DaShaun M. McCray BSN, RN, CCM*
*Nurse Manager Care in the Community*
*Robert J. Dole VAMC*
*5500 E. Kellogg*
*Wichita, Kansas 67218*
*Phone: 316-685-2221 ext 52734*

**From:** Duda, Ruth <Ruth.Duda@va.gov>
**Sent:** Friday, January 31, 2020 12:22 PM

**To:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Subject:** RE: Consult Backlog 1-31-20

Question, in the sustain section, by omission, it appears we do not need any additional nursing staff.
Is that what you are saying?
This is being compared to the staffing model numbers presented to the Pentad and submitted to the VISN. Those number reflected 6 more RN's.
Ruth

**From:** McCray, DaShaun <DaShaun.McCray@va.gov>
**Sent:** Friday, January 31, 2020 12:02 PM
**To:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Cc:** Duda, Ruth <Ruth.Duda@va.gov>
**Subject:** Consult Backlog 1-31-20

Sir,

Is this what you are looking for? I have went over this with the Lead MSA and we see this as an appropriate plan if we are able to get the staff from department X.  We currently have 6  fully operable work stations available and 4 chairs.

To Sustain we would need to add the 4 additional MSA's to finish covering our current teams and anticipated 1 new team. Once we know how the RCT affects Community Care we would address the need based on increased workload.

Very Respectfully,

DaShaun

*Back log 3*
*Status & Plan*

**Duda, Ruth**

| | |
|---|---|
| **From:** | Duda, Ruth |
| **Sent:** | Sunday, February 9, 2020 5:11 PM |
| **To:** | Cummings, Robert V. |
| **Subject:** | RE: Backlog-status and plan |

The two RN selected were already calculated into the model. Those were on our org chart back from June. We are just now filling them.
We have tried for 4 months for voluntary OT and only 4 employees work, so there are several categories that are only getting worse.
We took the approach the same as when CO mandated the stand-down. The employees were informed and the floor was offered to alternative suggestions. None came forward, besides 'we all work'.
Temp staff will be able to be trained for the scanning and indexing and that takes on average 2 weeks before they are efficient.
However, to sustain and not get in the same boat we are in now, is why I really need the MSA filled on the model. MSA will always turnover.

We can discuss this more face to face if you like. I want us on the same page. I know you are supporting us and I want to represent the same picture as you propose.
Thanks for your help
Ruth

**From:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Sent:** Friday, February 7, 2020 12:06 PM
**To:** Duda, Ruth <Ruth.Duda@va.gov>
**Subject:** RE: Backlog-status and plan

1. **I was told two RNs had been selected and accepted OCC RN positions.  ????**
2. **"Mandatory" OT is not an employee sensitive approach.  Voluntary OT plus temp staff seem more employee sensitive (as in AES).  Thoughts?**
3. **Should I request today approval for 8 temps for four weeks?**

**From:** Duda, Ruth <Ruth.Duda@va.gov>
**Sent:** Friday, February 7, 2020 11:03 AM
**To:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Subject:** RE: Backlog-status and plan

To Address Backlog: Using Mandatory OT with assignments. Dates to be announced to staff today (2/7/20) Stand down for scanning will be 2/22 and 3/7. 6 hours each day. Scheduling backlog is being addressed by scheduling only M-Thurs. of each week.

| Task | Required Qualifications | Type of Computer Access Required | Backlog Volume | Time Required per Consult (Minutes) | Consults per Hour | Total Time to Complete Backlog (Hours) | Vol per wee per FTE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Approval** | completed by RN | | | | 15 | 4 | 0 |
| **Authorization/Scheduling** | **MSA function** | | **2183** | **20** | **3** | | **728** |
| calls for preferences | use a phone/docin CPRS and CTB | no | | | | | |
| records to vendors for pre-scheduling review | able to use right fax & fax machine/able to scan/convert to ref doc | yes-Rt. Fax | | | | | |
| follow-up to vendors to schedule | use excell/CTM | no | | | | | |
| schedule veteran in VISTA | MSA schedule training-and OCC scheduling | yes | | | | | |
| enter data in HSRM | OCC function | yes | | | | | |
| ensure authorization to vendors w/records if needed. | OCC function-routes through HSRM | | | | | | |
| **Collecting Reports** | **MSA function-** phone/doc. In CPRS and use CTB | | **608** | **20** | 3 | | 203 |
| **Scanning, Indexing, Closing** | **MSA function-**able to use right fax & fax machine/able to scan/convert to ref doc/ use CTB | | 7000 | 4 | 15 | | 467 |
| **TOTAL** | | | | | | | **1397** |

