## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DASHAUN MCCRAY,

                              **Plaintiff**,                    **Case No. 22-2154-DDC**

**v.**

**DENIS MCDONOUGH, in his capacity as
Secretary of the Department of Veterans
Affairs**,

                              **Defendant**.

## MEMORANDUM AND ORDER

At times, this case reads like a television series about the workplace. In these office-based shows, employee-supervisor tensions run high, and interpersonal conflicts often overshadow the job itself. Such workplace discord came to characterize plaintiff DaShaun McCray's Nurse Manager position at the Robert J. Dole Veterans Affairs Medical and Regional Office Center ("the Wichita VA"). But plaintiff didn't perceive her workplace woes as run-of-the-mill. Instead, she identified a more nefarious motive. Plaintiff believes the office strife arose because she is an African American, and her direct supervisor, Ruth Duda, is not. And Duda treated plaintiff differently because of her race, or at least plaintiff so contends. Then—after plaintiff complained of Duda's alleged discriminatory treatment—Duda retaliated against her, plaintiff asserts. So, plaintiff brings employment discrimination and retaliation claims based on Duda's actions. Plaintiff asserts those actions violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and makes claims against defendant Denis McDonough, in his capacity as Secretary of the Department of Veterans Affairs.

Defendant moves for summary judgment.  Doc. 119.  He argues that the eight discrete acts which informed plaintiff's Equal Employment Opportunity (EEO) formal complaint do not rise to the requisite adversity level to support either racial discrimination or retaliation claims. And even if they do, defendant asserts that the Wichita VA had legitimate, nondiscriminatory business reasons for its actions.  The court agrees.  While the office-place clashes are less than desirable, the court holds that no reasonable juror could find the employment actions plaintiff has asserted are sufficiently adverse to clear the relevant legal threshold.  Nor could such a juror conclude that Duda's alleged discriminatory acts gave rise to an inference of discrimination. Finally, no reasonable juror could find that Duda's alleged retaliation manifested the requisite causal connection to plaintiff's protected activity.  And so, the court grants defendant's Motion for Summary Judgment (Doc. 119).

The court explains its decision, below, in the following sequence:  *First*, the court recounts the relatively few facts pertinent to defendant's summary judgment motion.  *Second*, the court recites the summary judgment standard before, *third*, narrowing plaintiff's claims to the discrete acts that plaintiff administratively exhausted.  With the claims so circumscribed, the court outlines the governing *McDonnell Douglas* burden-shifting framework, *fourth*.  The court applies the framework to plaintiff's racial discrimination claims, *fifth*, and to plaintiff's retaliation claims, *sixth*.  *Finally*, the court addresses briefly the last two prongs of the *McDonnell Douglas* framework and then recites its conclusions.

## I.    Background

The following facts pertinent to plaintiff's racial discrimination and retaliation claims are either uncontroverted or, if controverted, are construed in a light most favorable to plaintiff.

### *Plaintiff's Position at the Wichita VA*

Plaintiff began working as a Grade 2 Staff Nurse in the Office of Community Care (OCC) at the Wichita VA on December 28, 2015.  Doc. 118 at 2 (Pretrial Order ¶ 2.a.vi.). Plaintiff twice sought promotion—unsuccessfully—to Staff Nurse 3, the second time in February 2018.  *See* Doc. 120-5 at 2 (Def. Ex. D) (showing plaintiff "not promoted"); Doc. 120-6 at 2 (Def. Ex. E) (same).  Following the second unsuccessful attempt, Ruth Duda—as plaintiff's supervisor—signed and submitted an appeal to the decision-making board, after which plaintiff secured the promotion to Staff Nurse 3.  Doc. 142-1 at 74, 75 (McCray Dep. 74:6–8, 75:1–25).

In late 2018, plaintiff applied for a supervisory position as OCC Nurse Manager.  *Id.* at 78 (McCray Dep. 78:20–25).  Duda herself selected plaintiff for promotion to that supervisory position.  *Id.* at 80, 81 (McCray Dep. 80:11–24, 81:16–19).  So, a little more than three years after starting at the Wichita VA, in February 2019, plaintiff assumed a Nurse Manager position with Duda as her direct supervisor.  Doc. 118 at 2 (Pretrial Order ¶¶ 2.a.viii.–x.).  Duda, for her part, had begun working at the VA as a Nurse Manager in February 2001.  *Id.* (Pretrial Order ¶¶ 2.a.viii., 2.a.ix.).  After about 16 years of experience, in June 2017, Duda had become Chief of the OCC.  *Id.*

### *Plaintiff's EEO Activity*

By January 2020, plaintiff's working relationship with Duda had unraveled.  So much so that plaintiff met with Duda's supervisor, Chief of Staff Dr. Robert V. Cummings, to complain. Doc. 142-1 at 138–39 (McCray Dep. 138:23–139:18).  At their meeting, plaintiff, Dr. Cummings, and one of plaintiff's co-workers—Elizabeth Dial—discussed Duda's micromanagement tendencies and Duda's behavior in the workplace, specifically as germane to the work backlog and plaintiff's responsibility for it.  *Id.* at 139–40 (McCray Dep. 139:2–140:19).

3

One week later, on January 31, 2020, plaintiff contacted an EEO Counselor for informal counseling. Doc. 118 at 2 (Pretrial Order ¶ 2.a.xi.). And, on March 30, 2020, plaintiff filed a formal complaint of employment discrimination with the VA's EEO office. *Id.* at 3 (Pretrial Order ¶ 2.a.xiii.). The VA issued its final agency decision denying plaintiff's claims on January 24, 2022. *Id.* at 4 (Pretrial Order ¶ 2.a.xvii.). Plaintiff then filed this lawsuit in April 2022. *Id.*

### Plaintiff's Transfer

In May 2020, plaintiff transferred to the VA facility in Aurora, Colorado. *Id.* (Pretrial Order ¶ 2.a.xv.). With plaintiff's promotion to the VA position in Colorado, plaintiff received a $42,472 pay raise. *Id.* (Pretrial Order ¶ 2.a.xvi.).

### Events of Alleged Discrimination and Retaliation

Plaintiff's formal EEO complaint asserted eight separate claims accepted by the EEO. *Id.* at 3 (Pretrial Order ¶ 2.a.xiv.). Plaintiff premised the eight claims on the following alleged actions—all performed by plaintiff's supervisor, Duda: intimidating plaintiff by yelling; failing to train plaintiff adequately; usurping plaintiff's supervisory authority by giving conflicting instructions to plaintiff's subordinates; increasing plaintiff's workload; refusing to allow plaintiff to speak in an executive meeting; violating plaintiff's personal space; undermining plaintiff's abilities as a supervisor by a conversation with plaintiff's subordinate and by a later meeting with plaintiff's mentor; and threatening to fire plaintiff. *Id.* at 3–4 (Pretrial Order ¶ 2.a.xiv.i.–2.a.xiv.viii.).

While court could outline here the detailed facts for each alleged Duda action, it'll be awhile before this Order can sink its teeth into these facts. So, the court postpones that detailed review. Instead, the court begins by, first, addressing some preliminary matters. They begin with the summary judgment legal standard; followed by narrowing the claims due to discrete acts and exhaustion; and concludes with the *McDonnell Douglas* burden-shifting framework.

4

II.        **Summary Judgment Legal Standard**

Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  But the court "need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it."  *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1173 (10th Cir. 2017).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 247–48.

The moving party discharges "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81

5

F.3d 988, 990 (10th Cir. 1996)); accord *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).  When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

The federal courts don't view summary judgment as a "disfavored procedural shortcut."  *Celotex*, 477 U.S. at 327.  To the contrary, it's an important procedure "designed 'to secure the just, speedy[,] and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

## III.      Narrowing Plaintiff's Claims

Before the court can evaluate plaintiff's claims under the summary judgment standard, it must determine which claims are viable.  The parties debate the viability of plaintiff's claims on two fronts:  (1) whether the claims must flow from discrete acts of discrimination/retaliation or may rely on a continuing pattern; and (2) whether plaintiff failed to exhaust any of her claims administratively.  The court addresses each viability argument, in turn, below.

### A.      Discrete Acts

First, the parties debate whether plaintiff must limit her claims to discrete events or may rely on an aggregate approach.  Plaintiff contends that the "continuing violation" doctrine, which would allow the court to consider events in aggregate, applies to her retaliation claim, but not her disparate treatment claim.  Doc. 141 at 29 (first citing *Kincaid v. Unified Sch. Dist. No. 500, Kan. City, Kan.*, 572 F. Supp. 3d 1081, 1089–90 (D. Kan. 2021); then citing *Dial v. McDonough*, No. CV 21-01071-KHV-ADM, 2022 WL 17289152 (D. Kan. Nov. 29, 2022)).  Plaintiff hopes to use the continuing violation doctrine because it greatly expands the employer conduct the court

can consider when evaluating whether defendant retaliated against plaintiff.  Plaintiff attempts to employ this expanded factual universe by blurring the lines between retaliation and retaliatory harassment.  As best the court can tell, plaintiff premises this approach on the court's ruling in the companion case, *Dial v. McDonough*.  In *Dial*, the court held that acts of retaliatory harassment, "when considered in the aggregate, r[o]se to the level of materially adverse action" sufficient to establish a prima facie case of retaliation.  2022 WL 17289152, at *13.  That is, retaliatory harassment—as proved by aggregate acts—provided the evidentiary support for a retaliation claim.

But this court has ruled already "that retaliation and retaliatory harassment are distinct claims[,]" despite "some confusion about whether retaliatory harassment is a theory of retaliation or an entirely separate claim."  *Kincaid*, 572 F. Supp. 3d at 1089–90 (citation and internal quotation marks omitted) (collecting cases where our court analyzed retaliatory harassment and retaliation as separate and distinct claims).  And Tenth Circuit precedent precludes "reliance on the continuing violation doctrine" for "claims involving disparate treatment or retaliation." *Brown v. Lowe's Home Centers*, 627 F. App'x 720, 725 (10th Cir. 2015) (citing *Martinez v. Potter*, 347 F.3d 1208, 1210–11 (10th Cir. 2003)).  So, the only way the court could consider aggregate acts to support a claim here is if plaintiff had asserted a retaliatory harassment claim.  But United States Magistrate Judge Angel Mitchell already has ruled that plaintiff's Complaint here never alleged retaliatory harassment.  Doc. 118 at 5–6 n.2.  Plaintiff didn't ask this court to review Judge Mitchell's ruling.  And so, plaintiff can't assert aggregate acts to support her retaliation claim; nor can her claims for disparate treatment discrimination claims rely on the continuing violation doctrine.  *Brown*, 627 F. App'x at 725.  So, the court evaluates only

7

"discrete retaliatory acts" here and disregards any aggregate effect of repeated violations. *Kincaid*, 572 F. Supp. 3d at 1090.

The parties' first viability argument thus narrows plaintiff's claims to discrete acts. But the question remains: which discrete acts? The parties' second viability argument takes up this question and the court further narrows the scope of plaintiff's claims as unexhausted. Part B, following, explains why.

### B.       Exhaustion

Defendant argues not only that plaintiff must rely on discrete acts, but also that plaintiff must have exhausted administratively those relied-upon discrete acts. Plaintiff brings her claims under Title VII. When a federal employee brings discrimination or retaliation claims under Title VII, a statutory framework governs the administrative complaint procedures that must precede a lawsuit. *Hickey v. Brennan*, 969 F.3d 1113, 1118 (10th Cir. 2020). And those procedures delimit the discrete acts plaintiff may rely on to support her claims, excluding those acts which plaintiff didn't administratively exhaust. *Id.* Failure to exhaust, as relevant here, may occur when a plaintiff didn't include the incident in the formal charge, or when an incident supporting a claim occurs too early or too late relative to plaintiff's EEO activity. The court explains each relevant exhaustion failure scenario, below, and then evaluates whether plaintiff has exhausted all her claims.

### 1.       Events Not Included in Formal Charge

As the court explained when dismissing plaintiff's constructive discharge claim in an earlier Order (Doc. 51), Title VII's charge-filing requirement generally prohibits a plaintiff from bringing "a Title VII action based upon claims that were not part of a timely-filed EEOC charge[.]" *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1181 (10th Cir. 2018) (internal quotation marks and citation omitted). This requirement serves two principal purposes: (1) "to give notice

of the alleged violation to the charged party;" and (2) "to give the EEOC an opportunity to conciliate the claim, which effectuates Title VII's goal of securing voluntary compliance." *Smith v. Cheyenne Ret. Invs. L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018) (internal quotation marks and citation omitted). So, to promote the purposes of the exhaustion rule, a "plaintiff's claim in court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Id.* (internal quotation marks and citation omitted).

While courts "liberally construe the plaintiff's allegations in the EEOC charge, the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim[.]" *Id.* (internal quotation marks, emphasis, and citation omitted). To identify the administratively exhausted claims, the "ultimate question is whether the conduct alleged [in the lawsuit] would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made [in the EEOC charge]." *Id.* at 1164–65 (internal quotation marks and citation omitted). And so "the Charge itself"—and not "the Charge and any responsive documents"—defines the scope of the investigation, "so the employer knows exactly what allegations to defend itself against." *Id.* at 1165–66. That is, "the court must look to the allegations in the charge, and not to the ensuing investigation or responsive documents to discern the scope of the claim that was administratively exhausted." *Lincoln v. BNSF Ry. Co.*, No. 15-4936-DDC-ADM, 2020 WL 4000912, at *7 (D. Kan. July 15, 2020) (citing *Smith*, 904 F.3d at 1165).

Here, defendant affirmatively raises the defense of exhaustion. Doc. 120 at 21–23. So, the court evaluates the specific event defendant claims is unexhausted. Then, the court applies the exhaustion requirement more broadly and narrows plaintiff's claims accordingly. In

particular, defendant argues that plaintiff hasn't exhausted her claims about Dr. Cummings's actions—such as when Dr. Cummings removed plaintiff from a work team, the Referral Coordination Team (RCT)—because plaintiff didn't include those actions in her EEO complaint. *Id.* at 23.  Instead, plaintiff's formal complaint alleged discriminatory and retaliatory behavior by Duda and Duda alone.  *Id.*  Plaintiff responds that the complaint is against the agency as a whole "for all discriminatory acts that took place against any individual."  Doc. 141 at 30.  And plaintiff contends that the investigated events encompassed Dr. Cummings removing plaintiff from the RCT.  *Id.*

Defendant has the better of this dispute.  Dr. Cummings's name never appears in the list of eight claims formally accepted by the EEO.  Doc. 118 at 3–4 (Pretrial Order ¶ 2.a.xiv.i.–vii.).  But Duda's name appears in all eight.  *Id.*  Plaintiff's EEO complaint only refers to Dr. Cummings by his title—Chief of Staff—and even then, it references him merely as the person with whom plaintiff discussed Duda's behavior.  *Id.* at 3 (Pretrial Order ¶ 2.a.xiv.iv.).  Nowhere in her list of claims does the phrase "Referral Coordination Team" pop up.  *See id.*  Indeed, none of plaintiff's claims contemplate removal from an assignment at all.  *See id.*  And the VA's Investigative Report lists Dr. Cummings solely as a "Witness."  Doc. 142-5 at 56 (Pl. Ex. 5).  To be sure, Dr. Cummings's decision to remove plaintiff from the RCT informs one alleged infraction by Duda—when Duda yelled at plaintiff, asking whether she was offended—and so appears in the VA's Investigative Report.  *Id.* at 16.  But references so scant don't provide notice to defendant that Dr. Cummings's actions feed plaintiff's claims, nor do they provide the EEOC with "an opportunity to conciliate[.]" *Smith*, 904 F.3d at 1164.  Defendant wouldn't have known it needed to defend itself against allegations about Dr. Cummings's behavior.  *Id.* at 1166.  And while the RCT removal surfaces in the EEOC investigation, its does so in "responsive

documents," but not in the charge itself. *Id.* at 1165. So, plaintiff hasn't exhausted administratively Dr. Cummings's action removing plaintiff from the RCT as a discrete event of retaliation. The court thus grants summary judgment to defendant on plaintiff's retaliation claim about RCT removal.