The staffing Model submitted to VISN that calculates all time required for all services.
Recommended: 6 RN and 5 MSA
I have discussed this with DaShaun McCray and she is in agreement that **at this time, we would forego adding any RN's and focus to make the current team more efficient**. The plan is to update the staffing model with current numbers at the end of Qtr 2.
I agree with the staffing model that **additional MSA support is needed**. The backlog itself speaks to volume of work. Ms. Dial has provided the expectations to the MSA team on efficiency and is tracking production.
Currently there are 4 MSA in the HR pipeline to vice positions vacated, this too impacts our numbers.
Furthermore, there are 2 MSA that are in the HR disciplinary actions: one is a request for removal, the other a reprimand. Both low or poor performance impacts our current numbers.
Due to the nature of the MSA position, there will always be turnover: adding the addition MSA position will help assure coverage for FLMA hours, daily absences (SL, AL-average 6-8 per day), and assist with the sudden influx of consults when issues arise on main campus (SPD, Physician removal, MRI down...).

Please let me know if you need further information.

Thank you for your guidance and support.

Ruth Duda, RN, BSN, MBA, MHC
Chief of Community Care
Robert J Dole VA
Wichita, KS
(316)685-2221 X57073

**From:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Sent:** Thursday, February 6, 2020 6:18 PM
**To:** Duda, Ruth <Ruth.Duda@va.gov>
**Subject:** RE: Backlog-status and plan

**Please send me the final temporary staffing plan so I can present to Pentad.**

**From:** Duda, Ruth <Ruth.Duda@va.gov>
**Sent:** Thursday, February 6, 2020 3:50 PM
**To:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Subject:** Backlog-status and plan

Since we are focusing on scheduling backlog M-Thursday, our scanning and indexing is growing. (Same staff do both)
Currently we are 7000 documents behind to scan and index. (three years ago it was 13,000) the trend is shifting in the wrong direction due to increase volume, staff turnover, …
So, I have asked Elizabeth for expectations of time allowed to schedule to be given to the MSA staff on scheduling to promote efficiency. (20 min.)

→ I also asked for the third time of Elizabeth and DaShaun to develop a plan to address the backlog. I suggested for a second time, assigning consults to other team members to spread the load and mandate OT for all MSA. This really is only MSA, but DaShaun like to step in and have the 'oversight'. I really don't care, just get me an action plan and follow it. Currently the OT is being done by 4 main MSA's on a volunteer basis. That is not an efficient plan to tackle the backlog.
Most likely, we will be mandating OT designated to scanning and indexing. That does require notice.

I did let Matt Irick know we would accept some light duties and interim accommodations but I will need IT support as I do not have computers or scanners in the open cubicles. He said he would ask IT, he does have one PSA.

Also, we have to consider, 1/3 of the MSA have been here less than 6 months, half of those less than 2 weeks. There is a lot to absorb and then we changed everything with HSRM, PPMS, …adding to that the programs do not always work.

I am trying to step back and allow them to supervise and function to their job titles.

Ruth Duda, RN, BSN, MBA, MHC
Chief of Community Care
Robert J Dole VA
Wichita, KS
(316)685-2221 X57073

*Claim 4*

*Cummings-*
*streamline*
*RCT -*

**Duda, Ruth**

| | |
|---|---|
| **From:** | Cummings, Robert V. |
| **Sent:** | Thursday, January 30, 2020 5:23 PM |
| **To:** | Duda, Ruth; McClure, Alicia M.; Keller, Becky A.; Tran, Joanna M.; Wood, Brenda |
| **Cc:** | Mosby, Ramona; McCray, DaShaun |
| **Subject:** | FW: Referral Coordination Team |