The court pauses here, momentarily, to note a broader point of application. Any discrete act plaintiff alleges as an act of discrimination or retaliation must find its origin in plaintiff's formal EEO charge—and not in the responsive documents. *Id.* at 1165–66. Plaintiff included eight discrete acts in her formal EEO complaint, and the parties have stipulated to those eight claims in the Pretrial Order. Doc. 118 at 3–4 (Pretrial Order ¶ 2.a.xiv.i.–viii.). These acts form the universe where any viable claim must originate. They include:

- Duda intimidating and yelling at plaintiff in April 2018,[1] *id.* (Pretrial Order ¶ 2.a.xiv.i.);

- Duda neglecting to provide plaintiff with necessary training from January 28, 2019, to January 4, 2020, *id.* (Pretrial Order ¶ 2.a.xiv.ii.);

- Duda instructing plaintiff's staff differently than plaintiff had in January 2019, thus usurping plaintiff's authority, *id.* (Pretrial Order ¶ 2.a.xiv.iii.);

- Duda increasing plaintiff's workload on January 24, 2020, after plaintiff's meeting with the Chief of Staff about Duda's alleged discrimination, *id.* (Pretrial Order ¶ 2.a.xiv.iv.);

---

[1]     The Pretrial Order adds the language "through the present" to both this discrete act and the act listed third, presumably as part of an attempt to suggest Duda's continuing pattern of intimidating through yelling, Doc. 118 at 3 (Pretrial Order ¶ 2.a.xiv.i.), and continuing pattern of usurping plaintiff's supervisory authority, *id.* (Pretrial Order ¶ 2.a.xiv.iii.). Indeed, plaintiff's Response criticizes defendant's analysis of four separate events, emphasizing these events "are not singular" and arguing that "Duda made a habit of excoriating African-American employees in front of others." Doc. 141 at 32. But the court addresses these claims only as discrete act claims because, as already discussed, Tenth Circuit precedent disallows a continuing violation approach to discrimination and retaliation claims. *Brown*, 627 F. App'x at 725.

- Duda refusing to allow plaintiff to speak during a meeting with the Medical Center Director on January 30, 2020, *id.* (Pretrial Order ¶ 2.a.xiv.v.);

- Duda violating plaintiff's personal space and yelling at plaintiff after a meeting with executive staff (the Pentad) on January 31, 2020, *id.* (Pretrial Order ¶ 2.a.xiv.vi.);

- Duda undermining plaintiff's ability as a supervisor when accusing plaintiff of interfering with a coworker's leadership opportunity by taking over at a meeting in February 2020, *id.* (Pretrial Order ¶ 2.a.xiv.vii.);

- Duda threatening to fire plaintiff when plaintiff asked Duda about another employee's expired nursing license, *id.* at 3–4 (Pretrial Order ¶ 2.a.xiv.viii.).

### 2.    Events Too Far Removed from EEO Counseling or Charge

Having limited the viable discrete act claims to those within the universe of the formal charge, the court now decides whether any of the eight discrete acts included in the formal charge—or those "which would reasonably grow out of the [eight] charges actually made," *Smith*, 904 F.3d at 1165–66—present exhaustion issues.  This is so because it's possible the event occurred too early or too late.  When an event occurs more than 45 days before plaintiff initiates contact with an EEO counselor—*i.e.*, too early—it is time-barred under 29 C.F.R. § 1614.105(a)(1).  *See Dial*, 2022 WL 17289152, at *8 ("[T]he Tenth Circuit requires plaintiff to contact an EEO counselor within 45 days of each discrete discriminatory act.  Unexcused failure to timely contact an EEO counselor precludes suit in federal court.").  And, when an event post-dates the formal charge—that is, it happened too late—then a plaintiff hasn't exhausted a claim administratively premised on that event unless she either amends her formal charge or files a new EEOC charge.  *Lincoln*, 2020 WL 4000912, at *7.  A plaintiff must exhaust "each act

separately . . . even when acts that post-date the EEOC complaint reasonably relate to others presented to the EEOC." *Eisenhour v. Weber Cnty.*, 744 F.3d 1220, 1227 (10th Cir. 2014) (citation omitted). And "unexhausted claims involving discrete employment actions are no longer viable." *Martinez*, 347 F.3d at 1210.

Here, plaintiff asserts claims based on events that occurred both too early and too late relative to her EEO activity. *First*, the too early ones: The parties agree that plaintiff first contacted an EEO counselor for informal counseling on January 31, 2020. Doc. 118 at 2 (Pretrial Order ¶ 2.a.xi.). So any events occurring more than 45 days before that counseling event—that is, before December 17, 2019—are statutorily time-barred from serving as the discrete act capable of supporting a claim for discrimination or retaliation. *See Dial*, 2022 WL 17289152, at *8. On this basis, defendant contests the following claims included in the formal charge:

> (1) Duda attempted to intimidate [plaintiff] on April 5, 2018, when she yelled at her in a public area about another employee's pay; (2) Duda failed to provide training or denied training prior to December 17, 2019; and (3) Duda usurped her authority by countermanding her instructions to staff in the OCC in January 2019.

Doc. 120 at 22. Plaintiff responds to defendant's arguments, contending that she still may use these too-early acts "for other purposes, including to establish discriminatory animus or as background evidence supporting a timely claim." Doc. 141 at 29.

The Tenth Circuit addressed an analogous situation in *Sunderman v. Westar Energy, Inc.*, 307 F. App'x 224 (10th Cir. 2009). In *Sunderman*, the district court had declined to consider alleged retaliatory acts that occurred before plaintiff filed a complaint with the Kansas Human Rights Commission (which later was cross-filed with the EEOC). 307 F. App'x at 226, 228. Our Circuit agreed with the district court. These earlier retaliatory acts couldn't support separate

causes of action for retaliation.  *Id.* at 229.  But the Circuit also clarified that "the court should have considered the prior retaliation alleged by plaintiff as background evidence when considering plaintiff's claim[.]"  *Id.*

Applying the Circuit's approach here, the court won't evaluate acts occurring more than 45 days before plaintiff's EEO complaint as discrete acts capable of supporting a claim for discrimination or retaliation.  This too-early determination eliminates the first and third claims in plaintiff's list of eight—Duda intimidating and yelling at plaintiff in April 2018, Doc. 118 at 3 (Pretrial Order ¶ 2.a.xiv.i.), and Duda instructing plaintiff's staff differently than plaintiff in January 2019, thus usurping plaintiff's authority, *id.* (Pretrial Order ¶ 2.a.xiv.iii.).  And this decision also shrinks the timeframe of plaintiff's second claim—Duda neglecting to provide plaintiff with necessary training from January 28, 2019, to January 4, 2020.  *Id.* (Pretrial Order ¶ 2.a.xiv.ii.).  The court replaces January 28, 2019, with December 17, 2019, to account for the statutorily time-barred period.  Nonetheless, the court will accept those untimely acts as "background evidence" for plaintiff's claims.  *Sunderman*, 307 F. App'x at 229.  The court applies a similar approach to those acts which occurred too late, as explained below.

*Second*, the too late events:  Defendant contends that plaintiff's EEO complaint contains no reference to receiving a lowered performance review in November 2020.  Doc. 120 at 23.  So, defendant asserts, plaintiff either must have amended her EEO charge or filed a new one.  *Id.* (citing *Lincoln*, 2020 WL 4000912, at *7, 11).  Having done neither, defendant asserts, plaintiff hasn't exhausted administratively a claim based on this November 2020 performance review.  And so, defendant argues, he is entitled to summary judgment on the performance-based review claim.  *Id.*  Plaintiff responds that this lowered performance review logically relates to the timely claims in the complaint.  Doc. 141 at 29.  And, plaintiff contends, the EEO "actually

investigated" this performance review during the EEO process, thus administratively exhausting this event. *Id.* at 29–30.

The court agrees with defendant. Plaintiff didn't exhaust administratively a claim based on plaintiff's lowered performance review. Even if plaintiff's lowered performance review followed from the alleged discriminatory events, making it "reasonably related" to the allegations at issue, that's not enough. For the review to qualify as a basis for a claim, plaintiff needed to exhaust it separately, "reasonably related" or not. *Eisenhour*, 744 F.3d at 1227. If unexhausted, it isn't a "viable" claim. *Martinez*, 347 F.3d at 1210. And so, defendant deserves summary judgment on any claim premised on the lowered performance review.

But, as with the too-early acts analyzed above, granting summary judgment "does not negate the relevance" of this allegedly retaliatory incident "'as background evidence in support of a timely claim.'" *Id.* at 1211 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). That is, while evidence of plaintiff's lowered performance review doesn't "expand her court claim," it can "support it." *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1175 (10th Cir. 2020); *see also Thompson v. Tyson Foods, Inc.*, No. 16-2496-DDC, 2018 WL 705667, at *3 (D. Kan. Feb. 5, 2018) (allowing later unexhausted acts to serve as background evidence for administratively exhausted claims). And so, the court will not evaluate a claim premised on plaintiff's lowered performance review but uses it as support for plaintiff's other claims.

After eliminating continuous violations, acts not included in the formal charge, and acts occurring too early or too late after plaintiff's EEO activity, the following six discrete acts remain viable as claims of discrimination or retaliation:

- Duda neglecting to provide plaintiff with necessary training from December 17, 2019, to January 4, 2020, *id.* (Pretrial Order ¶ 2.a.xiv.ii.);

- Duda increasing plaintiff's workload on January 24, 2020, after plaintiff's meeting with the Chief of Staff about Duda's alleged discrimination, *id.* (Pretrial Order ¶ 2.a.xiv.iv.);

- Duda refusing to allow plaintiff to speak during a meeting with the Medical Center Director on January 30, 2020, *id.* (Pretrial Order ¶ 2.a.xiv.v.);

- Duda violating plaintiff's personal space and yelling at plaintiff after a meeting with executive staff (the Pentad) on January 31, 2020, *id.* (Pretrial Order ¶ 2.a.xiv.vi.);

- Duda undermining plaintiff's ability as a supervisor when accusing plaintiff of interfering with a coworker's leadership opportunity by taking over at a meeting in February 2020, *id.* (Pretrial Order ¶ 2.a.xiv.vii.);

- Duda threatening to fire plaintiff when plaintiff asked Duda about another employee's expired nursing license, *id.* at 3–4 (Pretrial Order ¶ 2.a.xiv.viii.).

Having identified all the viable claims, the court now may analyze those claims using the summary judgment standard. But first, the court addresses one other preliminary matter—the *McDonnell Douglas* burden-shifting framework. Because plaintiff's discrete acts detailed above provide indirect evidence of discrimination and retaliation, the court applies this burden-shifting to all plaintiff's remaining viable claims.

## IV.    *McDonnell Douglas* Burden-Shifting Framework

A Title VII plaintiff may use direct evidence or indirect evidence, or both, to support her claims. *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). At the summary judgment stage, the court analyzes indirectly supported claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Khalik v. United Air Lines*, 671

F.3d 1188, 1192 (10th Cir. 2012).  Under *McDonnell Douglas*, a plaintiff, *first*, must establish a prima facie case.  *Bekkem*, 915 F.3d at 1267.  The "burden on the employee to establish a prima facie case is light[.]"  *Guy v. McDonough*, No. 20-6158, 2021 WL 3854764, at *2 (10th Cir. Aug. 30, 2021).  *Second*, if plaintiff satisfies the obligations for a prima facie case, then the burden shifts to defendant to produce "'a legitimate nondiscriminatory reason for its employment decision.'"  *Bekkem*, 915 F.3d at 1267 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).  As with the employee's burden in the first step, the employer's burden at this second stage is "exceedingly light."  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007) (internal quotation marks omitted).  *Last*, the burden shifts back to the plaintiff "to show that there is a genuine dispute of material fact whether the employer's proffered reason for the challenged action is pretextual—*i.e.*, unworthy of belief."  *Bekkem*, 915 F.3d at 1267 (quotation cleaned up).

The court, next, applies this framework to plaintiff's claims, starting with *McDonnell Douglas*'s first prong:  the prima facie case.  The court evaluates plaintiff's prima facie case separately for her racial discrimination claims and then for her retaliation claims, below.

## V.        Racial Discrimination and a Prima Facie Case

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]"  42 U.S.C. § 2000e-2(a)(1).  To make out a prima facie case for race discrimination, plaintiff must present "evidence that:  (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination."  *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022) (internal quotation marks and citation omitted).  Neither party here disputes that plaintiff—an African American—belongs to a protected class.  Doc. 118

at 2 (Pretrial Order ¶ 2.a.v.); Doc. 141 at 30–31.  But the parties do disagree about the second

and third requirements for a prima facie case of race discrimination:  whether the alleged

discriminatory actions constitute adverse employment actions and whether the circumstances

surrounding those actions give rise to an inference of discrimination.  The court recites the legal

standard for those second and third requirements below.  Then the court applies these legal

standards to plaintiff's viable racial discrimination claims one-by-one, keeping always in mind

that plaintiff's burden on this front "'is not onerous.'"  *Ford*, 45 F.4th at 1222 (quoting *Orr v.*

*City of Albuquerque*, 417 F.3d 1144, 1152 (10th Cir. 2005)).

   *The second requirement*:  Courts define the term adverse employment action "liberally,"

meaning that these actions "are not simply limited to monetary losses in the form of wages or

benefits."  *Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 604 (10th Cir. 2019) (internal

quotation marks and citation omitted).  "A strong indicator that a challenged employment action

is adverse 'is that the action causes harm to future employment prospects.'"  *Id.* at 605 (quoting

*Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004)).  And, to qualify as adverse, an

employment action generally must include "a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits."  *Ford*, 45 F.4th at 1222 (internal quotation

marks and citation omitted).