**There has been a new plan initiated by VACO.  We must have RCT functional in at least one area on Monday.  This significantly impacts the planning thus far and likely implies a change of direction.**

**For consistency of thought and planning the individuals in the "To" line who have met are requested to attend the 1/31 meeting.  That meeting is the only opportunity for planning prior to initiation of the first RCT.**

**Ms. Behnk can provide details of the VACO/VISN requirement.**

**From:** Behnk, Pamela A. <Pamela.Behnk@va.gov>
**Sent:** Thursday, January 30, 2020 4:59 PM
**To:** Cummings, Robert V. <Robert.Cummings@va.gov>
**Subject:** Referral Coordination Team

Dr. Cummings,

The following people are part of the original group that is supposed to come to the meeting tomorrow for the Referral Hub planning meeting.

Ruth Duda
Alicia McClure
Becky Keller
Ramona Mosby
Joanne Tran
Brenda Wood

**VA** | Department of Veterans Affairs

## EXECUTIVE CAREER FIELD (ECF) PERFORMANCE APPRAISAL PROGRAM
## VETERANS HEALTH ADMINISTRATION (VHA)

### PERFORMANCE PLAN AND APPRAISAL OF

| EMPLOYEE'S NAME *(Last, First, Middle Initial)* | POSITION TITLE, SERIES AND NUMBER | GRADE/SALARY |
|---|---|---|
| McCray, DaShaun | Nurse Manager for CITC | III/4 |

| DEPARTMENT/OFFICE | LOCATION |
|---|---|
| Care in the Community | Robert J. Dole VA Medical Center Wichita, KS |

| DATE ASSIGNED PRESENT POSITION | PERFORMANCE CYCLE COVERED BY THIS PERFORMANCE PLAN |
|---|---|
| 01/20/2019  *(MM/DD/YYYY)* | *(MM/DD/YYYY)* FROM 01/20/2019   *(MM/DD/YYYY)* TO 09/30/2019 |

### SECTION A - PERFORMANCE PLAN

Identify the elements (critical, non-critical, and additional) and performance standards for the position to be rated. Critical elements (i.e., those elements which contribute towards accomplishing organizational goals and objectives and are of such importance that unacceptable performance of them would result in unacceptable performance in the position) are to be identified with an asterisk. Each position must have at least one critical element and one non-critical element. Performance standards are statements of the individual's expectations and organizational expectations or requirements established by management for each element. There are usually three to five performance standards for each element. Attach Performance Plan.

### PERFORMANCE PLAN COMMUNICATED

| DATE COMMUNICATED | SIGNATURE OF RATER | SIGNATURE OF EMPLOYEE |
|---|---|---|
| 04/22/2019 | Ruth Duda, Chief CITC | *Nathan M. McCray* |

### CHANGES TO PERFORMANCE PLAN

Attach changes to Performance Plan. Changes may be recorded anytime during the rating period. Communication of changes must be documented.

| DATE COMMUNICATED | SIGNATURE OF RATER | SIGNATURE OF EMPLOYEE |
|---|---|---|
| | | |

### SECTION B - PROGRESS REVIEW

At least one progress review is required during the appraisal year. Employee must be informed of his/her level of performance as measured against the performance plan.

A performance review was conducted and discussed, and the employee's performance as of this date:

☐ Is considered Fully Successful or better.
☐ Needs improvement to be Fully Successful or better.

| SIGNATURE OF RATER | DATE |
|---|---|
| | |

| SIGNATURE OF EMPLOYEE | DATE |
|---|---|
| | |

COMMENTS

VA FORM
JUN 2011 **3482e**

SUPERSEDES VA FORM 3482e, SEP 2008,
WHICH WILL NOT BE USED.

000177

## SECTION C - ACTUAL ACHIEVEMENT

Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. **Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpassed. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.**

| ELEMENTS *(Use the same keyword description for each element as in Section A)* | *INDICATES CRITICAL ELEMENT | EXCEPTIONAL | FULLY SUCCESSFUL | UNACCEPTABLE |
|---|---|---|---|---|
| Leading Change (20%) | ☒ | ☒ | ☐ | ☐ |
| Leading People (20%) | ☒ | ☒ | ☐ | ☐ |
| Business Acumen (10%) | ☐ | ☐ | ☒ | ☐ |
| Building Coalitions (10%) | ☒ | ☒ | ☐ | ☐ |
| Results Driven (40%) | ☒ | ☒ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |

Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned. Specific achievements at the Fully Successful level may also be described.