   To be certain, the Supreme Court's recent decision in *Muldrow v. City of St. Louis, Mo.*,

may require extraction of "significant" and "significantly" from *Ford*'s adverse definition.[2]  144

_____

[2]       *Muldrow* specifically considers a Title VII challenge to a job transfer.  144 S. Ct. at 972.  The
Tenth Circuit hasn't addressed the breadth of *Muldrow*'s reach.  But some Circuits have acknowledged
that *Muldrow* may affect the adverse employment action analysis more generally, that is, beyond the job
transfer context.  *See, e.g.*, *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 885 (6th Cir. 2024)
(acknowledging *Muldrow* may call the Sixth Circuit's precedent "into doubt" but saving "*Muldrow*'s
effect on our caselaw for another day").  And our court has applied *Muldrow* more broadly, consulting its

S. Ct. 967, 974 (2024) ("To demand 'significance' is to add words—and significant words, as it

were—to the statute Congress enacted.  It is to impose a new requirement on a Title VII

claimant, so that the law as applied demands something more of her than the law as written.")

Nonetheless, *Muldrow* still requires "some disadvantageous change in an employment term or

condition" or "some harm respecting an identifiable term or condition of employment."  *Id.* at

974 (internal quotation marks and citation omitted).  And so—even without importing the

significance requirement into the definition of adverse—"a mere inconvenience or an alteration

of job responsibilities does not qualify."  *Ford*, 45 F.4th at 1222 (internal quotation marks and

citation omitted).  That is, "[n]ot everything that makes an employee unhappy is an actionable

adverse action."  *Braxton*, 769 F. App'x at 604 (internal citation and quotation marks omitted).

       *The third requirement*:  A prima facie case of discrimination also requires evidence that

"the challenged action took place under circumstances giving rise to an inference of

discrimination."  *Ford*, 45 F.4th at 1215 (internal quotation marks and citations omitted).

Plaintiffs often satisfy this burden "by proof that the employer treated similarly situated

employees more favorably[.]"  *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir.

2005).  Nonetheless, courts shouldn't "mistake[]" proof of a similarly situated employee "as an

---

lenient standard when analyzing an adverse employment action not in the job transfer context.  *See Harris v. U.S. Dep't of Veterans Affs., Sec'y of*, No. 2:22-CV-02489-HLT, 2024 WL 3010879, at *10 (D. Kan. June 14, 2024) ("No reasonable jury could conclude that the alleged multiple investigations were an adverse employment action, even under the more lenient standard of *Muldrow*.").  This Order doesn't require the court to decide the scope of *Muldrow* today, however.

       Instead, the court accounts for a broad application that would alter the adverse standard as applied to this case.  After all, plaintiff here brings her discrimination claims under the same statutory provision at issue in *Muldrow*, 42 U.S.C. § 2000e-2(a)(1).  And *Muldrow* largely rests on a textual reading of that very provision, making application to this case conceivable.  *See Smith v. McDonough*, No. CV 20-1321 KK/JFR, 2024 WL 2804428, at *8–10 (D.N.M. May 31, 2024) (completing a sua sponte review of a previous Order's ruling on disparate treatment claims not involving a job transfer to account for *Muldrow*'s new standard).  And so, the court will not apply the potentially offending "significant" from *Ford*'s adverse standard.  Thus—even if courts apply to all § 2000e-2(a)(1) employment discrimination cases *Muldrow*'s denouncement against importing "significant," "serious," "substantial, or any similar adjective" into the text of Title VII—the analysis here remains unaffected.

indispensable element of the prima facie case." *Id.*  Only when a plaintiff uses the similarly situated employee method to raise an inference of discrimination is a claim properly analyzed only in those terms.  *Id.* at 1173–74.  A variety of other circumstances can give rise to the inference of a discriminatory motive.  *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). They include:  decisionmakers' actions or remarks that may reflect a discriminatory animus; treating employees outside the protected class preferentially; repeatedly recommending plaintiff for positions unsuitable to her qualifications; or failing to offer plaintiff's name for positions well-suited to her qualifications.  *Id.*

The court now applies these prima facie standards to the viable discrimination claims already outlined above.  But first, for ease of reference, the court recites the still-viable claims from plaintiff's EEO charge.[3]  Because plaintiff hasn't identified (at least not clearly) which claims support discrimination and which retaliation, the court considers all six remaining claims, first, under the discrimination rubric.  The claims—in abbreviated form—include:  neglecting to provide training; increasing plaintiff's workload; refusing to allow plaintiff to speak during a meeting; violating plaintiff's space and yelling at plaintiff; accusing plaintiff of interfering with a coworker's leadership opportunity by taking over a meeting; and threatening to fire plaintiff.

---

[3]     Plaintiff asserts that she has established other discriminatory acts as well and lists, for example, the following infractions:

> Duda often spoke over Plaintiff and the other African-American supervisors in front of their employees.  She undercut the ability of the black supervisors to perform, giving them busy work, countermanding instructions, and encouraging employees to bring complaints to her.  Ruth Duda treated the black supervisors dismissively while she treated the white employees under them much differently.  She usurped the black supervisors' authority so that they were incapable of supervising the white employees and she disrespected the black supervisors in front of their supervisees.

Doc. 141 at 33.  But, where this list diverges from the claims already considered by the court, it simply levels conclusory allegations without referencing discrete acts to bolster these allegations.  The court thus limits its consideration of plaintiff's discrimination claims to those acts of disparate treatment outlined in the plaintiff's EEO charge and properly preserved in the Pretrial Order, all of which appropriately identify discrete acts.

Mindful of the summary judgment standard—requiring the court to view the evidence and draw inferences in the light most favorable to the non-moving party—the court evaluates whether plaintiff has established that these claims qualify as adverse employment actions giving rise to an inference of discrimination. *Nahno-Lopez*, 625 F.3d at 1283. The court begins with the first viable claim listed: Duda neglecting to provide plaintiff with training. Doc. 118 at 3 (Pretrial Order ¶ 2.a.xiv.ii.).

A.      **Failure to Train Prima Facie Case**

Plaintiff alleges that Duda failed to provide the nurse manager training necessary for plaintiff to complete a staffing model duty. *Id.* And Duda—as plaintiff's immediate supervisor—held responsibility for training in such daily duties. Doc. 142-1 at 115 (McCray Dep. 115:3–8). The staffing model required plaintiff to input "numbers for identifying staffing needs." *Id.* at 110 (McCray Dep. 110:11–12). Plaintiff contends that Duda instructed plaintiff to watch while Duda performed the task, once, and considered that sufficient training—"that's how you do it." *Id.* at 110, 111 (McCray Dep. 110:13–15, 111:2–5). But plaintiff was never given the opportunity to "actually do it" because Duda "kept doing it every month until it came up to where [Duda] just wanted [plaintiff] to do it" in January 2020. *Id.* (McCray Dep. 110:23–111:1, 6–8). So, plaintiff asserts, Duda failed to train her on the staffing model duty since just showing plaintiff on the computer once isn't adequate training.

Plaintiff testified at her EEO proceedings that—despite the allegedly insufficient training—she didn't have any problem with completing the staffing model duty. *Id.* at 113–15 (McCray Dep. 113:17–115:2). Nor did plaintiff's completing the staffing model without more training result in any pay reduction, demotion, or decrease in benefits. *Id.* at 111, 113 (McCray Dep. 111:18–23, 113:7–10). But, plaintiff asserts, she experienced informal disciplinary action

when the Chief of Staff met with her and asked, "when are you leaving because Miss Duda has

an organization to run." *Id.* at 111–12 (McCray Dep. 111:24–112:8).

Plaintiff also contends that Duda neglected to train plaintiff in the areas of budget reports,

consult data, tracking, and labor mapping.  Plaintiff concedes that she received "large scale"

training on consult tracking—but not from Duda, her supervisor.  *Id.* at 192–93 (McCray Dep.

192:24–193:12).  These tasks, as it turns out, all fall under the duty to complete the staffing

model.  The budget reports were "in regards to the staffing model in regards to the number of

staff needed for the number of consults that come through our department."  *Id.* at 193 (McCray

Dep. 193:13–18).  And the labor mapping involved the "amount of employees . . . per month

actually working within their full FTE."  *Id.* (McCray Dep. 193:19–21).  So, in the end, Duda's

singular demonstration of the staffing model—when plaintiff watched while Duda completed the

staffing model on the computer—encompassed these budget reports and labor mapping.  *See id.*

at 194 (McCray Dep. 194:10–21).

Duda, for her part, asserts that the "staffing model is simple to complete" and that she

considered walking plaintiff through the process "to be on-the-job training."  Doc. 120-2 at 4

(Duda Decl. ¶¶ 23–24).  Duda also contends that she herself "never received any specific training

on how to complete the staffing model when [she] served both Nurse Manager and Chief of the

OCC."  *Id.* (Duda Decl. ¶ 24).  Up until a certain point, Duda completed these tasks—which

were part of plaintiff's job description, not Duda's.  *Id.* at 193–94 (McCray Dep. 193:24–194:9).

And then, in January 2020, Duda began requiring plaintiff to complete them.  *Id.* at 192–93, 194

(McCray Dep. 192:24–193:4, 194:10–16).

### 1.    Adverse Employment Action

Applying the case law defining adverse employment actions to Duda's alleged failure to

train, the court first notes that plaintiff didn't lose money in the form of wages or benefits.  Of

course the absence of monetary losses in those forms doesn't preclude Duda's alleged failure to train from qualifying as an adverse employment action. *Braxton*, 769 F. App'x at 604. Nonetheless, an adverse employment action requires some form of "harm to future employment prospects," *id.* at 605 (citation and internal quotation marks omitted), or a "change in employment status," term, or condition, *Ford*, 45 F.4th at 1222 (citation and internal quotation marks omitted). Even when the court draws all inferences in the light most favorable to the plaintiff—thus concluding that Duda should have, but failed, to train plaintiff—an adverse employment action's requisite "harm" or "change" simply doesn't manifest itself here.

Most problematic for plaintiff's failure to train claim is the fact that plaintiff didn't exhaust either one of her alleged harms. She alleges two harms: (1) receiving a fully successful rating—as opposed to an outstanding rating—on her performance evaluation, allegedly resulting in the loss of an award; and (2) the informal discipline she experienced in her conversation with the Chief of Staff. The first harm plaintiff cites—receiving a fully successful rating on her performance evaluation—allegedly resulted in plaintiff's loss of a performance award.[4] But, again, the court already has determined plaintiff didn't exhaust a claim premised on an award loss because plaintiff neglected to amend her EEO Complaint to include it later. And so, the performance award can provide no more than background evidence.

Plaintiff contends a second harm follows from Duda's failure to train her: informal discipline. At a meeting with the Chief of Staff, Dr. Cummings, on January 31, 2020, he "reared

---

[4] Defendant has offered evidence suggesting that, under the VA Handbook 5017, plaintiff's "fully successful" grade actually didn't disqualify plaintiff from a monetary award. Doc. 151-1 at 12–13 (Kaus Decl. Ex. A1) (explaining that superior performance awards "may be granted to . . . employees . . . if a rating of fully successful/satisfactory or higher is achieved. A fully successful rating must include the attainment of an exceptional achievement level on at least one critical element to be eligible for an award"). Because plaintiff received an "exceptional" achievement under "Leading Change"—a critical element—plaintiff would have qualified for an award even with a fully successful rating. *See* Doc. 120-13 at 2. This evidence reinforces the court's conclusion that the performance evaluation issue doesn't qualify as an adverse employment action.

back in his chair and said, when are you leaving because Miss Duda has an organization to run." Doc. 142-1 at 112 (McCray Dep. 112:2–5). Plaintiff considered that inquiry informal discipline. *Id.* (McCray Dep. 112:6–8, 16–22). But recall that no claims premised on Dr. Cummings's actions may persist because plaintiff didn't include them in her EEO Complaint.

Even if Dr. Cummings's actions could supply the requisite harm here—applying a generous exhaustion analysis—a reasonable juror still couldn't find an adverse employment action. Plaintiff doesn't indicate that the Chief of Staff documented their conversation or in any way included it in plaintiff's personnel file. Indeed, he wouldn't have had anything to include. As it turned out—despite feeling inadequately trained for the task—plaintiff completed the staffing model duty without problem. To be sure, plaintiff received a new responsibility when Duda expected plaintiff to complete the staffing model duty for the first time in January 2020. But Tenth Circuit precedent clarifies that "a mere inconvenience or an alteration of job responsibilities does not qualify" as an adverse employment action. *Ford*, 45 F.4th at 1222 (citation and internal quotation marks omitted). And so, no reasonable juror could find that Duda's failure to train qualified as an adverse employment action, even under *Muldrow*'s more lenient "some disadvantageous change in an employment term or condition" standard. 144 S. Ct. at 974.

## 2.    Inference of Discrimination

What's more, even if plaintiff had exhausted these two harms and the harms permitted a reasonable juror to find an adverse employment action, plaintiff still would have to establish that the lack of training "took place under circumstances giving rise to an inference of discrimination." *Ford*, 45 F.4th at 1215 (internal quotation marks and citation omitted). Such an inference might arise where Duda "treated similarly situated employees more favorably," for instance, by offering more substantial training on the staffing model duty, budget reports, consult

data, or tracking and labor mapping. *Sorbo*, 432 F.3d at 1173. Plaintiff provides no such

comparison. To be sure, plaintiff asserts that this "lack of training was specific to [plaintiff] and

was not directed at her Caucasian counterparts." Doc. 141 at 14. But the cite to the record

plaintiff provided in support of this assertion doesn't even mention plaintiff's Caucasian

counterparts. *Id.* (citing Doc. 142-1 at 201–03 (McCray Depo. 201:1–203:3) (explaining

plaintiff's lack of training and loss of award but never speaking about other employees'

training)). And elsewhere, plaintiff concedes she had no similarly situated Caucasian employees.

Doc. 142-1 at 187–88 (McCray Dep. 187:11–188:1). So, it is evident that a similarly situated

employee-based inference of discrimination fails.

But that doesn't end the inference of discrimination inquiry. Similarly situated

employees is "just one sufficient means" and not "an indispensable element of the prima facie

case." *Sorbo*, 432 F.3d at 1173. Recall that a plaintiff, even absent a similarly situated

employee, may prove an inference of discrimination with circumstances such as: a

decisionmaker's actions or remarks that may reflect a discriminatory animus; treating employees

outside the protected class preferentially; repeatedly recommending plaintiff for positions

unsuitable to her qualifications; or failure to offer plaintiff's name for positions well-suited to her

qualifications. *Plotke*, 405 F.3d at 1101.