ELEMENTS/ACHIEVEMENT(S)

*Completed without employee input:*

Ms McCray is growing into a strong leader + vital to OCC success. Very cognitive of clinical + financial responsibilities. Many accolades given from VISN leadership on her knowledge of OCC policies + ftns/roll.

This section may also be used to describe significant accomplishments not otherwise described in the appraisal, to comment on the potential for higher level positions, and/or to document VHA Personal Development Plans. Append additional pages as necessary.

VA FORM 3482e, JUN 2011

## SECTION D - SUMMARY RATING

TYPE OF RATING

☒ ANNUAL RATING OF RECORD    ☐ SPECIAL RATING (Position Changes - Employee or Rater)

PERIOD COVERED BY THIS APPRAISAL

FROM  02/xx/2019  *(MM/DD/YYYY)*    TO   09/30/2019  *(MM/DD/YYYY)*

**NOTE: Performance Rating** - Using achievement levels assigned in Section C (excluding additional elements if used) and the criteria described below, check the appropriate rating.

PERFORMANCE RATING

☐ **OUTSTANDING** - Achievement levels for all elements are designated as Exceptional.

☒ **EXCELLENT** - Achievement levels for all critical elements are designated as Exceptional.  Achievement levels for noncritical elements are designated as at least Fully Successful.  Some, but not all, noncritical elements may be designated as Exceptional.

☐ **FULLY SUCCESSFUL -** The achievement level for at least one critical element is designated as Fully Successful.  Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.

☐ **MINIMALLY SATISFACTORY -** Achievement levels for all critical elements are designated as at least Fully Successful.  However, the achievement level(s) for one (or more) noncritical elements is (are) designated as Unacceptable.

☐ **UNACCEPTABLE -** The achievement level(s) for one (or more) critical element(s) is (are) designated as Unacceptable.

| SIGNATURE OF RATER | TITLE OF RATER | DATE *(MM/DD/YYYY)* |
|---|---|---|
| *Ruth Duda* | Chief of ~~Staff~~ *Community of Care* | 10/24/2019 |

## SECTION E - HIGHER LEVEL APPROVAL

**NOTE:**  *Required <u>only</u> for Minimally Satisfactory and Unacceptable ratings of record.*

☐ Concur with recommended rating.

☐ Do not concur with rating.  Approve rating of: _____ .

BASIS FOR PERFORMANCE RATING CHANGE

| SIGNATURE AND TITLE OF APPROVING OFFICIAL | | DATE *(MM/DD/YYYY)* |
|---|---|---|
| | | |

| | SIGNATURE OF EMPLOYEE | DATE *(MM/DD/YYYY)* |
|---|---|---|
| A copy of this performance appraisal was given to me. ▶ | *Nisha M. McCray* | 10/24/2019 |

VA FORM 3482e, JUN 2011           3

# FY 2019 ECF PERFORMANCE STANDARD-NURSE MANAGER

Overall Guidance: FY 2019 Performance Plan Template will address: 1) Strategic Intent 2) Demonstrate Performance, and 3) Integrity within each of the 5 critical elements reflecting supervisory core qualifications

| | Performance Standard | Critical/Non-critical Element | Fully Successful | Exceptional |
|---|---|---|---|---|
| Leading Change (20%) | *Develops and implements an organizational vision that integrates key program goals, priorities, values, and other factors by establishing and sharing best practices to address two or more quality issues | Critical | Submission of one best practices for -yellow belt or Assist in remediating underperforming services Assisted with tracking of PM To meet VISN Goal of GT 90% for the entire FY 2019. | FS plus documented sustained or meaningful improvement of implemented, adopted/replicated best practice  Supported the Mission Act changes for CC. The following programs were successfully implemented: VCA/DST/CC Call Center/CC Prosthetic/IA-PA conversion/ED template for consults of all ED visits. |
| | *Assesses and adjust to changing situations making organizational improvements  *Creates a work environment that encourages creative thinking, collaboration, and transparency; and maintaining program focus. | | Held weekly Nursing staff meetings encouraging ideas to improve processes within department. Willing to listen to team ideas | |
| | *Supports organization movement of 'Just Culture' | | Discuss Just Culture at staff meetings twice a year, include case study and decision tree Gets all the facts before jumping to conclusions. Recognizes with empowerment also comes occasional mistakes | FS plus: Invite HRO to staff meeting at least one time per year and discuss Just Culture. HRO was presented twice in staff meetings by C. Graves with examples for CC. |