Here, plaintiff primarily relies on her own testimony to prove Duda's discriminatory

animus. Indeed, the "Inadequate Training" section of plaintiff's statement of facts relies

exclusively on plaintiff's deposition.[5] And plaintiff asserts that she "has testified clearly and

---

[5] Plaintiff does provide one cite to EEO RFA #5 as a "see also" reference when explaining that Duda required plaintiff to complete the staffing model duty without providing training. Doc. 141 at 14. But the court was unable—despite combing through plaintiff's exhibits—to decipher which document plaintiff referenced by "EEO RFA #5[.]" The onus is on the parties to clarify where in the record evidence sits: "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . citing *to particular parts* of materials in the record[.]" Fed. R. Civ P. 56(c)(1)(A) (emphasis

cogently that African American employees in Ruth Duda's division—no matter their position—
were treated less favorably than Caucasian employees." Doc. 141 at 38. But citing "only her
deposition without any other supporting evidence . . . is insufficient to create an issue of material
fact." *Ford*, 45 F.4th at 1223–24. A plaintiff must instead include "sufficient objective
evidence" and not simply reference "her own deposition transcript." *Id.* at 1224 (emphasis
omitted) (quoting *Wheeler v. BNSF Ry. Co.*, 418 F. App'x 738, 751 (10th Cir. 2011)). As the
court explains below, plaintiff hasn't adduced sufficient objective evidence of any of the
circumstances identified in *Plotke*—or any other circumstances, for that matter—to support an
inference of discrimination. 405 F.3d at 1101.

    *First*, plaintiff provides no evidence that Duda's actions reflect a discriminatory animus.
She has proffered no facts suggesting that Duda refused to train African American employees
because of their race, or that she wanted her African American employees to fail because of her
discriminatory animus. *Id. Second*, plaintiff hasn't adduced evidence that Duda trained
Caucasian employees (even if not similarly situated) preferentially to African Americans. *Id.*
Nor do the summary judgment facts identify circumstances commensurate with, *third*, repeatedly
recommending plaintiff for positions unsuitable to her qualifications or, *fourth*, failing to offer
plaintiff's name for positions well-suited to her qualifications. *Id.*

    Instead, the summary judgment facts furnish evidence of just the opposite: It's
undisputed that Duda strived to help plaintiff acquire positions well-suited to her qualifications.
Before plaintiff secured the OCC Nurse Manager position, she had applied twice—and been

---

added). "Judges are not like pigs, hunting for truffles buried in briefs" or exhibits. *United States v.
Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). And so, the court declines to consider plaintiff's EEO RFA
#5 evidence, or, indeed, any evidence cited as an EEO RFA for the simple reason that plaintiff hasn't
identified what this means. The same problem existed with plaintiff's "Response to the VA's (Agency)
Request for Admissions," "CBA," and "EEO Interrog." cites. Defendant encountered similar difficulty
with plaintiff's filings. *See, e.g.*, Doc. 145-1 at 20–22 (noting repeatedly that plaintiff "has not attached
any 'EEO RFA' documents").

denied twice—a promotion to Staff Nurse 3. *See* Doc. 120-5 at 2 (Def. Ex. D) (showing plaintiff "not promoted"); Doc. 120-6 at 2 (Def. Ex. E) (same). After the second denial in January 2018, plaintiff wrote, and Duda as plaintiff's direct supervisor signed and submitted, an appeal which resulted in plaintiff's promotion to Staff Nurse 3. Doc. 142-1 at 74, 75 (McCray Dep. 74:6–8, 75:1–25). Duda asserts that she also spoke to the Nurse Executive to advocate for plaintiff's promotion. Doc. 120-2 at 2 (Duda Decl. ¶ 10). Duda knew, at that time, that plaintiff was African American. Doc. 142-1 at 76–77 (McCray Dep. 76:21–77:3). Then, in late 2018, plaintiff applied for the OCC Nurse Manager position. *Id.* at 78 (McCray Dep. 78:20–25). And Duda herself selected plaintiff for that promotion to the position of Nurse Manager—a supervisory position—because she believed plaintiff was the most qualified candidate. *Id.* at 80, 81 (McCray Dep. 80:11–24, 81:16–19). Again, Duda knew, at that time, that plaintiff was African American. *Id.* at 81–82 (McCray Dep. 81:22–82:1). So, plaintiff hasn't provided any evidence capable of demonstrating any circumstances arguably establishing an inference of discriminatory animus.

Plaintiff does give it one more try. Beyond her own testimony, plaintiff provides one nugget of evidence that, she suggests, proves Duda's discriminatory animus: "Duda was later demoted for her manner of handling a racial slur in the division." Doc. 141 at 38. Plaintiff neglects to cite to the record for support of this assertion. But, the court, independently, unearthed what it assumes is the referenced event. *See* Doc. 143 at 2–10. In sum, another employee had charged Duda with making an inappropriate racial comment about her head covering. *Id.* And the record contains a proposed reprimand for the comment—though nothing in the record confirms Duda's purported demotion. *Id.* at 2. But the incident occurred on March 5, 2021. *Id.* And plaintiff transferred to the VA facility in Aurora, Colorado in May 2020. Doc.

118 at 4 (Pretrial Order ¶ 2.a.xiv.xv.).  A reasonable juror couldn't find a comment made to another employee more than a year after Duda's alleged failure to train plaintiff—and almost a year after plaintiff had left the Wichita VA altogether—as sufficient objective evidence giving rise to an inference of discrimination.

In sum, no reasonable juror could find that Duda's alleged failure to train qualifies as an adverse employment action as it lacks the requisite harm, *Braxton*, 769 F. App'x at 604, or "change in employment status," *Ford*, 45 F.4th at 1222 (internal quotation marks and citation omitted).  And—if it did qualify as an adverse employment action—plaintiff hasn't presented sufficient objective evidence that the circumstances here give rise to an inference of discrimination.  Plaintiff thus fails to establish a prima facie case of racial discrimination based on a failure to train.  So, the court moves on to the next theory of discrimination and its prima facie case, then—increased workload.

### B.   Increased Workload Prima Facie Case[6]

---

[6]   Plaintiff contends that, "[o]n January 24, 2020, Duda increased McCray's workload after McCray had a meeting with the Chief of Staff to discuss Duda's behavior."  Doc. 118 at 3 (Pretrial Order ¶ 2.a.xiv.iv.).  Plaintiff's care to specify the timing of this increased workload—after plaintiff complained about discrimination—suggests this increased workload claim is one for retaliation, which will be addressed later in this Order.  Much of the supporting evidence also frames this claim as a retaliation claim instead of a discrimination claim.  For example, when asked how her workload increased, plaintiff begins her response by stating, "Miss Duda was informed that I reached out to Dr. Cummings 1-24-20.  Miss Duda returned to the office at 1551 and sent an E-mail[.]"  Doc. 142-1 at 142–43 (McCray Dep. 142:24–143:1).  And when asked whether she had a problem with the increased workload, plaintiff responded, "No problem with increased workload, but feeling that is was retaliation."  *Id.* at 150–51 (McCray Dep. 150:25–151:1).  It would seem, then, that the court needn't address increased workload as a claim for racial discrimination.

But plaintiff's briefing is often imprecise, frequently addressing discrimination and retaliation in the same section or paragraph.  And in the Pretrial Order, plaintiff includes increased workload under her racial discrimination section, specifying that Duda created "busy work" for her "that was not relevant to the OCC's core mission, including excessive meetings and responding to congressional inquiries, which were not part of her normal job description."  Doc. 118 at 10 (Pretrial Order ¶ 3.a.E.).  So, exercising an abundance of caution to evaluate each of plaintiff's claims, the court addresses increased workload as a claim for racial discrimination.

Plaintiff asserts her increased workload required that she, first, send a new staff training requirements list. Doc. 142-1 at 142–43 (McCray Dep. 142:24–143:3). Beyond the list, plaintiff alleges there were "just little things that [Duda] just came up with, you know, out of her head[.]" *Id.* at 144 (McCray Dep. 144:24–25). Finally, plaintiff identifies the "consult tracking manager, identifying the metrics, figuring out a way to reduce the metrics . . . [and] work on different things in regards to readiness" as another method of increased workload. *Id.* at 145 (McCray Dep. 145:7–11). Defendant suggests that these duties are neither new nor an increase. He cites emails which show Duda assigning plaintiff the new staff training requirements list—and asking her to email it to a Mr. Rhein—as early as January 9, 2020. Doc. 120 at 37; Doc. 120-21 at 1–2 (Def. Ex. T). And he argues that the "documentary evidence also shows that [plaintiff] was already responsible for tracking the performance measures for the OCC consults from the outset." Doc. 120 at 37 (citing Doc. 120-7 (Def. Ex. F)).[7]

### 1.    Adverse Employment Action

Drawing all inferences in favor of the plaintiff and assuming the duties plaintiff enumerated both were new *and* resulted in legitimate workload increases, these increases still don't qualify as an adverse employment action. Recall that "a mere inconvenience or an alteration of job responsibilities does not qualify" as an adverse employment action. *Ford*, 45 F.4th at 1222 (internal quotation marks and citation omitted). What's more, plaintiff concedes that the increased workload didn't result in a pay reduction, demotion, benefits decrease, or

---

[7]    Plaintiff claims this fact is controverted because defendant's Exhibit F (Doc. 120-7) doesn't support the fact alleged. Having reviewed the document, the court recognizes words that suggest tracking performance *may* have been part of plaintiff's job. *Id.* at 8–9 ("CC Department will demonstrate improvement or maintain . . . existing high performance in 50% of the CC Consult Management SAIL metrics."). But, the VA specific jargon makes any effort to define the job requirements precisely a daunting task. In the end, the court comes to its conclusions by drawing the inference in the light most favorable to plaintiff and assumes plaintiff's alleged workload increase was both new and caused legitimate increases.

discipline.  Doc. 142-1 at 150 (McCray Dep. 150:4–14).  And plaintiff admitted that she didn't

have any problem dealing with the increased workload because she is "a working person."[8]  *Id.*

(McCray Dep. 150:15–25).  To be sure, courts don't limit an adverse employment action "to

monetary losses in the form of wages or benefits."  *Braxton*, 769 F. App'x at 604 (internal

quotation marks and citation omitted).  And "an increased workload might constitute an adverse

employment action in some circumstances[.]"  *Jones v. Barnhart*, 349 F.3d 1260, 1269–70 (10th

Cir. 2003).  But a "generalized" claim of an increased workload is insufficient.  *Id.* at 1270.  An

adverse employment action causes "harm to future employment prospects," *Braxton*, 769 F.

App'x at 605 (quotation cleaned up), or generally must include a "change in employment status,"

*Ford*, 45 F.4th at 1222 (quotation cleaned up).  Plaintiff hasn't identified any admissible

evidence to establish this workload increase harmed her future employment prospects or changed

her employment status, terms, or conditions.  *See West v. Norton*, 376 F. Supp. 2d 1105, 1122

(D.N.M. 2004) ("Unless accompanied by a material change in the plaintiff's employment's terms

and conditions, an increase in workload is insufficient to establish an adverse employment

action.").

## 2.      Inference of Discrimination

And, even if her increased workload qualified as an adverse employment action, plaintiff

again must provide evidence that the circumstances of her workload increase give rise to an

inference of discrimination.  *Ford*, 45 F.4th at 1215.  Plaintiff provides no evidence of a similarly

situated employee treated more favorably by being assigned a lightened workload.  *Sorbo*, 432

F.3d 1173.  The summary judgment facts contain no comparison of plaintiff's workload to

others in her position, or to any others at all.  Plaintiff's Response alleges that Duda gave her

---

[8]      Plaintiff also asserted in this context that, while she didn't have a problem with the increased
workload, she did "feel[] that it was retaliation."  Doc. 142-1 at 150–51 (McCray Dep. 150:23–151:1).
The court addresses the retaliation claim later in this Order.

African American employees (and *only* her African American employees) unbearable workloads. Doc. 141 at 34.  But plaintiff doesn't cite the summary judgment record or provide any specific, objective evidence of this disparate workload division.  Nor does plaintiff direct the court to actions or remarks by Duda that could reflect discriminatory animus in dividing up the workload among employees.  *Plotke*, 405 F.3d at 1101.  Conclusory allegations that the workload was uneven based on race are insufficient to give rise to an inference of discrimination.

Even though plaintiff's burden is "light," no reasonable juror could find that the workload increase qualifies an adverse employment action or that the circumstances of the workload increase give rise to an inference of discrimination.  *Guy*, 2021 WL 3854764, at *2.  And so, plaintiff fails to establish a prima facie case of racial discrimination based on an increased workload.

On to the next theory—racial discrimination through acts of undermining and humiliation.

### C.  Prima Facie Case for Refusing to Allow Plaintiff to Speak

Plaintiff alleges that Duda undermined her authority and humiliated her when Duda refused to allow plaintiff to speak during a meeting with the Medical Center Director on January 30, 2020.  Doc. 118 at 3 (Pretrial Order ¶ 2.a.xiv.v.).  Plaintiff attended a meeting with the Medical Center Director to address staff shortage and coverage issues on January 30, 2020.  Doc. 142-1 at 154 (McCray Dep. 154:6–19).  Duda—also attending the meeting—recommended that hiring additional staff could solve the problem.  *Id.* at 154–55 (McCray Dep. 154:2–155:3). Plaintiff didn't think that was the best way to solve the issue.  *Id.*  The Medical Center Director asked for plaintiff to address the issue.  *Id.* at 154 (McCray Dep. 154:20–23).  But Duda responded instead, saying that she, as the chief, was the appropriate one to speak, not plaintiff. *Id.*  Later in the meeting, however—when asked directly by HR—plaintiff had the opportunity to

speak to the Medical Center Director and present her approach to the staff shortage issue. *Id.* at 155–56 (McCray Dep. 155:15–156:11). On February 1, 2020, the Medical Center Director expressed, by email, that he found plaintiff's "analysis and articulation right on target" and appreciated "the difference between throwing bodies (perhaps the wrong ones) at the problem rather than [f]ixing the real problem then staffing accordingly." Doc. 120-17 at 1 (Def. Ex. P).

Defendant contends that plaintiff's opportunity to speak at the meeting (eventually) means that Duda didn't refuse to allow her to speak. That is, the "uncontroverted evidence shows that [plaintiff]'s allegation is false. As [plaintiff] admitted under oath, her own communications from the time of the event show that the 'opposite' occurred." Doc. 120 at 40. And so, defendant argues, the court should grant defendant summary judgment against plaintiff on this issue. The court agrees. Plaintiff spoke at the meeting. Nonetheless, drawing all inferences in the light most favorable to plaintiff, these facts still could suggest that "Duda refused to allow [plaintiff] to speak during the meeting." Doc. 118 at 3 (Pretrial Order ¶ 2.a.xiv.v.). That is, plaintiff spoke later—but not with Duda's permission—and only when asked directly by HR. Doc. 142-1 at 155–56 (McCray Dep. 155:15–156:11). What's more, plaintiff still suffered embarrassment and humiliation from not getting to speak when the Medical Center Director asked her to do so, even if she later voiced her perspective. And so, rather than granting defendant summary judgment on this claim because plaintiff's allegation is "false," the court again engages in a prima facie case analysis, next. Doc. 120 at 40.