|  |  |  |  |
|--|--|--|--|
| | | Staff can verbalize a clear understanding of whole health and use of appropriate consults for WHS. WHS consult data to be tracked and trended to utilization | |
| | | Staff training has been completed of upcoming additions in whole health medicine to include: Yoga/Tai Chi-Not rolled out yet in Mission Act plan | FS Plus: reflect trended data with monitor to appropriateness of consults |
| | *Implement Whole Health Standards | | |

| | Performance Standard | Critical/ Non-critical Element | Fully Successful | Exceptional |
|--|--|--|--|--|
| Leading People (20%) | *Demonstrates VA Core Values. Creates an environment that ensures all employees clearly understand VA Core Values and the requirement to demonstrate them: Integrity, Commitment, Advocacy, Respect, Excellence. (I CARE)

*Promotes a learning environment through feedback, coaching, development plans, access to training, and timely completion of mandatory training. | Critical | Self-demonstrate ICARE values by being engaged and visible to staff. Will hold and document monthly staff meetings, will review and analyze consult data to ensure accuracy and timeliness of consults.



will participate in EOC rounds | FS Plus: Will conduct weekly oversight meetings. And review strategies to overcome obstacles Noted above-


FS Plus: timely resolutions of any EOC findings with deadlines given |

*Employee Engagement

*Optimize Employee Performance to practice at top of licensure, certification or training, and identify areas of waste.

AES data sharing of top 3 areas noted to improve and increase sharing of metrics. Develop plan to show an improvement of 1% of FY 18 Baseline

80% of proficiencies appraisals are completed timely

CC does not have EOC rounds. As we are a leased building.

However, EOC concerns are reported at the time of noticed or notified. Such as AC out, ceiling tiles leaking water, strong sewer smell from restroom, trash outside blowing into area. FS Plus: make improvement of 4% on 2- of 3 areas implemented by 9/30/19 with documented successes from FY 18 baseline AES scores provided to staff and discussed at Staff meeting. Moreover, staff recognition increased from 11% to 42%, and overall satisfaction went from 0.16 to 3.44 on the scale of 0-4

90% of all proficiencies are completed timely
Yes

| | Performance Standard | Critical/ Non-critical Element | Fully Successful | Exceptional |
|---|---|---|---|---|
| Business Acumen (10%) | *Nurse Managers will take ownership of the budget for their areas of influence | Non-Critical | Identifies, documents and implements efforts in at least 1 area to improve efficiency. | FS Plus: makes measurable progress in efficiency in 2 areas |

| | | | | |
|---|---|---|---|---|
| | *Improve accuracy and Quality of Clinical Documentation | | Service will conduct random consult audits of at least 10% of volume with an accuracy rate of 80% to performance standards Completes audits as related to calls. And follows through with team members if errors or learning opportunities identified to min. further mistakes. | Service will conduct random consult audits of at least 10% of volume with an accuracy rate of 90% to performance standards |
| | *Labor Mapping | | Labor mapping will be completed timely 80% of the time Labor Mapping completed timely | Labor mapping will be completed timely 90% of the time |
| | *OT report | | OT reports submitted timely with justification to need 90% of the time OT submitted timely and manages work loads to min. OT NM will develop an understanding of the budget tool. | FS Plus: actions to decrease OT NM will be able to manage budge effectively and demonstrate fiscal responsibility with authorization of consults |
| | *Budget Tool over CC Consults | | Still in training process | |