### 1.    Adverse Employment Action

Even when the court exercises inferential favor for plaintiff and accredits Duda's refusal, plaintiff still hasn't presented evidence for a reasonable juror to find Duda's actions qualify as an adverse employment action. Plaintiff testified that this alleged refusal to speak didn't result in pay reduction, demotion, benefits decrease, or disciplinary action. Doc. 142-1 at 161 (McCray

32

Dep. 161:5–16).  On the contrary, the summary judgment facts reveal that the Medical Center Director praised plaintiff, and he wrote that he "felt good about the interchange."  Doc. 120-17 at 1 (Def. Ex. P).  Perhaps this praise occurred in spite of—not because of—Duda.  Nonetheless, no summary judgment facts indicate any "'harm to future employment prospects.'"  *Braxton*, 769 F. App'x at 605 (quoting *Hillig*, 381 F.3d at 1031).  Nor do any facts here suggest a "change in employment status[.]"  *Ford*, 45 F.4th at 1222 (quotation cleaned up).  Under no formulation, therefore, does Duda's refusal qualify as an adverse employment action.  To be sure, Duda's behavior during the meeting may have frustrated plaintiff, but "[n]ot everything that makes an employee unhappy is an actionable adverse action."  *Braxton*, 769 F. App'x at 604 (internal citation and quotation marks omitted).  And feelings of humiliation alone can't provide the requisite harm to support an adverse employment action.  *Id.* at 605 (explaining that "feelings of humiliation alone are not enough to establish an adverse employment action").  So, the court concludes that no reasonable juror could find an adverse employment action, here.

## 2.    Inference of Discrimination

Nor does plaintiff proffer evidence that Duda's refusal "took place under circumstances giving rise to an inference of discrimination."  *Ford*, 45 F.4th at 1215 (internal quotation marks and citations omitted).  No similarly-situated employee—that is, an employee under Duda's supervision—was allowed to speak during the meeting.  Doc. 142-1 at 156 (McCray Dep. 156:16–18).  Nor did any other circumstances—like Duda's actions or remarks surrounding plaintiff's ability to speak—reflect a discriminatory animus.  *Plotke*, 405 F.3d at 1101.  Instead, Duda invoked her position as "the chief"—not plaintiff's race—as her deciding factor in who should speak in the presence of the medical director.  Doc. 142-1 at 154 (McCray Dep. 154:20–23).

At bottom, no reasonable juror could conclude Duda's prohibiting plaintiff from speaking until later in the meeting supplies the requisite harm needed to support a claim for racial discrimination. Plaintiff fails to adduce evidence of the requisite harm for an employment action to qualify as adverse. Indeed, the end-result of that meeting for plaintiff was praise and commendation by the medical director. And even if adverse, Duda didn't prevent plaintiff from speaking in circumstances that give rise to an inference of discrimination. No other employees under Duda's supervision were allowed to speak at the meeting. And Duda noted her position, not any racial considerations, as the justification for requiring plaintiff to remain quiet. Plaintiff thus fails to establish a prima facie case on her refusal to speak theory of racial discrimination.

Up next: racial discrimination by undermining plaintiff's authority and plaintiff's supervisory abilities.

### D.    Undermining Plaintiff's Authority and Plaintiff's Supervisory Abilities

To determine whether plaintiff has created a triable issue of race discrimination by Duda's undermining, the court begins with the relevant facts, then considers whether a reasonable factfinder could find an adverse employment action. The court then considers whether plaintiff has adduced sufficient evidence to support an inference of discrimination. Plaintiff alleges that Duda undermined her authority and abilities as a supervisor during a February 2020 conversation with one of plaintiff's subordinates, Janelle Adams, and in a subsequent meeting with plaintiff's mentor. Doc. 118 at 3 (Pretrial Order ¶ 2.a.xiv.vii.). On February 7, 2020, plaintiff participated in a meeting where Janelle Adams was presenting information about documenting veterans hospitalized in the community. Doc. 142-1 at 123, 164–65 (McCray Dep. 123:12–23, 164:17–165:6). While Ms. Adams was speaking, plaintiff inserted specific instructions about how to handle correctly this community hospital documentation under the relevant directive. *Id.* at 123–24 (McCray Dep. 123:20–124:4). A few

34

days after the meeting, Duda allegedly approached Ms. Adams at her desk and asked whether plaintiff had treated Ms. Adams hostilely or took over during the meeting. *Id.* at 122, 168 (McCray Dep. 122:14–17, 168:4–7). Ms. Adams denied any such conversation under oath. Doc. 120-23 at 2 (Adams Aff. ¶ 10).

Then, on February 14, 2020, Duda called a meeting with plaintiff and plaintiff's mentor, Heather Brown. Doc. 142-1 at 169–70 (McCray Dep. 169:10–170:1). Plaintiff previously had informed Duda that Ms. Brown was her mentor, assisting plaintiff with professional growth and development. *Id.* at 171 (McCray Dep. 171:7–12); Doc. 120-12 at 1 (Def. Ex. K). Among other things, the three discussed plaintiff's interactions in the February 7 meeting with Ms. Adams. Doc. 120-12 at 2 (Def. Ex. K). As reported in Duda's recap email, Duda asserted that plaintiff "took all leadership away from Janelle [Adams] and . . . appeared [to take] credit for all progress made[.]" *Id.* And Duda instructed plaintiff on best practices for correcting errors in meetings and allowing "a way to 'save face.'" *Id.* Plaintiff responded that Duda had "slandered" her and "discredited [her] abilities" in front of plaintiff's mentor. *Id.* at 1. And plaintiff contends that Duda never should have discussed such personnel issues in front of plaintiff's mentor. Doc. 141 at 36. Duda, for her part, asserts that she invited plaintiff's mentor "to coach and assist [plaintiff] with being an effective leader" because Duda thought "that [plaintiff] might be more willing to accept advice and counsel from Ms. Brown." Doc. 120-2 at 3 (Duda Decl. ¶¶ 18–19).

The court infers here that Duda spoke with Ms. Adams about plaintiff's behavior in this meeting. The court also consults as "background evidence," *Sunderman*, 307 F. App'x at 229, plaintiff's allegations that Duda repeatedly undermined plaintiff's authority by allowing Caucasian employees to air their grievances directly to Duda—thereby jumping over plaintiff in the line of command, Doc. 142-1 at 187 (McCray Dep. 187:11–21). And the court draws the

inference that Duda's purpose when inviting plaintiff's mentor to the meeting was to discredit plaintiff in front of plaintiff's mentor.  But, despite these favorable inferences, plaintiff still hasn't presented evidence that would allow a reasonable factfinder to perceive an adverse employment action here.

### 1.    Adverse Employment Action

Plaintiff neglects to establish any harm to her employment prospects, status, terms, or conditions as a result of Duda's alleged undermining.  *First*, plaintiff didn't identify any material consequence to her employment because of Duda's alleged post-meeting conversation with Ms. Adams.  *Id.* at 168–69 (McCray Dep. 168:24–169:8).  Instead, she saw "it as defamation."  *Id.* (McCray Dep. 168:24–169:2).  But plaintiff didn't ever assert a defamation claim; she brought a racial discrimination claim which requires an adverse employment action.  Recall that feelings of humiliation alone—such as those that accompany being talked about behind one's back—don't rise to the level of an adverse employment action.  *Braxton*, 769 F. App'x at 605.

*Second*, as it applies to the meeting with her mentor on February 14, 2020, plaintiff contends that this meeting affected her performance appraisal—knocking it down from outstanding to fully successful and precluding receipt of her annual award.  Doc. 142-1 at 174–75 (McCray Dep. 174:13–175:11).  Plaintiff concedes, however, that the February 14 meeting didn't result in a pay reduction, demotion, disciplinary action, or benefits decrease.  *Id.* at 180–81 (McCray Dep. 180:18–181:4).  And the court determined already that plaintiff didn't exhaust any claims premised on a lowered performance appraisal.

The meeting itself, even if taken as rebuke, also can't constitute an adverse employment action.  "This Court has repeatedly held that incidents of written and verbal counseling are typically too inconsequential to constitute actionable adverse actions."  *Walker v. Wormuth*, No. 20-CV-02338-EFM-JPO, 2021 WL 5113679, at *7 (D. Kan. Nov. 3, 2021) (internal quotation

marks and citation omitted) (collecting cases).  And any humiliation plaintiff experienced at the meeting because Duda aired her alleged shortcomings in front of her mentor also doesn't qualify as an adverse employment action.  *Braxton*, 769 F. App'x at 605.

Plaintiff thus provides no summary judgment facts that suggest Duda's undermining— her conversation with Ms. Adams or meeting with plaintiff's mentor—resulted in any "'harm to future employment prospects,'" *Braxton*, 769 F. App'x at 605 (quoting *Hillig*, 381 F.3d at 1031), or "change in employment status," *Ford*, 45 F.4th at 1222 (quotation cleaned up).  That is, plaintiff never ties this incident to present or future repercussions for the terms or conditions of her employment.

## 2.    Inference of Discrimination

But suppose a reasonable factfinder could determine an adverse employment action resulted from Duda's alleged undermining.  To present a prima facie case of racial discrimination in that scenario, plaintiff would have to establish that the adverse employment action "took place under circumstances giving rise to an inference of discrimination." *Ford*, 45 F.4th at 1215 (internal quotation marks and citation omitted).  But plaintiff herself testified that Duda was motivated by power—not race—in undermining plaintiff's authority.  Doc. 142-1 at 126 (McCray Dep. 126:13–20).  This testimony pulls the rug out from under any suggestion that Duda's actions give rise to an inference of discrimination.  Plaintiff also stated this event was based on retaliation—not race.  *Id.* at 126–27 (McCray Dep. 126:13–127:5).  No juror, deciding reasonably, could hear such plaintiff testimony and infer racial discrimination.

And so, plaintiff fails to establish a prima facie case for her undermining authority and supervisory abilities claim of discrimination, both because it lacks the requisite harm of an adverse employment action and doesn't give rise to the inference of discrimination.

37

The court moves on to plaintiff's racial discrimination claim premised on Duda's alleged acts of intimidation and yelling, next.

### E.     Acts of Intimidation and Yelling

The court again begins its analysis of this part of plaintiff's discrimination claim with the relevant facts, then proceeds to the claim's legal elements.  Plaintiff alleges that Duda violated plaintiff's personal space and yelled at her on January 31, 2020.  Doc. 118 at 3 (Pretrial Order ¶ 2.a.xiv.vi.).  Plaintiff explains that Duda came into plaintiff's office, stood behind plaintiff's desk, and looked over plaintiff's shoulder at an email.  Doc. 142-1 at 161–62 (McCray Dep. 161:20–162:7).  The email pertained to a plan to clear up a backlog by close of business on January 31.  *Id.* at 162 (McCray Dep. 162:12–17).  And plaintiff testified that the only way for Duda to view plaintiff's computer screen was from behind plaintiff's desk and behind plaintiff. *Id.* at 163 (McCray Dep. 163:1–12).  While standing there, Duda allegedly yelled at plaintiff, accusing plaintiff of not letting Duda speak during a meeting with their superiors and of giving their superiors incorrect information.  Doc. 118 at 3 (Pretrial Order ¶ 2.a.xiv.vi.).  And Duda also yelled, asking if plaintiff was offended.  *Id.*

### 1.     Adverse Employment Action

No reasonable juror could find this personal space violation and yelling qualify as adverse employment actions.  This court already has explained in an earlier Order that "having a supervisor yell at the plaintiff—even in a public area—just won't carry the day."  *McCray v. McDonough*, No. 22-2154-DDC-ADM, 2023 WL 171927, at *8 (D. Kan. Jan. 12, 2023) (internal quotation marks and citation omitted); *see also Freeman v. Kansas*, 128 F. Supp. 2d 1311, 1320 (D. Kan.) ("A supervisor may yell and scold an employee without violating Title VII.  Neither federal or state law mandate congenial relationships between supervisors and employees." (internal quotation marks and citations omitted)), *aff'd*, 22 F. App'x 967 (10th Cir. 2001).  While

38

a supervisor's yelling and intimidation may be poor form, "Title VII does not prohibit all

distasteful practices by employers.  [A supervisor] could be unconscionably rude and unfair to

[an employee] without violating Title VII."  *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182,

1188 (10th Cir. 2002).  And plaintiff testified that the January 2020 yelling and intimidation

didn't result in a reduction in pay, demotion, disciplinary action, or decrease in benefits.  Doc.

142-1 at 106–07 (McCray Dep. 106:11–107:5).  As repeated already in this Order, plaintiff thus

provides no summary judgment facts that suggest any "'harm to future employment prospects,'"

*Braxton*, 769 F. App'x at 605 (quoting *Hillig*, 381 F.3d at 1031), or "change in employment

status," *Ford*, 45 F.4th at 1222 (quotation cleaned up).  The summary judgment record doesn't

support a reasonable juror finding that this yelling and intimidation constitute an adverse

employment action.

## 2.    Inference of Discrimination

And, even if adverse, Duda's alleged intimidation and yelling here must take place

"under circumstances giving rise to an inference of discrimination" to present a prima facie case.

*Ford*, 45 F.4th at 1215 (internal quotation marks and citation omitted).  That is, a plaintiff must

provide "sufficient objective evidence," *id.* at 1224, of actions or remarks that may reflect a

discriminatory animus, for example, or preferential treatment of employees outside the protected

class, *Plotke*, 405 F.3d at 1101.  A plaintiff also may rely on a similarly-situated employee

comparison.  *Sorbo*, 432 F.3d at 1173.  But plaintiff's "personal belief is insufficient to create an

issue of material fact."  *Ford*, 45 F.4th at 1222.  And "[u]nsupported assertions or subjective

belief of discrimination carry no probative weight . . . and are insufficient to preclude the grant

of summary judgment."  *Womack v. Unified Gov't of Wyandotte Cnty. / Kan. City, Kan.*, No. CV

19-2446-KHV, 2021 WL 4356085, at *10 (D. Kan. Sept. 24, 2021) (citing *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006)).

Here, when asked the basis for her conclusion that Duda stood over her and yelled because of her race, plaintiff testified: Duda's "desire to intimidate and make people feel beneath her" or "to make people of color intimidated by her" formed the basis of her conclusion. Doc. 142-1 at 108–09 (McCray Dep. 108:25–109:8). But such a response doesn't provide any objective evidence, *Ford*, 45 F.4th at 1224, of actions or remarks that may reflect a discriminatory animus, *Plotke*, 405 F.3d at 1101. Instead, plaintiff relies on her own "personal belief" of Duda's character and desires, which "is insufficient to create an issue of material fact." *Ford*, 45 F.4th at 1222. Plaintiff's unsupported assertions and subjective belief of discrimination cannot preclude summary judgment for defendant on this claim.