| | | | | |
|---|---|---|---|---|
| Building Coalitions (10%) | *will perform as a highly functional team with multiple internal coalitions and partnerships to produce a seamless Veteran experience | Critical | Unit Based councils (UBS) will be fully functional within dept. Supported UBC. | 2 UBC projects will be implemented within depart. With demonstrated positive outcomes FS Plus: assess the health of CC program and authorization processes to ensure auth. Are entered prior to care rendered. Measured with retro authorizations <10% |
| | Engages in internal and external stake holders to integrate services within local capacity and CCN. | | Facilitates a smooth transition from Provider Agreements to Veteran Care Agreements for all Community Care Consults | Lead OCC in completion of VCA for Mission Act readiness, oversight to all transitions with |

multiple programs (HSRM/e-cams/CPO). Strong collaboration with community vendors in process changes.

| | Performance Standard | Critical/ Non-critical Element | Fully Successful | Exceptional |
|---|---|---|---|---|
| Results Driven (40%) | SAIL/Quality-Improve overall value and effectiveness of care | Critical | Participate in SAIL team initiative achieving movement to next quartile for that domain. | Participate in a SAIL Team specific to CC department and achieving movement to next quarter for that domain. Will demonstrated education and improved outcome reflected from education of services in PM and decrease number of DC due to anything other than closed with records<br><br>CC department led the VISN the entire year in consult performance. Only facility to meet all three key Performance measure every month. Closed year out with a 99% compliance for pending consults <7 days, 93.4% compliance status for consult active <30 days and 93% compliance rate for consults scheduled within 90 days.    CC has met all scanning goals set by CO and VISN. |
| | * Performance Measures (PM)of SAIL include pending to active in 48 hours or less, active to scheduled in 7 days or less from entry date, 30 days from entry date to scheduled appointment, and 90 days from entry date to close of consult with records retrieved and indexed | | Monitoring of PM data with analysis of DC consults with reason codes. | |

| | | |
|---|---|---|
| *Improvement of CC operations | Consult PM of Pending, Active, Scheduled, and Closed processes assessed to achieve CC depart. rate of 10% improvement over baseline or maintain a score of 95% or better | FS Plus: CC Dept. will achieve a greater than 15% improvement over baseline or maintains a score of 97% or greater. |
| *Improvement of referral timeliness by improving consult management | CC Department will demonstrate improvement or maintain (currently meeting target) existing high performance in 50% of the CC Consult Management SAIL metrics | FS Plus: CC Department will demonstrate improvement or maintain (currently meeting target) existing high performance in 75% of the CC Consult Management SAIL metrics |

Signature of Employee

Date 10/24/19



**DEPARTMENT OF VETERANS AFFAIRS**
**Robert J. Dole**
**Medical & Regional OfficeCenter**
**5500 E. Kellogg**
**Wichita, KS  67218**

MEMORANDUM FOR RECORD                                      5-28-2020

This panel was tasked to accomplish a fact finding of the Office of Community Care (OCC) to determine adequacy of communication, understanding of work, provision of coaching/guidance by supervisors/leads, collaboration amongst staff, collaboration and coordination amongst leadership, and outstanding issues that need to be addressed.

Interviews were accomplished of Chief of department, Supervisor, lead MSAs and Nursing staff assigned to OCC both currently and previously. During this investigation, One supervisor retired, and the other supervisor took a position at a different VA. The Chief has a new nurse manager assigned.

It is the finding of this panel that the overall issues in question may have self-resolved due to the supervisory changes that occurred within the department shortly prior to the start and during this investigation. The management of the department changed and currently leaves Ms. Duda as the Chief with new supervisory personnel directly subordinate to her.  Some changes in team dynamics have also occurred, and the majority of personnel interviewed have stated that the changes in the department in the past couple of weeks have been positive.

It was determined by this panel that requirements of this department are rapidly changing and communication of these changes has been troublesome. Almost all respondents noted that communication is deficient between MSAs and Nursing staff. There have been sporadic meetings to attempt to collaborate dissemination of information, however, they are infrequent and often spur of the moment leaving all personnel confused with direction and guidance.  Communication is difficult due to the pace of changes, the division of the department, and the tools utilized to communicate (mostly email which is overwhelming in volume and content). An added struggle with communication has been the development of telework agreements due to the pandemic that has created barriers to group encounters.