Plaintiff also contends that "Duda used the intimidation tactics and yelling as a way to disrespect the black employees," and asserts that "Duda treated the black supervisors dismissively while she treated the white employees under them much differently." Doc. 141 at 33. But plaintiff doesn't cite any objective evidence of this disparate treatment other than to argue that "Duda was eventually disciplined and demoted for the manner in which she handled racist remarks directed at one of her employees." *Id.* Presumably—and the court must presume as plaintiff doesn't clarify—this objective evidence refers to the incident with the head covering comment. The court previously discussed this comment—and disregarded it as too far removed from the incidents at hand to give rise to an inference of discrimination. *See* § V.A.2.

Finally, plaintiff argues that the court must consider "all the other bad acts in which Duda engaged" including that Duda had "racially harassed" a previous African American employee (Tenesha Burks); that Duda treated both plaintiff and her African American counterpart

(Elizabeth Dial) "in a demeaning, degrading, dismissive manner[;]" and that Duda "placed black employees, including Plaintiff, under intense scrutiny" but "did not do the same with Caucasian employees." Doc. 141 at 34–35.  Plaintiff appears to suggest that Duda routinely treated employees outside the protected class preferentially, though plaintiff neglects to reference the relevant case law. *Plotke*, 405 F.3d at 1101.  If she had demonstrated such preferential treatment, it could lead a reasonable juror to conclude the intimidation and yelling give rise to an inference of discrimination. *Id.*  But the summary judgment facts simply can't support this preferential treatment argument.

In alleging preferential treatment, plaintiff relies heavily on her own deposition and affidavit.[9]  *See* Doc. 141 at 16–18.  As the court explained previously, such reliance "without any other supporting evidence . . . is insufficient to create an issue of material fact." *Ford*, 45 F.4th at 1223–24.  A plaintiff instead must include "sufficient objective evidence" and not simply reference "her own deposition transcript" or affidavit. *Id.* at 1224 (emphasis omitted) (quoting *Wheeler*, 418 F. App'x at 751).  If this over-reliance wasn't problem enough, plaintiff's own deposition also doesn't support—at least not consistently—plaintiff's preferential treatment argument.

_____

[9]        Plaintiff also cites Duda's deposition but only to establish facts about disciplining Ms. Dial.  Doc. 142-4 at 39–40 (Duda Dep. 155:12–160:22).  And plaintiff cites to EEO RFA documents, which the court already has explained it cannot find—and will not dig for—in the exhibits. *See* n. 5.  Finally, plaintiff cites Ms. Dial's deposition from another case.  Doc. 141 at 17.  A party may reference such a deposition at summary judgment. *See* 10A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2722 (4th ed. 2023) ("Depositions taken for purposes of another case also may be utilized."); *Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001) ("Sworn deposition testimony may be used by or against a party on summary judgment regardless of whether the testimony was taken in a separate proceeding.").  Plaintiff neglected, however, to submit this document with her brief in this case, as well.  The court isn't in the business of rifling—needle-in-a-haystack style—through another case's employment discrimination docket on plaintiff's behalf.  The unattached documents thus aren't properly "in the record" in this case as required by Fed. R. Civ. P. 56(c)(1), and so the court doesn't consider them here.

For example, plaintiff alleges that "Duda was openly hostile and derisive with her African-American employees . . . [but] did not use a dismissive and denigrating tone with white employees nor publicly yell at them." Doc. 141 at 17. But plaintiff's deposition excerpts that supposedly support this statement do not mention white employees at all. Doc. 142-1 at 100–01, 161–63 (McCray Dep. 100:20–101:10, 161:17–163:20). The deposition testimony simply describes Duda's treatment of plaintiff without comparison to any other employees. *Id.* What's more, other portions of plaintiff's deposition testimony suggest that Duda treated Caucasian employees, at least at times, with a similar level of denigration. For instance, plaintiff testified that Duda displayed "personal," "targeted" behavior toward, and created a hostile work environment for, two Caucasian employees, Marcia Dickinson and Lori Lewis. *Id.* at 26–27, 30–31 (McCray Dep. 26:15–27:22, 30:17–31:3); *id.* at 206 (McCray Dep. 206:2–4, 7–15). And other summary judgment evidence appears to confirm Duda's denigration of Caucasian employees as well. In a documented interview, Ms. Lewis asserted that Duda

> stood outside [Ms. Lewis's] cubicle where it could have been overheard by others and told [Ms. Lewis] that she was not smart enough to continue working in the department and that she should start looking for another job . . . [Ms. Lewis's] perception was that she was too stupid to do her job [and she] [f]elt like she was being nit-picked and being more closely watched.

Doc. 120-26 at 1.

The court must draw inferences in the light most favorable to the non-moving party, *Nahno-Lopez*, 625 F.3d at 1283, but it needn't "make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it," *Harte*, 864 F.3d at 1173. And here, the summary judgment record doesn't support plaintiff's bare assertion that Duda demeaned and denigrated *only* African American employees. And so, while preferential treatment for those outside the protected class could lead a reasonable juror to find an inference of discrimination,

plaintiff here hasn't supported her preferential treatment assertion with summary judgment facts. Plaintiff's preferential treatment argument thus doesn't provide the requisite inference of discrimination, and plaintiff's prima facie case for racial discrimination fails here, as well.

Last in the line-up is plaintiff's racial discrimination claim premised on Duda's alleged threat to terminate plaintiff's employment.  The court addresses it, below.

### F.     Threats to Terminate Employment

Start, once again, with the facts.  Plaintiff alleges that Duda threatened to fire plaintiff on March 2, 2020.  Doc. 118 at 3–4 (Pretrial Order ¶ 2.a.xiv.viii.).  Plaintiff had "asked Duda how to proceed with an employee's expired nursing license[.]"  *Id.*  When plaintiff mentioned the importance of strictly following the relevant regulations, "Duda said, 'I find your response interesting, as I was also told to fire you when you violated the HIPAA law.  Yet I chose a merciful route.'"  *Id.*  Before addressing this alleged termination threat, the court must pause and play catch up.  The court stops here to explain plaintiff's HIPPA law violation before resuming its analysis of Duda's alleged threat.

In 2017, plaintiff received discipline for accessing—26 times without authorization—the medical chart of someone she knew.  Doc. 142-1 at 82–85 (McCray Dep. 82:18–85:4). According to the proposed reprimand, plaintiff had become involved in a personal relationship with the veteran whose file she accessed, and she accessed it for "non-clinically necessary purposes."  Doc. 120-4 at 3 (Def. Ex. C).  After the incident, Duda was told to fire plaintiff for violating HIPPA law.  Doc. 142-1 at 182–83 (McCray Dep. 182:18–183:12); Doc. 120-2 at 1 (Duda Decl. ¶¶ 4–5).  Plaintiff, as a Title 38 employee, could receive a penalty ranging from a reprimand to a removal for a violation of HIPPA's privacy laws.  Doc. 142-1 at 183–84 (McCray Dep. 183:20–184:7); Doc. 118 at 2 (Pretrial Order ¶ 2.a.vii.).  Duda chose not to fire plaintiff, but instead issued a reprimand.  Doc. 142-1 at 183, 184 (McCray Dep. 183:2–15, 184:19–23); Doc.

120-2 at 2 (Duda Decl. ¶¶ 6–7).  And the incident was removed from plaintiff's file in 2019.  Doc. 142-1 at 182–83 (McCray Dep. 182:18–183:5).

Back to the threat analysis:  when plaintiff mentioned an employee's expired license, Duda referred back to the 2017 HIPPA violation on March 2, 2020.  Plaintiff understood this reference as "an implicit threat" to fire her.  Doc. 141 at 8.  Duda—for her part—denies that she threatened to remove plaintiff from federal service or that she recommended or suggested to anyone such removal.  Doc. 120-2 at 4–5 (Duda Decl. ¶¶ 27–29).  Duda also asserts that she didn't have independent authority to remove plaintiff, anyway; only the medical director possessed such authority.  *Id.* at 5 (Duda Decl. ¶ 28).

Defendant contends that plaintiff's allegation "does not reflect that she was threatened with removal" and that this, alone, suffices for the court to grant defendant judgment as a matter of law against this claim.  Doc. 120 at 45.  Defendant is right.  Interpreting Duda's comment as an implicit threat seems like a stretch.  A reasonable interpretation of her statement suggests Duda wanted plaintiff to extend the same mercy to the unlicensed nurse that Duda had extended to plaintiff—nothing more.  Plus, plaintiff's violative behavior occurred in 2017—and so any subsequent removal based on that event likely would've occurred at that time.  Assuming a threat of removal based on a three-year-old incident—and an incident since removed from plaintiff's employment file—doesn't square with reasonableness.  Three years out, the incident, as plaintiff herself described it, is "a moot point."  Doc. 142-1 at 182–83 (McCray Dep. 182:18–183:1).  Thus, plaintiff's fear that Duda would remove her when Duda referenced the HIPPA incident seems unwarranted.  And the court needn't "make unreasonable inferences[.]"  *Harte*, 864 F.3d at 1173.  So, the court could end the analysis here.  But even if the court exercises great caution and—drawing all inferences in the light most favorable to plaintiff—assumes Duda's statement

was a veiled threat, the alleged threat still doesn't satisfy the requirements for an adverse

employment action. *Nahno-Lopez*, 625 F.3d at 1283.

1.        **Adverse Employment Action**

Recall—for the last time—that an adverse employment action requires some "'harm to

future employment prospects,'" *Braxton*, 769 F. App'x at 605 (quoting *Hillig*, 381 F.3d at 1031),

or "change in employment status," *Ford*, 45 F.4th at 1222 (quotation cleaned up).  Plaintiff

hasn't adduced facts demonstrating that Duda's alleged threat to remove plaintiff here harmed

plaintiff's employment prospects, status, terms, or conditions.  And the Tenth Circuit has "never

expressly held that an unrealized threat of termination, without more, constitutes an adverse

employment action." *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005).

Indeed, our Circuit has affirmed summary judgment where "the alleged threat was not an adverse

employment action because it was never carried out." *Id.*  Such Circuit precedent has led courts

in our district to conclude that a "mere threat of termination, if never carried out and standing

alone, is not an adverse employment action." *Schmidt v. GPI-KS-SB, LLC*, No. 13-CV-2381-

KHV, 2014 WL 5431157, at *8 (D. Kan. Oct. 27, 2014).  So, Duda's alleged threat here, which

she never carried out (and, notably, never had the authority to carry out), doesn't qualify as an

adverse employment action.

2.        **Inference of Discrimination**

But even if Duda's alleged threat did qualify as an adverse employment action and no

reasonable jury could find that it does—plaintiff must provide evidence that the threat "took

place under circumstances giving rise to an inference of discrimination." *Ford*, 45 F.4th at 1215

(internal quotation marks and citations omitted).  But plaintiff offers no evidence that this

threat—if it was one—originated in racial discrimination.  As previously discussed, no similarly

situated employee existed with whom plaintiff can compare herself.  Doc. 142-1 at 187–88

(McCray Dep. 187:11–188:1).  And none of Duda's actions or remarks surrounding this event indicate discriminatory animus.  *Plotke*, 405 F.3d at 1101.  Plaintiff offers no evidence that Duda intimated by word or deed that her alleged desire to remove plaintiff stemmed from plaintiff's race.  Nor does plaintiff proffer evidence that Duda leveled such threats only against African Americans, thus treating employees outside the protected class preferentially.  *Id.*  The *Plotke* circumstances also suggest repeated recommendations for unsuitable positions or failure to offer plaintiff's name for suitable positions can indicate a discriminatory motive.  *Id.*  But the summary judgment facts here indicate that Duda took efforts to save plaintiff's job—not terminate it, as would have conformed to the penalty range for a Title 38 employee.  Doc. 142-1 at 183–84 (McCray Dep. 183:20–184:7).  Duda's declaration explains her recommendation regarding the HIPPA reprimand like this:  "I felt that removal was too harsh a penalty and not the best solution because, in my opinion, [plaintiff] was a valuable employee with good clinical skill in the OCC."  Doc. 120-2 (Duda Decl. ¶ 6).  So, even if the court interprets Duda's statement as a veiled threat, plaintiff hasn't adduced any evidence to indicate that threat was made because of plaintiff's race.  Plaintiff thus hasn't established a prima facie case of racial discrimination for her claim premised on Duda's alleged threat of removal.

Thus ends the courts' analysis of *McDonnell Douglas*'s first prong—plaintiff's prima facie case—as it applies to plaintiff's racial discrimination claims.  The court concludes that no reasonable juror could find any adverse employment action giving rise to an inference of discrimination amidst plaintiff's exhausted, discrete act claims.

So, the court now moves to plaintiff's retaliation claims, evaluating them under *McDonnell Douglas*'s first prong.

46

VI.        **Retaliation and a Prima Facie Case**

Turning to plaintiff's retaliation claims, plaintiff premises these claims on the same

discrete acts addressed as alleged racial discrimination, above.  But, the "failure of a

discrimination claim is not necessarily fatal to a retaliation claim[,]" and so the court must

analyze separately these discrete acts under retaliation case law.  *Ford*, 45 F.4th at 1224.

Because those discrete acts provide indirect evidence of retaliation, the *McDonnell Douglas*

burden shifting framework again applies.  *See Khalik*, 671 F.3d at 1192.  And so, the burden rests

first on plaintiff to establish a triable issue for each element of a prima facie case of retaliation.

*Bekkem*, 915 F.3d at 1267.

This distinct evaluation begins with the essential aspects of the controlling statute and

cases.  Title VII makes retaliation unlawful by providing that an employer may not "discriminate

against any of his employees . . . because [the employee] has opposed any practice made an

unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).

> To state a prima facie Title VII retaliation claim, "a plaintiff must show (1) that
> she engaged in protected opposition to discrimination, (2) that a reasonable
> employee would have found the challenged action materially adverse, and (3) that
> a causal connection existed between the protected activity and the materially
> adverse action."

*Bekkem*, 915 F.3d at 1267 (quoting *Khalik*, 671 F.3d at 1193).  The court evaluates plaintiff's

prima facie case of retaliation, starting with the first requirement—engaging in protected

opposition to discrimination—below.

A.        **Engaging in Protected Opposition**

"To establish protected opposition, 'no magic words are required,' but 'the employee

must convey to the employer his or her concern that the employer has engaged in a practice

made unlawful by [the relevant employment law].'"  *Guy*, 2021 WL 3854764, at *3 (brackets in

original) (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)).

And "the absence of a reference to unlawful discrimination . . . can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII." *Petersen*, 301 F.3d at 1188.