The understanding of work is problematic due to the communication breakdowns. Staff do not receive the same information at the same time, may receive conflicting information, or may not implement the information shared. Training is provided by trainers, but is not uniform and information may be provided differently, depending on the trainer. In general, MSAs and Nurses do know their own roles, but may not always understand the division of duties.

The supervisors seem to lack time for coaching. Leads are more often sought out for information; as was DaShaun, historically. Staff are allowed to "skip" the leads and their supervisor and go straight to the Chief for information; thus creating a gap in information and a lack of trust in the supervisors, as well as a perception of favoritism.

Collaboration among staff in general is acceptable. The one exception noted was rectified with the team change previously stated.

The major disfunction identified by this panel is coordination of leadership. There is very little coordination amongst leadership when it comes to how they supervise staff, how they communicate

information to staff, how they communicate with each other, how they organize their teams, how information flows up, how information flows via chain of command, etc. There appears to be an issue or personality conflict between the Chief and each of the supervisors. From the testimony of one supervisor and the Chief herself, it seems that Ms. Duda is a good program manager and is good with staff, but is not as good at leading supervisors. It seems that she allows staff to jump the chain of command, leaves out the supervisors on important issues, and does not communicate equally or require the same level or amount of accountability. It is the opinion of the team that Ms. Duda may benefit from leadership skills, education, development, and mentoring on being in the Chief role vs. a supervisor and how to handle supervisors who report to her vs. staff who report to the supervisors.

The biggest deterrent to the team was the conflict between the Chief and the supervisors, and the identified lack of communication provided to all personnel. This created a tenseness in the environment that may now be corrected with the supervisory changes. However, without provision of some supervisory training, the potential for continuation of similar problems with new supervisors is possible but unknown. Nearly all staff complained about the toilets overflowing and having problems with environmental issues due to their lack of space and poor building maintenance at the Parklane facility No other outstanding issues were identified by department personnel.

This concludes the findings of this panel.


MELVIN BINGHAM          MISTY LESTER              RAYMON MILES
Chief, Prosthetics      Chief, Social Work Service  Chief, EMS

| **From:** | Blackburn, Lisa R. |
| **To:** | Bingham, Melvin J.; Miles, Raymon S.; Lester, Misty |
| **Cc:** | Dean, Christina |
| **Subject:** | Assignment Notification |
| **Date:** | Thursday, April 9, 2020 7:31:14 AM |
| **Attachments:** | Charge Letter.pdf |
| | Discrimination Definitions by Type.pdf |
| | FF Analysis - Blank.docx |
| | Witness Notice.docx |
| | Weingarten Rights Form.pdf |
| | FF questionForm.docx |

You have been tasked by the PENTAD to complete a confidential fact finding.  Please see attached documents for details.  HR will assist you with questions appropriate to the scope.  Please note that Mr. Bingham is out of the office until Monday.

Thank you,

# Lisa Blackburn

Executive Assistant to the
Medical Center Director
Robert J. Dole VA Medical Center
5500 E. Kellogg Dr
Wichita, KS 67218
Phone: (316) 651-3610
Fax:  (316) 651-3666
"How old would you be if you didn't know how old you are?" ~ Satchel Paige

**Department of
Veterans Affairs**

# Memorandum

Date: April 8, 2020

From: Chief of Staff

Subj: Fact Finding Charge Letter

To: Melvin Bingham, Chief of Prosthetics
Misty Lester, Chief of Social Work
Raymon Miles, Chief of Environmental Management

1. This is to inform you that you have been assigned to conduct a Pentad (ORM) directed, confidential fact finding in the Office of Community Care to evaluate adequacy of communication, understanding of work, provision of coaching/guidance by supervisors/leads, collaboration amongst staff, collaboration and coordination amongst the leadership, and identification of outstanding issues needing to be addressed.

2. You are to coordinate with Human Resources prior to initiating this fact finding to receive the material related to this matter that you will need to be able to properly conduct the investigation.

3. At the conclusion of the fact finding, please provide your analysis and all notes to the Employee/Labor Relations staff in HR for follow up.

Robert V Cummings, MD

Cc: HR (ER/LR)