Plaintiff contends that Duda retaliated against her for the protected activity of complaining about discrimination to Dr. Cummings, the Chief of Staff, at a meeting with him on January 24, 2020. Doc. 142-1 at 197 (McCray Dep. 197:15–24). But not even plaintiff's description of her conversation with Dr. Cummings on January 24, 2020, includes any reference to unlawful discrimination. *See id.* at 138–42 (McCray Dep. 138:19–142:7). Instead, the conversation reportedly focused on "Duda's behavior in the workplace in regards to making it look as if the backlog was a result of [plaintiff's] negligence and the daily work in managing our staff" and on Duda's "[m]icromanagement and blame" in working the backlog and offering overtime. *Id.* at 139–40 (McCray Dep. 139:2–140:19). Dr. Cummings likewise declared that the meeting was about an ongoing conflict with Duda's management style. Doc. 120-10 at 2 (Cummings Decl. ¶¶ 8, 10). And he had no recollection of plaintiff mentioning discrimination during the meeting, racial or otherwise. *Id.* (Cummings Decl. ¶ 9). Indeed, defendant included in the Pretrial Order a defense challenging whether plaintiff's meeting with Dr. Cummings qualifies as a protected activity under Title VII. Doc. 118 at 27 (Pretrial Order ¶ 4.b.vii.).

But defendant's summary judgment motion never develops this absence of protected activity argument. *See generally* Doc. 120. And Dr. Cummings allegedly suggested EEO mediation in the January 24, 2020, meeting. Doc. 142-1 at 141–42 (McCray Dep. 141:23–142:4). In a follow-up email, plaintiff declined his offer of mediation and then explicitly referenced unlawful discrimination. Doc. 120-11 (Def. Ex. J) ("I am declining mediation and pursuing other filing rights to address the following issues:  harassment, retaliation, hostile work

environment and discrimination due to race.")  Drawing all inferences in favor of the nonmoving

party, plaintiff, the court thus assumes, without deciding, that plaintiff engaged in protected

opposition under Title VII during her meeting with Dr. Cummings on January 24, 2020.  And so,

the rubber hits the road, so to speak, on the second and third prongs of plaintiff's prima facie

retaliation case.  The court takes them up in reverse order, starting with the causation prong,

next.

### B.        Causal Connection

Recall that a plaintiff must show "'that a causal connection existed between the protected

activity and the materially adverse action.'"  *Bekkem*, 915 F.3d at 1267 (quoting *Khalik*, 671 F.3d

at 1193).  So, plaintiff must show that Duda took action against plaintiff out of a desire to

retaliate for plaintiff's complaint to Dr. Cummings on January 24, 2020.  *See Hinds*, 523 F.3d at

1203.  "As a prerequisite to this showing, [plaintiff] must first come forward with evidence from

which a reasonable factfinder could conclude that those who decided to [act against her] had

knowledge of [her] protected activity."  *Id.*  "An employer's action against an employee cannot

be *because* of that employee's protected opposition unless the employer knows the employee has

engaged in protected opposition."  *Petersen*, 301 F.3d at 1188 (emphasis in original).  "Plaintiff

must therefore point to evidence that those who acted against him knew of his formal

complaints."  *Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019).  And "bare speculation"

supporting an employer's knowledge of plaintiff's protected opposition just won't do.  *Lindsay v.

Denver Pub. Schs.*, 88 F.4th 1323, 1328 (10th Cir. 2023).

The court next analyzes whether plaintiff establishes the requisite causal connection here

for a reasonable juror to conclude that Duda knew of plaintiff's protected opposition.  The court

does so by first addressing just one of plaintiff's retaliation claims—the failure to provide

training claim.  Then, the court considers the other five retaliation claims under the Tenth

Circuit's holding in *Lindsay*, 88 F.4th at 1328.

Plaintiff's failure to train claim spanned from January 28, 2019, to January 4, 2020, as

stipulated in the Pretrial Order.  Doc. 118 at 3 (Pretrial Order ¶ 2.a.xiv.ii.).  But plaintiff didn't

engage in protected opposition by complaining to Dr. Cummings until January 24, 2020.  And

so, plaintiff's protected activity "*post*-dated" Duda's alleged failure to train plaintiff.  *Ford*, 45

F.4th at 1226; *see also Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1226 (10th Cir. 2016)

(explaining that when a hiring decision was made *before* plaintiff asserted his ADA rights,

plaintiff couldn't establish a causal connection).  And this chronological discrepancy means that

plaintiff cannot maintain her retaliation claim for unprovided training occurring *before* plaintiff's

protected activity.  That's just the way time works.  And so, the court grants defendant summary

judgment on the failure to train retaliation claim under the causal connection analysis alone.  The

court moves on to plaintiff's five other retaliation claims, analyzing them under the causal

connection prong, below.

The Tenth Circuit's holding in *Lindsay* is instructive in analyzing the requisite causal

connection for the five remaining retaliation claims.  In *Lindsay*, our Circuit affirmed a summary

judgment ruling favoring an employer.  Our Circuit held that the employee's arguments—

designed to demonstrate her executive director's knowledge of her protected activity—were "too

speculative" and so, the employee had "failed to prove causation."  *Id.* at 1331.

The *Lindsay* plaintiff-employee had served on a panel to select a new executive director.

*Id.* at 1325.  While on the panel, one member allegedly made negative, racially discriminatory

comments about an executive director candidate.  *Id.*  The employee spoke up at the panel to

defend the candidate.  *Id.*  When the candidate wasn't selected, the employee informed the

candidate about the negative and, allegedly, racially discriminating comments. *Id.* And the candidate then filed charges of discrimination with the EEOC on April 26, 2019, and with the Colorado Civil Rights Division (CCRD) on July 18, 2019. *Id.* The employee's employment was terminated on July 31, 2019, and the employee then filed claims for retaliation. *Id.* at 1327.

*Lindsay* required that an employee—to prove causation—must marshal evidence that the executive director who fired her knew of either her defense of the candidate at the panel or her role in the candidate's discrimination charges. *Id.* at 1328. To demonstrate such knowledge, the employee pointed to meetings between the executive director and another panel member, claiming that the panel member "indisputably had every opportunity to tell [the executive director] who it was that had objected to the racist conduct[.]" *Id.* (internal quotation marks omitted). But, both parties to those meetings denied—in sworn declarations under oath—that the panel member ever disclosed that information to the executive director. *Id.* The Circuit held that the employee's "suggestion that the two discussed protected action by [the employee] is mere unsupported speculation" and "not a finding" that the executive director "had knowledge." *Id.* at 1328–29.

Trying to save her causation argument, the employee also relied on the temporal proximity of the candidate's second filing and the employee's termination, among other things. *Id.* at 1330. But the Circuit clarified that—while such temporal proximity may justify "'an inference of retaliatory motive'"—the temporal proximity doesn't provide a substitute for "'evidence that the decisionmakers *knew* of the protected conduct.'" *Id.* (emphasis in original) (quoting *Singh*, 936 F.3d at 1043). In sum, the Circuit held that the employee "failed to present sufficient evidence from which a reasonable person could infer that the [executive director] was

aware by the time of [the employee's] termination that she had engaged in protected activity." *Id.* at 1331.

Here, plaintiff alleges that Duda knew about the January 24, 2020, discrimination complaints plaintiff made at a meeting with Dr. Cummings. Doc. 142-1 at 142 (McCray Dep. 142:24–25); Doc. 141 at 3. And to prove Duda's knowledge, plaintiff points to two circumstances: a meeting between Dr. Cummings and Duda on January 27, 2020; and the temporal proximity of that meeting and Duda's increased requirements/scrutiny—or, as plaintiff described it, Duda's post-meeting "pounding on stuff[.]" Doc. 142-1 at 199–200 (McCray Dep. 199:25–200:25). But each attempt to establish a causal connection fails.

*First*, the Duda/Cummings meeting: Dr. Cummings emailed plaintiff the day after the Duda/Cummings meeting and professed that he didn't mention the plaintiff/Cummings meeting to Duda. Doc. 120-11 at 1 (Def. Ex. J); Doc. 142-1 at 199–200 (McCray Dep. 199:15–200:5). Dr. Cummings also declared under penalty of perjury that he didn't inform Duda of the plaintiff/Cummings meeting. Doc. 120-10 at 2 (Cummings Decl. ¶ 11). Of course, such testimony doesn't decide the knowledge question. *Lindsay*, 88 F.4th at 1328–29 ("[S]worn testimony denying knowledge (no matter how saintly the witness) is not dispositive at the summary-judgment stage."). But *Lindsay* also makes clear that a meeting where one knowledgeable of a protected activity had "every opportunity to tell" provides nothing more than "mere unsupported speculation" and "not a finding" of knowledge. *Id.* at 1328–29. And so, the mere existence of the Duda/Cummings meeting doesn't fulfill plaintiff's burden to demonstrate Duda's knowledge of plaintiff's discrimination complaints.

Undeterred, plaintiff tries another tack to demonstrate Duda's knowledge. Next, plaintiff adduces evidence of Duda's use of the phrase "get out of the weeds" after the Duda/Cummings

meeting.  Doc. 142-1 at 199–200 (McCray Dep. 199:25–200:12).  Apparently, plaintiff

employed that exact phrase to complain about Duda's excessive oversight and micromanagement

during the plaintiff/Cummings meeting.  *Id.*; *id.* at 139–40 (McCray Dep. 139:2–140:19).  And

so plaintiff sees Duda's use of the "get out of the weeds" phrase as a smoking gun to demonstrate

Duda's knowledge.  Doc. 141 at 3.  But, as defendant astutely argues, the most a juror could

infer from this "get out of the weeds" phraseology is "that Duda was aware of or had a suspicion

that [plaintiff] complained about [Duda's] *management style*," not about Duda's alleged

discrimination.  Doc. 151 at 10 (emphasis added).  And complaining about excessive oversight

and a supervisor's management style isn't protected activity under Title VII.  So, even drawing

all inferences in the light most favorable to plaintiff and assuming Dr. Cummings told Duda

*something* about the plaintiff/Cummings meeting, the evidence only points to Duda knowing

plaintiff's complaints about Duda's management style.  Plaintiff has failed to shoulder her

burden to adduce evidence that Duda knew plaintiff had participated in protected activity.

Plaintiff's demonstration of Duda's protected-activity knowledge thus falls short, and with it, her

requisite causal connection for a prima facie retaliation claim.

　　　　*Second*, temporal proximity:  Plaintiff also alleges that Duda's behavior *immediately after*

the Duda/Cummings meeting indicates retaliation.  Doc. 141 at 3.  When asked how she contests

Dr. Cummings's assertion that he didn't discuss the plaintiff/Cummings meeting with Duda,

plaintiff responds:  "As soon as [Duda] met with him she came back and started pounding on

stuff[.]"  Doc. 142-1 at 200 (McCray Dep. 200:13–20).  Plaintiff thus invokes—though not in so

many words—temporal proximity as a causal connection for her retaliation claim.  But the

Circuit has clarified that temporal proximity doesn't relieve the plaintiff of her burden to proffer

"'evidence that the decisionmakers *knew* of the protected conduct.'"  *Lindsay*, 88 F.4th at 1330

(emphasis in original) (quoting *Singh*, 936 F.3d at 1043).  Such evidence must allow "a reasonable factfinder [to] conclude that those who decided to [act against her] had knowledge of [her] protected activity," *Hinds*, 523 F.3d at 1203, and "knew of [her] formal complaints," *Singh*, 936 F.3d at 1043.  Indeed, the "proximity between a [protected] activity and the alleged retaliatory act is meaningless unless those who caused the alleged retaliatory act to occur are shown to have been aware of the specific activity." *Luke v. Hosp. Shared Servs., Inc.*, 513 F. App'x 763, 767 (10th Cir. 2013) (brackets in original) (internal quotation marks and citation omitted).

Recall that plaintiff has the burden to establish that Duda knew of the protected conduct. *See Lindsay*, 88 F.4th at 1330.  And plaintiff hasn't carried her burden here.  Dr. Cummings has twice professed that he didn't inform Duda of plaintiff's complaints.  Doc. 120-11 at 1 (Def. Ex. J); Doc. 142-1 at 199–200 (McCray Dep. 199:15–200:5); Doc. 120-10 at 2 (Cummings Decl. ¶ 11).  And plaintiff responds with nothing more than "bare speculation" to suggest otherwise. *Lindsay*, 88 F.4th at 1328.  Plaintiff thus fails to establish any basis for a reasonable juror to find that Duda knew of her protected activity.

But even if the court has it wrong—and plaintiff has come forward with enough for a reasonable juror to find a causal connection between her protected activity and Duda's allegedly materially adverse actions—plaintiff's prima facie case still falls flat.  Plaintiff also fails to provide evidence by which a reasonable juror could find that plaintiff established the other prong necessary for a retaliation action:  that "a reasonable employee would have found the challenged action[s] materially adverse[.]" *Bekkem*, 915 F.3d at 1267 (citation and internal quotation marks omitted).  So, exercising an abundance of caution, the court reviews the material adversity of the actions underlying plaintiff's five remaining retaliation claims, below.

54

C.      **Materially Adverse Action**

The second prong of a prima facie case for Title VII retaliation requires a plaintiff to demonstrate "'that a reasonable employee would have found the challenged action materially adverse[.]'" *Bekkem*, 915 F.3d at 1267 (quoting *Khalik*, 671 F.3d at 1193). The Supreme Court has clarified that the "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). That is, a Title VII retaliation claim requires "an adverse employment action . . . that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018) (quoting *Burlington N.*, 548 U.S. at 68); *see Muldrow*, 144 S. Ct. at 976 (suggesting that, in the retaliation context, the "materially adverse" standard remains valid). "Requiring this level of adversity is necessary to separate significant from trivial harms, petty slights, minor annoyances and simple lack of good manners[.]" *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1216 (10th Cir. 2010) (quotation cleaned up). As the Supreme Court has explained, Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington N.*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

The court now applies this standard to determine if a reasonable factfinder could find the following materially adverse:

- plaintiff's increased workload;

- Duda preventing plaintiff from speaking at a meeting;

- undermining plaintiff's authority;

- Duda intimidating and yelling at plaintiff; and

- Duda threatening to fire plaintiff.

### 1.    Increased Workload

Our Circuit has clarified—in the retaliation context—that "an adverse employment action 'does not extend to a mere inconvenience or an alteration of job responsibilities[.]'" *Tran v. Trs. of State Colls. in Colo.*, 355 F.3d 1263, 1267 (10th Cir. 2004) (quoting *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000)).  On this basis a court in our Circuit recently held that an increased workload wasn't a materially adverse action when the increase "did not significantly change [plaintiff's] duties, and the additional work fell within her position description and pay grade." *Ellington v. Kendall*, No. 1:20-CV-00174, 2023 WL 2466090, at *25 (D. Utah Mar. 10, 2023).

Plaintiff's alleged workload increase here aligns with *Ellington*'s description.  As explained in the discrimination via increased workload section above, *see* § V.B., plaintiff asserts the increased workload included sending a new staff training requirements list, utilizing the consult tracking manager to reduce metrics, and "just little things." Doc. 142-1 at 142–43, 144, 145 (McCray Dep. 142:21–143:3, 144:22–25, 145:7–11).  Plaintiff alleges that "Duda created 'busy work[,]'" such as "excessive meetings and Congressionals." Doc. 141 at 15.  Plaintiff concedes that she didn't have a problem with the workload, though she felt that it was a form of retaliation. Doc. 142-1 at 150–51 (McCray Dep. 150:23–151:1).

As a preliminary matter, portions of this increased workload retaliation claim suffer from a similar chronological disparity that also applied to the failure to train retaliation claim.  *See* § VI.B.  The summary judgment facts suggest that Duda had assigned or forecast assignment of some of this workload increase—before plaintiff engaged in her protected activity on January 24, 2020.  For instance, emails exchanged between plaintiff and Duda on January 9, 2020, and January 12, 2020, indicate that Duda had assigned plaintiff to complete the new staff training requirements list before plaintiff engaged in any protected activity. *See* Doc. 120-21 at 1–2 (Def.

Ex. T).  And Duda testified in the EEO Investigative Report that she had announced an increase

in supervisory duties at a January 6, 2020 staff meeting following the roll out of the new

MISSION Act programs—weeks before plaintiff's protected activity.  Doc. 142-5 at 59.  Indeed,

plaintiff herself testified that the MISSION Act, which the Wichita VA had implemented

sometime in early 2019, had a "big impact" on the Wichita VA office and the OCC, which "had

to take on the scheduling" thereby changing "the impact of work required from the staff."  Doc.

142-1 at 87–89 (McCray Dep. 87:3–89:2).  And she identified the consult tracking manager as a

new product they "started using" with the implementation of the MISSION Act, sometime after

March 2019.  *Id.* at 89–90, 92–93 (McCray Dep. 89:19–90:4, 92:19–93:4).  And so, plaintiff's

protected activity "*post*-dated" some of her alleged increased workload, a chronological problem

that makes such workload increases irrelevant for purposes of a retaliation claim.  *Ford*, 45 F.4th

at 1226.

 But, even drawing all inferences in favor of the plaintiff—and assuming that some of the

alleged workload increases occurred *after* plaintiff's protected activity—the increases themselves

constituted nothing more than "an alteration of job responsibilities," *Tran*, 355 F.3d at 1267

(citation and internal quotation marks omitted), not a significant change that fell outside

plaintiff's "position description and pay grade," *Ellington*, 2023 WL 2466090, at *25.  Plaintiff

testified, for example, that she received outside training—*i.e.*, training from the VA but not from

her direct supervisor—about how "to utilize the consult tracking manager[.]"  Doc. 142-1 at 193

(McCray Dep. 193:4–12).  Presumably, the Wichita VA wouldn't have provided plaintiff with

such outside training if it didn't expect plaintiff to use the consult tracking manager as part of her

job duties.  Indeed, when plaintiff discusses the consult tracking manager, budget reports, and

labor mapping, she acknowledges that "they were already part of [her] job descriptions, but [she]

57

had not been formally trained to do them by Miss Duda[.]" *Id.* at 193–94 (McCray Dep. 193:9–194:2).

In sum, plaintiff's allegedly increased workload can't support a prima facie case of retaliation. The summary judgment facts indicate the Wichita VA put many of the alleged increases in motion before plaintiff engaged in protected activity. And, even if that weren't the case, the allegedly new duties align with an alteration in job responsibilities, which don't qualify as a materially adverse action sufficient to support a retaliation claim. The court thus grants defendant summary judgment against plaintiff's increased workload retaliation claim.

### 2.      Speaking Refusal

Recall that plaintiff attended a meeting with the Medical Center Director to address staff shortage and coverage issues on January 30, 2020. Doc. 142-1 at 154 (McCray Dep. 154:6–19). When the Medical Center Director asked for plaintiff's perspective on hiring additional staff, Duda asserted that she sat in the best position to answer his query, not plaintiff. *Id.* (McCray Dep. 154:20–23). Later in the meeting, plaintiff had the opportunity to speak to the Medical Center Director's question and present her approach. *Id.* at 155–56 (McCray Dep. 155:15–156:11). And, a few days after the meeting, the Medical Center Director emailed plaintiff and praised her analysis of the hiring decision. *See* Doc. 120-17 at 1 (Def. Ex. P).

No reasonable juror, on these facts, could find a materially adverse action sufficient to support a retaliation claim. Even presuming Duda possessed a retaliatory motive when prohibiting plaintiff from speaking, the retaliation must "produce[] an injury or harm" to be actionable. *Burlington N.*, 548 U.S. at 67. Here, no injury or harm followed Duda's refusal. Indeed, plaintiff spoke later in the meeting, and the Medical Center Director lauded her opinions. And if there was any harm here—in the form of plaintiff's embarrassment in front of the Director—no juror could reasonably conclude that this harm would have "'dissuaded a

reasonable worker from making or supporting a charge of discrimination.'" *Lincoln*, 880 F.3d at 540 (quoting *Burlington N.*, 548 U.S. at 68).  This alleged retaliation fits, instead, squarely within the "petty slights" and "minor annoyances" category that material adversity intends to weed out. *Johnson*, 594 F.3d at 1216 (quotation cleaned up).  The court thus holds as a matter of law that Duda's speaking prohibition doesn't rise to the adversity level required for a retaliation claim.

### 3.     Undermining Plaintiff's Authority and Supervisory Abilities

Similarly, no reasonable jury could conclude that Duda's acts undermining plaintiff's authority and supervisory abilities constitute materially adverse actions.  "Minor discipline that alters none of the conditions of employment cannot qualify as materially adverse action." *McCants v. Correct Care Sols., LLC*, No. 16-2787-DDC, 2018 WL 2445157, at *8 (D. Kan. May 31, 2018): *see also Steele v. Kroenke Sports Enters., L.L.C.*, 264 F. App'x 735, 746 (10th Cir. 2008) (holding that no reasonable jury could conclude that a verbal warning without evidence of further discipline constituted materially adverse action).  And on-the-job counseling that serves "only to remind [plaintiff] of her responsibilities as a federal employee and to stress the importance of behaving in a professional manner" is likewise "insufficient to establish" a "materially adverse action." *Ellington*, 2023 WL 2466090, at *25 (quotation cleaned up).

Recall that plaintiff claims Duda undermined her authority and abilities as a supervisor, *first*, by approaching one of plaintiff's subordinates and asking whether the subordinate felt plaintiff stole the subordinate's leadership opportunity during a committee meeting.  Doc. 142-1 at 122, 168 (McCray Dep. 122:14–17, 168:4–7).  *Second*—in a later meeting with plaintiff and plaintiff's mentor—Duda discussed this committee meeting and plaintiff's alleged leadership theft.  Doc. 120-12 at 2 (Def. Ex. K).  Plaintiff interpreted this discussion as slander and an attempt to "discredit[] [her] abilities" in front of her mentor.  *Id.* at 1.  And plaintiff contends the meeting knocked her performance appraisal down a notch, though she concedes the meeting

didn't precipitate a pay reduction, demotion, disciplinary action, or benefits decrease.  Doc. 142-1 at 174–75, 180–81 (McCray Dep. 174:13–175:11, 180:18–181:4).

A reasonable factfinder couldn't conclude that Duda's discussion with plaintiff's subordinate—if inappropriate at all, given Duda's supervisory role—surpassed a "trivial harm[], petty slight[], minor annoyance[] [or] simple lack of good manners." *Johnson*, 594 F.3d at 1216 (quotation cleaned up).  Nor does plaintiff identify any resulting "injury or harm" from this conversation. *Burlington N.*, 548 U.S. at 67.  And Duda's later meeting with plaintiff and plaintiff's mentor, while unpleasant for plaintiff, served "only to remind [plaintiff] of her responsibilities as a federal employee and to stress the importance of behaving in a professional manner." *Ellington*, 2023 WL 2466090, at *25 (quotation cleaned up).  Perhaps—at most—this meeting constituted minor discipline; but with no evidence of any other discipline, this meeting doesn't capture the requisite adversity to support a retaliation claim. *McCants*, 2018 WL 2445157, at *8; *see also Steele*, 264 F. App'x at 746.  The court thus grants summary judgment to defendant on plaintiff's retaliation claim premised on Duda's undermining.

### 4.     Acts of Intimidation and Yelling

Next in line for possible retaliation claims—Duda's acts of intimidation and yelling.  Our court previously held that a supervisor yelling at an employee and invading that employee's personal space—when reaching over her—amounted to "nothing more than a 'simple lack of good manners.'" *McCants*, 2018 WL 2445157, at *8 (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir. 2007)); *see also Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005) (holding that "an angry outburst by a lieutenant" during an internal affairs investigation didn't "materially affect[] [plaintiff's] employment status.  Th[is] act[] may have made her work environment unpleasant, but [it is] insufficient to support a retaliation claim."); *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir.

2009) ("First, the intimidation that [plaintiff] allegedly suffered, which he summarily describes as being stared and yelled at, . . . is not an actionable harm."). And our court determined that "no reasonable jury could find such behavior sufficient to dissuade an employee from reporting illegal discrimination." *McCants*, 2018 WL 2445157 at *8.

The same is so here. Plaintiff's allegations that Duda intimidated her, yelled at her, and violated her personal space on January 31, 2020, Doc. 118 at 3 (Pretrial Order ¶ 2.a.xiv.vi.), are similarly "insufficient to support a retaliation claim," *Duncan*, 397 F.3d at 1314. Undoubtedly, Duda's actions "made [plaintiff's] work environment unpleasant," *id.*, but the case law is clear that such "lack of good manners" doesn't support a retaliation claim, *McCants*, 2018 WL 2445157, at *8 (quotation cleaned up). To hold otherwise would repurpose Title VII as "a general civility code for the American workplace[,]" which the Supreme Court has determined isn't Title VII's aim. *Burlington N.*, 548 U.S. at 68 (quotation cleaned up). And so, no reasonable jury could conclude that Duda's yelling, violating plaintiff's personal space, and thereby intimidating plaintiff provides the requisite adversity to support a retaliation claim.

### 5.    Threats to Terminate Employment

Finally, plaintiff premises a retaliation claim on Duda's alleged threat to terminate her employment. The Tenth Circuit addressed employment threats in the retaliation context in *Braxton*, 769 F. App'x at 602. In *Braxton*, two African American assembly workers—who, according to their personnel files, had a penchant for excess talking—were limited from interacting when their employer placed a metal barrier between their work stations. *Id.* The workers later moved the metal barrier, allegedly to clean beneath it. *Id.* Both workers were sent home from work for part of two days—they allege as punishment for moving the barrier, but, the manager contends, for talking. *Id.* After returning home, the men jointly called the human resources department to complain about racial profiling, the metal barrier, and their treatment

that day.  *Id.*  Later, the plant manager referenced that HR call in a conversation with one of the workers, and that worker interpreted the manager's statements as a threat.  *Id.*  The Circuit affirmed the district court's holding that the manager's alleged retaliatory threat "was not *materially* adverse because it was wholly unrealized and [the worker] continued to work in his position."  *Id.* at 606 (emphasis in original) (internal quotation marks omitted).  The Circuit explained that the manager's "vague and isolated comment, for which there were no attendant consequences, falls far short of the applicable standard" to state a prima facie case of retaliation, and so "summary judgment is appropriate on this claim[.]"  *Id.*

Here, plaintiff alleges that Duda threatened to fire her by referring back to Duda's mercy when plaintiff violated HIPPA privacy laws in 2017.  On March 2, 2020, plaintiff "asked Duda how to proceed with an employee's expired nursing license, and Duda said, 'I find your response interesting, as I was also told to fire you when you violated the HIPAA law.  Yet, I chose a merciful route.'"  Doc. 118 at 3–4 (Pretrial Order ¶ 2.a.xiv.viii.).  Plaintiff perceived "an implicit threat" to fire her in Duda's reference to the 2017 event.  Doc. 141 at 8.

Applying Tenth Circuit case law about threats in the retaliation context, no reasonable juror could conclude that Duda's statement here was materially adverse—even if the court infers (favorably to plaintiff) that Duda's "vague and isolated comment" was a veiled threat.  *Braxton*, 769 F. App'x at 606.  Like in *Braxton*, Duda's threat "was wholly unrealized[.]"  *Id.* (internal quotation marks omitted).  Plaintiff "continued to work in [her] position," *id.*, "still receives a salary from the VA[,]" and later secured a "promotion to the VA in Colorado," along with a pay raise, Doc. 118 at 4 (Pretrial Order ¶ 2.a.xv.–xvi.).  Duda's alleged threat thus had "no attendant consequences," falling "far short of the applicable standard" for retaliation's prima facie case.

*Braxton*, 769 F. App'x at 606.  And so, the court holds "summary judgment is appropriate" on this retaliation claim, as well.  *Id.*

Thus ends the analysis of *McDonnell Douglas*'s first prong:  plaintiff's burden to establish a prima facie case.  Plaintiff's burden "'is not onerous.'"  *Ford*, 45 F.4th at 1222 (quoting *Orr*, 417 F.3d at 1152).  Nonetheless, plaintiff hasn't shouldered her first-prong burden for any of her racial discrimination or retaliation claims.  That is, no reasonable juror could find that plaintiff suffered—in any of the discrete acts plaintiff exhausted—an adverse employment action taking place under circumstances giving rise to an inference of discrimination.  *Id.* at 1215 (internal quotation marks and citations omitted).  Nor could a reasonable juror find that plaintiff suffered a materially adverse action with a causal connection to plaintiff's protected activity.  *Id.* at 1224.  All plaintiff's racial discrimination and retaliation claims thus fail at *McDonnell Douglas* prong one.

## VII.      Legitimate, Nondiscriminatory Reasons and Pretext

The court needn't proceed with the last two prongs of the *McDonnell Douglas* analysis.  Our Circuit, "in analyzing discrimination and retaliation claims on summary judgment, . . . has not infrequently dismissed such claims for failure to establish a prima facie case."  *Hinds*, 523 F.3d at 1202 n.12.  And while our Circuit "readily concede[s] that the prima facie case requirement may sometimes prove a sideshow to the main action of pretext," it also notes the propriety of deciding some cases on *McDonnell Douglas*'s first prong.  *Id.*  Indeed, "if an employee fails to present even the limited quantum of evidence necessary to raise a prima facie" case, the Circuit has found it "pointless to go through the motions of the remainder of the *McDonnell Douglas* framework[.]"  *Id.*  Aiming to avoid pointless work, the court stops here.

63

**VIII.      Conclusion**

The court grants defendant Denis McDonough's Motion for Summary Judgment (Doc. 119).  After narrowing plaintiff's claims to those discrete acts administratively exhausted, the court determines that no reasonable juror could conclude plaintiff established a prima facie case for discrimination.  Plaintiff's claims neither constitute an adverse employment action nor give rise to an inference of discrimination.  The court also determines that no reasonable juror could conclude plaintiff established a prima facie case for retaliation.  Plaintiff establishes neither the requisite causal connection nor the adverse materiality needed for her retaliation claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Denis McDonough's Motion for Summary Judgment (Doc. 119) is granted.

**IT IS SO ORDERED.**

**Dated this 27th day of August, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree_____**
**Daniel D. Crabtree**
**United States District Judge**
